**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MOBY S.P.A.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MORGAN STANLEY, MORGAN STANLEY & CO. LLC, ANTONELLO DI MEO, MASSIMO PIAZZI AND DOV HILLEL DRAZIN,<br><br>　　　　　　　Defendants. | Case No. 1:21-cv-08031 |

**MEMORANDUM OF LAW IN SUPPORT OF MOBY'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

FACTS ................................................................................................................................5

I.     Background on the Parties and Moby's Ongoing Restructuring Efforts ............................5

       A.     Moby ....................................................................................................................5

       B.     *Concordato* Proceedings ...................................................................................5

       C.     Chapter 15 Proceedings .......................................................................................7

       D.     Third-Party Investigative Firm ...........................................................................8

       E.     Defendants ...........................................................................................................8

II.    Defendants' Active Scheme to Derail the *Concordato* ......................................................9

       A.     The 2016 Financing and Issuance of the Notes ...................................................9

       B.     Defendants' Scheme to Increase Their Share of the Notes in Order to
              Derail Moby's *Concordato* Plan .......................................................................12

       C.     Defendants' Scheme to Harm Other Creditors ....................................................14

       D.     Defendants' Unlawful Use of Confidential Information to Further Their
              Scheme ................................................................................................................17

III.   DEFENDANTS' SCHEME IS PART OF A PATTERN OF OBSTRUCTION TO
       HARM MOBY ...............................................................................................................21

       A.     Overview ..............................................................................................................21

       B.     Di Meo's Successful Efforts to Derail the DFDS Deal and Moby's
              Restructuring Plans .............................................................................................24

       C.     Triggering of a Liquidity Crisis in Late 2019 and Other Significant Harm ..........26

       D.     Active Interference in Moby's Restructuring Efforts Between 2019 and
              2021......................................................................................................................27

IV.    Defendants' Scheme to Seize Control of Moby Accelerates and is within
       Imminent Reach Absent Injunctive Relief.........................................................................29

ARGUMENT ...................................................................................................................35

I.     Moby Will Suffer Irreparable Harm Absent a Temporary Restraining Order and
       Preliminary Injunction ..........................................................................................36

II.    Moby is Likely to Prevail on the Merits ...............................................................37

       A.    Tortious Interference with Business Relations Against Di Meo ..........................38

       B.    Tortious Interference with Business Relations and Conspiracy to
             Tortiously Interfere with Business Relations against All Defendants .................39

       C.    Violation of the Racketeer Influenced and Corrupt Organizations Act................40

III.   Alternatively, Moby's Claims Raise Serious Questions And The Balance of
       Hardships Decidedly Favor moby ...........................................................................40

IV.    No Bond Is Required For The Relief Moby Seeks Here ........................................42

V.     Providing Notice to Defendants of this Application Would Render Fruitless
       Further Prosecution of the Action............................................................................42

       CONCLUSION...........................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

### <u>Cases</u>

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir. 1985)................................................................................. 37

*AIM Intern. Trading, L.L.C. v. Valcucine S.p.A.,*
    2002 WL 1285557 (S.D.N.Y. 2002)........................................................................ 41

*Andino v. Fischer,*
    555 F. Supp. 2d 418 (S.D.N.Y. 2008).................................................................... 35

*BigStar Entm't, Inc. v. Next Big Star, Inc.,*
    105 F. Supp. 2d 185 (S.D.N.Y. 2000).................................................................... 37

*Brenntag Int'l Chems., Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999).................................................................................. 36

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,*
    601 F.2d 48 (2d Cir. 1979).................................................................................... 41

*Catskill Dev., L.L.C. v. Park Place Entm't. Corp.,*
    547 F.3d 115 (2d Cir. 2008).................................................................................. 38

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F.3d 30 (2d Cir. 2010)............................................................................. 35, 41

*D'Orange v. Feely,*
    894 F. Supp. 159 (S.D.N.Y. 1995)........................................................................ 40

*Demirayak v. City of New York,*
    746 F. App'x 49 (2d Cir. 2018) ............................................................................ 36

*Doctor's Assocs., Inc. v. Distajo,*
    107 F.3d 126 (2d Cir. 1997).................................................................................. 42

*Gallagher v. N.Y. State Bd. of Elections,*
    477 F. Supp. 3d 19 (S.D.N.Y. 2020)..................................................................... 41

*In re Abreu,*
    527 B.R. 570 (Bankr. E.D.N.Y. 2015)................................................................... 38

*Int'l Controls Corp. v. Vesco,*
    490 F.2d 1334 (2d Cir. 1974)................................................................................ 42

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,*
    441 F. Supp. 2d 552 (S.D.N.Y. 2006).................................................................... 37

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979).................................................................. 36

*Mamiya Co. v. Masel Supply Co. Corp.*,
   719 F.2d 42 (2d Cir. 1983).................................................................. 36

*Matter of Vuitton et Fils S.A.*,
   606 F.2d 1 (2d Cir. 1979)................................................................... 42

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
   2003 WL 22909149 (S.D.N.Y. 2003)................................................. 37

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................ 41

## Statutory Authorities

11 U.S.C. §§ 101 et seq.......................................................................... 4

18 U.S.C. § 1343..................................................................................... 40

18 U.S.C. § 1964(c)................................................................................ 40

## Rules and Regulations

Fed. R. Civ. P. 65.............................................................................. 1, 42

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Moby S.p.A. ("Moby" or "Company") respectfully moves *ex parte*, by order to show cause, for a temporary restraining order and preliminary injunction against Defendants Morgan Stanley, Morgan Stanley & Co. LLC, Antonello Di Meo ("Di Meo"), Massimo Piazzi ("Piazzi") and Dov Hillel Drazin ("Drazin") (collectively, "Defendants").

## INTRODUCTION

This is a case about an Italian vulture investor, Di Meo and Morgan Stanley and its subsidiaries (together, "Morgan Stanley") attempting to illegally acquire control of Moby, one of the world's largest passenger shipping companies based in Italy. They are doing so by trying to acquire a majority of Moby's bonds at a substantial discount using inside information so that they can assume control of, liquidate and dismember the Company.

Moby brings this action in this District because Morgan Stanley is based here, Defendants orchestrated and are attempting to execute their illegal scheme from this District, and Moby's bonds are governed by New York law.

Moby is owned by the Onorato family, which has been in the shipping industry for over 140 years and five generations. Moby itself is nearly 40 years old and employs approximately 6,000 people whose jobs will disappear if Moby is liquidated.

Moby is in a restructuring proceeding (a type of pre-bankruptcy proceeding) before the Civil Bankruptcy Section of the Court of Milan, Italy ("Milan Tribunal"). It has reached an agreement with a substantial number of its bondholders on a restructuring plan and is now seeking additional creditor approval to reach an agreement with its creditors and avoid liquidation.

Defendants are minority bondholders and have received confidential information regarding Moby's restructuring plan – including proprietary information concerning Moby's finances and operations. Specifically, Di Meo received such information after signing a non-disclosure

agreement ("NDA") with Moby in which he expressly promised that he would keep the information confidential and acknowledged that Moby's information is protected by Italian and European Union market abuse laws.   Nevertheless, Defendants are using that non-public information to acquire additional bonds in their attempt to take control of Moby.

If successful, Defendants' scheme would also unlawfully minimize or eliminate the return for other creditors (among them U.S. parties), including bondholders with whom Moby has reached a restructuring agreement.   By contrast, Moby's restructuring proposal is aimed at maximizing returns for all creditors while also preserving the livelihoods of thousands of people in Europe and ensuring the continued provision of critical transportation services in the Mediterranean.

That Defendants are acting with malicious intent – to cripple the restructuring and thereafter dismantle the Company, eliminating thousands of jobs in the process – is further underscored by the fact that Moby is currently operating successfully.   For instance, in summer 2021, Moby had a successful season, with revenues exceeding expectations.   It makes no legitimate sense for creditors (such as Defendants here) to take actions aimed at destroying the Company, especially when it is just months away from emerging from its restructuring proceeding.   Rather, Defendants are doing so for their selfish interest and at the expense of Moby's employees and other creditors.

Di Meo previously deployed other tactics to illegally acquire Moby.   In 2019, Di Meo orchestrated the filing of a fraudulent involuntary bankruptcy petition ("Involuntary Petition"), which the Milan Tribunal summarily dismissed as having been inappropriately filed because Moby was not insolvent.   The Involuntary Petition, however, caused Moby significant economic and

reputational harm, including making it substantially more difficult and expensive for Moby to refinance its debt.

Also in 2019, Di Meo thwarted Moby's attempt to refinance its debt through a transaction with DFDS A/S ("DFDS"), a Danish shipping company, that involved the sale and purchase of various vessels ("DFDS Deal").  Di Meo did so by unlawfully making it impossible for Moby to meet a key condition of the transaction:  ensuring that the vessels were free of mortgages.  As a result of Di Meo's intentional and unlawful scuttling of the DFDS Deal, Moby was forced to enter into restructuring proceedings in June 2020.

Faced with these repeated acts of economic piracy, Moby, through counsel, retained an investigative firm to discover whether Di Meo planned additional schemes to acquire control of a majority of Moby's bonds and, as a result, Moby.  This investigation yielded recordings of conversations by Di Meo and Morgan Stanley that directly corroborate the core allegations in the Verified Complaint which serves as a basis for this Application for a Temporary Restraining Order and Preliminary Injunction ("Application").  These conversations are set forth herein and appended to the Declaration of Gabriel F. Soledad ("Soledad Declaration" or "Soledad Decl.") as Exhibit A.

Among the key revelations of the investigation is that Morgan Stanley is participating in the unlawful scheme by intentionally concealing the fact that it holds at least a 10% proprietary (ownership) position in the bonds.  It is doing so despite being a market maker, which typically involves entities providing liquidity to investors by standing ready to neutrally buy or sell bonds at any time and not favoring one investor over another, much less – as Morgan Stanley is doing here – partnering with one investor to the detriment of other investors.  Indeed, to ensure its ownership position remains undetected (notably, from other bondholders), Morgan Stanley is using Di Meo as a straw person to control its stake in the bonds.

Moby plans to file for recognition of its Italian bankruptcy proceedings in the United States under chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* ("Chapter 15").  Chapter 15 allows a foreign company, such as Moby, to enforce a foreign bankruptcy court's orders against parties subject to jurisdiction in the United States.  A Chapter 15 proceeding can include a stay against any effort to execute against a foreign debtor's (Moby's) assets by any creditor within the jurisdiction of the United States (Morgan Stanley).

Moby is in the process of obtaining final approval in Italy to file for Chapter 15, which it anticipates will be forthcoming shortly.  In Chapter 15 proceedings, Moby will seek an automatic stay order and an order to cease trading in its bonds to stop Defendants' continuing efforts to illegally disrupt the restructuring and thwart the hard-fought understandings that Moby has with its creditors.

At this juncture, however, Moby cannot afford to wait until the final approval.  Defendants, unlawfully using Moby's confidential information and violating multiple U.S. and European laws, continue to acquire a sufficient quantum of bonds in order to secure majority bondholder status. If successful, Defendants would have a dominant voting stake in the restructuring because creditors in Italy, like in a Chapter 11 bankruptcy proceeding in the United States, have a vote in whether to approve a debtor's restructuring plan.  Endowed with such power, Defendants can singlehandedly determine Moby's future, including by vetoing Moby's restructuring plan and, instead, requesting that the Milan Tribunal liquidate the Company.

Absent injunctive relief from this Court, Defendants will imminently accomplish their unlawful scheme.  Moby thus seeks a temporary restraining order against Defendants enjoining them from (i) acquiring, selling or otherwise trading any bonds issued by Moby; (ii)  attaching any Moby assets; and (iii) otherwise interfering with Moby's restructuring.

# FACTS

## I.     BACKGROUND ON THE PARTIES AND MOBY'S ONGOING RESTRUCTURING EFFORTS

### A.     Moby

Moby is a privately owned, leading Italian shipping company headed by the Onorato family.  Verified Complaint ¶ 16.  It was founded in 1982 by its current Chairman, Vincenzo Onorato, whose family has played a leading role in the Italian shipping industry for five generations and over 140 years.  *Id.*  Moby has multiple business lines and subsidiaries (together, "Moby Group").  *Id.* ¶ 17.  The Moby Group collectively has approximately 6,000 employees – based primarily in southern Europe – with the majority of its businesses and operations executed by Moby and its main subsidiary, Compagnia Italiana di Navigazione S.p.A. ("CIN").  *Id.* ¶ 20.

The Italian government deems Moby to be systemically important to the national transportation and maritime industry.  In view of the absence of bridges connecting mainland Italy to Sicily or Sardinia, Moby's passenger and freight services provide critical infrastructure to Italian citizens and businesses.  Given its importance, the Italian national and regional governments provide the Moby Group with subsidies (totaling several million Euros per year) to operate certain routes considered to be in the public interest throughout the year and, in particular, during the low season.  The low season spans from October to March, when there are fewer tourists using the ferries than in spring and summer.  *Id.* ¶ 22.

### B.     *Concordato* Proceedings

Moby is subject to a "*concordato*," or restructuring, proceeding before the Milan Tribunal. The objective of the *concordato* is for Moby to reach an agreement with its creditors regarding its outstanding debts and enable it to avoid being placed into liquidation.  *Id.* ¶ 26.  On June 30, 2020, Moby filed a preliminary petition for a court-supervised restructuring where current management

remains in control ("Preliminary Petition").  *Id.* ¶ 27.  As part of this process Moby was entitled to file a proposal for the repayment of its debts, together with a plan detailing how such debts would be restructured or discharged (respectively, "Concordato Proposal" and "Concordato Plan").  On March 29, 2021, Moby filed a full petition for admission to the *concordato* that included a proposal for the repayment of its debts, together with a plan detailing how such debts would be restructured or discharged, developed after extensive negotiations with its creditors ("Full Petition").  *Id.* ¶ 30.  In May 2021, CIN filed a full petition with the Milan Tribunal for admission to the *concordato*.  *Id.*

On September 21, 2021 and following months of negotiations, Moby – together with CIN and Onorato Holding – entered into a non-binding memorandum of understanding ("MOU") with an *ad hoc* group of bondholders ("Ad Hoc Group 1") that holds more than 33% of the outstanding principal of the bonds.  *Id.* ¶ 34.  Pursuant to the MOU, the Moby Group and Ad Hoc Group 1 will continue negotiations with the objective of, among other things, obtaining additional financing in support of a restructuring plan to submit to Moby Group creditors.[1]  *Id.*  If consummated, the agreement will allow for Moby to continue its operations and preserve jobs supporting thousands of people.  *Id.*

The Moby Group and Ad Hoc Group 1 are currently working closely to facilitate a successful restructuring and, for avoidance of doubt, none of the allegations or claims set forth in the Verified Complaint are against any member of Ad Hoc Group 1.  *Id.* ¶ 35.

---

[1]   The parties to the MOU agreed that the terms of the MOU are strictly confidential and cannot be disclosed unless obligated by law, required by an order of a competent court or authority, or with the prior written consent of the other Parties.

The Milan Tribunal set the creditors' meetings to vote on the respective restructuring proposals of Moby and CIN for December 2021. *Id.* ¶ 31. At the forthcoming meeting of Moby's creditors ("Creditors Meeting"), the creditors will vote on Moby's restructuring proposal, which must be approved by the majority (by value of claims) of the creditors entitled to vote. If the creditors do not approve Moby's Concordato Proposal and Concordato Plan, the Milan Tribunal may declare the Company bankrupt and subject to liquidation. *Id.* ¶ 32. In such a scenario, Moby management would be replaced and the Company ultimately liquidated. *Id.*

### C.    Chapter 15 Proceedings

Moby intends to shortly file a petition with a U.S. Bankruptcy Court to seek protection under Chapter 15. Moby is eligible for Chapter 15 protection because it has property in the United States, including its contract rights under the indenture governing the bonds ("Indenture"). The Indenture designates New York law as the governing law, and the parties irrevocably consented to Manhattan as the venue of any proceeding arising under the bonds. *See* Soledad Decl. Ex. B §§ 13.07, 13.13.

Chapter 15 protection affords Moby (i) the ability to implement and enforce, in the United States, current and future orders issued by the Milan Tribunal, including one that would confirm creditors' approval of the Concordato Proposal and Plan; and (ii) upon the U.S. Bankruptcy Court's recognition of the *concordato*, relief in the form of orders that would preclude creditors – including those aiming to obstruct Moby's restructuring efforts in Italy, such as Defendants – from interfering with Moby's assets (the Indenture and MOU) in the United States.

In addition, Chapter 15 provides for preliminary relief, such as a stay to protect Moby's assets and contract rights in the United States from its creditors. Provisional relief under Chapter 15 includes an order restricting trading in Moby's bonds to further protect Moby's contract rights (the Indenture and MOU) and the *concordato* proceeding itself.

-7-

Moby has been preparing to file for Chapter 15 protection for the past several months and is awaiting final approval from the Commissioners to initiate the procedure.

**D.      Third-Party Investigative Firm**

In April 2021, in response to the egregious and sustained attacks it has endured for close to two years, Moby – through external counsel – retained a global third-party investigative services firm ("Investigative Firm") that specializes in, among other things, complex fraud cases to conduct an investigation ("Investigation").  *Id.* ¶ 41.  In particular, Moby determined that it needed to defend itself and undertake steps to root out precisely how and why Di Meo was waging this aggressive, orchestrated and unlawful campaign.  *Id.* ¶ 42.

As made plain in this Application, the result of the Investigative Firm's work confirmed what Moby had long assumed:  Di Meo has waged a multi-year campaign to intentionally harm, batter and, ultimately, assume control over Moby.  Among other things, the Investigation revealed Di Meo's central role in the filing of the Involuntary Petition in September 2019 and derailing of the DFDS Deal in October 2019 – both of which led to a precipitous decline in Moby's liquidity and ultimately forced it into restructuring.

The Investigation resulted in recorded statements by Defendants Di Meo and Drazin during which they repeatedly acknowledged their role in the scheme to unlawfully cripple and seize Moby.  The transcripts of such recorded statements are attached to the Soledad Declaration as Exhibit A.

**E.      Defendants**

Defendants are among Moby's largest creditors, holding at least €79 million (or 26.33%) of Moby's senior secured notes ("Notes").  *Id.* ¶ 78.  Defendant Di Meo is an Italian national who now operates his own family office and independent investment firm but formerly was affiliated with the UK affiliate of New York-based hedge fund Sound Point Capital Management, LP

("Sound Point").  *Id.* ¶¶ 50-51.  In or around summer 2020, Di Meo left Sound Point and the latter sold its Notes to Di Meo.  *Id.* Di Meo subsequently began acquiring Notes through his personal funds and that of his investment company.  *Id.* ¶ 75.

Defendant Piazzi is an Italian national resident in the United States and Di Meo's close friend.  He is a Managing Director at various subsidiaries of Defendant Morgan Stanley. Defendant Drazin is a Canadian national resident in the United Kingdom.  He is a Managing Director at Defendant Morgan Stanley & Co. LLC.  *Id.* ¶ 58.  Drazin and Piazzi specialize in distressed debt within their respective positions at Morgan Stanley and Morgan Stanley & Co. LLC.  *Id.* ¶¶ 54 & 59  Morgan Stanley also holds Notes valued at approximately €29 million, although it has taken concerted steps to hide the fact that it holds any position in the Notes.  (*See infra* at 10-11.)  This has included obtaining a notarized statement from a public notary in London attesting that Di Meo controls 26% of the Notes.  *Id.*

## II.    DEFENDANTS' ACTIVE SCHEME TO DERAIL THE *CONCORDATO*

### A.    The 2016 Financing and Issuance of the Notes

In February 2016, and to primarily extinguish existing debt, Moby obtained €260 million in financing from a consortium of eight U.S. and non-U.S. banks ("Lenders") and issued €300 million in senior secured bonds (also referred to herein as the "Notes").  The Lender-issued financing included a €200 million loan to be repaid in annual installments through 2021 ("Term Loan").  Moby issued the Notes in accordance with the Indenture, which provides that both it and the Notes are subject to New York law.  Soledad Decl. Ex. B § 13.07.

Upon information and belief, Di Meo holds Notes valued at approximately €50 million, while Morgan Stanley holds Notes valued at approximately €29 million, collectively making up 26% of all the Notes.  Verified Complaint ¶ 73.  In a recorded conversation with the Investigative Firm on August 9, 2021, Di Meo stated the following:

So, 50 million, and I'll be 100% transparent with you, I hope that, again, you treat the information with confidentiality, and I don't want to even see in emails or anything else. *50 million is directly controlled by my investment company. 29 million is controlled by Morgan Stanley.*

Soledad Decl. Ex. A at 87.

Defendants have coordinated their acquisition of the Notes.  In recorded conversations with the Investigative Firm on June 3 and August 22, 2021, Di Meo described his relationship with Morgan Stanley as "trustworthy" and stated that a "consortium" existed between his company and Morgan Stanley.

My trader, trusted friend is at Morgan Stanley. I know the global head of the business, he's Italian, he's my brother. *We've been buying these 80 million [in Notes] together.* (June 3, 2021; emphasis added.)

I have my own investment company, I manage family office money. I worked in London for 20 years in JP Morgan, TPG Capital, Barclays, and Sound Point Capital. *I used to work with [Defendant] Hillel Drazin at Barclays for a few years, so we know each other very well and there is a very trustworthy relationship. . . Hillel also works at Morgan Stanley with one of my best friends, Massimo Piazzi, who is an Italian national, like me, who runs globally the distressed business of Morgan Stanley. . . . So, there is a consortium basically between my investment company and Morgan Stanley*, which has acquired a significant portion of the bonds of Moby, Moby-CIN, . . . . (August 22, 2021; emphasis added.)

*Id.* ¶¶ 58, 136.

Upon information and belief, following his departure from Sound Point in or around June 2020, Di Meo began acquiring Notes by using personal funds and those of his investment company.  Verified Complaint ¶ 75.  During Di Meo's tenure at Sound Point and through around mid-2020, Sound Point also held a stake in the Notes.  In or around Summer 2020, Sound Point sold its share, at about the time that Di Meo left the firm.  *Id.*

Notwithstanding that it holds an approximate 10% share in the Notes, Morgan Stanley has taken concerted steps to conceal that it holds any position – including because of its role as a market maker.  *Id.* ¶ 76.  Entities holding such a role typically provide liquidity to investors by

standing ready to neutrally buy or sell bonds at any time and not favoring one investor over another, much less partnering with one investor to the detriment of other investors. *Id.*  Indeed, Morgan Stanley has gone so far as obtaining a notarized statement from a public notary in London attesting that Di Meo collectively holds 26% of the Notes.  In effect, Morgan Stanley is using Di Meo as a frontperson to conceal its position. *Id.*

In recorded conversations with the Investigative Firm on August 9, 16 and 22, 2021, Di Meo described these efforts to conceal Morgan Stanley's position in the Notes:

> As you might understand . . . *Morgan Stanley cannot formally enter into agreement because they are a market maker* . . . Now you need to understand the sensitivity around Morgan Stanley, which is the following. *First, they are a market maker, they cannot be seen by hedge fund clients as siding with one. So, they cannot enter formally into agreements with me or with anybody else because they are a market-making desk*  . . . (August 9, 2021; emphasis added.)

> I had Morgan Stanley send an email to a notary public in London saying that I effectively manage their position, and that's why I have this legal public statement . . . by Savills London that says, "Antonello di Meo controls 26% of the bonds."  So, *the notary public wrote this statement, this sworn statement on the basis of an email that Morgan Stanley sent to represent that I have the management of their position*.  (August 9, 2021; emphasis added.)

> . . . [B]ecause again, Morgan Stanley, you have to understand the sensitivity around it.  Because it's public on the name, because they need to be able to trade. So, if I ask a trader of Morgan Stanley to be part of a meeting with people he doesn't know, and therefore he cannot trust, to participate into a conversation where I will be disclosing what can be considered material, non-public, price-sensitive information, he might get a bit nervous. (August 16, 2021; emphasis added.)

> So, it's very important to always do things with the view that it becomes public, and is there a problem with people and so on. *So, also that's why my . . .  I'm being very thoughtful and careful when it comes to the involvement of Morgan Stanley because they cannot, at this point in time, publicly say, "We are supporting him". They are saying that privately to a notary public in London that is preparing a notarized statement that says that those bonds . . .  let me show you the statement in the next few days . . . that says that those bonds 100% are given to my control. But again, they cannot do it in public because it will create issues from a trading perspective, they will need to be restricted, and if they're restricted, they cannot buy bonds on the portfolio.* (August 16, 2021; emphasis added.)

Soledad Decl. Ex. A at 89-90, 115, 123.

**B.    Defendants' Scheme to Increase Their Share of the Notes in Order to Derail Moby's *Concordato* Plan**

As of the date of this Application, Defendants are thus among Moby's largest creditors and have a vote in whether to approve or reject the Concordato Plan and Proposal at the Creditors' Meeting.  In recorded conversations with the Investigative Firm on May 26, August 9 and August 16, Di Meo represented that Morgan Stanley will agree with whatever he decides in connection with Moby's restructuring:

> Obviously, when it comes to the trading business of Barclays, well-connected, but *I'm well-connected to most of the distressed debt trading businesses of investment banks*. *One of my best friends who runs the global business of Morgan Stanley*, I'm very well-connected with Stifel, which is the independent broker that trades in Europe and in the U.S., distressed loans and bonds. (May 26, 2021; emphasis added.)

> The guy who runs Morgan Stanley Global, Massimo Piazzi, is my best friend. . . . He's the head of global distressed debt business of Morgan Stanley . . . *He will vote what I say him to vote.* (August 9, 2021; emphasis added.)

> So, let me have a word with the trader who is ultimately in charge with the position, and reports into my friend, Massimo Piazzi, who's the Global Head. . . . The trader is an American-Jewish guy, he's very commercial. He understands things very quickly. But his attitude is, "I support Antonello because there will be a good trade". So, I can answer 100% of the questions of anybody in this deal, I, even myself, I don't disclose 70% of the things to the trader, *because the trader just needs to vote the bonds in the way I tell him to* . . . . Now, I can have a word with him and we can try, in order to speed things up, to do everything in one go, but maybe just with a video call with me, the board could be understanding of all the difficult questions to be answered, and I'm sure I can get them comfortable. You said, if they want the last mile with the Morgan Stanley trader, I don't know what kind of value added the call, he can bring, other than saying, *'This is my name, I work for Morgan Stanley and I support Antonello Di Meo with our boards, in the negotiation with the company, but I can only tell you that offline because on the record, I cannot state such things*." (August 16, 2021; emphasis added.)

*Id.* ¶¶ 17, 116.

In particular, Di Meo's plan – agreed with and facilitated by Morgan Stanley – is to increase Defendants' collective 26% stake in the Notes (as of August 2021) in order to have a dominant voting stake among Moby's creditors in connection with the *concordato* proceeding.

With such majority voting power in hand, Defendants can singlehandedly direct the future of the proceeding and, in turn, Moby's existence. Defendants can do so by (i) rejecting Moby's Concordato Proposal and Plan (the acceptance of which requires the majority of creditors' votes) and, as permissible under Italian law, request that the Milan Tribunal put Moby into liquidation given the failed approval (*see supra* at 6-7); or (ii) presenting a competing restructuring plan that, among other things, is contingent upon the removal of existing management and the installation of handpicked successors. Under either scenario, Defendants can unilaterally use their voting power to drive a storied company out of existence.

In recorded conversations with the Investigative Firm between late July and late August 2021, Di Meo clearly described his intentions – and this above scheme – as follows:

So, you don't need to have 51% of the bond, you don't need to get to 150 million because in the second bondholders' meeting, you just need to have one third of quorum to have the meeting, and then the majority of that. So, *under my calculation, once [another . . . ] hedge fund is bought out, then we control for sure the bondholders' meeting*. Once you control for sure the bondholders' meeting, you control the vote for 300 million of bond in one class, and that controls the vote of the creditors of Moby because there is less . . . simple majority. (July 29, 2021; emphasis added.)

So, that's the idea. That's the whole idea, it's . . . again, my plan is, *I need to buy . . . and make sure that I have 100% of control of the restructuring plan, which means I put forward a plan and I vote, and nobody can block me, that's 100% controlled*. (August 9, 2021; emphasis added.)

The competing proposal will involve a partial swap of the bonds into equity, to take control, majority or relative majority, to be seen, of the company. *Ultimately, I want to be in a position where only our vote is enough to pass with the majority the competing plan that I will put forward, and that's why we want to buy certain bonds, to make sure that we can sell, vote such proposal. Our proposal*. (August 16, 2021; emphasis added.)

In order to be 100% sure about the voting of the alternative plan, there is a small *additional investment that we are contemplating in making in the bonds to secure mathematical certainty of voting the alternative plan through. Once we secure this alternative small investment in the bonds, to have the mathematical certainty to have our plan approved, we can effectively put forward any plan that we like, and*

*vote it ourselves without relying upon other creditors' vote.*  (August 22, 2021; emphasis added.)

When it comes to putting forward an alternative plan, the alternative plan will provide . . . for a sale of the two vessels immediately to the entity that we'll indicate, given that you have an interest in these two specific vessels. *And at the same time, the plan, the alternative plan, will provide for a change in ownership, total or partial, of the current shareholdings. So, we as creditors will take over the relative majority of the equity in the restructured business.* . . . So, the structure would allow for you to secure, . . . , the immediate acquisition of those two vessels, and at the same time, through your purchased bonds, *which will be converted into partial equity, you will also have an equity interest in the restructured business of Moby, which will change governance.* . . . That's overall the big picture.  (August 22, 2021; emphasis added.)

And my plan, *supported also by the backing of Morgan Stanley*, is to put forward an alternative competing restructuring plan which provides for a change in governance in the company.  (August 22, 2021; emphasis added.)

*Id.* ¶¶ 73, 93, 118, 137-39.

## C.     Defendants' Scheme to Harm Other Creditors

Defendants' scheme would also impair the rights of other Moby creditors.  This is because the scheme necessarily involves acquiring a blocking position to undo the progress represented by the MOU in an effort to devalue Moby and overall creditor recoveries in favor of Defendants' individual gain.

Among other things, Di Meo seeks to convert Defendants' Notes into equity with "governance rights" (meaning, upon information and belief, that with a majority bondholder stake, he would obtain control over how to manage Moby, including by deciding whom to appoint within management) and, with such authority, minimize recovery to other creditors.   In recorded conversations with the Investigative Firm on May 26 and June 3, 2021, Di Meo repeatedly emphasized this objective:

So, basically, *my plan is to use my key voting rights to minimize the recovery of other creditors* and cut the deal with the equity to co-own the equity with him. (May 26, 2021; emphasis added.)

> We try to line up enough bonds to control 50% and then to also get the new equity of the business. We spend some – less money than 70, let's say 40, so we spend 35-40 million for the purchase of the bonds, and we spend, let's say, 40 million in the equity capital increase . . . So, *to create the asymmetry to reduce the creditors' recovery to the maximum we can, so that our equity investment is worth much more in the remaining perimeter, we need to put some fresh equity in the plan*.  (June 3, 2021; emphasis added.)

*Id.* ¶¶ 22, 56.

In recorded conversations with the Investigative Firm on August 9 and 16, 2021, Di Meo unequivocally represented his intent to increase Defendants' share of the Notes and to buy just enough to then proceed with his plan – to the clear detriment of other bondholders.  As made express in the statements below, Di Meo is motivated solely by his and co-Defendants' interests and their objective of seizing Moby.

> And I can push by myself the plan through the bondholders meeting . . . once you buy the bondholders with 50 million, the mathematics of the bondholders meeting is such that *I don't need to buy anybody else . . . The other guys [bondholders] will never try to defend themselves once they know that I have the votes in the bondholders' meeting to push the plan I want. They will come and knock on my door asking me to join the group, but I don't need their votes anymore, at that point*. (August 9, 2021; emphasis added.)

> *Ultimately, I want to be in a position where only our vote is enough to pass with the majority the competing plan* that I will put forward, and that's why we want to buy certain bonds, to make sure that we can sell, vote such proposal . . . The proposal will say, "All the creditors, including our bonds, get certain recovery over the next five years, but *because we will make an equity capital increase, we'll take control of the company*." So, let's say there are various ways of doing it, and we are not at the stage to exactly crafting the way of doing it because we want to wait for the judicial commissioner's report in September, October. So, but ballpark, all the creditors, 700 million, take 20 cents in a dollar over the life of the plan . . . [T]he company will pay 20 cents in a dollar, *we will sell some ships, or we will get cash flows from the operations in the business. We will pay 20 cents of the dollar, so let's say 200 million to all the creditors over the next five years, and to do that, to take control of the company, we'll make a capital increase . . . sorry, really . . . an equity raise, an equity capital increase. . . .* And the other thing is that, for example, the risk we're running now is that . . . I discussed this with you a month ago . . . I think end of August, or at the latest the beginning of September is the closing of the window to buy the other bonds because if the bond purchase doesn't happen, of the other bonds, *then the risk I'm running/ we're running is that the deal takes a*

> *shape that gets discussed and . . . a few times between the hedge fund and the current shareholder, such that then, it's very difficult for a hedge fund to sell the bonds because the deal is taking a positive shape, the hedge fund is seeing, let's say, 80% recovery in the deal that they are trying to negotiate with the owner and therefore they are gonna say, "Why do I need to sell it 50 cents on a dollar?"* (August 16, 2021; emphasis added.)

*Id.* ¶¶ 93, 118.

Di Meo's determination to take over Moby and potentially dismantle it – despite his own admissions in conversations with the Investigative Firm that the Company is "stable" and "doing much better now" financially (*id.* ¶ 79)– is further reflected in statements made during recorded conversations with the Investigative Firm on July 29 and August 16, 2021.  Specifically, Di Meo states that his competing restructuring plan for Moby – should he succeed in being able to secure majority voting power – is premised upon disposing of important Moby assets (two vessels) to make his proposal "more credible" to the Milan Tribunal (i.e., because it demonstrates that Moby would have an infusion of liquidity).  Di Meo then makes clear that his proposal also contemplates selling two additional Moby vessels for a *low price*.  The disposal of vessels in such a manner, of course, harms other creditors because it lowers the value of Moby's assets.

> I don't want all my eggs in this basket, personally, so the optimal way for me to do it is ideally with you because then, *you also bring the value of buying the two large ships in the back end and that's value. That's valuable to me because that makes my alternative plan more credible vis-a-vis the court. But if you guys don't show up, I'm collecting the funding through my contacts to buy out that one hedge fund so that it's game over.*  (July 29, 2021; emphasis added.)

> Because it makes no sense, *now that the situation is stable, the company is doing much better now with COVID coming out, there is a lot of demand for transportation in these vessels, so the situation is stable, it's not gonna go into bankruptcy, now that the court has admitted the company to a proper . . .* So, ideally, if you guys get there on time, happy days because there is the additional value add [added value] which is the buy of the ships, which gives more cash flow in the plan, certainty of cash flows in the plan. I don't need to say, "I hope I will sell those ships for value," I already have bids for these ships at this value, and that's a transaction which would be part of the restructuring . . .  (July 29, 2021; emphasis added.)

So, "Dear court, dear creditors, two ships will be already sold for this amount." *Then we sell other two ships at very low valuation, and that's how you recover 20 cents on the dollar. And what's left over is for the equity. So, your purchase of the two ships will be part of the plan,* it will not be something that we first take it over, we sit on the new board and then we decide. No. Will be part of the plan, so the moment when we vote, the plan will already say, "*The moment the plan is approved, these two ships are sold for this price, this entity, no matter what.*" So, that's important that you understand. There is no execution risk if we vote in favor of the plan that you don't get the two ships. It will be part of the plan. *And it will be executed the moment the Chapter 11 gets sanctioned by the court, and therefore all the write-offs and swapping to equity happen.*   (August 16, 2021; emphasis added.)

*Id.* ¶¶ 79, 120.

### D.   Defendants' Unlawful Use of Confidential Information to Further Their Scheme

Di Meo, together with his co-conspirators, formed and implemented their plan of building a position in the Notes by unlawfully using confidential information relating to Moby's restructuring.  The disclosure and use of such information are prohibited under NDAs that Di Meo and Sound Point executed in 2020 and 2021 (Soledad Decl. Exs. C & D), as well as under Italian and EU laws.

Under the NDAs, Moby agreed to disclose to selected bondholders, including Sound Point and Di Meo, confidential, non-public information relating to the Company and its subsidiaries, for the sole purpose of facilitating the conclusion of a restructuring agreement.  Soledad Decl. Ex. C at 1-2; Ex. D at 1-2.  This confidential, non-public information included that pertaining to the Moby Group's business, properties, assets, liabilities and operations, among other things.  Verified Complaint ¶ 88.  Sound Point and Di Meo, in turn, agreed to comply with the terms of the NDAs, which specifically restricted them from (i) disclosing confidential information obtained from Moby; and (ii) using Moby's confidential information for purposes other than the negotiation and

implementation of a restructuring agreement with the Company.  Soledad Decl. Ex. C § 2, Ex. D § 2.

Furthermore, pursuant to the NDAs, Sound Point and Di Meo explicitly (i) acknowledged that confidential information shared by Moby included insider information protected by Regulation EU no. 596/2014 and Italy's Legislative Decree no. 58/1998 (collectively, "Market Abuse Laws"); and (ii) agreed that trading of the Notes would be restricted if it violated Market Abuse Laws.  In addition, according to the NDAs, Sound Point and Di Meo agreed to be restricted from entering into any discussion or agreement relating to the Notes with other Moby creditors if that would contravene the Market Abuse Laws.  Soledad Decl. Ex. C § 5, Ex. D § 5.

Notwithstanding these obligations and the clear and unequivocal prohibitions to which he should have abided, upon information and belief, Di Meo has been trading the Notes and conspiring with Morgan Stanley, including Piazzi and Drazin, from the time he left Sound Point in or around June 2020 to the present.  Verified Complaint ¶ 90.  Di Meo has done so by, upon information and belief, both disclosing inside information to third parties (including Piazzi and Drazin,) and leveraging such information to help effectuate his scheme.  This is because, in order to determine when, from whom, and how many Notes the Defendants must acquire to obtain a majority voting stake, Di Meo necessarily must leverage information concerning, among other things, (i) the status of Moby's negotiations with other creditors and the components of restructuring proposals; and (ii) whether and which bondholders may be willing to sell their shares and/or be amenable to his competing proposals.  *Id.* ¶ 91.

Upon information and belief and through the date of this Application, Di Meo continues to access and exploit inside information pertaining to Moby.  In furtherance of their scheme, Defendants continue to capitalize on inside information to attempt to convince additional third

parties (beyond Morgan Stanley) to finance between € 70 million and € 150 million so that they can acquire more Notes.  That Di Meo effectively has real-time inside information is reflected in the following statements, which he made during recorded conversations with the Investigative Firm on August 9 and 16, 2021.

> So, I spoke to them two days ago, they understand the other hedge funds that own 100 million. They are speaking to the company, you know that I have a different strategy on this point. . . .  They're speaking to the company. They understand now there was a legal action by the state vis-à-vis Moby last week, which basically makes them understand now that the state will want a change of ownership. *So, they told me that they're formally speaking with the company, but they're not going to rush the negotiation before September because they also understand that the court and the state, in some way, will effectively push out the current shareholder from the governance*. So, they are pretending to negotiate because they have an interest to receive all the information that you can receive only if you speak to the company, but they-- again, they are not rushing into any agreement formally. *And even if they do, they don't have the votes to put the plan through, so it's irrelevant because they need my vote. Because I need to buy them*. That's the only-- that's why we are talking, because--. . . . Yes, but they don't have the vote to push through the bondholders meeting because I will block it in the bondholders meeting.  (August 9, 2021; emphasis added.)

> We can definitely top up that amount, if needed, between Morgan Stanley and I. So, in terms of-- so, if you agree, it's better if you give me a list of questions on email about what the board will ask me. I think it's easier if we do it in two steps: the first one is the board meeting with myself, then-- because again, Morgan Stanley, you have to understand the sensitivity around it. Because it's public on the name, because they need to be able to trade. So, if I ask a trader of Morgan Stanley to be part of a meeting with people he doesn't know, and therefore he cannot trust, to participate into a conversation *where I will be disclosing what can be considered material, non-public, price-sensitive information,* he might get a bit nervous. So, let me have a word with the trader who is ultimately in charge with the position, and reports into my friend, Massimo Piazzi, who's the Global Head (August 16, 2021, emphasis added)

Soledad Decl. Ex. A at 91-92, 115.

Similarly, Di Meo had no qualms about disclosing sensitive information about the Moby Group and the value of its assets to multiple third parties, including (i) the Grimaldi Group, Moby's primary competitor; and (ii) prominent Italian political figures, such as those at the Italian Ministry of Economic Development.  As articulated in recorded conversations with the Investigative Firm

on May 26, July 29 and August 9, and August 16, 2021, Di Meo stated that the Grimaldi Group
and the Ministry of Economic Development favor a change in Moby's governance and would give
him carte blanche to run the Company his way should Defendants succeed on their scheme.

> The lawyer of Grimaldi has got in touch with me in the past, there have been just
> exchange of views, let's say, but I've been playing my game, he's playing his game.
> (May 26, 2021)

> I explained to you last time, the Ministry of Economic Development is
> sponsored . . . owned by the Northern League, and the Northern League has been
> funded by the main competitor of Moby. . . .  The leverage is that you can, once
> you control the situation, your vote can procure the bankruptcy in liquidation or the
> continuity, that's the leverage. *But more than the leverage is a gift that you bring
> to the table to the Ministry, which is, I put you in the position to have the largest
> ferry asset in Italy be operated by normal governance, by [...] without any support,
> I would say to the - to the Ministry I would say, "Tell me who should run this
> business, I just put the structure where I make my money and I leave the governance
> to whoever you dictate should be run this business by."* So, that's what it is. This
> perspective is dangerous. When people go up the stairs. (July 29, 2021; emphasis
> added.)

> Yes. I understand that they [Grimaldi] sponsor financially the Northern League.
> They are one of the financial sponsors of the Northern League. *That's why Grimaldi
> hates Onorato, and that's why he wants to see this company managed by another
> owner. They know that they cannot take over the company because of
> anticompetition rules, but he personally hates Onorato, and so, his objective in life
> is to have Moby taken over by different owner.* I'm sure they would prefer to have
> a friendly owner that they can have a better marketplace with better pricing, to make
> more money, that's what Grimaldi is after. . . . In a normal world, they shouldn't
> bother about Italy, he only has a personal beef with Onorato, which has gone into
> the public press. They say things to each other through the newspapers, like, I don't
> know. And so, his objective, which is a personal vendetta, is to see Onorato without
> his company. (August 9, 2021; emphasis added.)

> *I've spoken to my intermediary who speaks to the Ministry and speaks to Tirrenia
> administrators, and their only objective is a change of equity, ownership of this
> company, to put a reliable equity owner in the seat.* That's what they care. So if I
> can create the situation to achieve these objective for them, they will support it.
> (August 9, 2021; emphasis added.)

> Well, I think that the chances are that there is a conversation before the vote, so the
> moment there is a competing plan that shows new governance, new shareholding,
> and before the vote, before the competing plan is put through and creditors vote,
> and *that's the moment where I plan to go to the real stakeholders, and the real*

*stakeholder is the government*, and first things first, because obviously they will have the view on how this money should be divided between these three companies, and who the stakeholders of the three companies should be . . . *And secondly, to Grimaldi, to the extent that he's willing to engage with the competitors. . . . So, I need to be very careful because I cannot be seen in public that I'm considering teaming up with a competitor of the company I'm investing in just to make-- to throw out the current shareholder of Moby.* (August 16, 2021; emphasis added.)

*Id.* ¶¶ 26, 75, 98, 107 & 124.

## III.   DEFENDANTS' SCHEME IS PART OF A PATTERN OF OBSTRUCTION TO HARM MOBY

### A.   Overview

Defendants' scheme to undermine and harm existing Moby management and ultimately assume control over the Company has long been in the works.  Defendants have been working closely together to orchestrate this takeover since 2018, at the latest, and their endeavor continues unabated today.  Indeed, Morgan Stanley was well familiar with Moby as a company – including its finances and operations – because, through in or around February 2018, it advised Moby on a potential takeover of the Lenders' debts.  Verified Complaint ¶ 94.  The takeover did not take place but, in the course of that advisory work, Morgan Stanley received confidential information pertaining to the Company.  *Id.*

In a recorded conversation with the Investigative Firm on August 22, 2021, Drazin – who was in New York at the time, summarized the agreement between Morgan Stanley and Di Meo as follows:

My partner at Morgan Stanley, as Antonello [Di Meo] mentioned, Massimo Piazzi, is also a very close friend of Antonello's . . . *We've been involved in this situation as a passive bondholder, but supportive of Antonello's plans since pre-corona, probably since 2019 maybe even 2018, and we remain, you know, committed to that proce*ss.  You know, we're – in this situation, *we are a capital partner behind Antonello's, you know, orchestration of the process.*  And our intent is to remain. (Emphasis added.)

Soledad Dec. Ex. A at 139-40.

Di Meo's machinations to usurp control over Moby has manifested in multiple forms – each with the goal of trying to force Moby into financial distress and restructure its debt. These have included the following:

(a)     In September 2019, by filing the sham Involuntary Petition that sought to force Moby into involuntary bankruptcy as well as obtain an injunction precluding the DFDS Deal from moving forward;

(b)     In October 2019, by successfully derailing the DFDS Deal – which would have netted approximately €75 million in proceeds and allowed Moby to repay approximately €66 million due under the Term Loan to the Lenders – by unlawfully ensuring that Moby could not meet the closing conditions; and

(c)     Between October 2019 and February 2021, by actively contesting and rejecting multiple proposals from Moby to various investors (including Sound Point) in connection with a proposed restructuring, which delayed Moby's filing of the Full Petition by a number of months.

As exposed by Investigation, Di Meo orchestrated the filing of the Involuntary Petition and failure of the DFDS Deal, both of which took place within a matter of just two months, directly caused Moby's liquidity crisis and forced Moby into restructuring proceedings. The reason that Di Meo was focused on stopping the DFDS Deal was because it would have resulted in proceeds that benefitted the Lenders as opposed to the bondholders (including Sound Point). In a recorded conversation with the Investigative Firm on June 3, 2021, Di Meo stated:

> . . . DFDS, the Norwegian company that wanted to buy two vessels. . . not for cash, but for exchange of vessels plus cash. . . . Was – buying the vessels at good prices, *the problem was that the proceeds from those vessel sales would have gone to the bank, not the bonds*. So, *it was not in my interest for the company to get cash to keep going and pay down the banks*, and then I would have been left at the end of

2023 with no vessels left and a big credit with the banks having gotten out in the meantime.

So, it was our – so, *we filed insolvency request, the bankruptcy request in September 2019 because also, we wanted this transaction to be stopped so that our position between the bond and the banks would have been equalized* . . . and not only equalized because we have more bonds that bank debts, *we can outvote the banks in the Chapter 11.* So, *I was stopping the bleeding of the cash, going to the bank side of the bonds* and I was gaining, negotiating, leveraging the Chapter 11 because the bond is bigger than the bank debts. So, that was the double purpose.

*Id.* ¶¶ 44-45 (Emphasis added.)

After unfounded allegations publicly aired within Europe as a result of the Involuntary Petition and with Moby being deprived of approximately €75 million in net proceeds, the following consequences ensued in the fourth quarter of 2019: (i) Moby was unable to move forward with its plans to pay down its debt to the Lenders and, for the first time, was unable to timely pay its debt obligations due under the Term Loan and Notes; (ii) Moby endured reputational harm, which resulted in the loss of two main clients and a decrease in passenger traffic, which translated into approximately €16 million in lost revenues; and (iii) suppliers began demanding payment within a shorter period of time or, in some cases, required immediate payment.  Verified Complaint ¶ 98. Ultimately, as a result of Di Meo's unlawful actions, in June 2020, Moby was forced to file the Preliminary Petition.

Like the arsonist returning to watch the house burn down, Di Meo relishes his role in triggering the liquidity crisis and subsequent filing for restructuring.  In a recorded conversation with the Investigative Firm on June 3, 2021, Di Meo stated:

And I'm a financial investor who's only after money, making money, . . . . "[Vincenzo Onorato, Moby's Chairman] cannot accept the concept that *I put him in a corner by filing a bankruptcy request two years ago, which has then determined the liquidity squeeze, the necessity to file for Chapter 11 and so on, in my request to partially govern the company* . . . ." (Emphasis added.)

Soledad Decl. Ex. A at 39.

In parallel, from late 2019 to early 2021, Di Meo consistently undertook value-destructive positions that hindered Moby's efforts to restructure its debt or otherwise implement necessary steps to implement any proposed plans to increase profitability.  Verified Complaint ¶ 101.  He repeatedly rejected Moby's restructuring proposals, notwithstanding that each successive plan afforded him and other creditors (including other bondholders) substantial benefits.  *Id.*  This ultimately led to prolonged delays in Moby filing for the Full Petition with the Milan Tribunal, thereby incurring unnecessary costs and, more importantly, stymying the Company's efforts to restructure its debts and strengthen its financial standing as soon as feasible.

### B.     Di Meo's Successful Efforts to Derail the DFDS Deal and Moby's Restructuring Plans

In 2017, the Moby Group had a profitable year, increasing its revenues by 8.6% from 2016. *Id.* ¶ 102. In 2018, however, profitability decreased, triggering a steep drop in the price of the Notes in the last quarter of 2018.  *Id.*  To improve the Moby Group's profitability and reduce its debt, in early 2019, Moby and its Lenders agreed on a business plan that set forth milestones for the period 2019 to 2021 ("Business Plan").  *Id.* ¶ 103.  A cornerstone of the Business Plan was the sale of certain non-strategic vessels – namely, vessels that were not mission-critical and whose sale would not have disrupted Moby's essential business – to pre-pay part of Moby's bank debt. *Id.*  Moby planned to use a substantial portion of these anticipated vessel sale proceeds to repay its outstanding debt under the Term Loan – at the time, amounting to €100 million – to the Lenders. *Id.* ¶ 104.

In or around mid-2019 and in accordance with the Business Plan, Moby began negotiating with DFDS over the sale of non-strategic vessels (i.e., the DFDS Deal).  *Id.* ¶ 106.  On September 6, 2019, Moby and DFDS executed agreements relating to the simultaneous sale and purchase of vessels to and from DFDS.  *Id.*   Moby was required to deliver the Moby Vessels to DFDS free of

any encumbrances, including the mortgages that collateralized the Term Loan and Notes, by October 25, 2019. *Id.* ¶ 108. If, by that date, Moby was unable to comply with such obligations, DFDS was entitled to damages in case of Moby's negligence and/or could terminate the DFDS Deal. *Id.*

Unfortunately, Di Meo destroyed Moby's plans to ensure a significant infusion of liquidity to help effectuate its Business Plan by leading an effort to file the Involuntary Petition and, when that plot failed, by rendering impossible for Moby to obtain the mortgage release – a condition precedent to closing the DFDS Deal.

### 1. The Sham Involuntary Petition

In September 2019, Di Meo caused the filing of the Involuntary Petition and accompanying request that the Milan Tribunal issue a temporary restraining order ("TRO") to enjoin the DFDS Deal. On September 10, 2019 – just four days after Moby and DFDS executed agreements relating to the DFDS Deal – Sound Point and Di Meo spearheaded an effort, involving other then-investors (together, "Ad Hoc Group 2"), to file the Involuntary Petition. *Id.* ¶ 113. In their filing, Ad Hoc Group 2 argued that Moby would not be able to repay the Notes that would be due in approximately three years and eight months from the date of such filing, notwithstanding that Moby was *current* on its payments on the Notes as of September 2019. *Id.*

Less than a week later, on September 16, 2019, Ad Hoc Group 2 – led by Sound Point and Di Meo – filed a TRO arguing that execution of the DFDS Deal would reduce Moby's assets to their detriment. *Id.* ¶ 114. The Milan Tribunal denied the TRO and rejected the Involuntary Petition. On September 17, 2019, the Milan Tribunal denied the TRO because, inter alia, certain elements for granting the TRO were not met. And, on October 3, 2019, the Milan Tribunal rejected the Involuntary Petition because Moby was solvent and would not be insolvent in the near term, let alone in February 2023 (over three years in the future) when the principal on the Notes was due.

*Id.* ¶ 115.  Furthermore, in its ruling on the Involuntary Petition, the Milan Tribunal noted that Ad Hoc Group 2 did not file the Involuntary Petition to obtain from the Tribunal a ruling that Moby was bankrupt; rather, the Tribunal found that it did so in order to force Moby to restructure debt. *Id.* ¶ 116.  The Milan Tribunal thus ultimately directed Ad Hoc Group 2 to pay Moby's legal costs related to the unwarranted Involuntary Petition.  *Id.*

### 2.      The Attack on the DFDS Deal

After his efforts to instrumentalize the Milan Tribunal as part of his scheme failed, Di Meo remain undeterred in his effort to derail the DFDS Deal.  Di Meo orchestrated a plan to force bank acting as a security agent in its agreement with the Lenders ("Bank") to not release the mortgages on the Moby Vessels by the October 25, 2019 deadline – a key condition to closing the DFDS Deal.  Ultimately, and despite the fact that Moby had complied with all of its obligations, Moby could not close the DFDS Deal because the mortgages remained on the Moby Vessels after the October 25 deadline.  Verified Complaint ¶ 118.

On October 29, 2019, DFDS walked away from the DFDS Deal as a direct result of Moby's inability to provide encumbrance-free vessels by October 25, 2019.  *Id.* ¶ 119.  Di Meo's second attempt at derailing the DFDS Deal was thus successful.  It had the effect of not only precluding the infusion of approximately €75 million in net proceeds from the transaction, but causing additional damages to Moby (including the prospect of a claim from DFDS).  Moby had intended to use the vast majority of the proceeds to repay the Lenders and significantly reduce the amount due under the Term Loan.

### C.      Triggering of a Liquidity Crisis in Late 2019 and Other Significant Harm

The filing of the sham Involuntary Petition and subsequent failure of the DFDS Deal triggered a severe liquidity crisis for the Moby Group in late 2019.  In particular, deprived of the

approximately €75 million in net proceeds that it had anticipated from the DFDS Deal, Moby was ultimately unable to implement the Business Plan.  *Id.* ¶ 120.

The failed DFDS Deal also caused Moby to miss payments, for the very first time, on its debt obligations due under the *Notes and Credit Facilities Agreement* (which required interest and installment payments in February 2020) to both the Lenders and holders of the Notes.  *Id.* ¶ 122.

Furthermore, the unfounded Involuntary Petition injured Moby Group's reputation with its customers, causing more than €16 million in lost revenues and, in turn, a corresponding decrease in its net profits.  *Id.*

Engineering Moby's liquidity crisis formed the first step of Di Meo's scehme, backed by Piazzi and Drazin, to take over the Company and its assets.  On multiple occasions across late 2019 and early 2020, Di Meo publicized his desire and intent to trigger an unnecessary liquidity crisis within Moby as opposed to help it strengthen.  For example, during a late 2019 meeting in Milan with Francesco Greggio, Moby's CFO, and an Italian attorney who had offered to mediate between Moby and several investors (including Sound Point), Di Meo stated that the investors wanted Moby to suffer a liquidity crisis in order to (i) force Moby into a situation of financial need; and, in turn, (ii) pressure Moby to restructure the debt as desired by certain bondholders (led by Di Meo and Sound Point).  *Id.* ¶ 124.

### D.    Active Interference in Moby's Restructuring Efforts Between 2019 and 2021

Following the failure of the DFDS Deal, Di Meo continued to hinder Moby's efforts to restructure its debt or otherwise implement necessary steps to implement its Business Plan. Between late 2019 and May 2020, Di Meo dragged Moby into pointless negotiations with other investors (including Sound Point), with no involvement of the Milan Tribunal, to cajole a restructuring of the company according to his terms.  *Id.* ¶ 125.

Despite Moby's good-faith effort to reach a restructuring agreement with Di Meo, the negotiations that took place between during this period failed primarily because the proposals that Di Meo advanced were illegal under Italian law and penalized Moby's other creditors (e.g., the Lenders) and other stakeholders.  *Id.* ¶ 126.  For example, during a May 16, 2020 video conference with Moby representatives, Di Meo proposed that Moby illegally misuse bank loans - ultimately guaranteed by the Italian government - that Moby could receive as part of Italy's national emergency plan to mitigate the negative effects of the COVID-19 pandemic ("May 16 Videoconference").[2]  Di Meo knew that these government-guaranteed bank loans could not be used to pay creditors and could only be use for business operations and ongoing payroll.  *Id.* ¶ 127.

During these May 2020 negotiations, Di Meo also threatened to force Moby into liquidation if Moby would not accept his illegal restructuring proposal.  Di Meo repeatedly made demands designed to create duress with the specific intent of extorting control over Moby.  In the May 16 Videoconference, Di Meo asserted that he would not care if Moby was declared bankrupt to the detriment of all of Moby's creditors.  In his words, Di Meo had invested "four liras" – an Italian expression meaning that the amount invested in Moby was relatively low – and would, in any case, earn back the amount of his investment regardless of Moby's fate.  *Id.* ¶ 128.

Di Meo's own words demonstrate that his objective is to take over Moby.  Upon information and belief, some of Moby's creditors were impressed by and reacted favorably to the confidential restructuring proposal (and related business plan) that Moby provided them in December 2020.  Howeever, Di Meo rejected it and made clear, at the time, that he would rather

---

[2]   At the May 16 Video Conference attended, among others, (i) Vincenzo Onorato, Moby's Chairman; (ii) Achille Onorato, Moby's CEO; (iii) several members of Moby's management, including Greggio, the CFO; (iv) Moby's Italian legal and financial advisors;  and (v) Di Meo.

see Moby liquidated than accept a restructuring proposal.  *Id.* ¶ 130.  Even at that time, his goal, of course, was to try to force Moby to give in and turn over control and assets in furtherance of Defendants' scheme.

On February 15, 2021, Di Meo managed to derail another restructuring proposal, which Moby made on January 28, 2021.  Moby presented a revised, confidential business plan ("January 2021 Proposal") that would have paid Di Meo and his bondholder group over €150 million – far more than the "four liras" that Di Meo used to purchase his Notes.  The value of the January 2021 Proposal to the bondholders was separately confirmed by an independent expert in charge of reviewing the proposal and preparing a report for the Milan Tribunal.  *Id.* ¶ 131.

On February 19, 2021, Di Meo made a counterproposal that, within the next three years, required a transfer of assets for €300 to €340 million from Moby to Di Meo and the group of bondholders that he led ("February 2021 Counterproposal").  *Id.* ¶ 132.  Moby rejected the February 2021 Counterproposal because (i) Di Meo would have obtained an excessive advantage from Moby (i.e., assets for €300 to €340 million); (ii) the Counterproposal was financially unfair to Moby's other creditors (who would have received a fraction of the amount recovered under Moby's January 2021 Proposal) and stakeholders; and (iii) the Counterproposal would not be approved by the Milan Tribunal because Moby could not successfully restructure.  *Id.* ¶ 133.

IV.     **DEFENDANTS' SCHEME TO SEIZE CONTROL OF MOBY ACCELERATES AND IS WITHIN IMMINENT REACH ABSENT INJUNCTIVE RELIEF**

Notwithstanding Di Meo's sustained attempts at derailing the restructuring, in late June 2021, the Milan Tribunal formally opened the *concordato* proceeding and scheduled the Creditors Meeting to approve Moby's restructuring plan for December 13, 2021.  After that decision, Di Meo intensified his plan to take over Moby – namely, by trying to acquire additional Notes to

increase Defendants' collective stake in them and, thereafter, attain a majority voting power among Moby's creditors.

Absent the Court's intervention, Defendants are on the cusp of succeeding.  In a recorded conversation with the Investigative Firm on August 22, 2021, Di Meo articulated his anticipated timeframe for acquiring the majority of the Notes and a dominant voting stake sufficient to derail the Concordato Plan and Proposal:

> The first part of September is the date . . . And the reason is that *I need the time to ask information to the court in September to make the plan and submit the plan in October. And I can only do that after the bonds are purchased*. So, that's the reality of it. . . . *Obviously I discussed this with Morgan Stanley in the past, and you know that we are going to invest the money ourselves in case you don't want to make the investment. So, again, we, at some point, we will need to pull the trigger because I need the sequencing of events to happen, and the sequencing of events start with purchase of the bonds*. Until we purchase the additional bonds, we cannot ask the confidential information to the court or the company, and then we cannot put together the alternative plan.  (Emphasis added.)

Soledad Decl. Ex. A at 142.

Upon information and belief, Defendants have, in recent weeks, begun implementing their plan in accordance with this timetable.  On or around September 22, 2021 – just one day after Moby executed the MOU with Ad Hoc Group 1 – Moby learned that a party or parties had been recently trading Notes in the market and that, as a result, the price of Notes had increased.

According to the Luxembourg Stock Exchange[3] and as set forth below, the price of the Notes steadily increased from September 6, 2021 through the date of this Application.

---

[3]   Data available at https://www.bourse.lu/security/XS1361301457/233916.

| Price of Notes Traded on the Luxembourg Stock Exchange | |
|---|---|
| **Date** | **% of Nominal Value (Euros)[4]** |
| September 6, 2021 | 34.032% |
| September 13, 2021 | 40.323% |
| September 14, 2021 | 40.188 % |
| September 15, 2021 | 40.084% |
| September 16, 2021 | 40.407% |
| September 20, 2021 | 41.167% |
| September 23, 2021 | 43.479% |
| September 24, 2021 | 43.604% |

Upon information and belief, only Defendants have the capacity and motivation to both drive up the price of the Notes and acquire Notes at these higher prices. Defendants are motivated, as demonstrated throughout this Application, to acquire a sufficient quantum of the Notes in order to gain control over the restructuring and Moby itself and in turn, obtain outsized returns on a risk-free investment.

Indeed, Di Meo represents that he can, and has in the past, set prices of the Notes by coordinating bids with Morgan Stanley and by using a broker-dealer with whom he has a longstanding relationship. In recorded conversations with the Investigative Firm on June 3, 2021, Di Meo summarized this scheme as follows:

> So, the way I would do it is, first, I would need to cut the deal with the hedge funds, which I don't need Morgan Stanley for. So, once I've cut the deal with the hedge funds, I will say, "You will receive technically the bid from Morgan Stanley" then I need to get the money to Morgan Stanley, it cannot come through you, clearly . . .

---

[4]   The price of the Note is measured as a percentage of the Note's nominal value. For example, if the Note's nominal value is €100, then a percentage, or rate, of 34.032% means that the price of the Note is €34.032.

I have a broker dealer that I use, so I usually . . . let's talk about my money, how I do it. I have my broker deal . . . I have a broker dealer in London that has a trading line with my trustee, my bank, and so, from my bank to . . . the money goes to the broker dealer who is just an agent, so he doesn't own the money in between, but he gives . . . because he has a trading line with Morgan Stanley, he gives the bid to Morgan Stanley. Morgan Stanley gives the bid to the hedge funds, and so that's the chain . . .

*Now, for me to give the order to the broker dealer that then gives the order to Morgan Stanley*, I need to have an escrow with . . . I use a trustee that I trust for many years, who has all my money, so we would need to put the money . . . the trustee is based in Isle of Man, so UK jurisdiction but very flexible, very private, which I like, and I'm sure you guys like. So, he would create-- and this guy manage billions, so me as a client with few tens of millions, it doesn't move the needle for him. So, that is a guarantee for you, guys. So, he would set up a client account in Royal Bank of Scotland or Barclays, these are the two banks he works with. . . . Or the-- yeah, these are the two banks he works with. So, he would set up a client account, the client account is an escrow account, we will write an escrow agreement so that we are, with your lawyers, 100% sure that--. . . . -the money is not going anywhere. So, the money goes-- the escrow agreement will say, 'I'm transferring this amount of money into this escrow account, client account of this famous trust company that will only be used under the direction of the portfolio manager--', which would be me, to-- 'only for the purpose of purchasing--.' . . . '-these bonds at a maximum price of X.' . . . *So, the trustee then has the money in the client account, then once I give him the direction, give a bid to the broker dealer on these bonds at this price, the broker dealer will give the bid to Morgan Stanley, and Morgan Stanley will buy the bonds from the hedge funds*. (Emphasis added.)

Soledad Decl. Ex. A at 58-60.

Furthermore, upon information and belief, there are no financial constraints limiting Defendants' ability to continue unlawfully using confidential information in order to achieve their objective of imminently acquiring a majority stake in the Notes. Indeed, Di Meo touts his willingness and ability, with the financial assistance of Morgan Stanley, to pay a premium to achieve his end goal of seizing Moby. In recorded conversations with the Investigative Firm on June 3, July 29 and August 9, 2021, Di Meo stated the following:

But the one thing that it would be anyway very powerful is having at least the bond buying money into some escrow that I can then direct trader at Morgan Stanley to buy . . . it's like . . . I would need to  ..  for the bond buying, it's not that you go to the market and you buy the bonds, you will never get to the levels you need. I need

to go to the three, four other bondholders in a group and saying, "I know you guys are frustrated", I'm gonna take this owner for the next two, three years in legal challenges, I'm gonna scare them out in a way. *And then I say, "Look, if you want out and I give you some profit on the current mark of the position you have, you're out and I'll take the bonds, and I will keep the fight on my own*." (June 3, 2021; emphasis added.)

The company is worth a lot of money, so it doesn't make any sense to be cheap and not buy out the [bondholder] for 25-30 million just because I want to save this 25-30 million, when *with this 25-30 million you can control half a billion of a company*, so I've come to that conclusion. (July 29, 2021; emphasis added.)

So, the move, *the move to have 100% control is to buy [a bondholder] out. I know it will take 50 to 60 cents on a dollar to buy this [bondholder] out, which means €25 to €30 million*. If your money is coming in, we will do it with your money. *If your money is not coming in, I will put some millions, and Morgan Stanley will put the rest*. (August 9, 2021; emphasis added.)

*Id.* ¶¶ 57, 79 & 93.

Morgan Stanley has the financial resources and desire to assist Di Meo in successfully buying out the Notes in order to subvert the restructuring process. In a recorded conversation with the Investigative Firm on August 22, 2021, Drazin (participating in the call from New York) summarized Morgan Stanley's position as follows:

*We certainly have the capacity to increase our exposure, I think. Right now, relative to our portfolio, this is a small investment. So, we have the capacity to increase that, for sure*. . . . I'm actually not sure we're gonna need that much, 23 million bucks is another almost 50 million bonds probably. So, it might get us to the threshold we need anyways, depending on the market conditions at the time. *But we definitely have the capacity to increase the exposure if we need to, in particular, to affect an outcome*. (Emphasis added.)

*Id.* ¶140.

Today and for the immediate future, Defendants actively seek to seize control over the Notes and derail the *concordato* proceeding. These continued efforts will irreversibly damage Moby and its employees.

And, moreover, Defendants are using deceptive, misleading and unlawful methods to effectuate their scheme.

(a)     First, upon information and belief, Di Meo has been using – and continues to use – confidential, inside information in violation of Market Abuse Laws in order to make decisions on when, from whom and how many Notes he and co-Defendants must acquire in order to accomplish their takeover scheme.  Verified Complaint ¶ 142.

(b)     Second, Morgan Stanley – despite holding at least €29 million in Notes (if not more, as of the filing of this Application) – has concealed (certainly from other bondholders) that it maintains such a position.  Morgan Stanley even went so far as instructing a notary in London to certify that Di Meo controls 26% of the Notes, inclusive of its stake. (*See supra* at 10-11.)  This continued concealment is instrumental to taking over Moby because, absent Morgan Stanley and Di Meo pooling their respective shares in the Notes, neither would be anywhere close to amassing majority control among the other creditors in the restructuring.

Without the intervention of this Court, Defendants' scheme will progress unabated– perhaps within just a matter of days or weeks.  If the scheme – which is founded upon insider and protected proprietary information, as well as conduct disguising the true owners of the Notes – succeeds, the harm to Moby and its employees, creditors, customers and owners will be irreparable.  This is because, once they possess the majority of the Notes, Defendants will defeat the purpose of the restructuring and derail the ongoing delicate.  In effect, Defendants could veto Moby's Concordato Plan and Proposal and, instead, force Moby into liquidation.  This would, in turn, allow Defendants to acquire valuable assets at lower costs, disfavor Moby's other creditors and stakeholders, and favor Moby's competitors.

Moby recently sought final approval from the commissioners appointed by the Milan Tribunal in Moby's *concordato* ("Commissioners") to file the Chapter 15 in the United States.  In the Chapter 15 proceeding, Moby could seek protection from the U.S. Bankruptcy Court in the

form of orders precluding creditors, such as Defendants, from interfering with Moby's assets in the United States – including the Indenture governing the Notes.

Moby, unfortunately, does not have the luxury of time to wait for the Commissioners' final approval and, in turn, the relief ordered by the U.S. Bankruptcy Court.  Defendants, in light of the recent trading activity, may be close to achieving their long-planned effort to assume control over and likely dismantle Moby (including by forcing the Company into liquidation and selling its valuable assets).

## ARGUMENT

A preliminary injunction and a temporary restraining order are warranted where a plaintiff will (i) suffer irreparable harm; and (ii) shows either (a) likelihood of success on the merits; or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010);  *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

Moby readily satisfies these requirements.  Moby faces existential, irreparable harm as Defendants are gearing up to take over the Company, oust its leadership, and force it into liquidation.  Moby is likely to succeed on the merits of its tortious interference and racketeering claims.  Defendants, fully aware of Moby's business relationships with numerous creditors (including other bondholders) critical to Moby's restructuring, have nonetheless conspired to interfere with such relationships and continue to do so with the goal of taking control of Moby and

pushing it into liquidation.[5]  Defendants' pattern of racketeering activity – repeated violations of the wire fraud statute in furtherance of a scheme to defraud Moby and the Milan Tribunal overseeing the *concordato* – has caused substantial injuries to Moby.  Alternatively, Moby's claims raise serious questions and the balance of hardships clearly tips in Moby's favor to preserve the status quo until the Court can resolve the parties' dispute on a full factual record.

Finally, the Court need not require a bond for the injunctive relief that Moby seeks and requiring Moby to provide notice to Defendants of its request for a temporary restraining order would render fruitless further prosecution of the action.

## I.    MOBY WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

"Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'  *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)). "[I]rreparable injury means injury for which a monetary award cannot be adequate compensation[,]" *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam), or "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied[,]" *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

---

[5]    That Defendants will continue with their scheme absent injunctive relief is underscored by the fact that Defendant Di Meo has previously tortiously interfered with Moby's business relationships – notably, with DFDS in 2019 – in order to further his scheme to cause Moby's liquidity crisis. The derailed DFDS Deal – which Di Meo helped cause – ultimately forced Moby into restructuring in the first place in June 2020.

"'Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company' may constitute irreparable harm.  Irreparable injury has been found also in '[t]he dilution of a party's stake in, or a party's loss of control of, a business.'"  *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 563 (S.D.N.Y. 2006); *see also Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *4 (S.D.N.Y. 2003) ("The dilution of a party's stake in, or a party's loss of control of, a business constitutes irreparable harm.").

As detailed above, absent an injunction, Defendants' actions aimed at undermining the *concordato* would proceed unabated and result in irreparable harm to Moby, its relationships with Ad Hoc Group 1 and other creditors, and the entire *concordato* process.  (*See supra* at 34-35.) Specifically, should Defendants succeed in acquiring a majority share of the Notes and, in turn, a majority voting stake, Defendants will be able to displace Ad Hoc Group 1 and impose a new plan for the company.  With a majority voting stake, Defendants would oust Moby's existing owners and management, causing irreparable harm to the Company.

## II.    MOBY IS LIKELY TO PREVAIL ON THE MERITS

To establish a likelihood of success on the merits, a plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent.'"  *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).  Moby is likely to prevail on the merits on its substantive claims, as detailed below.[6]

_____

[6]    Moby brings four tortious interference claims in the Complaint, two for interference in connection with the DFDS Sale, and two for interference with business relations in connection

A.      **Tortious Interference with Business Relations Against Di Meo**

Moby is likely to succeed in its claim for tortious interference with the business relations against Di Meo.  To establish a prima facie case of tortious interference with business relations, a plaintiff must show the following: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *In re Abreu*, 527 B.R. 570, 587 (Bankr. E.D.N.Y. 2015) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  These elements are met in this case.

*First*, Moby had business relationship with multiple creditors, including the Lenders and former and current holders of Notes (together, "Creditors").  *See supra* at 9.

*Second*, Di Meo was aware of Moby's relationships and interfered (and continues to interfere) with it, including by (i) repeatedly and unjustifiably prolonging the restructuring process from late 2019 to early 2021, thereby resulting in multiple delays in Moby's filing of a full *concordato* petition with the Milan Tribunal; and (ii) using confidential information relating to Moby and its restructuring, in violation of Italian and EU laws, as well as NDAs executed by Sound Point and Di Meo, to acquire Notes, with the objective of voting against Moby's restructuring proposal and disrupting the *concordato* proceeding in the Milan Tribunal.

*Lastly*, Di Meo has caused injury to Moby's business relationships, including with the Creditors.  Di Meo continues to aim to harm Moby through its improper actions, including by (i)

---

with Moby's ongoing restructuring progress.  The instant request for injunctive relief only concerns the two latter claims.

delaying the restructuring process from in or around October 2019 to February 2021; (ii) deliberately crippling the restructuring process, including by seeking to buy out Notes from other investors at a premium and based upon confidential information; and (iii) seeking to unilaterally veto Moby's restructuring plan and either impose one of his choosing or, in the alternative, seek that the Milan Tribunal place Moby into liquidation.

### B.    Tortious Interference with Business Relations and Conspiracy to Tortiously Interfere with Business Relations against All Defendants

Similarly, Moby will likely prevail against Defendants on its second claim of tortious interference and its claim for conspiracy to commit tortious interference with business relations.

*First*, Moby has business relationships with the Creditors. *Second*, Defendants know that Moby and the Creditors had and have ongoing business relationships.

*Third*, Defendants intentionally interfered, or conspired to interfere, with Moby's business relationships with Creditors – and is continuing to interfere with such business relationships – by using confidential information relating to Moby and its restructuring, in violation of Italian and EU laws, as well as the NDAs executed by Sound Point and Di Meo, to acquire Notes, with the objective of voting against Moby's restructuring proposal and disrupting the *concordato* proceeding in the Milan Tribunal.  Indeed, Defendants specifically designed their plan to minimize the recovery of Moby's Creditors and maximize their recovery.  *See* Soledad Decl. Ex. A at 56 ("So, to create the asymmetry to reduce the creditors' recovery to the maximum we can, so that our equity investment is worth much more in the remaining perimeter, we need to put some fresh equity in the plan.").

*Lastly*, Defendants' improper actions were aimed at, and Defendants continue to aim to harm, Moby, including by (i) deliberately crippling the restructuring process, by seeking to buy out Notes from other investors at a premium and based upon confidential information, among other

things; and (ii) seeking to unilaterally veto Moby's restructuring plan and either impose one of his choosing or, in the alternative, seek that the Milan Tribunal place Moby into liquidation.

### C.      Violation of the Racketeer Influenced and Corrupt Organizations Act

Moby is likely to succeed in its claim for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against Defendants.  "To establish a cause of action under RICO, a plaintiff must allege seven distinct elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *D'Orange v. Feely*, 894 F. Supp. 159, 162 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 1393, 1996 WL 446254 (Table) (2d Cir. 1996) (citation omitted).  Finally, a plaintiff must show that it was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

Moby has satisfied its burden in both respects.  *First*, it has alleged that Defendants, through a series of communications concerning a scheme to defraud Moby and the Milan Tribunal overseeing the *concordato*, transmitted via electronic means in violation of the wire fraud statue (18 U.S.C. § 1343), which constituted a pattern of racketeering activity, sought to acquire control of an enterprise that affected foreign commerce.  *Second*, Moby has alleged that its property, including but not limited to the Indenture, has been injured as result of Defendants' efforts to acquire majority creditor control of Moby, which they have sought through their pattern of racketing activity, in violation of section 1962.

## III.      ALTERNATIVELY, MOBY'S CLAIMS RAISE SERIOUS QUESTIONS AND THE BALANCE OF HARDSHIPS DECIDEDLY FAVOR MOBY

At a minimum, Moby has shown that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation" and that the balance of hardships tips decidedly

in Moby's favor. *Citigroup Glob. Mkts.*, 598 F.3d at 35 (citations omitted). These serious questions include whether Defendants' actions (i) have tortiously interfered with Moby's business relationships such that its restructuring process has been jeopardized; and (ii) undertaken as part of their scheme to defraud Moby and the Milan Tribunal overseeing the *concordato* constitute a pattern of racketing activity.

In addition to these serious questions, the hardships decidedly favor Moby. "In assessing the balance of the equities, the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 49 (S.D.N.Y. 2020) (citation omitted). The requested relief—which merely maintains the status quo—comes at minimal cost to Defendants, which must simply refrain from illegally acquiring additional Notes. In contrast, Moby will be potentially destroyed if Defendants' plans are allowed to continue unabated.

In similar circumstances, courts have found that "the balance of equities tips firmly in plaintiffs' favor [when,] if the status quo is not preserved, their business will be eliminated." *AIM Intern. Trading, L.L.C. v. Valcucine S.p.A.*, 2002 WL 1285557, at *6 (S.D.N.Y. 2002); *see also Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979) (holding that the risk that the party seeking the preliminary injunction will have its business destroyed demonstrates a balance of hardships in favor of the moving party). The balance of equities thus supports injunctive relief to avoid the liquidation of Moby and facilitate an orderly adjudication of Moby's claims against Defendants.

"In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). The public consequences of

prohibiting Defendants from illegally acquiring Notes are minimal—but doing so would support public interest, including by protecting thousands of jobs within Moby, and continuing to provide reliable transportation services throughout the Mediterranean Sea.

## IV.   NO BOND IS REQUIRED FOR THE RELIEF MOBY SEEKS HERE

Moby should not be required to post a bond if the request for a preliminary injunction and a temporary restraining order is granted.  The Second Circuit has held a court "may dispense with security where there has been no proof of likelihood of harm to the party enjoined."  *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974); *see also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (holding that "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement" in circumstances such as "where there has been no proof of likelihood of harm") (citations omitted).  Here, the injunctive relief Moby seeks, enjoining Defendants from (i) acquiring, selling or otherwise trading any Notes; (ii) attaching any Moby assets; and (iii) otherwise interfering with Moby's restructuring, poses no likelihood of harm to Defendants, obviating any need for a bond.

## V.   PROVIDING NOTICE TO DEFENDANTS OF THIS APPLICATION WOULD RENDER FRUITLESS FURTHER PROSECUTION OF THE ACTION

Moby has filed the instant request for injunctive relief *ex parte* because providing notice to Defendants would prompt them to acquire at the earliest possibility the Notes needed to gain control over Moby and execute on their plan to push the Company into liquidation.  As such, good and sufficient reasons exist for the Court to grant Moby's *ex parte* request for a temporary restraining order.  *See, e.g.*, *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) ("If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of 'notice,' and it is surely not what the authors of [Rule 65] either anticipated or intended.").  That is especially so here,

where Defendants have admitted to their plan to take over control of Moby and have been engaging in a years-long scheme to do so while engaging in unlawful conduct and disregarding their contractual and legal obligations.

## **CONCLUSION**

For the foregoing reasons, Moby respectfully requests that the Court enter a temporary restraining order and preliminary injunction enjoining Defendants from (i) acquiring, selling or otherwise trading any Notes; (ii) attaching any Moby assets; and (iii) otherwise interfering with Moby's restructuring, pending an adjudication on the merits.

Dated:    September 28, 2021                **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                                            /s/ Gabriel F. Soledad

Gabriel F. Soledad
Juan P. Morillo (*pro hac vice application forthcoming*)
Jeanhee Hong
Marc P. Hedrich
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email:  gabrielsoledad@quinnemanuel.com
Email:  juanmorillo@quinnemanuel.com
Email:  jeanheehong@quinnemanuel.com
Email:  marchedrich@quinnemanuel.com

*Attorneys for Moby S.p.A.*