# EXHIBIT B

**EXECUTION VERSION**

ONORATO ARMATORI S.P.A.,
as the Company

ALE1 B.V.

and

THE GUARANTORS PARTY HERETO

€300,000,000 7.75% Senior Secured Notes due 2023

————————

INDENTURE
February 11, 2016

————————

CITIBANK N.A., LONDON BRANCH,
as Trustee, Paying Agent and Transfer Agent

UNICREDIT S.P.A.,
as Representative of the Holders of the Notes and Security Agent

and

CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG,
as Registrar

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01    Definitions.................................................................................................1
SECTION 1.02    Other Definitions ....................................................................................47
SECTION 1.03    Rules of Construction .............................................................................48

## ARTICLE II

## THE NOTES

SECTION 2.01    Form and Dating ....................................................................................48
SECTION 2.02    Execution and Authentication.................................................................49
SECTION 2.03    Registrar, Paying Agent and Transfer Agent...........................................50
SECTION 2.04    Paying Agent to Hold Money .................................................................51
SECTION 2.05    Holder Lists.............................................................................................51
SECTION 2.06    Transfer and Exchange ...........................................................................52
SECTION 2.07    Replacement Notes .................................................................................65
SECTION 2.08    Outstanding Notes...................................................................................66
SECTION 2.09    Treasury Notes .......................................................................................66
SECTION 2.10    Temporary Notes ....................................................................................67
SECTION 2.11    Cancellation ............................................................................................67
SECTION 2.12    Defaulted Interest....................................................................................67
SECTION 2.13    Additional Amounts ...............................................................................67
SECTION 2.14    Currency Indemnity ...............................................................................72
SECTION 2.15    Deposit of Moneys.................................................................................72
SECTION 2.16    Additional Notes ....................................................................................72
SECTION 2.17    FATCA. ..................................................................................................74

## ARTICLE III

## REDEMPTION AND PREPAYMENT

SECTION 3.01    Notices to Trustee ..................................................................................74
SECTION 3.02    Selection of Notes To Be Redeemed or Purchased ..................................75
SECTION 3.03    Notice of Redemption.............................................................................75
SECTION 3.04    Effect of Notice of Redemption..............................................................76
SECTION 3.05    Deposit of Redemption or Purchase Price ...............................................77
SECTION 3.06    Notes Redeemed or Purchased in Part.....................................................77
SECTION 3.07    Mandatory Redemption ..........................................................................77
SECTION 3.08    Asset Disposition Offer...........................................................................77
SECTION 3.09    Redemption for Taxation Reasons...........................................................79

# TABLE OF CONTENTS

**Page**

ARTICLE IV

COVENANTS

| | | |
|---|---|---|
| SECTION 4.01 | Payment of Notes | 80 |
| SECTION 4.02 | Maintenance of Office or Agency | 81 |
| SECTION 4.03 | Reports | 82 |
| SECTION 4.04 | Compliance Certificates | 84 |
| SECTION 4.05 | Taxes | 84 |
| SECTION 4.06 | Limitation on Transfer of Vessels | 84 |
| SECTION 4.07 | Limitation on Restricted Payments | 84 |
| SECTION 4.08 | Limitation on Restrictions on Distributions from Restricted Subsidiaries | 92 |
| SECTION 4.09 | Limitation on Indebtedness | 94 |
| SECTION 4.10 | Limitation on Sales of Assets and Subsidiary Stock | 101 |
| SECTION 4.11 | Limitation on Transactions with Affiliates | 105 |
| SECTION 4.12 | Limitation on Liens | 108 |
| SECTION 4.13 | Corporate Existence | 108 |
| SECTION 4.14 | Offer To Repurchase upon Change of Control | 108 |
| SECTION 4.15 | Additional Notes Guarantees and Collateral | 111 |
| SECTION 4.16 | Maintenance of Listing | 112 |
| SECTION 4.17 | Suspension of Covenants on Achievement of Investment Grade Status | 112 |
| SECTION 4.18 | Further Instruments and Acts | 113 |
| SECTION 4.19 | Permitted Reorganization | 113 |
| SECTION 4.20 | Completion of the Post-Issuance Merger; Granting of Post-Merger Collateral and Additional Vessel Collateral; Release of Tirrenia in A.S. Mortgages. | 114 |
| SECTION 4.21 | Cancellation of Moby Treasury Shares | 115 |

ARTICLE V

MERGER AND CONSOLIDATION

| | | |
|---|---|---|
| SECTION 5.01 | The Company | 115 |
| SECTION 5.02 | The Guarantors | 117 |

ARTICLE VI

DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| SECTION 6.01 | Events of Default | 118 |
| SECTION 6.02 | Acceleration | 121 |
| SECTION 6.03 | Other Remedies | 122 |
| SECTION 6.04 | Waiver of Past Defaults | 122 |

iii

**TABLE OF CONTENTS**

**Page**

SECTION 6.05      Control by Majority ...............................................................................122
SECTION 6.06      Limitation on Suits..................................................................................122
SECTION 6.07      Rights of Holders To Receive Payment...................................................123
SECTION 6.08      Collection Suit by Trustee ......................................................................123
SECTION 6.09      Trustee May File Proofs of Claim ...........................................................124
SECTION 6.10      Priorities.................................................................................................124
SECTION 6.11      Undertaking for Costs.............................................................................124
SECTION 6.12      Stay, Extension and Usury Laws .............................................................125
SECTION 6.13      Restoration of Rights and Remedies........................................................125


ARTICLE VII

THE TRUSTEE, THE SECURITY AGENT AND AGENTS

SECTION 7.01      Duties of Trustee.....................................................................................125
SECTION 7.02      Rights of Trustee.....................................................................................127
SECTION 7.03      Individual Rights of Trustee ....................................................................130
SECTION 7.04      Trustee's Disclaimer ...............................................................................131
SECTION 7.05      Notice of Defaults...................................................................................131
SECTION 7.06      Compensation and Indemnity .................................................................131
SECTION 7.07      Replacement of Trustee ..........................................................................132
SECTION 7.08      Successor Trustee by Merger, etc ...........................................................134
SECTION 7.09      Eligibility; Disqualification.....................................................................134
SECTION 7.10      Resignation of Agents.............................................................................134
SECTION 7.11      Agents; General Provisions.....................................................................134


ARTICLE VIII

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

SECTION 8.01      Option To Effect Legal Defeasance or Covenant Defeasance................135
SECTION 8.02      Legal Defeasance and Discharge .............................................................136
SECTION 8.03      Covenant Defeasance..............................................................................136
SECTION 8.04      Conditions to Legal Defeasance or Covenant Defeasance .....................137
SECTION 8.05      Deposited Money and Government Securities To Be Held in Trust;
                   Other Miscellaneous Provisions ..............................................................138
SECTION 8.06      Repayment to Company...........................................................................138
SECTION 8.07      Reinstatement..........................................................................................138

ARTICLE IX

AMENDMENT, SUPPLEMENT AND WAIVER

SECTION 9.01      Without Consent of Holders ...................................................................139
SECTION 9.02      With Consent of Holders .........................................................................140

iv

# TABLE OF CONTENTS

**Page**

SECTION 9.03     Supplemental Indenture ...................................................142
SECTION 9.04     Revocation and Effect of Consents.....................................142
SECTION 9.05     Notation on or Exchange of Notes.......................................143
SECTION 9.06     Trustee and the Security Agent To Sign Amendments, etc ....143
SECTION 9.07     Payments for Consent ........................................................143
SECTION 9.08     Notice of Amendment, Supplement or Waiver......................143
SECTION 9.09     Meeting of Holders of Notes...............................................144

## ARTICLE X

## SATISFACTION AND DISCHARGE

SECTION 10.01     Satisfaction and Discharge.................................................145
SECTION 10.02     Application of Trust Money................................................146

## ARTICLE XI

## GUARANTEES

SECTION 11.01     Guarantees........................................................................146
SECTION 11.02     Limitation on Liability......................................................148
SECTION 11.03     Limitations on Italian Guarantors ......................................148
SECTION 11.04     Successors and Assigns......................................................150
SECTION 11.05     No Waiver .........................................................................150
SECTION 11.06     Modification......................................................................150
SECTION 11.07     Execution of Supplemental Indenture for Future Guarantors...............150
SECTION 11.08     Non-Impairment................................................................151
SECTION 11.09     Release of Guarantees.......................................................151

## ARTICLE XII

## COLLATERAL, SECURITY AND INTERCREDITOR AGREEMENT

SECTION 12.01     The Collateral....................................................................152
SECTION 12.02     Limitations on the Collateral .............................................153
SECTION 12.03     Impairment of Security Interests........................................153
SECTION 12.04     Release of Liens on the Collateral .....................................154
SECTION 12.05     Additional Intercreditor Agreement....................................155
SECTION 12.06     Security Agent ..................................................................157

## ARTICLE XIII

## MISCELLANEOUS

SECTION 13.01     Notices .............................................................................157

v

## TABLE OF CONTENTS

**Page**

SECTION 13.02    Communications ...................................................................................158
SECTION 13.03    Certificate and Opinion as to Conditions Precedent ...............................159
SECTION 13.04    Statements Required in Certificate or Opinion........................................159
SECTION 13.05    Rules by Trustee and Agents .....................................................................159
SECTION 13.06    No Personal Liability of Directors, Officers, Employees and
                 Stockholders ..............................................................................................159
SECTION 13.07    Governing Law ..........................................................................................160
SECTION 13.08    No Adverse Interpretation of Other Agreements......................................160
SECTION 13.09    Successors ..................................................................................................160
SECTION 13.10    Severability ................................................................................................160
SECTION 13.11    Counterpart Originals.................................................................................160
SECTION 13.12    Table of Contents, Headings, etc ..............................................................160
SECTION 13.13    Submission to Jurisdiction; Appointment of Agent..................................160
SECTION 13.14    Prescription ................................................................................................161
SECTION 13.15    Noteholders' Representative.......................................................................161

EXHIBITS

Exhibit A      FORM OF NOTE

Exhibit B      FORM OF CERTIFICATE OF TRANSFER

Exhibit C      FORM OF CERTIFICATE OF EXCHANGE

Exhibit D      FORM OF SUPPLEMENTAL INDENTURE

INDENTURE dated as of February 11, 2016 among ONORATO ARMATORI S.P.A., a joint stock company (*società per azioni*) organized under the law of the Republic of Italy (together with its successors and assigns, the "Company"), ALE1 B.V., the Guarantors (as defined herein), CITIBANK, N.A., LONDON BRANCH, as Trustee, Paying Agent and Transfer Agent (each as defined herein), UNICREDIT S.P.A., as representative (*rappresentante*) pursuant to and for the purposes set forth under Article 2414-*bis*, paragraph 3 of the Italian Civil Code (the "Representative") and Security Agent (as defined herein), and CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG, as Registrar (as defined herein).

Each party agrees as follows for the benefit of each other and for the other parties and for the equal and ratable benefit of the Holders (as defined herein) of the Notes (as defined herein).

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01        Definitions.

"144A Global Note" means a Global Note substantially in the form of Exhibit A hereto, bearing the applicable Global Note Legend and Private Placement Legend, and deposited with or on behalf of, and registered in the name of, the respective Depositary therefor or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"Acquired Indebtedness" means Indebtedness (1) of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary, or (2) assumed in connection with the acquisition of assets from such Person, in each case whether or not Incurred by such Person in connection with such Person becoming a Restricted Subsidiary or such acquisition or (3) of a Person at the time such Person merges with or into or consolidates or otherwise combines with the Company or any Restricted Subsidiary.  Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Restricted Subsidiary, with respect to clause (2) of the preceding sentence, on the date of consummation of such acquisition of assets and, with respect to clause (3) of the preceding sentence, on the date of the relevant merger, consolidation or other combination.

"Additional Assets" means:

(1)        any property or assets (other than Indebtedness and Capital Stock) used or to be used by the Company, a Restricted Subsidiary or otherwise useful in a Similar Business (it being understood that capital expenditures on property or assets already used in a Similar Business or to replace any property or assets that are the subject of such Asset Disposition shall be deemed an investment in Additional Assets);

(2)        the Capital Stock of a Person that is engaged in a Similar Business and becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Company or a Restricted Subsidiary; or

(3)     Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary.

"Additional Notes" means additional Notes (other than the Initial Notes) having identical terms and conditions to the Notes, except to the extent permitted under Section 2.16, that may be issued from time to time under this Indenture in accordance with the terms hereof, including Sections 2.02, 4.09 and 4.12 hereof.  Any Additional Notes shall be treated with the Notes as a single class for all purposes under this Indenture, except as otherwise set forth in Section 2.16(c).  Unless the context otherwise requires, all references to Notes shall include the Initial Notes and any Additional Notes.

"Additional Vessels" means the following vessels owned by Moby: (a) "Moby Zaza" (formerly "Wind Perfection"), (b) "Moby Kiss" (formerly "Galaxy") and (c) "Helena".

"Additional Vessel Collateral" means the first-priority mortgages granted over the Additional Vessels in accordance with this Indenture.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means any Authentication Agent, Registrar, co-registrar, Transfer Agent, Paying Agent or additional paying agent.

"Agreed Security Principles" means the agreed security principles as set out in the Credit Agreement as in effect on the Issue Date, as applied reasonably and in good faith by the Board of Directors or an Officer of the Company.

"Applicable FATCA Law" means any law or regulation relating to FATCA or similar law or regulation of non-U.S. jurisdiction including, but not limited to: (a) any U.S. or non-U.S. statute or regulation; (b) any rule or practice of any Governmental Authority with which the Trustee is bound or accustomed to comply; and (c) any intergovernmental agreement entered into pursuant to FATCA or agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Applicable Premium" means, with respect to any Note on any redemption date, the greater of:

(1)     1.0% of the principal amount of such Note; and

(2)     the excess of:

(i)     the present value at such redemption date of (x) the redemption price of such Note at February 15, 2019 (such redemption price being set forth in the table appearing under paragraph 5 of such Note), plus (y) all required interest

2

payments due on such Note through February 15, 2019 (excluding accrued but unpaid interest), computed using a discount rate equal to the Bund Rate as of such redemption date plus 50 basis points; over

> (ii)      the outstanding principal amount of such Note;

as calculated by the Company or on behalf of the Company by such Person as the Company shall designate.  For the avoidance of doubt, the calculation of the Applicable Premium shall not be an obligation or duty of the Trustee, Registrar, Paying Agent or Transfer Agent.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary with respect thereto that apply to such transfer or exchange.

"Asset Disposition" means any direct or indirect sale, lease (other than an operating lease entered into in the ordinary course of business), transfer, issuance or other disposition, or a series of related sales, leases (other than operating leases entered into in the ordinary course of business), transfers, issuances or dispositions that are part of a common plan, of shares of Capital Stock of a Subsidiary (other than directors' qualifying shares), property or other assets (each referred to for the purposes of this definition as a "disposition") by the Company or any of its Restricted Subsidiaries, including any disposition by means of a merger, consolidation or similar transaction; provided that the sale, conveyance or other disposition of all or substantially all the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Section 4.14 or Article V and not by Section 4.10.  Notwithstanding the preceding provisions of this definition, the following items shall not be deemed to be Asset Dispositions:

> (1)      Subject to Section 4.06, a disposition by a Restricted Subsidiary to the Company or by the Company or a Restricted Subsidiary to a Restricted Subsidiary;

> (2)      a disposition of cash, Cash Equivalents, Temporary Cash Investments or Investment Grade Securities;

> (3)      a disposition of inventory or other assets in the ordinary course of business;

> (4)      a disposition of obsolete, surplus or worn out equipment or other assets, or equipment or other property that is no longer useful in the conduct of the business of the Company and its Restricted Subsidiaries or a disposition of a vessel or vessels that is or are no longer useful in the conduct of the business of the Company and its Restricted Subsidiaries and that is made in the ordinary course of business;

> (5)      transactions permitted under Section 5.01 or a transaction that constitutes a Change of Control;

(6)     an issuance of Capital Stock by a Restricted Subsidiary to the Company or to another Restricted Subsidiary or as part of or pursuant to an equity incentive or compensation plan approved by the Board of Directors of the Company;

(7)     any dispositions of Capital Stock, properties or assets in a single transaction or series of related transactions with a fair market value (as determined in good faith by the Board of Directors or an Officer of the Company) of less than €7.5 million;

(8)     any Restricted Payment that is permitted to be made, and is made, under Section 4.07 and the making of any Permitted Payments or Permitted Investments;

(9)     dispositions in connection with Permitted Liens;

(10)    dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(11)    the licensing or sub-licensing of intellectual property or other general intangibles and licenses, sub-licenses, leases or subleases of other property in each case in the ordinary course of business;

(12)    foreclosure, condemnation or any similar action with respect to any property or other assets;

(13)    the sale or discount (with or without recourse, and on customary or commercially reasonable terms and for credit management purposes) of accounts receivable or notes receivable arising in the ordinary course of business, or the conversion or exchange of accounts receivable for notes receivable;

(14)    any disposition of Capital Stock, Indebtedness or other securities or assets of an Unrestricted Subsidiary;

(15)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired, or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(16)    any surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind;

(17)    any disposition of assets to a Person who is providing services related to such assets, the provision of which have been or are to be outsourced by the Company or any Restricted Subsidiary to such Person, provided that the fair market value of the assets disposed of does not exceed €10.0 million;

4

(18)     any disposition of assets of CIN or its Restricted Subsidiaries of up to €100.0 million to satisfy any state aid repayments, interest in respect thereof, fines, penalties or similar amounts owing to Italian national, regional or other governmental or administrative agencies, other regulators or authorities or pursuant to court orders, judgments, decisions, settlements or resolutions in respect of the Ongoing State Aid Investigation in order to finance the payment, settlement or extinguishment of any such amounts owing by the Company or any Subsidiary, provided that any Net Cash Proceeds in excess of such amounts then owing shall otherwise be applied in accordance with Section 4.10(a)(3) and, if applicable, Section 4.10(b); and

(19)     sales or dispositions of receivables in connection with any Qualified Receivables Financing or any factoring transaction or in the ordinary course of business.

"<u>Associate</u>" means (i) any Person engaged in a Similar Business of which the Company or its Restricted Subsidiaries are the legal and beneficial owners of between 20% and 50% of all outstanding Voting Stock and (ii) any joint venture engaged in a Similar Business entered into by the Company or any Restricted Subsidiary.

"<u>Authorized Person</u>" means any person who is designated in writing by the Company from time to time to give instructions to the Trustee or an Agent under this Indenture.

"<u>Bankruptcy Law</u>" means (a) the Italian Royal Decree No. 267 of March 16, 1942, as amended from time to time or any other bankruptcy, insolvency, liquidation or similar laws of general application and (b) the United States Bankruptcy Code of 1978 or any similar United States federal or state law for the relief of debtors or any amendment to, succession to or change in any such law, in each case as in effect from time to time.

"<u>Board of Directors</u>" means (1) with respect to the Company or any corporation, the board of directors or managers, as applicable, of the corporation, or any duly authorized committee thereof; (2) with respect to any partnership, the board of directors or other governing body of the general partner of the partnership or any duly authorized committee thereof; and (3) with respect to any other Person, the board or any duly authorized committee of such Person serving a similar function.  Whenever any provision of this Indenture requires any action or determination to be made by, or any approval of, a Board of Directors, such action, determination or approval shall be deemed to have been taken or made if approved by a majority of the directors (excluding employee representatives, if any) on any such Board of Directors (whether or not such action or approval is taken as part of a formal board meeting or as a formal board approval).

"<u>Bund Rate</u>" means the yield to maturity at the time of computation of direct obligations of the Federal Republic of Germany (*Bunds or Bundesanleihen*) with a constant maturity (as officially compiled and published in the most recent financial statistics that has become publicly available at least two Business Days (but not more than five Business Days) prior to the redemption date (or, if such financial statistics are not so published or available, any publicly available source of similar market data selected by the Company in good faith)) most nearly equal to the period from the redemption date to February 15, 2019; <u>provided</u>, <u>however</u>, that if the period from the redemption date to February 15, 2019 is not equal to the constant

maturity of a direct obligation of the Federal Republic of Germany for which a weekly average yield is given, the Bund Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of direct obligations of the Federal Republic of Germany for which such yields are given, except that if the period from such redemption date to February 15, 2019 is less than one year, the weekly average yield on actually traded direct obligations of the Federal Republic of Germany adjusted to a constant maturity of one year shall be used.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in Milan, Italy, London, United Kingdom, or New York, New York, United States are authorized or required by law to close; provided, however, that for any payments to be made under this Indenture, such day shall also be a day on which the TARGET2 payment system is open for the settlement of payments.

"Capital Stock" of any Person means any and all shares of, rights to purchase, warrants or options for, or other equivalents of or partnership or other interests in (however designated), equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Capitalized Lease Obligation" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes on the basis of IFRS.  The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined on the basis of IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

(1)     securities issued or directly and fully Guaranteed or insured by a Permissible Jurisdiction or, in each case, any agency or instrumentality thereof (provided that the full faith and credit of such country or such member state is pledged in support thereof), having maturities of not more than two years from the date of acquisition;

(2)     certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances (in each case, including any such deposits made pursuant to any sinking fund established by the Company or any Restricted Subsidiary) having maturities of not more than one year from the date of acquisition thereof (a "Deposit") issued or held by any lender party to the Credit Agreement or by any bank or trust company (a) at any time since January 1, 2012, the Company or any Subsidiary held Deposits with such bank or trust company (or any branch, subsidiary or affiliate thereof), (b) whose commercial paper is rated at least "A-3" or the equivalent thereof by S&P or at least "P-3" or the equivalent thereof by Moody's (or if at the time neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization) or (c) (in the event that the bank or trust company does not have commercial paper which is rated) having combined capital and surplus in excess of €250 million;

(3)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (1) and (2) entered into with any bank meeting the qualifications specified in clause (2) above;

(4)     commercial paper rated at the time of acquisition thereof at least "A-3" or the equivalent thereof by S&P or "P-3" or the equivalent thereof by Moody's or carrying an equivalent rating by a Nationally Recognized Statistical Rating Organization, if both of the two named rating agencies cease publishing ratings of investments or, if no rating is available in respect of the commercial paper, the issuer of which has an equivalent rating in respect of its long-term debt, and in any case maturing within one year after the date of acquisition thereof;

(5)     readily marketable direct obligations issued by a Permissible Jurisdiction having one of the two highest rating categories obtainable from either Moody's or S&P (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization) with maturities of not more than two years from the date of acquisition;

(6)     Indebtedness or Preferred Stock issued by Persons with a rating of "BBB–" or higher from S&P or "Baa3" or higher from Moody's (or, if at the time, neither is issuing comparable ratings, then a comparable rating of another Nationally Recognized Statistical Rating Organization) with maturities of 12 months or less from the date of acquisition;

(7)     bills of exchange issued in a Permissible Jurisdiction eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent); and

(8)     interests in any investment company, money market or enhanced high yield fund which invests 95% or more of its assets in instruments of the type specified in clauses (1) through (7) above.

"Change of Control" means:

(1)     the Company becomes aware that (by way of a report or any other filing pursuant to any regulatory filing, proxy, vote, written notice or otherwise) any "person" or "group" of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Issue Date), other than one or more Permitted Holders, is or has become the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Issue Date), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company; provided, that, for the purposes of this clause, no Change of Control shall be deemed to occur by reason of the Company becoming a Subsidiary of a Successor Parent;

(2)     the adoption of a plan relating to the liquidation or dissolution of the Company; or

(3)      the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, consolidation or other business combination transaction), in one or a series of related transactions, of all or substantially all the assets of the Company and its Restricted Subsidiaries taken as a whole to a Person, other than (i) a Restricted Subsidiary or (ii) one or more Permitted Holders.

"CIN" means Compagnia Italiana di Navigazione S.p.A.

"Clearstream" means Clearstream Banking, *société anonyme*, or any successor securities clearing agency.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means the property and assets of the Company or any other Person over which a Lien has been granted to secure the obligations of the Company or any Guarantor under the Notes, the Notes Guarantees and this Indenture pursuant to the Security Documents.

"Common Depositary" means Citibank Europe plc, as common depositary for Euroclear and Clearstream as depositary for the Global Notes, together with its successors in such capacity.

"Commodity Hedging Agreements" means, in respect of a Person, any commodity purchase contract, commodity futures or forward contract, commodities option contract or other similar contract (including commodities derivative agreements or arrangements), to which such Person is a party or a beneficiary.

"Company" means Onorato Armatori S.p.A. and, subsequent to the Post-Issuance Merger, MergerCo or any other Successor Company in accordance with this Indenture.

"Consolidated EBITDA" for any period means, without duplication, the Consolidated Net Income for such period, plus the following to the extent deducted in calculating such Consolidated Net Income:

(1)      Consolidated Interest Expense and Receivables Fees;

(2)      Consolidated Income Taxes;

(3)      consolidated depreciation expense;

(4)      consolidated amortization or impairment expense;

(5)      any expenses, charges or other costs related to any Equity Offering, Investment, acquisition (including amounts paid in connection with the acquisition or retention of one or more individuals comprising part of a management team retained to manage the acquired business; provided that such payments are made in connection with such acquisition and are consistent with the customary practice in the industry at the time of such acquisition), disposition, recapitalization or the Incurrence of any Indebtedness permitted by this Indenture (in each case whether or not successful) (including any such

8

fees, expenses or charges related to the Transactions), in each case, as determined in good faith by the Board of Directors or an Officer of the Company;

(6)     any minority interest expense (whether paid or not) consisting of income attributable to minority equity interests of third parties in such period or any net earnings, income or share of profit of any Associates, associated company or undertaking;

(7)     the amount of management, monitoring, consulting, employment and advisory fees and related expenses paid in such period to the Permitted Holders to the extent permitted by Section 4.11;

(8)     amounts paid by the Company or any Restricted Subsidiary to satisfy any state aid repayments, interest in respect thereof, fines, penalties or similar amounts owing to Italian national, regional or other governmental or administrative agencies, other regulators or authorities or pursuant to court orders, judgments, decisions, settlements or resolutions in respect of the Ongoing State Aid Investigation; and

(9)     other non-cash charges, write-downs or items reducing Consolidated Net Income (excluding any such non-cash charge, write-down or item to the extent it represents an accrual of or reserve for cash charges in any future period) or other non-cash items classified by the Company as extraordinary, exceptional, unusual or nonrecurring items, less other non-cash items of income increasing Consolidated Net Income (excluding any such non-cash item of income to the extent it represents a receipt of cash in any future period).

Notwithstanding the foregoing, the provision for taxes and the depreciation, amortization, non-cash items, charges and write-downs of a Restricted Subsidiary shall be added to Consolidated Net Income to compute Consolidated EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income (loss) of such Subsidiary was included in calculating Consolidated Net Income for the purposes of this definition.

"Consolidated Income Taxes" means Taxes or other payments, including deferred Taxes, based on income, profits or capital (including, without limitation, withholding Taxes) and corporation Tax and franchise Taxes of any of the Company and its Restricted Subsidiaries whether or not paid, estimated, accrued or required to be remitted to any Governmental Authority.

"Consolidated Interest Expense" means, for any period (in each case, determined on the basis of IFRS), the consolidated net interest income/expense of the Company and its Restricted Subsidiaries, whether paid or accrued, including, without limitation any Pension Items, amortization of debt discount (but not debt issuance costs, commissions, fees and expenses), the interest component of deferred payment obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings plus or including (without duplication) any interest, costs and charges consisting of:

(1)     interest expense attributable to Capitalized Lease Obligations;

(2)     non-cash interest expense (excluding any non-cash interest expense attributable under IFRS to foreign exchange translations or movement in the mark-to-market valuation of Hedging Obligations or other derivative instruments);

(3)     dividends on other distributions in respect of all Disqualified Stock of the Company and all Preferred Stock of any Restricted Subsidiary, to the extent held by Persons other than the Company or a subsidiary of the Company;

(4)     net payments and receipts (if any) pursuant to interest rate Hedging Obligations (excluding amortization of fees) with respect to Indebtedness;

(5)     the consolidated interest expense that was capitalized during such period; and

(6)     any interest on Indebtedness of another Person that is guaranteed by such Person or one of its Subsidiaries which are Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Subsidiaries which are Restricted Subsidiaries.

"Consolidated Net Income" means, for any period, the profit/(loss) for the financial period of the Company and its Restricted Subsidiaries determined on a consolidated basis on the basis of IFRS; provided, however, that there will not be included in such Consolidated Net Income:

(1)     subject to the limitations contained in clause (3) below, any profit/(loss) for the financial period of any Person if such Person is not a Restricted Subsidiary, except that the Company's equity in the profit/(loss) for the financial period of any such Person will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents (x) actually distributed by such Person during such period to the Company or a Restricted Subsidiary as a dividend or other distribution or return on investment or (y) only for the purpose of determining the amount available for Restricted Payments under Section 4.07(a)(5)(C)(i) that could have been distributed, as reasonably determined by an Officer of the Company (subject, in the case of a dividend or other distribution or return on investment to a Restricted Subsidiary, to the limitations contained in clause (2) below);

(2)     solely for the purpose of determining the amount available for Restricted Payments under Section 4.07(a)(5)(C)(i), any profit/(loss) for the financial period of any Restricted Subsidiary (other than Guarantors) if such Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Company or a Guarantor by operation of the terms of such Restricted Subsidiary's charter or any agreement, instrument, judgment, decree, order, statute or governmental rule or regulation applicable to such Restricted Subsidiary or its shareholders (other than (a) restrictions that have been waived or otherwise released, (b) restrictions pursuant to the Credit Agreement, the Notes or this Indenture, and (c) restrictions not prohibited by Section 4.08), except that the Company's equity in the net income of any such Restricted Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash

10

Equivalents actually distributed or that could have been distributed by such Restricted Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend to another Restricted Subsidiary, to the limitation contained in this clause) even if encumbrances or restrictions to make distributions in cash or Cash Equivalents arise or exist by reason of applicable law or applicable rules, regulation or order;

(3)     any net gain (or loss) realized upon the sale or other disposition of any asset or disposed operations of the Company or any Restricted Subsidiaries (including any disposals of vessels and including pursuant to any sale/leaseback transaction) which is not sold or otherwise disposed of in the ordinary course of business (as determined in good faith by the Board of Directors or an Officer of the Company);

(4)     any extraordinary, exceptional, unusual or nonrecurring gain, loss, charge or expense as determined in good faith by the Board of Directors or an Officer of the Company (including in respect of any rebranding of the business (or any part thereof)) or any charges, expenses or reserves in respect of any restructuring, disposal, closing, redundancy or severance; or otherwise in respect of the Acquisitions (as defined in the Offering Memorandum) but excluding, for the avoidance of doubt, amounts paid by the Company or any Restricted Subsidiary to satisfy any state aid repayments, interest in respect thereof, fines, penalties or similar amounts owing to Italian national, regional or other governmental or administrative agencies, other regulators or authorities or pursuant to court orders, judgments, decisions, settlements or resolutions in respect of the Ongoing State Aid Investigation;

(5)     the cumulative effect of a change in accounting principles;

(6)     any non-cash compensation charge or expense arising from any grant of stock, stock options or other equity based awards and any non-cash deemed finance charges in respect of any Pension Items or other provisions;

(7)     all deferred financing costs written off and premiums paid or other expenses Incurred directly in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness;

(8)     any unrealized gains or losses in respect of Hedging Obligations or any ineffectiveness recognized in earnings related to qualifying hedge transactions or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions, in each case, in respect of Hedging Obligations;

(9)     any unrealized foreign currency transaction gains or losses in respect of Indebtedness of any Person denominated in a currency other than the functional currency of such Person and any unrealized foreign exchange gains or losses relating to translation of assets and liabilities denominated in foreign currencies;

(10)     any unrealized foreign currency translation or transaction gains or losses in respect of Indebtedness or other obligations of the Company or any Restricted Subsidiary owing to the Company or any Restricted Subsidiary;

11

(11)     any purchase accounting effects including, but not limited to, adjustments to inventory, stock, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by IFRS and related authoritative pronouncements (including the effects of such adjustments pushed down to the Company and the Restricted Subsidiaries), as a result of any consummated acquisition, or the amortization or write-off of any amounts thereof;

(12)     any goodwill or other intangible asset impairment charge, amortization or write-off;

(13)     the impact of capitalized, accrued or accreting or pay-in-kind interest or principal on Subordinated Shareholder Funding; and

(14)     to the extent covered by insurance and actually reimbursed, or, so long as the Company has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable insurer in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), losses with respect to business interruption.

"Consolidated Net Leverage" means, with respect to any Person as of any date of determination, the sum without duplication of (a) the total amount of Indebtedness of such Person and its Restricted Subsidiaries on a consolidated basis (excluding Hedging Obligations entered into for bona fide hedging purposes and not for speculative purposes), plus (b) an amount equal to the greater of the liquidation preference or the maximum fixed redemption or repurchase price of all Disqualified Stock of such Person and all preferred stock of Restricted Subsidiaries of such Person, less (c) cash and Cash Equivalents of such Person and its Restricted Subsidiaries.

"Consolidated Net Leverage Ratio" means, as of any date of determination, the ratio of (x) Consolidated Net Leverage at such date to (y) the aggregate amount of Consolidated EBITDA for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which internal consolidated financial statements of the Company are available; provided, however, that for the purposes of calculating Consolidated EBITDA for such period, if, as of such date of determination:

(1)     since the beginning of such period, the Company or any Restricted Subsidiary has closed or disposed of any company, any business, any group of assets constituting an operating unit of a business or any ship (any such disposition, a "Sale") or if the transaction giving rise to the need to calculate the Consolidated Net Leverage Ratio is such a Sale, Consolidated EBITDA for such period will be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the company, business, group of assets or ship which are the subject of such Sale for such period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto after giving pro forma effect to such Sale as if such Sale occurred on the first day of such period; provided that if any such Sale constitutes "discontinued operations" in accordance with IFRS, Consolidated Net Income shall be reduced by an amount equal to the Consolidated

12

Net Income (if positive) attributable to the company, business, group of assets or ship which are the subject of such Sale for such period or increased by an amount equal to the Consolidated Net Income (if negative) attributable thereto after giving pro forma effect to such Sale as if such Sale occurred on the first day of such period;

(2)     since the beginning of such period, the Company or any Restricted Subsidiary (by merger or otherwise) has made an Investment in any Person that thereby becomes a Restricted Subsidiary, or otherwise has acquired any company, any business, any group of assets constituting an operating unit of a business or any ship (any such Investment or acquisition, a "Purchase"), including any such Purchase occurring in connection with a transaction causing a calculation to be made hereunder, Consolidated EBITDA for such period will be calculated after giving pro forma effect thereto, including anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation, as if such Purchase occurred on the first day of such period; and

(3)     since the beginning of such period, any Person (that became a Restricted Subsidiary or was merged or otherwise combined with or into the Company or any Restricted Subsidiary since the beginning of such period) will have made any Sale or any Purchase that would have required an adjustment pursuant to clause (1) or (2) above if made by the Company or a Restricted Subsidiary since the beginning of such period, Consolidated EBITDA for such period will be calculated after giving pro forma effect thereto, including anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation, as if such Sale or Purchase occurred on the first day of such period.

For the purposes of this definition and the definitions of Consolidated EBITDA, Consolidated Income Taxes, Consolidated Interest Expense and Consolidated Net Income, (a) calculations will be as determined in good faith by a responsible financial or accounting officer of the Company, including in respect of anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation, as though the full effect of such anticipated expenses and cost savings synergies were realized on the first day of the relevant period, and (b) in determining the amount of Indebtedness outstanding on any date of determination, pro forma effect shall be given to any Incurrence, repayment, repurchase, defeasance or other acquisition, retirement or discharge of Indebtedness as if such transaction had occurred on the first day of the relevant period.

"Consolidated Senior Secured Net Leverage Ratio" means the Consolidated Net Leverage Ratio, but calculated by excluding all Indebtedness of the Company and its Restricted Subsidiaries other than Senior Secured Indebtedness of the Company and its Restricted Subsidiaries; provided, however, that the *pro forma* calculation of the Consolidated Net Leverage Ratio shall not give effect to (a) any Indebtedness Incurred on such date of determination pursuant to Section 4.09(b) or (b) the repayment, repurchase, redemption, defeasance or other discharge of any Indebtedness on such date of determination, to the extent that such repayment, repurchase, redemption, defeasance or other discharge is made with the proceeds of Indebtedness Incurred pursuant to Section 4.09(b), other than, in (a) above,

Indebtedness Incurred pursuant to Section 4.09(b)(5) of such paragraph thereof (except for Indebtedness incurred pursuant to clause (5)(B) of such paragraph).

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing in any manner, whether directly or indirectly, any operating lease, dividend or other obligation that does not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor"), including any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation; or

(b)     to maintain the working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Agreement" means the term loan and revolving credit facility agreement dated February 1, by and among, *inter alios*, the Company, the Mandated Lead Arrangers and lenders named therein, UniCredit S.p.A., as agent, and UniCredit S.p.A., as Security Agent, as amended, supplemented, refinanced, replaced or otherwise modified from time to time.

"Credit Facility" means, with respect to the Company or any of its Subsidiaries, one or more debt facilities, indentures or other arrangements (including the Credit Agreement or commercial paper facilities and overdraft facilities) with banks, other institutions or investors providing for revolving credit loans, term loans, notes, receivables financing (including through the sale of receivables to such institutions or to special purpose entities formed to borrow from such institutions against such receivables), letters of credit or other Indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced, restructured, refinanced, repaid, increased or extended from time to time (whether in whole or in part and whether or not with the original administrative agent and lenders or another administrative agent or agents or banks, other institutions or investors and whether provided under the Credit Agreement or one or more other credit or other agreements, indentures, financing agreements or otherwise) and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing (including any notes and letters of credit issued pursuant thereto and any Guarantee and collateral agreement, patent and trademark security agreement, mortgages or letter of credit applications and other Guarantees, pledges, agreements, security agreements and collateral documents). Without limiting the generality of the foregoing, the term "Credit Facility" shall include any agreement or instrument (1) changing the maturity of any Indebtedness Incurred thereunder or contemplated thereby, (2) adding Subsidiaries of the Company as additional borrowers or guarantors thereunder, (3) increasing the amount of

14

Indebtedness Incurred thereunder or available to be borrowed thereunder or (4) otherwise altering the terms and conditions thereof.

"Credit Support" means collectively, with respect to a Guarantor that has carried out a Whitewash Procedure, the security interests in the Collateral granted by such Guarantor pursuant to the Security Documents and the Notes Guarantee granted by such Guarantor.

"Currency Agreement" means, in respect of a Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"Custodian" means, in the case of any Global Note held through Euroclear or Clearstream, the Common Depositary.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Deferred Payments" has the meaning given in the Offering Memorandum in "Description of Certain Financing Arrangements—Tirrenia-CIN Acquisition Agreement".

"Definitive Registered Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend or the "Schedule of Exchanges of Interests in the Global Note" attached hereto.

"Depositary" means, with respect to any Global Note, the Person specified in Section 2.03 hereof as the Depositary with respect to such Global Note or any successor thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Board of Directors or an Officer of the Company) of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Disposition that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of cash, Cash Equivalents or Temporary Cash Investments received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration.  A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 4.10.

"Disinterested Director" means, with respect to any Affiliate Transaction, a member of the Board of Directors of the Company having no material direct or indirect financial interest in or with respect to such Affiliate Transaction. A member of the Board of Directors of the Company shall be deemed not to have such a financial interest by reason of such member's holding Capital Stock of the Company or any Parent or any options, warrants or other rights in respect of such Capital Stock.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

(1)    matures or is mandatorily redeemable for cash or in exchange for Indebtedness pursuant to a sinking fund obligation or otherwise;

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock (excluding Capital Stock which is convertible or exchangeable solely at the option of the Company or a Restricted Subsidiary); or

(3)    is or may become (in accordance with its terms) upon the occurrence of certain events or otherwise redeemable or repurchasable for cash or in exchange for Indebtedness at the option of the holder of the Capital Stock in whole or in part, in each case on or prior to the earlier of (a) the Stated Maturity of the Notes or (b) the date on which there are no Notes outstanding; provided, however, that (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock and (ii) any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Stock if any such redemption or repurchase obligation is subject to compliance by the relevant Person with Section 4.07.

"Equity Offering" means a sale of Capital Stock (other than to the Company or any of its Subsidiaries) by any Parent, the proceeds of which are contributed as Subordinated Shareholder Funding or to the equity (other than through the issuance of Disqualified Stock) of the Company or any of its Restricted Subsidiaries.

"Escrowed Proceeds" means the proceeds from the offering of any debt securities or other Indebtedness paid into an escrow account with an independent escrow agent on the date of the applicable offering or Incurrence pursuant to escrow arrangements that permit the release of amounts on deposit in such escrow account upon satisfaction of certain conditions or the occurrence of certain events. The term "Escrowed Proceeds" shall include any interest earned on the amounts held in escrow.

"Euro Equivalent" means, with respect to any monetary amount in a currency other than euro, at any time of determination thereof by the Company, the amount of euro obtained by converting such currency other than euro involved in such computation into euro at the spot rate for the purchase of euro with the applicable currency other than euro as published in *The Financial Times* in the "Currency Rates" section (or, if *The Financial Times* is no longer published, or if such information is no longer available in *The Financial Times*, such source as may be selected in good faith by the Board of Directors or an Officer of the Company) on the date of such determination.

"Euroclear" means Euroclear Bank SA/NV or any successor securities clearing agency.

"European Government Obligations" means any security that is a direct obligation of, or obligations guaranteed by, a country that is a member of the European Monetary Union on the date of this Indenture (other than Greece, Portugal or Cyprus), and the payment for which such country pledges its full faith and credit.

"European Union" means all members of the European Union as of January 1, 2004 and the Czech Republic.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"Excluded Contribution" means Net Cash Proceeds or property or assets received by the Company as capital contributions to the equity (other than through the issuance of Disqualified Stock) of the Company after the Issue Date or from the issuance or sale (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Company or any Subsidiary of the Company for the benefit of its employees to the extent funded by the Company or any Restricted Subsidiary) of Capital Stock (other than Disqualified Stock) of the Company, in each case, to the extent designated as an Excluded Contribution pursuant to an Officer's Certificate of the Company.

"Excluded Vessels" means: (i) the vessel "Pace"; (ii) the vessel "Sparviero"; (iii) the five vessels owned by Moby's subsidiary Toremar as of the Issue Date; and (iv) the three vessels owned by Moby's subsidiary San Cataldo as of the Issue Date.

"FATCA" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities imposed pursuant to Sections 1471 to 1474 of the Code, any successor law or regulation implementing or complying with, or introduced in order to conform to such Sections or any intergovernmental agreement or any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"fair market value" may be conclusively established by means of an Officer's Certificate or a resolution of the Board of Directors of the Company setting out such fair market value as determined by such Officer or the Board of Directors of the Company in good faith.

"Fixed Charge Coverage Ratio" means, for any period, the ratio of:

      (a)      Consolidated EBITDA; to

      (b)      Consolidated Interest Expense;

provided that in calculating the Fixed Charge Coverage Ratio or any element thereof for any period, *pro forma* calculations will be made in good faith by the Board of Directors or an Officer of the Company (including any anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation (regardless of whether these anticipated expenses and cost

17

savings synergies could then be reflected in *pro forma* financial statements to the extent prepared)); provided, further, without limiting the application of the previous proviso, that for the purposes of calculating Consolidated EBITDA or Consolidated Interest Expense for such period, if, as of such date of determination:

(1)     since the beginning of such period, the Company or any Restricted Subsidiary has made a Sale or if the transaction giving rise to the need to calculate the Fixed Charge Coverage Ratio is such a Sale, (a) Consolidated EBITDA for such period will be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the company, business, group of assets or ship which are the subject of such Sale for such period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto after giving *pro forma* effect to such Sale as if such Sale occurred on the first day of such period; provided that if any such Sale constitutes "discontinued operations" in accordance with IFRS, Consolidated Net Income shall be reduced by an amount equal to the Consolidated Net Income (if positive) attributable to the company, business, group of assets or ship which are the subject of such Sale for such period or increased by an amount equal to the Consolidated Net Income (if negative) attributable thereto after giving *pro forma* effect to such Sale as if such Sale occurred on the first day of such period; and (b) the Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or of any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and the continuing Restricted Subsidiaries in connection with such Sale for such same period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Company and the continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such Sale);

(2)     since the beginning of such period, the Company or any Restricted Subsidiary (by merger or otherwise) has made a Purchase, including any such Purchase occurring in connection with a transaction causing a calculation to be made hereunder, Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving *pro forma* effect thereto, including anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation, as if such Purchase occurred on the first day of such period; and

(3)     since the beginning of such period, any Person (that became a Restricted Subsidiary or was merged or otherwise combined with or into the Company or any Restricted Subsidiary since the beginning of such period) will have made any Sale or any Purchase that would have required an adjustment pursuant to clause (1) or (2) above if made by the Company or a Restricted Subsidiary since the beginning of such period, Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving *pro forma* effect thereto as if such Sale or Purchase occurred on the first day of such period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness for a period equal to the remaining term of such Indebtedness).

For the purposes of this definition, (a) calculations will be as determined in good faith by a responsible financial or accounting officer of the Company (including in respect of anticipated expenses and cost savings synergies that have occurred or are reasonably expected to occur within the next 18 months following the date of such calculation, and as though the full effect of anticipated expenses and cost savings synergies were realized on the first day of the relevant period) and (b) in determining the amount of Indebtedness outstanding on any date of determination, *pro forma* effect shall be given to any Incurrence, repayment, repurchase, defeasance or other acquisition, retirement or discharge of Indebtedness as if such transaction had occurred on the first day of the relevant period; provided, however, that the *pro forma* calculation shall not give effect to (a) any Indebtedness Incurred on such date of determination pursuant to Section 4.09(b) or (b) the repayment, repurchase, redemption, defeasance or other discharge of any Indebtedness on such date of determination, to the extent that such repayment, repurchase, redemption, defeasance or other discharge is made with the proceeds of Indebtedness Incurred pursuant to Section 4.09(b), other than, in (a) above, Indebtedness Incurred pursuant to Section 4.09(b)(5) of such paragraph thereof (except for Indebtedness incurred pursuant to clause (5)(B) of such paragraph).

"Global Notes" means, collectively, the 144A Global Note and the Regulation S Global Note.

"Global Note" means a Global Note substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchange of Interests in the Global Note" attached thereto) issued in accordance with Section 2.01 or 2.06 hereof.

"Global Note Legend" means the legend set forth in Section 2.06(f)(2), which is required to be placed on all Global Notes issued under this Indenture.

"Governmental Authority" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory, self-regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person, including any such obligation, direct or indirect, contingent or otherwise, of such Person:

(1)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2)     entered into primarily for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means any Restricted Subsidiary that Guarantees the Notes.

"Hedging Agreement" means any Interest Rate Agreement, Currency Agreement, Commodity Hedging Agreement or other agreement entered into by the Company or any of its Subsidiaries to offset, balance or manage risks related to any businesses, services or activities engaged in by the Company or any of its Subsidiaries or any Associates in the ordinary course.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Hedging Agreement.

"Holdco" means ALE1 B.V., limited liability company (*Besloten Vennootschap*) formed under the laws of the Netherlands, and any successor thereto.

"Holder" means each Person in whose name the Notes are registered on the Registrar's books, which shall initially be the nominee of Euroclear or Clearstream.

"IFRS" means the International Financial Reporting Standards (formerly, International Accounting Standards) endorsed from time to time by the European Union or any variation thereof with which the Company or its Restricted Subsidiaries are, or may be, required to comply; provided that at any date after the Issue Date the Company may make an irrevocable election to establish that "IFRS" shall mean IFRS as in effect on a date that is on or prior to the date of such election.  The Company shall give notice of any such election to the Trustee.

Notwithstanding the foregoing, with respect to all ratios and calculations based upon IFRS contained in this Indenture, any lease, concession or license of property that would be considered an operating lease under IFRS as of the Issue Date and any guarantee given by the Company or any Restricted Subsidiary in the ordinary course of business solely in connection with, and in respect of, the obligations of the Company or any Restricted Subsidiary under any such operating lease shall be computed in accordance with IFRS as in the effect on the Issue Date.

"Incur" means issue, create, assume, enter into any Guarantee of, incur, extend or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing and any Indebtedness pursuant to any revolving credit or similar facility shall only be "Incurred" at the time any funds are borrowed thereunder.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication):

(1)     the principal of indebtedness of such Person for borrowed money;

(2)     the principal of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances, performance, completion, surety or appeal bonds or similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments) (except to the extent such reimbursement obligations are Incurred in the ordinary course of business and such obligations are satisfied or reimbursed within 30 days of Incurrence), in each case only to the extent that the underlying obligation in respect of which the instrument was issued would be treated as Indebtedness;

(4)     the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (except trade payables), where the deferred payment is arranged primarily as a means of raising finance, which purchase price is due more than one year after the date of placing such property in service or taking final delivery and title thereto, including, for the avoidance of doubt, the Deferred Payments for so long and to the extent they remain outstanding;

(5)     Capitalized Lease Obligations of such Person;

(6)     the principal component of all obligations, or liquidation preference, of such Person with respect to any Disqualified Stock or, with respect to any Restricted Subsidiary, any Preferred Stock (but excluding, in each case, any accrued dividends);

(7)     the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; provided, however, that the amount of such Indebtedness will be the lesser of (a) the fair market value of such asset at such date of determination (as determined in good faith by the Board of Directors or an Officer of the Company) and (b) the amount of such Indebtedness of such other Persons;

(8)     Guarantees by such Person of the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person; and

(9)     to the extent not otherwise included in this definition, net obligations of such Person under Hedging Agreements (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such obligation that would be payable by such Person at such time).

The term "Indebtedness" shall not include Subordinated Shareholder Funding or any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under IFRS as in effect on the Issue Date or any deposit made in relation thereto, any asset retirement obligations, prepayments or deposits or grants received from clients or customers or Authorities, in each case, in the ordinary course of business, any income tax or other payables, any social security or tax obligations, any obligations with respect to Pension

Items or any bonds in relation thereto, or obligations under any profit sharing agreement, license, permit or other approval (or Guarantees given in respect of such obligations) Incurred prior to the Issue Date or in the ordinary course of business.

The amount of Indebtedness of any Person at any time in the case of a revolving credit or similar facility shall be the total amounts of funds borrowed and then outstanding.  The amount of Indebtedness of any Person at any date shall be determined as set forth above or otherwise provided in this Indenture, and (other than with respect to letters of credit or Guarantees of Indebtedness specified in clause (6), (7) or (8) above) shall be (a) in the case of any Indebtedness issued with original issue discount, the amount in respect thereof that would appear on the balance sheet (excluding any notes thereto) of such Person in accordance with IFRS and (b) the principal amount of the Indebtedness, in the case of any other Indebtedness.

Notwithstanding the above provisions, in no event shall the following constitute Indebtedness:

(i)     Contingent Obligations Incurred in the ordinary course of business and obligations under or in respect of Qualified Receivables Financing;

(ii)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; provided, however, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 30 days thereafter; or

(iii)     for the avoidance of doubt, any accrued expenses obligations in respect of workers' compensation claims, early retirement or termination obligations, Pension Items or similar claims, obligations or contributions or social security or wage Taxes.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Independent Financial Advisor" means an investment banking or accounting firm or any third-party appraiser, in each case of international standing; provided, however, that such firm or appraiser is not an Affiliate of the Company.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Notes" means the €300,000,000 aggregate principal amount of Notes issued under this Indenture on the date hereof.

"Initial Public Offering" means an Equity Offering of the Capital Stock of the IPO Entity following which there is a Public Market and, as a result of which, the Capital Stock

of the IPO Entity in such offering are listed on an internationally recognized exchange or traded on an internationally recognized market.

"instructions" means any written notices, written directions or written instructions received by the Trustee or any of the Agents in accordance with the provisions of this Indenture from an Authorized Person or from a person reasonably believed by the Trustee or any of the Agents to be an Authorized Person.

"Intercreditor Agreement" means the intercreditor agreement to be dated on or about the Issue Date among, *inter alios*, the Trustee, the Security Agent, the agent for the Credit Agreement, certain hedging counterparties and the other parties named therein, as amended, restated or otherwise modified or varied from time to time.

"Interest Period" means the period commencing on and including an Interest Payment Date and ending on but excluding the next succeeding Interest Payment Date, with the exception that the first Interest Period shall commence on and include the Issue Date and end on and exclude August 15, 2016.

"Interest Rate Agreement" means, with respect to any Person, any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement to which such Person is party or a beneficiary.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan or other extensions of credit (other than advances or extensions of credit to customers, suppliers, directors, officers or employees of any Person in the ordinary course of business, and excluding any debt or extension of credit represented by a bank deposit other than a time deposit) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or the Incurrence of a Guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of IFRS; provided, however, that endorsements of negotiable instruments and documents in the ordinary course of business will not be deemed to be an Investment.  If the Company or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Company or any Restricted Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time equal to the fair market value of the Capital Stock of such Subsidiary not sold or disposed of in an amount determined as provided in Section 4.07(c).

For purposes of Section 4.07:

(1)  "Investment" will include the portion (proportionate to the Company's equity interest in a Restricted Subsidiary to be designated as an Unrestricted Subsidiary)

23

of the fair market value of the net assets of such Restricted Subsidiary at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Company's "Investment" in such Subsidiary at the time of such redesignation less (b) the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets (as conclusively determined in good faith by the Board of Directors or an Officer of the Company) of such Subsidiary at the time that such Subsidiary is so re-designated a Restricted Subsidiary; and

(2)     any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Board of Directors or an Officer of the Company.

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced (at the Company's option) by any dividend, distribution, interest payment, return of capital, repayment or other amount or value received in respect of such Investment.

"Investment Grade Securities" means:

(1)     securities issued or directly and fully guaranteed or insured by a Permissible Jurisdiction (other than Cash Equivalents);

(2)     debt securities or debt instruments with a rating of "A–" or higher from S&P or "A3" or higher by Moody's or the equivalent of such rating by such rating organization or, if no rating of Moody's or S&P then exists, the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization, but excluding any debt securities or instruments constituting loans or advances among the Company and its Subsidiaries; and

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) above, which fund may also hold cash and Cash Equivalents pending investment or distribution.

"Investment Grade Status" shall occur when the Notes receive both of the following:

(1)     a rating of "BBB–" or higher from S&P; and

(2)     a rating of "Baa3" or higher from Moody's;

or the equivalent of such rating by either such rating organization or, if no rating of Moody's or S&P then exists, the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization.

"IPO Entity" means the Company, any Parent or any Successor Company of the Company or any Parent.

"Issue Date" means February 11, 2016.

"Italian Civil Code" means the Italian civil code, enacted by Royal Decree No. 262 of March 16, 1942, as subsequently amended and supplemented.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"Management Advances" means loans or advances made to, or Guarantees with respect to loans or advances made to any Management Investors:

(1)     in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business;

(2)     in respect of moving related expenses Incurred in connection with any closing or consolidation of any facility or office; or

(3)     not exceeding €1.0 million in the aggregate outstanding at any time.

"Management Investors" means the officers, directors, employees and other members of the management of or consultants to any Parent, the Company or any of their respective Subsidiaries, or spouses, family members or relatives thereof, or any trust, partnership or other entity for the benefit of or the beneficial owner of which (directly or indirectly) is any of the foregoing, or any of their heirs, executors, successors and legal representatives, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of the Company, any Restricted Subsidiary or any Parent.

"Market Capitalization" means an amount equal to (i) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity on the date of the declaration of the relevant dividend multiplied by (ii) the arithmetic mean of the closing prices per share of such common stock or common equity interests for the 30 consecutive trading days immediately preceding the date of declaration of such dividend.

"Merger Condition Precedent Documents" means (1) an excerpt issued by the registry of companies (*registro delle imprese*) of the place of incorporation of the Company, showing that the deed of merger (*atto di fusione*) relating to the Post-Issuance Merger has been duly filed with and recorded into the same registry and (2) a certified true copy (*copia autenticata*) of the shareholders resolutions passed by each of the Company and Moby to approve the Post-Issuance Merger, showing that the Post-Issuance Merger will be effective (*efficace*) as from the date referred to under article 2504-*bis*, second paragraph, first sentence, of the Italian Civil Code.

"Moby" means Moby S.p.A.

"Moody's" means Moody's Investors Service, Inc. or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Nationally Recognized Statistical Rating Organization" means a nationally recognized statistical rating organization within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act.

"Net Available Cash" from an Asset Disposition means cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

> (1)   all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses Incurred, and all Taxes paid or required to be paid or accrued as a liability under IFRS (after taking into account any available tax credits or deductions and any Tax Sharing Agreements), as a consequence of such Asset Disposition;

> (2)   all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon such assets, or which are required by applicable law to be repaid out of the proceeds from such Asset Disposition;

> (3)   all distributions and other payments required to be made to minority interest holders (other than any Parent, the Company or any of their respective Subsidiaries) in Subsidiaries or joint ventures as a result of such Asset Disposition; and

> (4)   the deduction of appropriate amounts required to be provided by the seller as a reserve, on the basis of IFRS, against any liabilities associated with the assets disposed of in such Asset Disposition and retained by the Company or any Restricted Subsidiary after such Asset Disposition.

"Net Cash Proceeds", with respect to any issuance or sale of Capital Stock or Subordinated Shareholder Funding, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually Incurred in connection with such issuance or sale and net of taxes paid or payable as a result of such issuance or sale (after taking into account any available tax credit or deductions and any Tax Sharing Agreements).

"New Holdco" means the Person who is a directly held Subsidiary of Holdco which becomes the new direct holding company of the Company.

"Note Documents" means the Notes (including Additional Notes), this Indenture, the Intercreditor Agreement and the Security Documents.

26

"<u>Notes Guarantees</u>" means the Guarantee of the Notes by the Guarantors and, for the avoidance of doubt, includes any Additional Notes Guarantee.

"<u>Notes</u>" means the Company's 7.75% Senior Secured Notes due 2023 issued under this Indenture.  Any Additional Notes shall be treated with the Initial Notes as a single class for all purposes under this Indenture, except as otherwise set forth in Section 2.16(c).  Unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"<u>Offering</u>" means the offering of the Notes.

"<u>Offering Memorandum</u>" means the offering memorandum dated February 5, 2016, relating to the offering of the Initial Notes.

"<u>Officer</u>" means, with respect to any Person, (1) any member of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer or the Secretary (a) of such Person or (b) if such Person is owned or managed by a single entity, of such entity, or (2) any other individual designated as an "Officer" for the purposes of this Indenture by the Board of Directors of such Person.

"<u>Officer's Certificate</u>" means, with respect to any Person, a certificate signed by one Officer of such Person.

"<u>Ongoing State Aid Investigation</u>" refers to the investigation of the European Commission described in the Offering Memorandum in "Business—Legal and Regulatory—Legal Proceedings—State Aid Investigation".

"<u>Opinion of Counsel</u>" means a written opinion from legal counsel, in form and substance reasonably satisfactory to the Trustee.  The counsel may be an employee of or counsel to the Company or its Subsidiaries.

"<u>Parent</u>" means Holdco on the Issue Date and thereafter any Person of which the Company at any time is or becomes a Subsidiary after the Issue Date and any holding companies established by any Permitted Holder for purposes of holding its investment in any Parent.

"<u>Parent Expenses</u>" means:

(1)     costs (including all professional fees and expenses) Incurred by any Parent in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Indenture or any other agreement or instrument relating to Indebtedness of the Company or any Restricted Subsidiary, including in respect of any reports filed with respect to the Securities Act, Exchange Act or the respective rules and regulations promulgated thereunder;

(2)     customary indemnification obligations of any Parent owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written

agreements with any such Person to the extent relating to the Company and its Subsidiaries;

(3)      obligations of any Parent in respect of director and officer insurance (including premiums therefor) to the extent relating to the Company and its Subsidiaries;

(4)      fees and expenses payable by any Parent in connection with the Transactions;

(5)      (a) general corporate overhead expenses, including professional fees and expenses and other operational expenses of any Parent related to the ownership or operation of the business of the Company or any of its Restricted Subsidiaries;

(6)      other fees, expenses and costs relating directly or indirectly to activities of the Company and its Subsidiaries in an amount not to exceed €2.0 million in any fiscal year; and

(7)      expenses Incurred by any Parent in connection with any Public Offering or other sale of Capital Stock or Indebtedness:

> (A)      where the net proceeds of such offering or sale are intended to be received by or contributed to the Company or a Restricted Subsidiary,

> (B)      in a pro-rated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed, or

> (C)      otherwise on an interim basis prior to completion of such offering so long as any Parent shall cause the amount of such expenses to be repaid to the Company or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed.

"Pari Passu Indebtedness" means Indebtedness of the Company or any Guarantor that ranks equally in right of payment to the Notes or the Notes Guarantees, as the case may be, and which, in each case, is secured by Liens on the Collateral, including the Credit Agreement.

"Participant" means, with respect to any Depositary, a Person who is a participant of or has an account with such Depositary.

"Paying Agent" means any Person authorized by the Company to pay the principal of (and premium, if any) or interest on any Note on behalf of the Company.

"Pension Items" means any costs, charges or liabilities, including contributions, made in respect of any pension funds or post-retirement benefit schemes, other than administration costs.

"Permissible Jurisdiction" means any state, commonwealth or territory of the United States or the District of Columbia, Canada or any province of Canada, Japan, any

member state of the European Union (as of January 1, 2004), Switzerland or Norway or any political subdivision, taxing authority agency or instrumentality of any such state, commonwealth, territory, union, country or member state.

"Permitted Asset Swap" means the concurrent purchase and sale or exchange of assets used or useful in a Similar Business or a combination of such assets and cash, Cash Equivalents or Temporary Cash Investments between the Company or any of its Restricted Subsidiaries and another Person; provided that any cash or Cash Equivalents received in excess of the value of any cash or Cash Equivalents sold or exchanged must be applied in accordance with Section 4.10.

"Permitted Collateral Liens" means (A) Liens on the Collateral described in one or more of clauses (2), (3), (4), (5), (6), (8), (9), (11), (12), (13), (14), (18), (19), (20), (22), (23), (27), (28) and (29) of the definition of "Permitted Liens"; (B) Liens on the Collateral to secure Indebtedness that is permitted to be Incurred under Section 4.09(a), Section 4.09(b)(1), 4.09(b)(2) (in the case of Section 4.09(b)(2), to the extent such Guarantee is in respect of Indebtedness otherwise permitted to be secured and specified in this definition of Permitted Collateral Liens), Section 4.09(b)(4)(a), Section 4.09(b)(5)(b), Section 4.09(b)(6) (in the case of Section 4.09(b)(6),  to the extent such Hedging Obligation relates to Interest Rate Agreements or Currency Agreements in respect of Indebtedness that is secured by the Collateral) or Section 4.09(b)(11) and any Refinancing Indebtedness in respect of such Indebtedness; provided, however, that (x) such Lien will not give an entitlement to be repaid with proceeds of enforcement of the Collateral in a manner which is inconsistent with the Intercreditor Agreement and any Additional Intercreditor Agreement and (y) each of the parties with respect to Indebtedness secured by Liens on the Collateral (other than in respect of Indebtedness permitted to be secured under Section 4.09(b)(4)(a) and other than in respect of Additional Notes) will have entered into an Additional Intercreditor Agreement, and (C) Liens on the Collateral that secure Indebtedness on a basis junior to the Notes or the Notes Guarantees, as applicable; provided that, in the case of clauses (B) and (C), such property and assets (including the Collateral), also secures the Notes or the Notes Guarantees on a senior basis; provided further that the holders of such Indebtedness (or their representative) accede to the Intercreditor Agreement or an Additional Intercreditor Agreement that ranks such Liens junior to the Liens securing the Notes regardless of the time such Liens are granted.

"Permitted Holders" means:

(1)     (i) any one of Vincenzo Onorato, his spouse, children and relatives (each a "Family Member"); (ii) any Person controlled or jointly controlled by any Family Member; (iii) any trust or other similar entity in which any Family Member whether alone or together with one or more other Family Members has all or substantially all of the beneficial interests; or (iv) the Affiliates and any Related Parties of any of the Persons listed form (i) to (iii) above; and

(2)     any person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"<u>Permitted Investment</u>" means (in each case, by the Company or any of its Restricted Subsidiaries):

(1)     Investments in (a) a Restricted Subsidiary (including the Capital Stock of a Restricted Subsidiary); <u>provided</u>, that intercompany loans made by the Company or any of its Restricted Subsidiaries (other than by CIN and its Restricted Subsidiaries) in CIN and its Restricted Subsidiaries shall not exceed €30.0 million at any one time outstanding (excluding (i) intercompany current liabilities Incurred in connection with credit management, cash management, cash pooling, netting, setting off or similar arrangements in the ordinary course of business and (ii) intercompany loans incurred in connection with the settlement of the Ongoing State Aid Investigation); (b) the Company or (c) a Person (including the Capital Stock of any such Person) by the Company and its Restricted Subsidiaries (other than by CIN and its Restricted Subsidiaries) that is engaged in any Similar Business and such Person will, upon the making of such Investment, become a Restricted Subsidiary;

(2)     Investments in another Person by the Company and its Restricted Subsidiaries (other than by CIN and its Restricted Subsidiaries) if such Person is engaged in any Similar Business and as a result of such Investment such other Person is merged, consolidated or otherwise combined with or into, or transfers or conveys all or substantially all its assets to, the Company or a Restricted Subsidiary;

(3)     Investments in cash, Cash Equivalents, Temporary Cash Investments or Investment Grade Securities;

(4)     Investments in receivables owing to the Company or any Restricted Subsidiary created or acquired in the ordinary course of business, including without limitation deferred receivables representing work in progress created in the ordinary course of business;

(5)     Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     Management Advances;

(7)     Investments in Capital Stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary, or as a result of foreclosure, perfection or enforcement of any Lien, or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement including upon the bankruptcy or insolvency of a debtor;

(8)     Investments made as a result of the receipt of non-cash consideration from a sale or other disposition of property or assets, including an Asset Disposition, in each case, that was made in compliance with Section 4.10;

(9)     Investments in existence on, or made pursuant to legally binding commitments in existence on, the Issue Date;

30

(10)     Hedging Agreements and related Hedging Obligations, which transactions or obligations are Incurred in compliance with Section 4.09;

(11)     Investments, taken together with all other Investments made pursuant to this clause (11) and then outstanding, in an aggregate amount at the time of such Investment not to exceed the greater of (x) €40.0 million and (y) 4.1% of Total Assets; provided that, if an Investment is made pursuant to this clause in a Person that is not a Restricted Subsidiary and such Person subsequently becomes a Restricted Subsidiary or is subsequently designated a Restricted Subsidiary pursuant to Section 4.07, such Investment shall thereafter be deemed to have been made pursuant to clause (1) or (2) of the definition of "Permitted Investment" and not this clause;

(12)     pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Liens otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 4.12;

(13)     any Investment to the extent made using Capital Stock of the Company (other than Disqualified Stock) or Subordinated Shareholder Funding or Capital Stock of any Parent as consideration;

(14)     any transaction to the extent constituting an Investment that is permitted and made in accordance with Section 4.11(b) (except those described in Sections 4.11(b)(1), 4.11(b)(3), 4.11(b)(6), 4.11(b)(8), 4.11(b)(9) and 4.11(b)(11)) and Investments in Receivables Subsidiaries;

(15)     Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or licenses or leases of intellectual property, in any case, in the ordinary course of business and in accordance with this Indenture;

(16)     Guarantees of Indebtedness of the Company or its Restricted Subsidiaries permitted to be incurred by the Company and the relevant Restricted Subsidiary (as applicable) under the covenant described under Section 4.09 and (other than with respect to Indebtedness) guarantees, keepwells and similar arrangements in the ordinary course of business; and

(17)     other than in respect of CIN and its Restricted Subsidiaries, Investments in the Notes and any Additional Notes.

"Permitted Liens" means, with respect to any Person:

(1)     Liens on assets or property of a Restricted Subsidiary that is not a Guarantor securing Indebtedness of any Restricted Subsidiary that is not a Guarantor;

(2)     pledges, deposits or Liens under workmen's compensation laws, unemployment insurance laws, social security laws or similar legislation, or insurance related obligations (including pledges or deposits securing liability to insurance carriers under insurance or self-insurance arrangements), or in connection with bids, tenders, completion guarantees, contracts (other than for borrowed money) or leases, or to secure

utilities, licenses, public or statutory obligations, or to secure surety, indemnity, judgment, appeal or performance bonds, guarantees of government contracts (or other similar bonds, instruments or obligations), or as security for contested Taxes or import or customs duties or for the payment of rent, or other obligations of like nature, in each case Incurred in the ordinary course of business;

(3)     Liens imposed by law, including carriers', warehousemen's, mechanics', landlords', materialmen's and repairmen's or other like Liens, in each case for sums not yet overdue for a period of more than 60 days or that are bonded or being contested in good faith by appropriate proceedings;

(4)     Liens for Taxes, assessments or other governmental charges not yet delinquent or which are being contested in good faith by appropriate proceedings; provided that appropriate reserves required pursuant to IFRS have been made in respect thereof;

(5)     Liens in favor of issuers of surety, performance or other bonds, guarantees or letters of credit or bankers' acceptances (not issued to support Indebtedness for borrowed money) issued pursuant to the request of and for the account of the Company or any Restricted Subsidiary in the ordinary course of its business;

(6)     encumbrances, ground leases, easements (including reciprocal easement agreements), survey exceptions, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of the Company and its Restricted Subsidiaries or to the ownership of its properties which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(7)     Liens on assets or property of the Company or any Restricted Subsidiary securing Hedging Obligations permitted under this Indenture;

(8)     leases, licenses, subleases and sublicenses of assets (including real property and intellectual property rights), in each case entered into in the ordinary course of business;

(9)     Liens arising out of judgments, decrees, orders or awards not giving rise to an Event of Default so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment, decree, order or award have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(10)    Liens on assets or property of the Company or any Restricted Subsidiary for the purpose of securing Indebtedness Incurred pursuant to Section 4.09(b)(7), provided that any such Lien may not extend to any assets or property of the Company or any Restricted Subsidiary other than assets or property acquired, improved, constructed

32

or leased with the proceeds of such Indebtedness and any improvements or accessions to such assets and property or proceeds of such property (including rents);

(11)   Liens arising by virtue of any statutory or common law provisions or standard terms and procedures relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts, securities accounts or other funds maintained with a depositary or financial institution;

(12)   Liens arising from Uniform Commercial Code financing statement filings (or similar filings in other applicable jurisdictions) regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business;

(13)   Liens existing on, or provided for or required to be granted under written agreements existing on, the Issue Date;

(14)   Liens on property, other assets or shares of stock of a Person at the time such Person becomes a Restricted Subsidiary (or at the time the Company or a Restricted Subsidiary acquires such property, other assets or shares of stock, including any acquisition by means of a merger, consolidation or other business combination transaction with or into the Company or any Restricted Subsidiary); provided, however, that such Liens are not created, Incurred or assumed in anticipation of or in connection with such other Person becoming a Restricted Subsidiary (or such acquisition of such property, other assets or stock); provided, further, that such Liens are limited to all or part of the same property or assets or stock (plus improvements, accessions, proceeds or dividends or distributions in connection with the original property, other assets or stock) that secured obligations to which such Liens relate;

(15)   Liens on assets or property of the Company or any Restricted Subsidiary securing Indebtedness or other obligations of the Company or such Restricted Subsidiary owing to the Company or another Restricted Subsidiary, or Liens in favor of the Company or any Restricted Subsidiary;

(16)   Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness that was previously so secured, and permitted to be secured under this Indenture; provided that any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Indebtedness being refinanced or is in respect of property that is or could be the security for or subject to a Permitted Lien hereunder;

(17)   any interest or title of a lessor under any Capitalized Lease Obligation or operating lease;

(18)   (a) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property over which the Company or any Restricted Subsidiary has easement rights or on any leased property and

33

subordination or similar arrangements relating thereto and (b) any condemnation or eminent domain proceedings affecting any real property;

(19)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(20)    Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(21)    Liens on Escrowed Proceeds for the benefit of the related holders of debt securities or other Indebtedness (or the underwriters or arrangers thereof) or on cash set aside at the time of the Incurrence of any Indebtedness or government securities purchased with such cash, in either case to the extent such cash or government securities pre-fund the payment of interest on such Indebtedness and are held in an escrow account or similar arrangement to be applied for such purpose;

(22)    Liens securing or arising by reason of any netting or set-off arrangement entered into in the ordinary course of banking or other trading activities, or liens over cash accounts securing cash pooling arrangements;

(23)    Liens arising out of conditional sale, title retention, hire purchase, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24)    Liens Incurred with respect to obligations which do not exceed €10.0 million at any one time outstanding;

(25)    Liens on Capital Stock or other securities or assets of any Unrestricted Subsidiary that secure Indebtedness of such Unrestricted Subsidiary;

(26)    Liens on Receivables Assets Incurred in connection with a Qualified Receivables Financing;

(27)    Liens in connection with customary cash management, cash pooling or netting or setting off arrangements in the ordinary course of business;

(28)    the Tirrenia in A.S. Mortgages provided such mortgages are discharged within 180 days of the Issue Date; and

(29)    any cash collateral arrangement securing the obligations of an ancillary lender, landlord, hedging counterparty or regulator in respect of ancillary facilities, leases, Hedging Obligations or capital, surety or other guarantee requirements under applicable regulations of the Company or its Restricted Subsidiaries.

"Permitted Reorganization" means a reorganization transaction comprising the incorporation of New Holdco and the transfer of the Capital Stock of the Company (including,

34

for the avoidance of doubt, any warrants in respect thereof) held by Holdco to New Holdco which complies with the requirements of the covenant described under Section 4.19.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

"Post-Issuance Merger" means the merger of the Company into Moby as described in the Offering Memorandum in "Summary—Transactions—The Post-Issuance Merger".

"Preferred Stock", as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Private Placement Legend" means the legend set forth in Section 2.06(f)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Public Debt" means any Indebtedness consisting of bonds, debentures, notes or other similar debt securities issued in (1) a public offering registered under the Securities Act or (2) a private placement to institutional and other investors, in each case, that are not Affiliates of the Company, in accordance with Section 4(a)(2) of and/or Rule 144A or Regulation S under the Securities Act, whether or not it includes registration rights entitling the holders of such debt securities to registration thereof with the SEC for public resale.

"Public Market" means any time after:

(1)     an Equity Offering has been consummated;

(2)     at least 20% of the total issued and outstanding shares of common stock or other common equity interests of the IPO Entity has been distributed to investors other than investors described in clause (1) of the definition of "Permitted Holders" or any other direct or indirect shareholders of the Company as of the Issue Date; and

(3)     shares of common stock or other common equity interests of the IPO Entity having a market value in excess of €100.0 million on the date of such Equity Offering have been distributed pursuant to such Equity Offering.

"Public Offering" means any offering, including an Initial Public Offering, of shares of common stock or other common equity interests that are listed on an exchange or publicly offered (which shall include an offering pursuant to Rule 144A and/or Regulation S under the Securities Act to professional market investors or similar Persons).

"Purchase Money Obligations" means any Indebtedness Incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (including Capital Stock), and whether acquired through the direct acquisition of such

property or assets or the acquisition of the Capital Stock of any Person owning such property or assets, or otherwise.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Receivables Financing" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:  (1) the Board of Directors or an Officer of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and the Receivables Subsidiary, (2) all sales of accounts receivable and related assets to the Receivables Subsidiary are made at fair market value (as determined in good faith by the Board of Directors or an Officer of the Company), and (3) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Board of Directors or an Officer of the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) to secure Indebtedness under a Credit Facility or Indebtedness in respect of the Notes shall not be deemed a Qualified Receivables Financing.

"Receivables Assets" means any assets that are or will be the subject of a Qualified Receivables Financing.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Company or any of its Subsidiaries), or (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto, including all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interest are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or

36

counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Subsidiary of the Company (or another Person formed for the purposes of engaging in a Qualified Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(1)     no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Restricted Subsidiary of the Company (excluding guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is subject to terms that are substantially equivalent in effect to a guarantee of any losses on securitized or sold receivables by the Company or any other Restricted Subsidiary of the Company, (iii) is recourse to or obligates the Company or any other Restricted Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iv) subjects any property or asset of the Company or any of its Restricted Subsidiaries, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(2)     with which neither the Company nor any other Restricted Subsidiary of the Company has any contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(3)     to which neither the Company nor any other Restricted Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"refinance" means refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, reissue, resell, extend or increase (including pursuant to any defeasance or discharge mechanism) and the terms "refinances," "refinanced" and "refinancing" as used for any purpose in this Indenture shall have a correlative meaning.

"Refinancing Indebtedness" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or

discharge mechanism) any Indebtedness existing on the date of this Indenture or Incurred in compliance with this Indenture (including Indebtedness of the Company that refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that refinances Indebtedness of the Company or another Restricted Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; provided, however, that:

> (1)     if the Indebtedness being refinanced constitutes Subordinated Indebtedness, the Refinancing Indebtedness has a final Stated Maturity at the time such Refinancing Indebtedness is Incurred that is the same as or later than the final Stated Maturity of the Indebtedness being refinanced or, if shorter, of the Notes;

> (2)     such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (plus, without duplication, any additional Indebtedness Incurred to pay interest or premiums required by the instruments governing such existing Indebtedness and costs, expenses and fees Incurred in connection therewith); and

> (3)     if the Indebtedness being refinanced is expressly subordinated to the Notes or the Notes Guarantees, such Refinancing Indebtedness is subordinated to the Notes or the Notes Guarantees on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced;

> provided, however, that Refinancing Indebtedness shall not include (i) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary, or (ii) Indebtedness of a Restricted Subsidiary that is not a Guarantor that refinances Indebtedness of the Company or a Guarantor, provided that if any such Refinancing Indebtedness is incurred with respect to the renewal, refund, refinancing, replacement, exchange, defeasance or discharge in full or in part of the Deferred Payments, such Refinancing Indebtedness is incurred by the Company.

> Refinancing Indebtedness in respect of any Credit Facility or any other Indebtedness may be Incurred within 180 days after the termination, discharge or repayment of any such Credit Facility or other Indebtedness.

> "Regulation S" means Regulation S promulgated under the Securities Act.

> "Regulation S Global Note" means a Note that is a Global Note substantially in the form of Exhibit A hereto, bearing the applicable Global Note Legend and the Private Placement Legend, and deposited with or on behalf of, and registered in the name of, the respective Depositary therefor or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903.

> "Related Parties" means any trust, corporation, partnership, limited liability company or other entity, shareholders, partners, members, owners or Persons holding 50.1% of the voting interests (including the entitlement to vote in the election of the board of directors or management of such entity) of which consists of any one or more Permitted Holders.

"Related Taxes" means:

(1)     any Taxes (other than (x) Taxes measured by gross or net income, receipts or profits and (y) withholding Taxes), required to be paid (provided such Taxes are in fact paid) by any Parent by virtue of its:

(a)     being organized or having Capital Stock outstanding (but not by virtue of owning stock or other equity interests of any corporation or other entity other than, directly or indirectly, the Company or any of the Company's Subsidiaries);

(b)     issuing or holding Subordinated Shareholder Funding;

(c)     being a Parent, directly or indirectly, of the Company or any of the Company's Subsidiaries;

(d)     receiving dividends from or other distributions in respect of the Capital Stock of, directly or indirectly, the Company or any of the Company's Subsidiaries; or

(e)     having made any payment in respect to any of the items for which the Company is permitted to make payments to any Parent pursuant to Section 4.07; or

(2)     if and for so long as the Company is a member of a group filing a consolidated or combined tax return with any Parent, any consolidated or combined Taxes measured by income for which such Parent is liable up to an amount not to exceed the amount of any such Taxes that the Company and its Subsidiaries would have been required to pay on a separate company basis or on a consolidated basis if the Company and its Subsidiaries had paid Tax on a consolidated, combined, group, affiliated or unitary basis on behalf of an affiliated group consisting only of the Company and its Subsidiaries; provided that distributions shall be permitted in respect of the income of an Unrestricted Subsidiary only to the extent such Unrestricted Subsidiary distributed cash for such purpose to the Company or its Restricted Subsidiaries.

"Responsible Officer" means any officer within the corporate trust and agency department of the Trustee, including any vice president, assistant vice president, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by such officers, or to whom any corporate trust matter is referred because of such individual's knowledge of and familiarity with the particular subject.

"Restricted Definitive Registered Note" means a Definitive Registered Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means any Investment other than a Permitted Investment.

39

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"Reversion Date" means, after the Notes have achieved Investment Grade Status, the date, if any, that such Notes shall cease to have such Investment Grade Status.

"Revolving Credit Facility" means the revolving credit facility tranche under the Credit Agreement.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 902" means Rule 902 promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"S&P" means Standard & Poor's Investors Ratings Services or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Indebtedness" means any Indebtedness secured by a Lien.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"Security Agent" means UniCredit S.p.A., acting as security agent pursuant to the Intercreditor Agreement or such successor Security Agent or any delegate thereof as may be appointed thereunder or any such security agent, delegate or successor thereof pursuant to an Additional Intercreditor Agreement.

"Security Documents" means the security agreements, pledge agreements, charge agreements, collateral assignments, and any other instrument and document executed and delivered pursuant to this Indenture or otherwise or any of the foregoing, as the same may be amended, supplemented or otherwise modified from time to time, creating the security interests in the Collateral as contemplated by this Indenture.

"Senior Management" means the officers, directors, and other current or former members of senior management of the Company or any of its Subsidiaries, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of the Company or any Parent.

"Senior Secured Indebtedness" means, with respect to any Person as of any date of determination, any Indebtedness that (a) is secured by a Lien on any Collateral that is at least *pari passu* with the Liens securing the Notes (including pursuant to the terms of the Intercreditor

Agreement or any Additional Intercreditor Agreement) and that is Incurred under Section 4.09(a) or clause (1), (4), (5), (6), (7), (11) or (12) of Section 4.09(b) and any Refinancing Indebtedness in respect thereof, (b) is secured by a Lien on any asset of the Company or any Restricted Subsidiary that does not constitute Collateral or (c) is Incurred by a Restricted Subsidiary that is not a Guarantor.

"Significant Subsidiary" means any Restricted Subsidiary that meets any of the following conditions:

(1)     the Company's and its Restricted Subsidiaries' investments in and advances to the Restricted Subsidiary exceed 10% of the Total Assets of the Company and its Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year;

(2)     the Company's and its Restricted Subsidiaries' proportionte share of the Total Assets (after intercompany eliminations) of the Restricted Subsidiary exceeds 10% of the Total Assets of the Company and its Restricted Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

(3)     the Company's and its Restricted Subsidiaries' equity in the income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle of the Restricted Subsidiary exceeds 10% of such income of the Company and its Restricted Subsidiaries on a consolidated basis for the most recently completed fiscal year.

"Similar Business" means (a) any businesses, services or activities engaged in by the Company or any of its respective Subsidiaries or Associates on the Issue Date and (b) any businesses, services and activities engaged in by the Company or any of its respective Subsidiaries or Associates that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof.

"Standard Securitization Undertakings" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Board of Directors or an Officer of the Company has determined in good faith to be customary in a Receivables Financing, including those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but shall not include any Contingent Obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Structure Memorandum" means the Structure Memorandum prepared in connection with the Transactions, dated December 11, 2015.

"Subordinated Indebtedness" means, with respect to any Person, any Indebtedness (whether outstanding on the Issue Date or thereafter Incurred) which is expressly subordinated in right of payment to the Notes and any Notes Guarantee pursuant to a written agreement (which, for the avoidance of doubt, will not include the Notes or any Pari Passu Indebtedness).

"Subordinated Shareholder Funding" means any funds provided to the Company by any Parent, any Affiliate of any Parent or any Permitted Holder or any Affiliate thereof, in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, in each case issued to and held by a Parent or a Permitted Holder, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Funding; provided, however, that such Subordinated Shareholder Funding:

(1)     does not mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Notes (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Company or any funding meeting the requirements of this definition);

(2)     does not require, prior to the first anniversary of the Stated Maturity of the Notes, payment of cash interest, cash withholding amounts or other cash gross-ups, or any similar cash amounts;

(3)     contains no change of control or similar provisions and does not accelerate and has no right to declare a default or event of default or take any enforcement action or otherwise require any cash payment, in each case, prior to the date that is six months following the Stated Maturity of the Notes;

(4)     does not provide for or require any security interest or encumbrance over any asset of the Company or any of its Subsidiaries; and

(5)     pursuant to its terms is fully subordinated and junior in right of payment to the Notes pursuant to subordination, payment blockage and enforcement limitation terms pursuant to the terms of the Intercreditor Agreement, an Additional Intercreditor Agreement or otherwise on terms which are customary in all material respects for similar funding.

"Subsidiary" means, with respect to any Person:

(1)     any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; or

(2)     any partnership, joint venture, limited liability company or similar entity of which:

(a)     more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership interests or otherwise; and

(b)     such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Successor Company" means, with respect to any Person (other than a Parent), the resulting, surviving or transferee Person and, with respect to a Parent, means a Successor Parent.

"Successor Parent" means, with respect to a Parent, any other Person of which more than 50% of the total voting power of the Voting Stock, at the time such Parent becomes a Subsidiary of such other Person, is "beneficially owned" (as such term is defined in Rules 13d-3 and 13d-5 under the Exchange Act (as in effect on the Issue Date)) by one or more other Persons that, immediately prior to such Parent becoming a Subsidiary of such other Person, "beneficially owned" more than 50% of the total voting power of the Voting Stock of such Parent.

"TARGET2" means the second generation trans-European automated real time gross settlement express transfer payment system.

"Tax Sharing Agreement" means any tax sharing or profit and loss pooling or similar agreement with customary or arm's length terms or any arrangement to purchase tax losses or share group relief entered into with any Parent or Unrestricted Subsidiary, as the same may be amended, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof.

"Taxes" means all present and future taxes, levies, imposts, deductions, charges, duties and withholdings and any charges of a similar nature (including interest, penalties and other liabilities with respect thereto) that are imposed by any government or other taxing authority.

"Temporary Cash Investments" means any of the following:

(1)     any investment in:

(a)     direct obligations of, or obligations Guaranteed by, (i) any Permissible Jurisdiction or (ii) any country in whose currency funds are being held specifically pending application in the making of an investment or capital expenditure by the Company or a Restricted Subsidiary in that country with such funds, or

(b)      direct obligations of any country recognized by the United States of America rated at least "A" by S&P or "A-1" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any Nationally Recognized Statistical Rating Organization);

(2)      overnight bank deposits, and investments in time deposit accounts, certificates of deposit, bankers' acceptances and money market deposits (or, with respect to foreign banks, similar instruments) maturing not more than one year after the date of acquisition thereof issued by:

(a)      any lender under the Credit Agreement,

(b)      any institution authorized to operate as a bank in any of the countries or member states referred to in clause (1)(a) above, or

(c)      any bank or trust company organized under the laws of any such country or member state or any political subdivision thereof, in each case, having capital and surplus aggregating in excess of €250 million (or the foreign currency equivalent thereof) and whose long-term debt is rated at least "A" by S&P or "A-2" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any Nationally Recognized Statistical Rating Organization) at the time such Investment is made;

(3)      repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) or (2) above entered into with a Person meeting the qualifications described in clause (2) above;

(4)      Investments in commercial paper, maturing not more than 270 days after the date of acquisition, issued by a Person (other than the Company or any of its Subsidiaries), with a rating at the time as of which any Investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any Nationally Recognized Statistical Rating Organization);

(5)      Investments in securities maturing not more than one year after the date of acquisition issued or fully Guaranteed by any Permissible Jurisdiction, and rated at least "BBB" by S&P or "Baa3" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any Nationally Recognized Statistical Rating Organization);

(6)      bills of exchange issued in any Permissible Jurisdiction eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent);

(7)      any money market deposit accounts issued or offered by a commercial bank organized under the laws of a country that is a member of the Organization for Economic Co-operation and Development, in each case, having capital and surplus in excess of €250 million (or the foreign currency equivalent thereof) or whose long term debt is rated at least "A" by S&P or "A2" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any Nationally Recognized Statistical Rating Organization) at the time such Investment is made;

(8)      investment funds investing 95% of their assets in securities of the type described in clauses (1) through (7) above (which funds may also hold reasonable amounts of cash pending investment and/or distribution); and

(9)      investments in money market funds complying with the risk limiting conditions of Rule 2a-7 (or any successor rule) of the SEC under the U.S. Investment Company Act of 1940, as amended.

"Tirrenia in A.S. Mortgaged Vessels" refers to the vessels "Athara", "Bithia", "Janas", "Nuraghes", "Sharden", "Espresso Ravenna", "Via Adriatico", "Raffaele Rubattino" and "Vincenzo Florio" all of which are owned by CIN but are mortgaged in favor of Tirrenia di Navigazione S.p.A. in A.S., and which, on the Issue Date, will be mortgaged in favor of the Notes and the Credit Facilities Agreement on a formally second-ranking, substantively first-ranking, basis (*secondo grado formale, primo grado sostanziale*) if the Tirrenia in A.S. Mortgages have not been released on the Issue Date but the underlying security indebtedness has been fully repaid on or prior to such date; if and when the Tirrenia in A.S. Mortgages have been released, the mortgages over the Tirrenia in A.S. Mortgaged Vessels in favor of the Notes and the Credit Facilities Agreement shall become both formally and substantively first-ranking (*primo grado formale e sostanziale*) by operation of law.

"Tirrenia in A.S. Mortgages" refers to the mortgages granted in favor of Tirrenia di Navigazione S.p.A. in A.S. over the Tirrenia in A.S. Mortgaged Vessels.

"Total Assets" means the consolidated total assets of the Company and its Restricted Subsidiaries in accordance with IFRS as shown on the most recent balance sheet of such Person.

"Transactions" means the issuance of the Notes and the use of proceeds thereof as described in "Use of Proceeds" in the Offering Memorandum and the payment or incurrence of any fees, expenses or charges associated with any of the foregoing.

"Trustee" means Citibank, N.A., London Branch, as trustee under this Indenture.

"Uniform Commercial Code" means the New York Uniform Commercial Code.

"Unrestricted Definitive Registered Note" means one or more Definitive Registered Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a Global Note substantially in the form of Exhibit A attached hereto that bears the applicable Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary therefor or its nominee, representing a series of Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Subsidiary" means:

(1)     any Subsidiary of the Company that at the time of determination is an Unrestricted Subsidiary (as designated by the Board of Directors of the Company in the manner provided below); and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary through merger, consolidation or other business combination transaction, or Investment therein) to be an Unrestricted Subsidiary only if:

(1)     such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any property of, the Company or any other Subsidiary of the Company which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary; and

(2)     such designation and the Investment of the Company in such Subsidiary complies with Section 4.07.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complies with the foregoing conditions.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided, that immediately after giving effect to such designation (1) no Default or Event of Default would result therefrom and (2)(x) the Company could Incur at least €1.00 of additional Indebtedness under clause (1) Section 4.09(a) or (y) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would not be less than it was immediately prior to giving effect to such designation, in each case, on a pro forma basis taking into account such designation.  Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors of the Company giving effect to such designation or an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"U.S. Person" means a U.S. Person as defined in Rule 902.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors.

46

"Whitewash Procedure" means the "whitewash procedure" under Article 2358 of the Italian Civil Code as described in the Structure Memorandum.

"Wholly Owned Subsidiary" means a Subsidiary of the Company, all the Voting Stock of which (other than directors' qualifying shares or shares required by any applicable law or regulation to be held by a Person other than the Company or another Wholly Owned Subsidiary) is owned by the Company or another Wholly Owned Subsidiary.

SECTION 1.02       Other Definitions.

| Term | Defined in Section |
| --- | --- |
| "Additional Amounts" | 2.13(a) |
| "Additional Intercreditor Agreement" | 12.05 |
| "Additional Notes Guarantee" | 4.15(a) |
| "Affiliate Transaction" | 4.11(a) |
| "Asset Disposition Offer" | 4.10(b) |
| "Asset Disposition Offer Amount" | 4.10(e) |
| "Asset Disposition Offer Period" | 4.10(e) |
| "Asset Disposition Purchase Date" | 4.10(e) |
| "Authentication Order" | 2.02 |
| "Authentication Agent" | 2.02 |
| "Change in Tax Law" | 3.09(2) |
| "Change of Control Offer" | 4.14(b) |
| "Change of Control Payment" | 4.14(b)(1) |
| "Change of Control Payment Date" | 4.14(b)(2) |
| "Company" | Preamble |
| "Company Share Pledge" | Section 12.04(4) |
| "Covenant Defeasance" | 8.03 |
| "Event of Default" | 6.01(a) |
| "Excess Proceeds" | 4.10(b) |
| "Final Additional Vessel Registration" | Section 4.20(d) |
| "Guaranteed Obligations" | 11.01(a) |
| "Initial Agreement" | 4.08(b)(3) |
| "Initial Lien" | 4.12 |
| "Interest Payment Date" | Exhibit A |
| "Italian Guarantor" | 11.03 |
| "Legal Defeasance" | 8.02 |
| "Legislative Decree No. 239" | Section 2.13(a)(3)(I) |
| "LxSE" | 2.03 |
| "MergerCo Share Pledge" | Section 12.04(4) |
| "Noteholders' Representative" | Section 13.15(b) |
| "Paying Agent" | 2.03 |
| "Payor" | 2.13(a) |
| "Permitted Payments" | 4.07(b) |
| "Register" | 2.05 |
| "Registrar" | 2.03 |
| "Relevant Taxing Jurisdiction" | 2.13(a)(3) |

| Term | Defined in Section |
|------|--------------------|
| "Representative" | Section 13.15(a) |
| "Restricted Payment" | 4.07(a) |
| "Suspension Event" | 4.17 |
| "Taxation Directive" | 2.03 |
| "Tax Redemption Date" | 3.09 |
| "Transfer Agent" | 2.03 |

SECTION 1.03        Rules of Construction.  Unless the context otherwise requires:

(a)      a term has the meaning assigned to it;

(b)      an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(c)      "or" is not exclusive;

(d)      "including" means including without limitation;

(e)      words in the singular include the plural, and in the plural include the singular;

(f)      "will" shall be interpreted to express a command;

(g)      references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time; and

(h)      references to any person "acting reasonably" and correlative expressions shall be construed to mean "acting reasonably in the interests of the Holders and having regard to the duties of the Trustee to the Holders".

ARTICLE II

THE NOTES

SECTION 2.01        Form and Dating.  (a) General.  The Notes shall be denominated in euros.  The Notes and the Trustee's or Authentication Agent's certificate of authentication will be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. The Initial Notes will initially be represented by the Global Notes. Each Note will be dated the date of its authentication.  The Notes shall be in minimum denominations of €100,000 and integral multiples of €1,000 in excess thereof. The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts

with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(a)     _Global Notes_.  Notes issued in global form will be substantially in the form of _Exhibit A_ attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form will be substantially in the form of _Exhibit A_ attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent outstanding Notes of each such series as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian therefor, at the direction of the Trustee, in accordance with Section 2.06 hereof.

(b)     _Euroclear and Clearstream Procedures Applicable_.  The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Global Notes that are held by Participants through Euroclear or Clearstream.

SECTION 2.02     _Execution and Authentication_.  An Officer must sign the Notes for the Company by manual or facsimile signature.

If the Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual or facsimile signature of the Trustee.  The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of a written order of the Company signed by an Officer (an "_Authentication Order_"), authenticate the Initial Notes.  Upon delivery of any Authentication Order at any time and from time to time thereafter, the Trustee (or the Authentication Agent) shall authenticate Additional Notes for original issue, or Definitive Registered Notes issued pursuant to Section 2.06 hereof, in an aggregate principal amount specified in such Authentication Order.  Such Authentication Order shall specify the aggregate principal amount of Notes to be authenticated, the series and type of Notes, the date on which the Notes are to be authenticated, and the date from which interest on such Notes shall accrue and whether the Notes are to be issued as Definitive Registered Notes or Global Notes or such other information as the Trustee may reasonably request.  In addition, such Authentication Order shall include (a) a statement that the Persons signing the Authentication Order have (i) read and understood the provisions of this Indenture relevant to the statements in the Authentication Order

and (ii) made such examination or investigation as is necessary to enable them to make such statements and (b) a brief statement as to the nature and scope of the examination or investigation on which the statements set forth in the Authentication Order are based.

The Trustee may appoint an authenticating agent (the "Authentication Agent") acceptable to the Company to authenticate Notes. Any such appointment shall be evidenced by an instrument signed by a Responsible Officer, a copy of which shall be furnished to the Company. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. The Trustee hereby appoints Citibank, N.A., London Branch as the Authentication Agent, and Citibank, N.A., London Branch hereby accepts such appointment. The Company confirms this appointment as acceptable to it. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authentication Agent. An Authentication Agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

SECTION 2.03    Registrar, Paying Agent and Transfer Agent.  The Company shall maintain offices or agencies where Notes may be presented for registration of transfer or for exchange (each, a "Registrar") and offices or agencies where Notes may be presented for payment (each, a "Paying Agent"), including a Paying Agent in London, United Kingdom for so long as the Notes are held in registered form. The Company shall also maintain a transfer agent (the "Transfer Agent") in London, United Kingdom. The Registrar, acting as agent of the Company solely for this purpose, shall keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent, Registrar or Transfer Agent without prior notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Paying Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee, acting as agent of the Company solely for this purpose, shall act as such. The Company or any of its Subsidiaries, acting as agent of the Company solely for this purpose, may act as Paying Agent or Registrar.

The Company initially appoints Euroclear and Clearstream to act as a Depositary with respect to the Global Notes.

The Company initially appoints Citibank, N.A., London Branch to act as the Paying Agent and Transfer Agent with respect to the Notes, and initially appoints Citigroup Markets Deutschland AG to act as the Registrar.  Each of the foregoing hereby accepts such appointments.

The Company shall enter into an appropriate agency agreement with any Paying Agent or co-Registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Company shall notify the Trustee of the name and address of any such agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee may appoint a suitably qualified and reputable party to act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06.

50

Upon notice to the Trustee, the Company may change any Paying Agent, Registrar or Transfer Agent; provided, however, that the Company shall maintain a Paying Agent in a European Union member state that will not be obliged to withhold or deduct tax pursuant to the European Council Directive 2003/48/EC regarding the taxation of savings income or any other directive implementing the conclusions of the ECOFIN Council meeting of 26 and 27 November 2000 on the taxation of savings income (the "Taxation Directive"), or any law implementing, or complying with or introduced in order to conform to, such directive.  For so long as the Notes are listed on the Official List of the Luxembourg Stock Exchange (the "LxSE") and admitted for trading on the Euro MTF Market of the LxSE, and the rules of the LxSE so require, the Company shall publish a notice of any change of Paying Agent, Registrar or Transfer Agent in a daily newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, to the extent and in the manner permitted by such rules, post such notice on the official website of the LxSE in accordance with Section 13.02.

Payment of principal shall be made upon the surrender of Definitive Registered Notes at the office of any Paying Agent. In the case of a transfer of a Definitive Registered Note in part, upon surrender of the Definitive Registered Note to be transferred, a Definitive Registered Note shall be issued to the transferee in respect of the principal amount transferred and a Definitive Registered Note shall be issued to the transferor in respect of the balance of the principal amount of the transferred Definitive Registered Note at the office of any Transfer Agent.

The obligations of the Agents are several and not joint.

SECTION 2.04    Paying Agent to Hold Money.  The Company shall require each Paying Agent other than the Trustee to agree that the Paying Agent will hold for the benefit of the Holder or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment.  Money held by a Paying Agent need not be segregated, except as required by law, and in no event shall any Paying Agent be liable for interest on any money received by it hereunder.  The Paying Agent will not hold any amounts in trust.  The Agents will not be liable for interest on any money received by it from the Company or any Guarantor. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Company at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee, the Paying Agent will have no further liability for the money.  Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee or any other entity that is not an affiliate of the Company will serve as Paying Agent for the Notes. For the avoidance of doubt, the Paying Agent and the Trustee shall be held harmless and have no liability with respect to payments or disbursements to be made by the Paying Agent and the Trustee (i) for which payment instructions are not made; and (ii) until they have confirmed receipt of funds sufficient to make the relevant payment.

SECTION 2.05    Holder Lists.  Subject to any applicable laws and regulations, the Company shall cause the Registrar to keep a register (the "Register") at its office in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of ownership, exchange and transfer of the Notes.  Such registration in the Register shall be conclusive evidence of the ownership of Notes. Included in the books and

records for the Notes shall be notations as to whether such Notes have been paid, exchanged or transferred, cancelled, lost, stolen, mutilated or destroyed and whether such Notes have been replaced. In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced and the Note issued in replacement thereof. In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled. The Registrar will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders.

Neither the Trustee nor any of its agents will have any responsibility or be liable for any aspect of the records in relation to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

SECTION 2.06    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes.  A Global Note may not be transferred as a whole except by the applicable Depositary to a nominee of the applicable Depositary, by a nominee of the applicable Depositary to the applicable Depositary or to another nominee of the applicable Depositary, or by the applicable Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.  All Global Notes of a series will be exchanged by the Company for Definitive Registered Notes if:

(1)    in the case of any Global Note, the Company delivers to the Trustee notice from Euroclear and Clearstream that they are unwilling or unable to continue to act as clearing agencies and a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary; or

(2)    in the case of any Global Note, there has occurred and is continuing an Event of Default with respect to such Global Note and the Participant who owns a book-entry interest in such Global Note so requests in writing.

Upon the occurrence of any of the events listed in clause (1) of this Section 2.06(a), the Company shall execute, and the Trustee shall, upon receipt of an Authentication Order, authenticate and deliver Definitive Registered Notes of the series and in an aggregate principal amount equal to the principal amount of the applicable Global Note tendered in exchange therefor. The Company shall, at the cost of the Company (but against such indemnity as the Registrar or any relevant Agent may require in respect of any tax or other duty of whatever nature which may be levied or imposed in connection with such exchange), cause sufficient Definitive Registered Notes to be executed and delivered to the Trustee for authentication and the Registrar for registration of the exchange and dispatch to the relevant Holders within 30 days of the relevant event. The Trustee or the Registrar shall, at the cost of the Company, deliver such Definitive Registered Notes to the Persons in whose names such Notes are so registered. Definitive Registered Notes issued in exchange for beneficial interests in Global Notes pursuant to

this Section 2.06(a) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its Participants or Indirect Participants or otherwise, shall instruct the Trustee.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); provided, however, that notable, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c), (d) or (e) hereof.

(b)    Transfer and Exchange of Beneficial Interests in the Global Notes.  The transfer and exchange of beneficial interests in the Global Notes will be effected through the applicable Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures.  Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act.  Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1)    Transfer of Beneficial Interests in the Same Global Note.  Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; provided, however, that transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person prior to the expiration of the 40-day "Distribution Compliance Period" under Regulation S, unless such person is a "Distributor" as defined in Rule 902.  Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note.  No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2)    All Other Transfers and Exchanges of Beneficial Interests in Global Notes.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar both (i) a written order from a Participant or an Indirect Participant given to the applicable Depositary in accordance with the Applicable Procedures directing the applicable Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged, and (ii) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase.

Upon satisfaction of all the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Registrar shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(3)     Transfer of Beneficial Interests to Another Restricted Global Note. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in a 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof.

(4)     Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.  A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(i)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(ii)     if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the appropriate certifications in item (3) thereof;

and, in each such case, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted

Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)     Transfer or Exchange of Beneficial Interests for Definitive Registered Notes.  If any one of the events listed in clause (1) or (2) of Section 2.06(a) has occurred or the Company has elected pursuant to Section 2.06(a) to cause the issuance of Definitive Registered Notes, transfers or exchanges of beneficial interests in a Global Note for a Definitive Registered Note shall be effected, subject to the satisfaction of the conditions set forth in the applicable subclauses of this Section 2.06(c).

(1)     Beneficial Interests in Restricted Global Notes to Restricted Definitive Registered Notes.  If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Registered Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Registered Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Registered Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B)     if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)     if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and, upon receipt of an Authentication Order, the Trustee shall authenticate and deliver to the Person designated in the instructions a Restricted Definitive Registered Note in the appropriate principal amount.  Any Restricted Definitive Registered Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions

from the Depositary and the Participant or Indirect Participant.  The Trustee shall deliver such Restricted Definitive Registered Notes to the Persons in whose names such Notes are so registered.  Any Restricted Definitive Registered Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2)    Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Registered Notes.  A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Registered Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Registered Note only:

(A)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

(B)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof; or

(C)    if the Registrar receives the following:

(i)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Registered Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(ii)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Registered Note, a certificate from such holder in the form of Exhibit B hereto, including the appropriate certifications in item (3) thereof,

and, in each such case set forth in this subparagraph (C), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3)    Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Registered Notes.  If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for an

Unrestricted Definitive Registered Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Registered Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and, upon receipt of an Authentication Order, the Trustee shall authenticate and deliver to the Person designated in the instructions an Unrestricted Definitive Registered Note in the appropriate principal amount.  Any Unrestricted Definitive Registered Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the applicable Depositary and the Participant or Indirect Participant.  The Trustee shall deliver such Unrestricted Definitive Registered Notes to the Persons in whose names such Notes are so registered.  Any Unrestricted Definitive Registered Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will not bear the Private Placement Legend.

(d)     Transfer and Exchange of Definitive Registered Notes for Beneficial Interests.

(1)     Restricted Definitive Registered Notes to Beneficial Interests in Restricted Global Notes.  If any Holder of a Restricted Definitive Registered Note proposes to exchange such Restricted Definitive Registered Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Registered Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)     if the Holder of such Restricted Definitive Registered Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)     if such Restricted Definitive Registered Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such Restricted Definitive Registered Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)     if such Restricted Definitive Registered Note is being transferred to the Company or any of its Subsidiaries, a certificate to the

effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (4) thereof,

the Trustee shall cancel the Restricted Definitive Registered Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the appropriate 144A Global Note, and in the case of clause (C) or (D) above, the appropriate Regulation S Global Note.

(2)     <u>Restricted Definitive Registered Notes to Beneficial Interests in Unrestricted Global Notes</u>.  A Holder of a Restricted Definitive Registered Note may exchange such Restricted Definitive Registered Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Registered Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only:

(A)     if such Restricted Definitive Registered Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (3)(c) thereof;

(B)     if such Restricted Definitive Registered Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (3)(a) thereof; or

(C)     if the Registrar receives the following:

(i)     if the Holder of such Restricted Definitive Registered Note proposes to exchange such Restricted Definitive Registered Note for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(c) thereof; or

(ii)     if the Holder of such Restricted Definitive Registered Note proposes to transfer such Restricted Definitive Registered Note to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit B</u> hereto, including the appropriate certifications in item (3) thereof,

and, in each such case set forth in this subparagraph (C), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(2), the Trustee shall cancel the Definitive Registered Note and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3)     Unrestricted Definitive Registered Notes to Beneficial Interests in Unrestricted Global Notes.  A Holder of an Unrestricted Definitive Registered Note may exchange such Unrestricted Definitive Registered Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Registered Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time.  Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Registered Note and increase or cause to be increased the aggregate principal amount of the relevant Unrestricted Global Note.

If any such exchange or transfer from an Unrestricted Definitive Registered Note to a beneficial interest is effected pursuant to this subparagraph (3) at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Unrestricted Definitive Registered Notes so transferred.

(e)     Transfer and Exchange of Definitive Registered Notes for Definitive Registered Notes.  Upon request by a Holder of Definitive Registered Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar shall register the transfer or exchange of Definitive Registered Notes.  Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Registered Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar and duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1)     Restricted Definitive Registered Notes to Restricted Definitive Registered Notes.  Any Restricted Definitive Registered Note may be transferred to and registered in the name of a Person who takes delivery thereof in the form of a Restricted Definitive Registered Note if the Registrar receives the following:

(A)     if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)     if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

59

(C)      if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications required by item (3) thereof.

(2)      Restricted Definitive Registered Notes to Unrestricted Definitive Registered Notes.  Any Restricted Definitive Registered Note may be exchanged by the Holder thereof for an Unrestricted Definitive Registered Note or transferred to a Person who takes delivery thereof in the form of an Unrestricted Definitive Registered Note if the Registrar receives the following:

(i)      if the Holder of such Restricted Definitive Registered Note proposes to exchange such Restricted Definitive Registered Note for an Unrestricted Definitive Registered Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(ii)      if the Holder of such Restricted Definitive Registered Note proposes to transfer such Restricted Definitive Registered Note to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Registered Note, a certificate from such Holder in the form of Exhibit B hereto, including the appropriate certifications in item (3) thereof,

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3)      Unrestricted Definitive Registered Notes to Unrestricted Definitive Registered Notes.  A Holder of Unrestricted Definitive Registered Notes may transfer such Unrestricted Definitive Registered Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Registered Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Registered Notes pursuant to the instructions from the Holder thereof.

(f)      Legends.  The following legends shall appear on the face of all Global Notes and Definitive Registered Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)      Private Placement Legend.  (A) Except as permitted by subparagraph (B) below, each Global Note and each Definitive Registered Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT. THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE U.S. SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN "OFFSHORE TRANSACTION" PURSUANT TO RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT, (2) AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR FOR WHICH IT HAS PURCHASED THE NOTES THAT ANY OFFER, SALE OR TRANSFER OF THIS NOTE IN THE CASE OF RULE 144A NOTES PRIOR TO THE DATE (THE RESALE RESTRICTION TERMINATION DATE) WHICH IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATES OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) MUST BE ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE U.S. SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE U.S. SECURITIES ACT, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS IN OFFSHORE TRANSACTIONS IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION

REQUIREMENTS OF THE U.S. SECURITIES ACT, SUBJECT IN EACH OF THE FOREGOING CASES TO ANY REQUIREMENT OF LAW THAT THE DISPOSITION OF ITS PROPERTY OR THE PROPERTY OF SUCH INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAWS AND ANY APPLICABLE LOCAL LAWS AND REGULATIONS AND FURTHER SUBJECT TO THE COMPANY'S, THE AGENTS' AND THE TRUSTEE'S RIGHTS PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER (I) PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM AND (II) IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE WITH A COPY TO THE AGENTS AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.  AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE U.S. SECURITIES ACT.

THE FAILURE TO PROVIDE THE COMPANY, THE TRUSTEE, THE REGISTRAR, THE TRANSFER AGENT AND ANY PAYING AGENT WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, A U.S. INTERNAL REVENUE SERVICE FORM W-9 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPLICABLE U.S. INTERNAL REVENUE SERVICE FORM W-8 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN U.S. FEDERAL WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE NOTES REPRESENTED BY THIS CERTIFICATE.

      (B)    Notwithstanding the foregoing, any Global Note or Definitive Registered Note issued pursuant to subparagraph (b)(4), (c)(2), (c)(3), (d)(2), (d)(3), (e)(2) or (e)(3) of this Section 2.06 (and all Notes

issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(2)     Global Note Legend.  Each Global Note will bear a legend in substantially the following form:

THIS GLOBAL NOTE IS HELD BY THE COMMON DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS GLOBAL NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS GLOBAL NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE COMMON DEPOSITARY TO A NOMINEE OF THE COMMON DEPOSITARY OR BY A NOMINEE OF THE COMMON DEPOSITARY TO THE COMMON DEPOSITARY OR ANOTHER NOMINEE OF THE COMMON DEPOSITARY OR BY THE COMMON DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR COMMON DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR COMMON DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY (WHICH SHALL INITIALLY BE CITIBANK EUROPE PLC) TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF THE COMMON DEPOSITARY OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY (AND ANY PAYMENT IS MADE TO THE COMMON DEPOSITARY OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE

OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, THE COMMON DEPOSITARY, HAS AN INTEREST HEREIN.

(g)     Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Registered Notes or a particular Global Note has been redeemed, repurchased or cancelled in whole and not in part, each such Global Note will be returned to or retained and cancelled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Registered Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such increase.

(h)     General Provisions Relating to Transfers and Exchanges.  (1) To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Registered Notes upon receipt of an Authentication Order or at the Registrar's request.

(2)     No service charge will be made to a Holder of a Global Note or to a Holder of a Definitive Registered Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.08, 4.10, 4.14 and 9.05 hereof).

(3)     No Transfer Agent or Registrar shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)     All Global Notes and Definitive Registered Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Registered Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Registered Notes surrendered upon such registration of transfer or exchange;

(5)     The Company shall not be required to register the transfer or exchange of any Notes:

(A)     for a period of 15 days prior to any date fixed for the redemption of such Notes;

(B)     for a period of 15 days immediately prior to the date fixed for selection of such Notes to be redeemed in part;

(C)     for a period of 15 days prior to the record date with respect to any interest payment date applicable to such Notes;

(D)     which the Holder has tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Disposition Offer; or

(E)     to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

The Company, the Trustee, any Paying Agent, the Registrar and the Transfer Agent will be entitled to treat the Holder as the owner of it for all purposes.

(6)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of, interest, premium and Additional Amounts, if any, on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7)     The Trustee shall authenticate Global Notes and Definitive Registered Notes in accordance with the provisions of Section 2.02 hereof.

(8)     All certifications, certificates and Opinions of Counsel required to be submitted to the Transfer Agent or the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile or other electronic transmission.

SECTION 2.07     Replacement Notes.  If any mutilated Note is surrendered to the Trustee, Registrar or the Company or the Trustee or Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met.  If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Company and the Trustee may charge for its expenses in replacing a Note.

If, after the delivery of such replacement Note, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment or registration such original Note, the Trustee shall be entitled to recover such replacement Note from the Person to whom it was delivered or any Person taking therefrom, except a bona fide

65

purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense Incurred by the Company, the Trustee, any Agent and any authenticating agent in connection therewith.

Subject to the provisions of the preceding paragraph of this Section 2.07, every replacement Note is an obligation of the Company and shall be entitled to all the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

SECTION 2.08      Outstanding Notes.  The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note; provided, however, that in determining whether the Holders of the required aggregate principal amount of the Notes have concurred in any direction, waiver or consent, any Notes owned by the Company or by any Person directly or indirectly controlled, or controlled by, or under direct or indirect common control with, the Company will be disregarded and deemed not to be outstanding.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser in whose hands such Note is a legal, valid and binding obligation of the Company.

If the entire principal amount and premium, if any, of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, and is not prohibited from paying such money to the Holders pursuant to the terms of this Indenture, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an Agent duly appointed in writing or may be embodied in or evidenced by an electronic transmission which identifies the documents containing the proposal on which such consent is requested and certifies such Holders' consent thereto and agreement to be bound thereby; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and where it is hereby expressly required, to the Company.

SECTION 2.09      Treasury Notes.  In determining whether the Holders of the required aggregate principal amount of the Notes have concurred in any direction, waiver or consent, Notes owned by the Company, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will

be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned will be so disregarded.

SECTION 2.10        Temporary Notes.  Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate, temporary Notes.  Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee.  Without unreasonable delay, the Company shall prepare and the Trustee (or the Authentication Agent) shall authenticate Definitive Registered Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all the benefits of this Indenture.

SECTION 2.11        Cancellation.  The Company at any time may deliver Notes to the Trustee for cancellation.  The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall dispose of such cancelled Notes in its customary manner unless the Company directs the Trustee to deliver cancelled Notes to the Company.  The Company may not issue new Notes to replace Notes that it has redeemed or paid or that have been delivered to the Trustee for cancellation.

SECTION 2.12        Defaulted Interest.  If the Company defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, in accordance with the terms hereof, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof.  The Company shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Company shall fix or cause to be fixed each such special record date and payment date in a manner satisfactory to the Trustee; provided that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest.  At least 10 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) shall mail or otherwise transmit or cause to be mailed or otherwise transmitted to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

SECTION 2.13        Additional Amounts.  (a) All payments made by or on behalf of the Company or a Successor Company under or with respect to the Notes, or any Guarantor (each of the Company, Successor Company and Guarantor, a "Payor") with respect to any Notes Guarantee, will be made free and clear of and without withholding or deduction for, or on account of, any Taxes unless the withholding or deduction of such Taxes is then required by law.  If any deduction or withholding for, or on account of, any Taxes imposed or levied by or on behalf of:

(1)        Italy or any political subdivision or Governmental Authority thereof or therein having power to tax;

67

(2)     any jurisdiction from or through which payment on any such Note or Notes Guarantee is made by the Company, Successor Company, Guarantor or their agents, or any political subdivision or Governmental Authority thereof or therein having the power to tax; or

(3)     any other jurisdiction in which the Payor is incorporated or organized, engaged in business for tax purposes or resident for tax purposes, or any political subdivision or Governmental Authority thereof or therein having the power to tax (each of clauses (1), (2) and (3), a "Relevant Taxing Jurisdiction"),

will at any time be required from any payments made with respect to any Note or Notes Guarantee, including, without limitation, payments of principal, redemption price, premium, if any, or interest, the Payor will pay (together with such payments) such additional amounts (the "Additional Amounts") as may be necessary in order that the net amounts received in respect of such payments after such withholding or deduction (including any such deduction or withholding from such Additional Amounts), will not be less than the amounts which would have been received in respect of such payments on any such Note or Notes Guarantee in the absence of such withholding or deduction; provided, however, that no such Additional Amounts will be payable for or on account of:

(A)     any Taxes that would not have been so imposed but for the existence of any present or former connection between the relevant Holder or the beneficial owner of a Note (or between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over the relevant Holder or beneficial owner, if the relevant Holder or beneficial owner is an estate, nominee, trust, partnership, limited liability company or corporation) and the Relevant Taxing Jurisdiction (including, but not limited to, being a citizen or resident or national or domiciliary of, or the existence of a business, a permanent establishment, a dependent agent, a place of business or a place of management present or deemed present in the Relevant Taxing Jurisdiction) but excluding, in each case, any connection arising solely from the acquisition, ownership or holding of such Note or Notes Guarantee, the enforcement of rights under any Note or Notes Guarantee or the receipt of any payment in respect thereof;

(B)     any Taxes that are imposed, withheld or deducted by reason of the failure of the Holder or the beneficial owner of the Note to comply with a written request of the Payor addressed to the Holder or the beneficial owner, after reasonable notice, to provide certification, information, documents or other evidence concerning the nationality, residence, identity or connection with the Relevant Taxing Jurisdiction of the Holder or such beneficial owner or to make any declaration or similar claim or satisfy any certification, identification, information or other reporting requirement relating to such matters, required by applicable law, regulation, treaty or administrative practice of the Relevant Taxing Jurisdiction as a precondition to exemption from all or part of such Tax;

provided in each case the Holder or beneficial owner is legally eligible to do so;

(C)     any Taxes that are payable otherwise than by deduction or withholding from a payment under or with respect to the Notes or any Notes Guarantee;

(D)     any estate, inheritance, gift, value added, sales, transfer, personal property or similar Taxes;

(E)     any Taxes that are required to be imposed, deducted or withheld pursuant to the Taxation Directive or any law implementing or complying with, or introduced in order to conform to, the Taxation Directive;

(F)     any Taxes imposed in connection with a Note presented for payment (where presentation is permitted or required for payment) by or on behalf of a Holder or beneficial owner who would have been able to avoid such Tax by presenting the relevant Note to, or otherwise accepting payment from, another Paying Agent in a member state of the European Union;

(G)     any Taxes which would not have been imposed if the Holder had presented the Note for payment (where presentation is permitted or required for payment) within 30 days after the relevant payment was first made available for payment to the Holder (except for Additional Amounts with respect to Taxes that would have been imposed had the Holder presented the Note for payment within such 30-day period);

(H)     any Taxes imposed on or with respect to a payment to a Holder that is a fiduciary or partnership or any Person other than the sole beneficial owner of such payment or Note, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such partnership or the beneficial owner of such payment or Note would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the actual Holder of such Note;

(I)     any Taxes to the extent such Taxes are on account of *imposta sostitutiva* (pursuant to Italian Legislative Decree No. 239 of April 1, 1996, as amended or supplemented from time to time ("Legislative Decree No. 239") and any related implementing regulations, and pursuant to Italian Legislative Decree No. 461 of November 21, 1997; provided that:

(i)     Additional Amounts shall be payable in circumstances in which the procedures required under Legislative Decree No. 239 in order to benefit from an exemption from

69

*imposta sostitutiva* have not been complied with due to the actions or omissions of the Company or the Guarantors or their agents (including, without limitation, any failure by the Company to list the Notes by the Issue Date on at least one of the following: (x) the Official List of the LxSE for admission to trading on the Euro MTF Market of the LxSE, or (y) the ExtraMOT for admission to trading on the exchange regulated market of Borsa Italiana); and

(ii)    for the avoidance of doubt, (A) no Additional Amounts shall be payable with respect to any Taxes to the extent such Taxes result from payment to a non-Italian resident legal entity or a non-Italian resident individual which are subject to *imposta sostitutiva* by reason of not being resident in a country which allows for a satisfactory exchange of information with Italy (white list) and (B) no Additional Amounts shall be payable with respect to Taxes to the extent such Taxes are on account of *imposta sostitutiva* if the Holder becomes subject to *imposta sostitutiva* after the Issue Date by reason of the approval of the ministerial Decree to be issued under art. 11(4)(c) of Legislative Decree No. 239, which may amend the list of the countries which allow for a satisfactory exchange of information with Italy, whereby such Holder's country of residence does not appear on the new list;

(J)    any Taxes imposed on or with respect to a Note pursuant to Sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any successor law or regulation implementing or complying with, or introduced in order to conform to, such sections of the Code or any intergovernmental agreement or any agreement entered into pursuant to Section 1471(b)(1) of the Code;

(K)    any combination of the above.

(b)    The Payor will (i) make any required withholding or deduction and (ii) remit the full amount deducted or withheld to the Relevant Taxing Jurisdiction in accordance with applicable law.  The Payor will use all reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Relevant Taxing Jurisdiction imposing such Taxes, in such form as provided in the ordinary course by the Relevant Taxing Jurisdiction and as is reasonably available, and shall provide such certified copies to the Trustee.  Such copies shall be made available to the Holders upon request and will be made available at the offices of the Registrar if the Notes are then listed on the Official List of the LxSE. The Payor will attach to each certified copy a certificate stating (x) that the amount of withholding Taxes evidenced by the certified copy was paid in connection with payments in respect of the principal amount of Notes then outstanding and (y) the amount of such withholding Taxes paid per €1,000 principal amount of the Notes.

(c)     If any Payor becomes aware that it will be obligated to pay Additional Amounts under or with respect to any payment made on any Note or Notes Guarantee, at least 30 days prior to the date of such payment, the Payor will deliver to the Trustee an Officer's Certificate stating the fact that Additional Amounts will be payable and the amount so payable and such other information necessary to enable the Paying Agent to pay Additional Amounts to Holders on the relevant payment date (unless such obligation to pay Additional Amounts arises, or the Payor becomes aware of such obligation, less than 45 days prior to the relevant payment date, in which case the Payor may deliver such Officer's Certificate as promptly as practicable after the date that is 30 days prior to the payment date).  The Trustee shall be entitled to rely solely on such Officer's Certificate without further inquiry, as conclusive proof that such payments are necessary.

(d)     Wherever in this Indenture or the Notes Guarantees there is mentioned, in any context the payment of:

(1)     principal;

(2)     purchase or redemption prices in connection with a purchase or redemption of Notes;

(3)     interest; or

(4)     any other amount payable on or with respect to any of the Notes or Notes Guarantees,

such reference shall be deemed to include payment of Additional Amounts pursuant to this Section 2.13 to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

(e)     The Payor will pay any present or future stamp, court or documentary Taxes, or any other excise, property or similar Taxes that arise in any jurisdiction from the execution, delivery, registration or enforcement of any Notes, any Notes Guarantee, this Indenture, the Security Documents or any other document or instrument in relation thereto (other than a transfer or exchange of the Notes after the initial syndication), or the receipt of any payments with respect thereto (limited, solely in the case of Taxes attributable to the receipt of any payments with respect thereto, to any such Taxes that are not excluded under Section 2.13(a)(3)(A) through (B) or Section 2.13(a)(3)(D) through (J) or any combination thereof), excluding any such Taxes, charges or similar levies imposed by any jurisdiction that is not a Relevant Taxing Jurisdiction.

(f)     The foregoing obligations of this Section 2.13 will survive any termination, defeasance or discharge of this Indenture and will apply *mutatis mutandis* to any jurisdiction in which any successor to the Company or any Guarantor is incorporated or organized, engaged in business for tax purposes or resident for tax purposes, or any political subdivision or taxing authority or agency thereof or therein and any jurisdiction from or through which payment on any Note or Notes Guarantee is made by or on behalf of such person.

SECTION 2.14     Currency Indemnity.  (a) The euro is the sole currency of account and payment for all sums payable by the Company and the Guarantors under or in connection with the Notes and the relevant Notes Guarantees, as the case may be, including damages.  Any amount received or recovered in a currency other than euro, whether as a result of, or the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company, any Guarantor, or otherwise by any Holder or by the Trustee, in respect of any sum expressed to be due to it from the Company or a Guarantor will only constitute a discharge to the Company or such Guarantor, as applicable, to the extent of the euro amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

(b)     If that euro amount is less than the euro amount expressed to be due to the recipient or the Trustee under any Note, the Company and the Guarantors will indemnify them against any loss sustained by such recipient or the Trustee as a result.  In any event, the Company and the Guarantors will indemnify the recipient or the Trustee on a joint and several basis against the cost of making any such purchase.  For the purposes of this currency indemnity provision, it will be prima facie evidence of the matter stated therein for the Holder or the Trustee to certify in a manner reasonably satisfactory to the Company (indicating the sources of information used) the loss it Incurred in making any such purchase.  These indemnities constitute a separate and independent obligation from the Company's and the Guarantor's other obligations, will give rise to a separate and independent cause of action, will apply irrespective of any waiver granted by any Holder or the Trustee (other than a waiver of the indemnities set out herein) and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or to the Trustee.

(c)     Except as otherwise specifically set forth herein, for purposes of determining compliance with any euro-denominated restriction herein, the Euro Equivalent amount for purposes hereof that is denominated in a currency other than euro shall be calculated based on the relevant currency exchange rate in effect on the date such non-euro amount is Incurred or made, as the case may be.

SECTION 2.15     Deposit of Moneys.  No later than 10:00 a.m. London time on each due date of the principal of, interest and premium (if any) on any Note and the Stated Maturity date of the Notes, the Company shall deposit with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such day or date, as the case may be, in a timely manner which permits the Trustee or Paying Agent to remit payment to the Holders on such day or date, as the case may be.  Subject to actual receipt of such funds as provided by this Section 2.15 by the designated Paying Agent, such Paying Agent shall make payments on the Notes in accordance with the provisions of this Indenture.  The Company shall promptly notify the Trustee and the Paying Agent of its failure to so act.

SECTION 2.16     Additional Notes.  (a) The Company shall be entitled, subject to its compliance with this Indenture, including Section 4.09, to issue Additional Notes under this Indenture in an unlimited principal amount which shall have terms substantially

identical to the Initial Notes except in respect of any of the terms which shall be set forth in an Officer's Certificate supplied to the Trustee referenced in clause (b) of this Section 2.16.

(b)      With respect to any Additional Notes, the Company shall set forth in an Officer's Certificate, a copy of each which shall be delivered to the Trustee, the following information:

(1)      the title of such Additional Notes;

(2)      the aggregate principal amount of such Additional Notes;

(3)      the date or dates on which such Additional Notes will be issued;

(4)      the rate or rates (which may be fixed or floating) at which such Additional Notes shall bear interest and, if applicable, the interest rate basis, formula or other method of determining such interest rate or rates, the date or dates from which such interest shall accrue, the interest payment dates on which such interest shall be payable or the method by which such dates will be determined, the record dates for the determination of Holders thereof to whom such interest is payable and the basis upon which such interest will be calculated;

(5)      the currency or currencies in which such Additional Notes shall be denominated and the currency in which cash or government obligations in connection with such series of Additional Notes may be payable;

(6)      the date or dates and price or prices at which, the period or periods within which, and the terms and conditions upon which, such Additional Notes may be redeemed, in whole or in part;

(7)      if other than denominations of €100,000 and in integral multiples of €1,000 in excess thereof, the denominations in which such Additional Notes shall be issued and redeemed; and

(8)      the ISIN, Common Code, CUSIP or other securities identification numbers with respect to such Additional Notes.

(c)      Such Additional Notes shall be treated, along with all other series of Notes, as a single class for the purposes of this Indenture with respect to waivers, amendments and all other matters which are not specifically distinguished for such series. Unless the context otherwise requires, for all purposes of this Indenture, references to "Notes" shall be deemed to include references to the Notes and shall be deemed to include the Initial Notes as well as any Additional Notes.  For all purposes other than United States federal income tax purposes, the Initial Notes and any Additional Notes shall be deemed to form one series, and references to the "Notes" shall be deemed to refer to the Initial Notes as well as any Additional Notes.  In the event that any Additional Notes are not fungible with any Notes previously issued for United States federal income tax purposes, such non-fungible Additional Notes shall be issued with a separate ISIN,

Common Code, CUSIP or other securities identification number, as applicable, so that they are distinguishable from such previously issued Notes.

SECTION 2.17    FATCA.

(a)    Any payment by an Agent  under this Indenture will be made without any deduction or withholding for or on account of FATCA unless such deduction or withholding is required by any Applicable FATCA Law.  If any Taxes in respect of FATCA are required to be paid by an Agent or any of its affiliates with respect to payments made under this Indenture, the Payor agrees that it shall promptly reimburse the Agent for such payment to the extent not covered by withholding from any payment.

(b)    The Payor undertakes to the Paying Agent that:

(1)    it will provide to the Paying Agent all documentation and other information in its possession required by the Paying Agent from time to time to comply with any Applicable FATCA Law forthwith upon request by the Agent; and

(2)    it will notify the Paying Agent  in writing within 30 days of any change that affects the Payor's FATCA status pursuant to any Applicable FATCA Law.

(c)    It shall be the sole responsibility of the Company to determine whether any payment to be made to the Paying Agent in respect of the Notes or otherwise in connection with this Indenture by the Company to the Paying Agent is subject to withholding under FATCA, and the Company shall promptly notify each Paying Agent upon determining or becoming aware of such  requirement. The Company shall provide such Paying Agent with all information in its possession required for such Paying Agent to be able to make any such payment.

ARTICLE III

REDEMPTION AND PREPAYMENT

SECTION 3.01    Notices to Trustee.  If the Company elects to redeem Notes pursuant to the optional redemption provisions of paragraph 5 of the Notes, it must furnish to the Trustee, at least 10 days but not more than 60 days (or such shorter period as may be agreed by the Trustee) before notice of redemption is given to Holders, an Officer's Certificate setting forth:

(a)    the section of this Indenture or the Notes pursuant to which the redemption shall occur;

(b)    the record date for the redemption and the redemption date;

(c)    the principal amount of, and premium, if any, on, the Notes to be redeemed; and

(d)      the redemption price.

SECTION 3.02      <u>Selection of Notes To Be Redeemed or Purchased</u>.  If less than all the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee or the Registrar will select the Notes for redemption or purchase as follows:

(a)      in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, as certified to the Trustee by the Company and in compliance with the requirements of Euroclear and/or Clearstream; or

(b)      if the Notes are not so listed, or such exchange prescribes no method of selection and the Notes are not held through Euroclear and/or Clearstream or Euroclear and/or Clearstream prescribes no method of selection, on a pro rata basis;

<u>provided</u>, <u>however</u>, that no Note of €100,000 in aggregate principal amount or less shall be redeemed in part.

In the event of partial redemption or purchase, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 10 nor more than 60 days prior to the redemption or purchase date by the Trustee or the Registrar from the outstanding Notes not previously called for redemption or purchase.

The Trustee shall promptly notify the Company and the Registrar (if not the Company) in writing of the Notes selected for redemption or purchase and, in the case of any Notes selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected will be in minimum amounts of €100,000 and integral multiples of €1,000 in excess thereof, except that if all the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of €1,000 (in excess of €100,000) shall be redeemed or purchased.  Except as provided in the preceding sentence of this Section 3.02, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Neither the Trustee nor the Registrar shall be liable for selections made under this Section 3.02.

SECTION 3.03      <u>Notice of Redemption</u>.  At least 10 days but not more than 60 days before a redemption date, the Company shall mail or otherwise transmit or cause to be mailed, by first class mail postage pre-paid, or otherwise transmitted a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed or otherwise transmitted more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes pursuant to Article VIII hereof or a satisfaction and discharge of this Indenture pursuant to Article X hereof; <u>provided</u> that, for so long as any Notes are represented by Global Notes, notices of redemption to Holders will be delivered to Euroclear and Clearstream (and such delivery will be deemed to satisfy the requirements of this paragraph), each of which shall give notices to the Holders of the book-entry interests.  For so long as the Notes are listed on the Official List of the LxSE and the rules of such exchange so require, the Company shall publish notice of redemption on the official

75

website of the LxSE, or in a daily newspaper with general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) and confirm the aggregate principal amount of Notes that will remain outstanding immediately after such redemption.

The notice shall identify the Notes to be redeemed and shall state:

(a)     the record date for the redemption and the redemption date;

(b)     the redemption price;

(c)     if any Note is to be redeemed in part only, the notice of redemption that relates to that Note shall state the portion of the principal amount thereof  to be redeemed, in which case a portion of the original Note will be issued in the name of the Holder thereof upon cancellation of the original Note. In the case of a Global Note, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof . Subject to the terms of the applicable redemption notice (including any conditions contained therein), Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption, unless the redemption price is not paid on the redemption date;

(d)     the name and address of the Paying Agent;

(e)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)     that, unless the Company defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)     the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)     that no representation is made as to the correctness or accuracy of the ISIN or Common Code number, if any, listed in such notice or printed on the Notes.

At the Company's direction, the Trustee or Paying Agent (as applicable) shall give the notice of redemption in the Company's name and at its expense; provided, that the Company has provided to the Trustee, at least ten days prior to the publication of the notice of redemption (unless a shorter period shall be acceptable to the Trustee in its sole discretion), an Officer's Certificate requesting that the Trustee or the Paying Agent (as applicable) give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph of this Section 3.03.

SECTION 3.04     Effect of Notice of Redemption.  Once notice of an unconditional redemption is mailed or otherwise transmitted in accordance with Section 3.03 hereof, or all conditions to a conditional redemption have been satisfied, any such Notes called

for redemption become irrevocably due and payable on the redemption date at the redemption price.  Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.  Any redemption and notice of redemption may, at the Company's discretion, be subject to the satisfaction of one or more conditions precedent (including, in the case of a redemption related to an Equity Offering, the consummation of such Equity Offering).

SECTION 3.05       Deposit of Redemption or Purchase Price.  No later than 10:00 a.m. London time, one Business Day prior to the redemption or purchase date, the Company shall deposit with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest, if any, and Additional Amounts, if any, on all Notes to be redeemed or purchased on that date other than Notes or portions of Notes called for redemption that have been delivered by the Company to the Trustee for cancellation.  The Paying Agent shall promptly return to the Company any money deposited with the Paying Agent by the Company in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest, if any, and Additional Amounts, if any, on, all Notes to be redeemed or purchased.  Neither the Trustee nor any Agent shall be required to pay out any money without such money first having been placed in its funds.

If the Company complies with the provisions of the preceding paragraph of this Section 3.05, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase unless the Paying Agent is prohibited from making such redemption payment pursuant to the terms of this Indenture.  If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date, and no additional interest will be payable to Holders whose Notes will be subject to redemption.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Company to comply with the preceding paragraph of this Section 3.05, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

SECTION 3.06       Notes Redeemed or Purchased in Part.  Upon surrender of a Note that is redeemed or purchased in part, the Company shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.  In the case of a Global Note, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof.

SECTION 3.07       Mandatory Redemption.  The Company is not required to make mandatory redemption payments or sinking fund payments with respect to the Notes.

SECTION 3.08       Asset Disposition Offer.  In the event that, pursuant to Section 4.10 hereof, the Company is required to commence an Asset Disposition Offer, it shall follow the procedures specified below.

Upon the commencement of an Asset Disposition Offer, the Company shall send or cause to be sent by first class mail, or otherwise transmit or cause to be otherwise transmitted, to the Trustee and each of the Holders at the address appearing in the security register, a notice stating:

(a)     that the Asset Disposition Offer is being made pursuant to Section 3.08 and 4.10 hereof and the length of time the Asset Disposition Offer will remain open;

(b)     the Asset Disposition Offer Amount, the purchase price and the Asset Disposition Purchase Date;

(c)     that any Note not tendered or accepted for payment will continue to accrue interest;

(d)     that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Disposition Offer will cease to accrue interest after the Asset Disposition Purchase Date;

(e)     that Holders electing to have a Note purchased pursuant to an Asset Disposition Offer may elect to have Notes purchased only in minimum denominations of €100,000 and in integral multiples of €1,000 in excess thereof, except that a Holder may elect to have all the Notes held by such Holder purchased even if not an integral multiple of €1,000 (in excess of €100,000);

(f)     that Holders electing to have a Note purchased pursuant to any Asset Disposition Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Note completed, or transfer by book-entry transfer, to the Company, a Depositary, if appointed by the Company, or a Paying Agent at the address specified in the notice at least three days before the Asset Disposition Purchase Date;

(g)     the procedure for withdrawing an election to tender;

(h)     that if the aggregate principal amount of the Notes surrendered in any Asset Disposition Offer by Holders and other Pari Passu Indebtedness surrendered by holders or lenders, collectively, exceeds the amount of Excess Proceeds, the Excess Proceeds shall be allocated among the Notes and Pari Passu Indebtedness to be purchased on a pro rata basis on the basis of the aggregate principal amount of tendered Notes and Pari Passu Indebtedness;

(i)     that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer); and

(j)     on or before the Asset Disposition Purchase Date, the Company shall, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Asset Disposition Offer Amount of Notes and Pari Passu Indebtedness or portions of Notes and Pari Passu Indebtedness so validly tendered and not properly withdrawn

78

pursuant to the Asset Disposition Offer, or if less than the Asset Disposition Offer Amount has been validly tendered and not properly withdrawn, all Notes and Pari Passu Indebtedness so validly tendered and not properly withdrawn and in minimum denominations of €100,000 and in integral multiples of €1,000 in excess thereof in respect of the Notes.  The Company shall deliver to the Trustee an Officer's Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.08.  The Company or the Paying Agent, as the case may be, shall promptly (but in any case not later than five Business Days after termination of the Asset Disposition Offer Period) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes so validly tendered and not properly withdrawn by such Holder, and accepted by the Company for purchase, and the Company shall promptly issue a new Note (or amend the Global Note), and the Trustee, upon delivery of an Officer's Certificate from the Company, shall (via the Authentication Agent) authenticate and mail or deliver (or cause to be transferred by book-entry) such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note surrendered; provided that each such new Note will be in a principal amount with a minimum denomination of €100,000 or in integral multiples of €1,000 in excess thereof. Any Note not so accepted will be promptly mailed or delivered (or transferred by book-entry) by the Company to the Holder thereof.

Other than as specifically provided in this Section 3.08, any purchase pursuant to this Section 3.08 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

SECTION 3.09        Redemption for Taxation Reasons.  The Company or Successor Company may redeem the Notes in whole, but not in part, at any time upon giving not less than 10 nor more than 60 days' notice to the Holders (which notice will be irrevocable) at a redemption price equal to 100% of the outstanding principal amount thereof, together with accrued and unpaid interest, if any, to, but excluding, the date fixed for redemption (a "Tax Redemption Date") (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date) and all Additional Amounts, if any, then due and which will become due on the Tax Redemption Date as a result of the redemption or otherwise, if any, if as a result of:

(1)        any change in, or amendment to, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Taxing Jurisdiction affecting taxation; or

(2)        any change in, or amendment to, an official position regarding the application, administration or interpretation of such laws, treaties, regulations or rulings (including pursuant to a holding, judgment or order by a court of competent jurisdiction or a change in published administrative practice) of a Relevant Taxing Jurisdiction (each of the foregoing in clauses (1) and (2), a "Change in Tax Law"),

the Company, Successor Company or Guarantor is, or on the next interest payment date in respect of the Notes or any Notes Guarantee would be, required to pay any Additional Amounts, and such obligation cannot be avoided by taking

reasonable measures available to the Company, Successor Company or Guarantor (including, for the avoidance of doubt, the appointment of a new Paying Agent where this would be reasonable and, in the case of a payment by a Guarantor, having the Company, Successor Company or another Guarantor make the payment, but not including assignment of the obligation to make payment with respect to the Notes). In the case of redemption due to withholding as a result of a Change in Tax Law in a jurisdiction that is a Relevant Taxing Jurisdiction at the date of the Offering Memorandum, such Change in Tax Law must become effective on or after the date of the Offering Memorandum. In the case of redemption due to withholding as a result of a Change in Tax Law in a jurisdiction that becomes a Relevant Taxing Jurisdiction after the date of the Offering Memorandum, such Change in Tax Law must become effective on or after the date the jurisdiction becomes a Relevant Taxing Jurisdiction (and, in the case of a Successor Company, on or after the date of assumption by the Successor Company of the Company's obligations hereunder).  Notice of redemption for taxation reasons will be published in accordance with Section 3.03. Notwithstanding the foregoing, no such notice of redemption will be given (a) earlier than 90 days prior to the earliest date on which the Payor would be obliged to make such payment of Additional Amounts and (b) unless at the time such notice is given, such obligation to pay such Additional Amounts remains in effect. Prior to the publication or mailing of any notice of redemption of the Notes pursuant to the foregoing, the Company, Successor Company or Guarantor will deliver to the Trustee (a) an Officer's Certificate stating that it is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to its right to so redeem have been satisfied and that it would not be able to avoid the obligation to pay Additional Amounts by taking reasonable measures available to it and (b) an opinion of an independent tax counsel of recognized standing to the effect that the Company, Successor Company or Guarantor has or will become obligated to pay Additional Amounts as a result of a Change in Tax Law. The Trustee will accept and shall be entitled to rely absolutely on such Officer's Certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent described above, without further inquiry, in which event it will be conclusive and binding on the Holders.

The foregoing provisions of this Section 3.09 will apply *mutatis mutandis* to any jurisdiction in which any successor to the Company, Successor Company or any Guarantor is organized or any political subdivision or taxing authority or agency thereof or therein.

ARTICLE IV

COVENANTS

SECTION 4.01        Payment of Notes.  The Company shall pay or cause to be paid the principal of, premium, if any, and interest and Additional Amounts, if any, on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, and interest and Additional Amounts, if any, will be considered paid on the date due if the Paying Agent

80

holds, as of 10:00 a.m. London time on the Business Day prior to such date (or such other time as the Company and the Paying Agent may mutually agree from time to time, but always subject to actual receipt), money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium and Additional Amounts, if any, and interest then due and is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture. The Company shall promptly notify the Trustee and the applicable Paying Agent of its failure to so deposit. Subject to actual receipt of such funds as provided by this Section 4.01 by the designated Paying Agent, such Paying Agent shall make payments on the Notes in accordance with this Indenture. In any event, the Company shall, prior to 10:00 a.m. London time on the Business Day prior to the date on which the Paying Agent receives payment, procure that the bank effecting payment for it confirms by SWIFT message to the Paying Agent that an irrevocable payment instruction has been given. A Paying Agent (or the Trustee, if applicable) shall only be obliged to make a payment under this Indenture if it has actually received cleared, immediately available funds from the Company as required under this Section 4.01.

The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to the then applicable interest rate on the Notes. The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) at the same rate to the extent lawful.

If a Paying Agent pays out funds on or after the due date therefor, or pays out funds (although it is not obligated to do so) on the assumption that the corresponding payment by the Company has been or shall be made and such payment has in fact not been so made by the Company, then the Company shall on demand reimburse the Paying Agent for the relevant amount, and pay interest to the Paying Agent on such amount from the date on which it is paid out to the date of reimbursement at a rate per annum equal to the cost to the Paying Agent of funding the amount paid out, as certified by the Paying Agent and expressed as a rate per annum.

SECTION 4.02    Maintenance of Office or Agency.  The Company shall maintain an office or agency (which may be an office of the Trustee or an Affiliate of the Trustee, Transfer Agent, Registrar or co-registrar) for the Notes in the United Kingdom, and for so long as the Notes are listed on the LxSE and the rules of the LxSE so require, in Luxembourg, where (1) Notes may be surrendered for registration of transfer or for exchange and (2) notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the United Kingdom, and for so long as any Notes are listed on the LxSE and the rules of the LxSE so require, in Luxembourg, for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 4.03      Reports.  (a) For so long as any Notes are outstanding, the Company will provide to the Trustee the following reports:

(1)      within 150 days after the end of the Company's fiscal year with respect to the fiscal year ended December 31, 2015 and within 120 days after the end of the Company's fiscal year beginning with the fiscal year ended December 31, 2016, annual reports containing, to the extent applicable, the following information:  (a) audited consolidated balance sheets of the Company or its predecessor as of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Company or its predecessor for the two most recent fiscal years, including complete footnotes to such financial statements and the report of the independent auditors on the financial statements; (b) unaudited *pro forma* income statement information and balance sheet information of the Company (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year; (c) an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, EBITDA and liquidity and capital resources of the Company, and a discussion of material commitments and contingencies and critical accounting policies; (d) a description of the business, management and shareholders of the Company, all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; and (e) a description of material risk factors and material recent developments;

(2)      within 75 days following the end of the first three fiscal quarters in each fiscal year of the Company beginning with the fiscal quarter ending March 31, 2016, all quarterly reports of the Company containing the following information:  (a) an unaudited condensed consolidated balance sheet as of the end of such fiscal quarter and unaudited condensed statements of income and cash flow for the most recently completed fiscal quarter year-to-date period ending on the unaudited condensed balance sheet date, and the comparable prior year periods, together with condensed footnote disclosure; (b) unaudited pro forma income statement information and balance sheet information of the Company (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the relevant fiscal quarter; (c) an operating and financial review of the unaudited year-to-date financial statements, including a discussion of the results of operations, financial condition, EBITDA and material changes in liquidity and capital resources of the Company, and a discussion of material changes not in the ordinary course of business in commitments and contingencies since the most recent report; and (d) material recent developments; and

82

(3)       promptly after the occurrence of any material acquisition, disposition, restructuring, Permitted Reorganization, merger or similar transaction, or any senior executive officer changes at the Company or change in auditors of the Company or any other material event that the Company or any of its Restricted Subsidiaries announces publicly, a report containing a description of such event.

(b)       All financial statements and *pro forma* financial information shall be prepared in accordance with IFRS as in effect on the date of such report or financial statement (or otherwise on the basis of IFRS as then in effect) and on a consistent basis for the periods presented; provided, however, that the reports set forth in clauses (1), (2) and (3) of Section 4.03(a) may, in the event of a change in IFRS, present earlier periods on a basis that applied to such periods.  Except as provided for in clause (c) of this Section 4.03, no report needs to include separate financial statements for any Subsidiaries of the Company. Notwithstanding the foregoing, the Company may satisfy its obligations under clauses (1) and (2) of Section 4.03(a) by delivering the corresponding consolidated annual and quarterly reports of any Parent. To the extent that material differences exist between the management, business, assets, shareholding or results of operations or financial condition of the Parent that is the reporting entity, the annual and quarterly reports shall include an explanation and an unaudited reconciliation of such material differences.

(c)       At any time that any of the Company's Subsidiaries are Unrestricted Subsidiaries and any such Unrestricted Subsidiary or group of Unrestricted Subsidiaries, if taken together as one Subsidiary, constitutes a Significant Subsidiary of the Company, then the annual and quarterly financial information required by clauses (1) and (2) of Section 4.03(a) shall include either (i) a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company or (ii) stand-alone audited or unaudited financial statements, as the case may be, of such Unrestricted Subsidiary or Unrestricted Subsidiaries (as a group or otherwise).

(d)       Substantially concurrently with the issuance to the Trustee of the reports specified in clauses (1), (2) and (3) of Section 4.03(a), the Company shall also (a) use its commercially reasonable efforts (i) to post copies of such reports on such website as may be then maintained by the Company and its Subsidiaries or (ii) otherwise to provide substantially comparable public availability of such reports (as determined by the Board of Directors or an Officer of the Company in good faith) or (b) to the extent the Board of Directors or an Officer of the Company determines in good faith that it cannot make such reports available in the manner described in clause (a) of this Section 4.03(d) owing to applicable law or after the use of its commercially reasonable efforts, furnish such reports to the Holders and, upon their request, prospective purchasers of the Notes.

(e)       The Company will also make available copies of all reports required by clauses (1) through (3) of Section 4.03(a), if and so long as the Notes are listed on the Official List of the LxSE and admitted for trading on the Euro MTF Market of the LxSE

and the rules of such exchange so require, at the offices of the Registrar or, to the extent and in the manner permitted by such rules, post such reports on the official website of the Official List LxSE.

(f)     In addition, so long as the Notes remain outstanding and during any period during which the Company is not subject to Section 13 or 15(d) of the Exchange Act nor exempt therefrom pursuant to Rule 12g3-2(b), the Company shall furnish to the Holders and, upon their request, prospective purchasers of the Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

SECTION 4.04     Compliance Certificates.  The Company will deliver to the Trustee, within 120 days after the end of each fiscal year (and within 14 days upon request at any time after the 120 days), an Officer's Certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Company shall deliver to the Trustee, as soon as reasonably practicable (but no later than 30 days after the occurrence thereof), an Officer's Certificate specifying any events of which it is aware which would constitute a Default, their status and what action the Company is taking or proposes to take in respect thereof.

SECTION 4.05     Taxes.  The Company shall pay, and the Company shall cause each Restricted Subsidiary to pay, prior to delinquency, all Taxes except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders.

SECTION 4.06     Limitation on Transfer of Vessels.  Notwithstanding anything to the contrary contained in this Indenture, neither the Company nor any of its Restricted Subsidiaries (other than CIN or any of its Restricted Subsidiaries) shall transfer any vessel or vessels useful in the conduct of the business of the Company and its Restricted Subsidiaries to CIN or any of its Restricted Subsidiaries; provided that the Company and its Restricted Subsidiaries (other than CIN or any of its Restricted Subsidiaries) may transfer vessels to CIN and its Restricted Subsidiaries if the aggregate fair market value of all such vessels transferred does not exceed €85.0 million. The foregoing shall not limit the ability of the Company and its Restricted Subsidiaries to lease or sublease vessels to CIN or any of its Restricted Subsidiaries.

SECTION 4.07     Limitation on Restricted Payments.  (a) The Company will not, and will not permit any of its Restricted Subsidiaries, directly or indirectly, to:

(1)     declare or pay any dividend or make any other distribution on or in respect of the Company's or any Restricted Subsidiary's Capital Stock (including any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) except:

(A)     dividends or distributions payable in Capital Stock of the Company (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Company or in Subordinated Shareholder Funding; and

(B)      dividends or distributions payable to the Company or a Restricted Subsidiary (and, in the case of any such Restricted Subsidiary making such dividend or distribution, to holders of its Capital Stock other than the Company or a Restricted Subsidiary on no more than a pro rata basis, measured by value);

(2)      purchase, redeem, retire or otherwise acquire for value any Capital Stock of the Company or any direct or indirect Parent of the Company held by Persons other than the Company or a Restricted Subsidiary (other than in exchange for Capital Stock of the Company (other than Disqualified Stock));

(3)      make any principal payment on, or purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Indebtedness (other than (a) any such payment, purchase, repurchase, redemption, defeasance or other acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of payment, purchase, repurchase, redemption, defeasance or other acquisition or retirement and (b) any Indebtedness Incurred pursuant to Section 4.09(b)(3));

(4)      make any payment (other than by capitalization of interest) on or with respect to, or purchase, repurchase, redeem, defease or otherwise acquire or retire for value any Subordinated Shareholder Funding; or

(5)      make any Restricted Investment in any Person;

(any such dividend, distribution, payment, purchase, redemption, repurchase, defeasance, other acquisition, retirement or Restricted Investment referred to in clauses (1) through (5) are referred to herein as a "Restricted Payment"), if at the time the Company or such Restricted Subsidiary makes such Restricted Payment:

(A)      a Default shall have occurred and be continuing (or would result immediately thereafter therefrom);

(B)      the Company is not permitted to Incur an additional €1.00 of Indebtedness pursuant to Section 4.09(a)(1) after giving effect, on a *pro forma* basis, to such Restricted Payment; or

(C)      the aggregate amount of such Restricted Payment and all other Restricted Payments made subsequent to the Issue Date (and not returned or rescinded) (including Permitted Payments permitted below by clauses (5) (without duplication of amounts paid pursuant to any other clause of Section 4.07(b)), (6), (10) and (11) of Section 4.07(b), but excluding all other Restricted Payments permitted by Section 4.07(b)) would exceed the sum of (without duplication):

85

(i)      50% of Consolidated Net Income for the period (treated as one accounting period) from the first day of the fiscal quarter commencing prior to the Issue Date to the end of the most recent fiscal quarter ending prior to the date of such Restricted Payment for which internal consolidated financial statements of the Company are available (or, in the case such Consolidated Net Income is a deficit, minus 100% of such deficit);

(ii)      100% of the aggregate Net Cash Proceeds, and the fair market value (as determined in accordance with the next succeeding paragraph) of property or assets or marketable securities, received by the Company from the issue or sale of its Capital Stock (other than Disqualified Stock) or Subordinated Shareholder Funding subsequent to the Issue Date or otherwise contributed to the equity (other than through the issuance of Disqualified Stock) of the Company subsequent to the Issue Date (other than (x) Net Cash Proceeds or property or assets or marketable securities received from an issuance or sale of such Capital Stock to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Company or any Subsidiary of the Company for the benefit of its employees to the extent funded by the Company or any Restricted Subsidiary, (y) Net Cash Proceeds or property or assets or marketable securities to the extent that any Restricted Payment has been made from such proceeds in reliance on Section 4.07(b)(6) and (z) Excluded Contributions since the Issue Date);

(iii)      100% of the aggregate Net Cash Proceeds, and the fair market value (as determined in accordance with the last paragraph of this Section 4.07(a)) of property or assets or marketable securities, received by the Company or any Restricted Subsidiary from the issuance or sale (other than to the Company or a Restricted Subsidiary or an employee stock ownership plan or trust established by the Company or any Subsidiary of the Company for the benefit of its employees to the extent funded by the Company or any Restricted Subsidiary) by the Company or any Restricted Subsidiary subsequent to the Issue Date of any Indebtedness that has been converted into or exchanged for Capital Stock of the Company (other than Disqualified Stock) or Subordinated Shareholder Funding (plus the amount of any cash, and the fair market value (as determined in accordance with the next succeeding paragraph) of property or assets or marketable securities, received by the Company or any Restricted Subsidiary upon such conversion or exchange) but excluding (x) Net Cash Proceeds to the extent that any Restricted Payment has been made from such proceeds in reliance on Section 4.07(b)(6) and (y) Excluded Contributions;

86

(iv)    the amount equal to the net reduction in Restricted Investments made by the Company or any of its Restricted Subsidiaries resulting from:

(A)    repurchases, redemptions or other acquisitions or retirements of any such Restricted Investment, proceeds realized upon the sale or other disposition to a Person other than the Company or a Restricted Subsidiary of any such Restricted Investment, repayments of loans or advances or other transfers of assets (including by way of dividend, distribution, interest payments or returns of capital) to the Company or any Restricted Subsidiary; or

(B)    the redesignation of Unrestricted Subsidiaries as Restricted Subsidiaries (valued, in each case, as provided in the definition of "Investment") not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Company or any Restricted Subsidiary in such Unrestricted Subsidiary, which amount, in each case under this clause (iv), was included in the calculation of the amount of Restricted Payments referred to in the first sentence of this clause (B);

provided, however, that no amount will be included in Consolidated Net Income for purposes of clause (5)(C)(i) of Section 4.07(a) to the extent that it is (at the Company's option) included under this clause (5)(C)(iv) of Section 4.07(a); and

(v)    the amount of the cash and the fair market value (as determined in accordance with the next succeeding paragraph) of property or assets or of marketable securities received by the Company or any of its Restricted Subsidiaries in connection with:

(A)    the sale or other disposition (other than to the Company or a Restricted Subsidiary or an employee stock ownership plan or trust established by the Company or any Subsidiary of the Company for the benefit of its employees to the extent funded by the Company or any Restricted Subsidiary) of Capital Stock of an Unrestricted Subsidiary of the Company; and

(B)    any dividend or distribution made by an Unrestricted Subsidiary or Affiliate to the Company or a Restricted Subsidiary;

provided, however, that no amount will be included in Consolidated Net Income for purposes of clause (5)(C)(i) of Section 4.07(a) to the extent that it is (at the Company's option) included under this clause (5)(C)(v) of Section 4.07(a); provided further, however, that such amount under this clause (5)(C)(v) of Section 4.07(a) shall not exceed the amount included in the calculation of the amount of Restricted Payments referred to in the first sentence of this clause (5)(C) of Section 4.07(a).

The fair market value of property or assets other than cash covered by this Section 4.07(a) shall be the fair market value thereof as determined in good faith by the Board of Directors or an Officer of the Company.

(b)      The foregoing provisions will not prohibit any of the following (collectively, "Permitted Payments"):

(1)      any Restricted Payment made in exchange (including any such exchange pursuant to the exercise of a conversion right or privilege in connection with which cash is paid in lieu of the issuance of fractional shares) for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Company (other than Disqualified Stock), Subordinated Shareholder Funding or a substantially concurrent contribution to the equity (other than through the issuance of Disqualified Stock or through an Excluded Contribution) of the Company subsequent to the Issue Date; provided, however, that to the extent so applied, the Net Cash Proceeds, or fair market value (as determined in accordance with the last paragraph of this Section 4.07(a)) of property or assets or of marketable securities, from such sale of Capital Stock, Subordinated Shareholder Funding or such contribution will be excluded from Section 4.07(a)(5)(C)(ii), and will not be considered Excluded Contributions or to be net cash proceeds from an Equity Offering for the purposes of "Optional Redemption" provisions of the Notes;

(2)      any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness made in exchange for, or out of the proceeds of the substantially concurrent Incurrence of Refinancing Indebtedness permitted to be Incurred pursuant to Section 4.09;

(3)      any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Preferred Stock of the Company or a Restricted Subsidiary made in exchange for or out of the proceeds of the substantially concurrent sale of Preferred Stock of the Company or a Restricted Subsidiary, as the case may be, that, in each case, is permitted to be Incurred pursuant to Section 4.09, and that in each case, constitutes Refinancing Indebtedness;

(4)      any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness:

(A)      (i) from Net Available Cash to the extent permitted under Section 4.10, but only if the Company shall have first complied with Section 4.10 and purchased all Notes tendered pursuant to any offer to repurchase all the Notes required thereby, prior to purchasing, repurchasing, redeeming, defeasing or otherwise acquiring or retiring such Subordinated Indebtedness and (ii) at a purchase price not greater than 100% of the principal amount of such Subordinated Indebtedness plus accrued and unpaid interest;

(B)      to the extent required by the agreement governing such Subordinated Indebtedness, following the occurrence of a Change of Control (or other similar event described therein as a "change of control"), but only (i) if the Company shall have first complied with Section 4.14, if required, and purchased all Notes tendered pursuant to the offer to repurchase all the Notes required thereby, prior to purchasing, repurchasing, redeeming, defeasing or otherwise acquiring or retiring such Subordinated Indebtedness and (ii) at a purchase price not greater than 101% of the principal amount of such Subordinated Indebtedness plus accrued and unpaid interest; or

(C)      (i) consisting of Acquired Indebtedness (other than Indebtedness Incurred (A) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was otherwise acquired by the Company or a Restricted Subsidiary or (B) otherwise in connection with or contemplation of such acquisition) and (ii) at a purchase price not greater than 100% of the principal amount of such Subordinated Indebtedness plus accrued and unpaid interest and any premium required by the terms of such Acquired Indebtedness;

(5)      any dividends paid within 60 days after the date of declaration if at such date of declaration such dividend would have complied with this Section 4.07;

(6)      the purchase, repurchase, redemption, defeasance or other acquisition, cancellation or retirement for value of Capital Stock of the Company, or any Parent or any entity formed for the purpose of investing in Capital Stock of the Company or any Parent (including any options, warrants or other rights in respect thereof) and loans, advances, dividends or distributions by the Company to any Parent to permit any Parent or such entity to purchase, repurchase, redeem, defease or otherwise acquire, cancel or retire for value Capital Stock of the Company or any Parent (including any options, warrants or other rights in respect thereof), or payments to purchase, repurchase, redeem, defease or otherwise acquire, cancel or retire for value Capital Stock of any Parent (including any options, warrants or other rights in respect thereof), in each case from Management Investors; provided that such payments, loans, advances, dividends or distributions do not exceed an amount (net of repayments of any such loans or

89

advances) equal to (A) €3.0 million in any calendar year (with unused amounts in any calendar year being carried over to the next two succeeding calendar years), plus (B) the Net Cash Proceeds received by the Company or its Restricted Subsidiaries subsequent to the Issue Date (including through receipt of proceeds from the issuance or sale of its Capital Stock or Subordinated Shareholder Funding to a Parent) from, or as a contribution to the equity (in each case under this clause (B), other than through the issuance of Disqualified Stock) of the Company from, the issuance or sale to Management Investors of Capital Stock (including any options, warrants or other rights in respect thereof), to the extent such Net Cash Proceeds have not otherwise been designated as Excluded Contributions and are not included in any calculation under Section 4.07(a)(5)(C)(ii);

(7)     the declaration and payment of dividends to holders of any class or series of Disqualified Stock, or of any Preferred Stock of a Restricted Subsidiary, Incurred in accordance with Section 4.09;

(8)     purchases, repurchases, redemptions, defeasances or other acquisitions or retirements of Capital Stock deemed to occur upon the exercise of stock options, warrants or other rights in respect thereof if such Capital Stock represents a portion of the exercise price thereof;

(9)     dividends, loans, advances or distributions to any Parent or any Affiliates or other payments by the Company or any Restricted Subsidiary in amounts equal to (without duplication):

(A)     the amounts required for any Parent to pay any Parent Expenses or any Related Taxes; or

(B)     amounts constituting or to be used for purposes of making payments (i) of fees, expenses and other payments in relation to the Transactions or (ii) to the extent specified in clauses (2), (3), (5), (7), (11) and (12) of Section 4.11(b);

(10)     so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, following a Public Offering of the Capital Stock of the Company or a Parent, the declaration and payment by the Company of, or loans, advances, dividends or distributions on, the Capital Stock of the Company in an amount per annum not to exceed the greater of (a) 6.0% of the Net Cash Proceeds received from such Public Offering by the Company or otherwise contributed to the Company's equity (other than through the issuance of Disqualified Stock or Excluded Contributions) and (b) an amount equal to 6.0% of the Market Capitalization; provided that, in the case of this clause (b), after giving *pro forma* effect to such loans, advances, dividends or distributions, the Consolidated Net Leverage Ratio of the Company and its Restricted Subsidiaries would not exceed 3.25 to 1.0; provided, further, in each case, that if such Public Offering was of the Capital Stock of a Parent, the net proceeds of any such loans,

advances, dividends or distributions are used to fund a corresponding dividend in equal or greater amount on the Capital Stock of such Parent;

(11)    so long as no Default or Event of Default has occurred and is continuing (or would result therefrom), (a) Restricted Payments (including loans or advances) in an aggregate amount outstanding at any time not to exceed €20.0 million since the Issue Date and (b) any Restricted Payment, provided that in the case of (11)(b) only the Consolidated Net Leverage Ratio on a *pro forma* basis after giving effect to any such Restricted Payment and any related transaction does not exceed 2.75 to 1.00;

(12)    payments by the Company, or loans, advances, dividends or distributions to any Parent to make payments, to holders of Capital Stock of the Company or any Parent in lieu of the issuance of fractional shares of such Capital Stock; provided, however, that any such payment, loan, advance, dividend or distribution shall not be for the purpose of evading any limitation of this Section 4.07 or otherwise to facilitate any dividend or other return of capital to the holders of such Capital Stock (as determined in good faith by the Board of Directors or an Officer of the Company);

(13)    Investments in an aggregate amount outstanding at any time not to exceed the aggregate cash amount of Excluded Contributions, or consisting of non-cash Excluded Contributions, or Investments to the extent made in exchange for or using as consideration Investments previously made under this clause (13);

(14)    dividends or other distributions of Capital Stock of Unrestricted Subsidiaries; and

(15)    payment of any Receivables Fees and purchases of Receivables Assets pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing.

(c)    The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment.  The fair market value of any cash Restricted Payment shall be its face amount, and the fair market value of any non-cash Restricted Payment shall be determined conclusively by the Board of Directors or an Officer of the Company acting in good faith. The Company, in its sole discretion, may classify any Investment or other Restricted Payment only on the date such Investment or Restricted Payment is made as being made in part under one of the provisions of this covenant (or, in the case of any Investment, the paragraphs in the definition of Permitted Investments) and in part under one or more other such provisions (or, as applicable, clauses to the extent such provisions apply to the same Investment or Restricted Payment, as the case may be).

SECTION 4.08        Limitation on Restrictions on Distributions from Restricted Subsidiaries.  (a) The Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(A)        pay dividends or make any other distributions in cash or otherwise on its Capital Stock or pay any Indebtedness or other obligations owed to the Company or any Restricted Subsidiary;

(B)        make any loans or advances to the Company or any Restricted Subsidiary; or

(C)        sell, lease or transfer any of its property or assets to the Company or any Restricted Subsidiary,

provided that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Company or any Restricted Subsidiary to other Indebtedness Incurred by the Company or any Restricted Subsidiary shall not be deemed to constitute such an encumbrance or restriction.

(b)        The provisions of Section 4.08(a) shall not prohibit:

(1)        any encumbrance or restriction pursuant to (a) the Credit Agreement, (b) this Indenture, the Notes, the Notes Guarantees, the Intercreditor Agreement, any Additional Intercreditor Agreement and the Security Documents or (c) any other agreement or instrument in effect at or entered into on the Issue Date;

(2)        any encumbrance or restriction pursuant to an agreement or instrument of a Person or relating to any Capital Stock or Indebtedness of a Person, entered into on or before the date on which such Person was acquired by or merged, consolidated or otherwise combined with or into the Company or any Restricted Subsidiary, or was designated as a Restricted Subsidiary, or on which such agreement or instrument is assumed by the Company or any Restricted Subsidiary in connection with an acquisition of assets (other than Capital Stock or Indebtedness Incurred as consideration in, or to provide all or any portion of the funds utilized to consummate, the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was acquired by the Company or was merged, consolidated or otherwise combined with or into the Company or any Restricted Subsidiary entered into or in connection with such transaction) and outstanding on such date; provided that, for the purposes of this clause (2), if another Person is the Successor Company, any Subsidiary thereof or agreement or instrument of such Person or any such Subsidiary shall be deemed acquired or assumed by the Company or any Restricted Subsidiary when such Person becomes the Successor Company;

(3)     any encumbrance or restriction pursuant to an agreement or instrument effecting a refinancing of Indebtedness Incurred pursuant to, or that otherwise refinances, an agreement or instrument referred to in clause (1) or (2) of this Section 4.08(b) or this clause (3) (an "Initial Agreement") or contained in any amendment, supplement or other modification to an agreement referred to in clause (1) or (2) of this Section 4.08(b) or this clause (3); provided, however, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such agreement or instrument are not materially more restrictive to the Holders, taken as a whole, with respect to such encumbrances and restrictions than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such refinancing or amendment, supplement or other modification relates (as determined in good faith by the Board of Directors or an Officer of the Company);

(4)     any encumbrance or restriction:

(A)     that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any lease, license or other contract;

(B)     contained in mortgages, pledges, charges or other security agreements permitted under this Indenture or securing Indebtedness of the Company or a Restricted Subsidiary permitted under this Indenture to the extent such encumbrances or restrictions restrict the transfer of the property or assets subject to such mortgages, pledges, charges or other security agreements; or

(C)     pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Company or any Restricted Subsidiary;

(5)     any encumbrance or restriction pursuant to Purchase Money Obligations and Capitalized Lease Obligations permitted under this Indenture, in each case, that impose encumbrances or restrictions on the property so acquired or any encumbrance or restriction pursuant to a joint venture agreement that imposes restrictions on the transfer of the assets of the joint venture;

(6)     any encumbrance or restriction with respect to a Restricted Subsidiary (or any of its property or assets) imposed pursuant to an agreement entered into for the direct or indirect sale or disposition to a Person of all or substantially all the Capital Stock or assets of such Restricted Subsidiary (or the property or assets that are subject to such restriction) pending the closing of such sale or disposition;

93

(7)     customary provisions in leases, licenses, joint venture agreements, and other similar agreements and instruments entered into in the ordinary course of business;

(8)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order (including encumbrances or restrictions on making distributions in cash or Cash Equivalents as a dividend or otherwise that arise or exist by reason of applicable law or any applicable rule, regulation or order) or encumbrances or restrictions required by any regulatory authority;

(9)     any encumbrance or restriction on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business;

(10)    any encumbrance or restriction pursuant to Hedging Agreements;

(11)    any encumbrance or restriction arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be Incurred subsequent to the Issue Date pursuant to Section 4.09 if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Holders than (i) the encumbrances and restrictions contained in the Credit Agreement the Intercreditor Agreement and the Security Documents or (ii) in comparable financings (as determined in good faith by the Board of Directors or an Officer of the Company) and where, in the case of clause (ii), the Company determines at the time such Indebtedness is Incurred that such encumbrances or restrictions will not adversely affect, in any material respect, the Company's ability to make principal or interest payments on the Notes;

(12)    any encumbrance or restriction existing by reason of any Lien permitted under Section 4.12; or

(13)    restrictions effected in connection with a Qualified Receivables Financing that, in the good faith determination of the Board of Directors or an Officer of the Company, are necessary or advisable to effect such Qualified Receivables Financing.

SECTION 4.09     Limitation on Indebtedness.  (a) The Company will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Indebtedness); provided, however, that the Company and any Restricted Subsidiary may Incur Indebtedness if on the date of such Incurrence and after giving pro forma effect thereto (including pro forma application of the proceeds thereof), (1) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred would have been at least 2.0 to 1.0 and, (2) to the extent that the Indebtedness is Senior Secured Indebtedness, the Consolidated Senior Secured Net Leverage Ratio for the Company and its Restricted Subsidiaries for the most recently ended

four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred would have been no greater than 3.0 to 1.0.

(b)      Section 4.09(a) shall not prohibit the Incurrence of the following Indebtedness:

(1)      Indebtedness Incurred pursuant to any Credit Facility (including in respect of letters of credit or bankers' acceptances issued or created thereunder), and any Refinancing Indebtedness in respect thereof and Guarantees in respect of such Indebtedness in a maximum aggregate amount of Indebtedness then outstanding not exceeding (i) the greater of (x) €300.0 million and (y) 31.0% of Total Assets, plus (ii) in the case of any refinancing of any Indebtedness permitted under this clause (1) or any portion thereof, the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses Incurred in connection with such refinancing, less (iii) the aggregate amount of all Net Available Cash from Asset Dispositions since the Issue Date applied by the Company or any Restricted Subsidiary pursuant to the covenant described under Section 4.10 to repay any Indebtedness under any Credit Facility Incurred pursuant to this clause (1) (and to permanently reduce commitments thereunder);

(2)      (A)      Guarantees by the Company or any Restricted Subsidiary of Indebtedness of the Company or any Restricted Subsidiary, in each case, so long as the Incurrence of such Indebtedness being guaranteed is permitted under the terms of this Indenture (other than pursuant to this clause (2)); provided that, if Indebtedness being guaranteed is subordinated to or *pari passu* with the Notes or a Notes Guarantee, then the guarantee must be subordinated to or *pari passu* with the Notes or Notes Guarantees, as applicable, to the same extent as the Indebtedness guaranteed; or

(B)      without limiting Section 4.12, Indebtedness arising by reason of any Lien granted by or applicable to such Person securing Indebtedness of the Company or any Restricted Subsidiary, in each case so long as the Incurrence of such Indebtedness is permitted under the terms of this Indenture (other than pursuant to this clause (2));

(3)      Indebtedness of the Company owing to and held by any Restricted Subsidiary or Indebtedness of a Restricted Subsidiary owing to and held by the Company or any Restricted Subsidiary; provided, however, that:

(A)      other than in respect of intercompany current liabilities Incurred in connection with credit management, cash management, cash pooling, netting, setting off or similar arrangements in the ordinary course of business of the Company and the Restricted Subsidiaries and only to the extent legally permitted (the Company and its Restricted Subsidiaries having completed all procedures required in the reasonable judgment of directors or officers of the obligee or obligor to protect such Persons from

95

any penalty or civil or criminal liability in connection with the subordination of such Indebtedness), if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, such Indebtedness must be unsecured and expressly subordinated to the prior payment in full in cash of all obligations then due (x) in the case of the Company with respect to the Notes, or (y) in the case of a Guarantor, with respect to its Notes Guarantee, in each case in the manner and to the extent provided for in the Intercreditor Agreement; and

(B)     (i) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than the Company or a Restricted Subsidiary; and (ii) any sale or other transfer of any such Indebtedness to a Person other than the Company or a Restricted Subsidiary, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this clause (3) by the Company or such Restricted Subsidiary, as the case may be;

(4)     Indebtedness represented by (a) the Notes (other than any Additional Notes) and the Notes Guarantees, (b) any Indebtedness (other than Indebtedness described in clauses (1), (3) and (4)(a) of this Section 4.09(b)) of the Company or any Restricted Subsidiary entered into or outstanding on the Issue Date after giving effect to the Transactions, (c) Refinancing Indebtedness that is Incurred in respect of any Indebtedness described in this clause (4) or clause (5)(A) of this Section 4.09(b) or Incurred pursuant to Section 4.09(a) and (d) Management Advances;

(5)     (a) Indebtedness of any Person outstanding on the date on which such Person becomes a Restricted Subsidiary of the Company or is merged, consolidated, amalgamated or otherwise combined with (including pursuant to any acquisition of assets and assumption of related liabilities) the Company or any Restricted Subsidiary or (b) Indebtedness of any Person Incurred in relation to any such acquisition, merger, consolidation, amalgamation or combination; provided, however, with respect to this clause (5), that (A) at the time of the acquisition or other transaction pursuant to which such Indebtedness was deemed to be Incurred (i)(x) the Company would have been permitted to Incur €1.00 of additional Indebtedness pursuant to Section 4.09(a)(1),after giving *pro forma* effect to the Incurrence of such Indebtedness pursuant to this clause (5) or (y) the Fixed Charge Coverage Ratio of the Company would not be less than it was immediately prior to giving pro forma effect to the incurrence of such Indebtedness pursuant to this clause (5) and (ii) if the Indebtedness is Senior Secured Indebtedness Incurred by the Company or a Restricted Subsidiary (other than such Person (and any of such Person's Subsidiaries) subject to the acquisition or other transaction pursuant to which such Indebtedness was Incurred), (x) the Company would have been permitted to Incur €1.00 of additional Indebtedness pursuant to Section 4.09(a)(2) or (y) the Consolidated Senior Secured Net Leverage Ratio would not be greater than it was immediately

prior to giving effect to such acquisition or other transaction on a *pro forma* basis or (B) in the case of Indebtedness described under this clause (5)(b) only, such Indebtedness, when taken together with all other Indebtedness incurred pursuant to this clause (5)(B) then outstanding and any Refinancing Indebtedness of Indebtedness incurred pursuant to this clause (5)(B) and Guarantees in respect thereof, does not exceed €100.0 million;

(6)     Indebtedness under Hedging Agreements entered into for bona fide hedging purposes of the Company or its Restricted Subsidiaries and not for speculative purposes (as determined in good faith by the Board of Directors or an Officer of the Company);

(7)     Indebtedness consisting of (A) Capitalized Lease Obligations, mortgage financings, Purchase Money Obligations or other Indebtedness, in each case, Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, plant or equipment used in a Similar Business, (B) Indebtedness otherwise Incurred to finance the purchase, lease, rental or cost of design, construction, installation or improvement of property (real or personal) or equipment that is used or useful in a Similar Business and (C) any Refinancing Indebtedness and Guarantees in respect of (A) or (B), in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (7) then outstanding, will not exceed the greater of (x) €50.0 million and (y)5.2% of Total Assets;

(8)     Indebtedness in respect of (a) workers' compensation claims, self-insurance obligations, performance, indemnity, surety, judgment, appeal, advance payment, customs, VAT or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties provided by the Company or a Restricted Subsidiary or relating to liabilities, obligations, indemnities or guarantees Incurred in the ordinary course of business or for governmental or regulatory requirements, (b) letters of credit, bankers' acceptances, guarantees or other similar instruments or obligations issued or relating to liabilities or obligations Incurred in the ordinary course of business; provided, however, that upon the drawing of such letters of credit or other instrument, such obligations are reimbursed within 30 days following such drawing, (c) the financing of insurance premiums in the ordinary course of business and (d) any credit management, cash management, cash pooling, netting, setting off or similar arrangements in the ordinary course of business of the Company and the Restricted Subsidiaries;

(9)     Indebtedness arising from agreements providing for customary guarantees, indemnification, obligations in respect of earn-outs or other adjustments of purchase price or, in each case, similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business or assets or Person or any Capital Stock of a Subsidiary (other than Guarantees of Indebtedness Incurred by any Person acquiring or disposing of such

business or assets or such Subsidiary for the purpose of financing such acquisition or disposition); provided that the maximum liability of the Company and its Restricted Subsidiaries in respect of all such Indebtedness shall at no time exceed the gross proceeds, including the fair market value of non-cash proceeds (measured at the time received and without giving effect to any subsequent changes in value), actually received by the Company and its Restricted Subsidiaries in connection with any such disposition;

(10)    (A)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within 30 Business Days of Incurrence;

(B)    Indebtedness owed on a short-term basis of no longer than 45 days to banks and other financial institutions Incurred in the ordinary course of business of the Company and its Restricted Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances of the Company and its Restricted Subsidiaries; and

(C)    Indebtedness Incurred by the Company or a Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case Incurred or undertaken in the ordinary course of business;

(11)    Indebtedness in an aggregate outstanding principal amount which, when taken together with any Refinancing Indebtedness and Guarantees in respect thereof and the aggregate principal amount of all other Indebtedness Incurred pursuant to this clause (11) then outstanding, will not exceed the greater of (x) €60.0 million and (y) 6.2% of Total Assets;

(12)    Indebtedness (including any Refinancing Indebtedness and Guarantees in respect thereof) in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (12) and then outstanding, will not exceed 100% of the Net Cash Proceeds received by the Company from the issuance or sale (other than to a Restricted Subsidiary) of its Subordinated Shareholder Funding or its Capital Stock (other than Disqualified Stock or an Excluded Contribution) or otherwise contributed to the equity (other than through the issuance of Disqualified Stock or an Excluded Contribution) of the Company, in each case, subsequent to the Issue Date; provided, however, that (i) any such Net Cash Proceeds that are so received or contributed shall be excluded for purposes of making Restricted Payments under Section 4.07(a) and clauses (1), (6), (10) and (14) of Section 4.07(b) to the extent the Company and its Restricted Subsidiaries Incur Indebtedness in reliance thereon and (ii) any Net Cash Proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness

98

pursuant to this clause (12) to the extent the Company or any of its Restricted Subsidiaries makes a Restricted Payment under Section 4.07(a) and/or clauses (1), (6), (10) and (14)  of Section 4.07(b) in reliance thereon; and

(13)    Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing.

Notwithstanding anything to the contrary contained herein, the aggregate principal amount of Indebtedness (excluding any interest paid in kind) that is permitted to be incurred by CIN and Restricted Subsidiaries of the Company that are not Guarantors pursuant to Section 4.09(a) and clauses (1), (5)(b) (other than Indebtedness incurred pursuant to clause (5)(B)), (7), (11) and (12) of this Section 4.09(b) and without double counting, including all Refinancing Indebtedness incurred by CIN or any such Restricted Subsidiary of the Company to redeem, refund, repay, replace, defease or discharge such Indebtedness, shall not exceed at any one time outstanding an amount equal to the greater of (x) €50.0 million and (y) 5.2% of Total Assets.

(c)    For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 4.09:

(1)    in the event that Indebtedness meets the criteria of more than one of the types of Indebtedness described in Section 4.09(a) and 4.09(b), the Company, in its sole discretion, will classify, and may from time to time reclassify, such item of Indebtedness and only be required to include the amount and type of such Indebtedness in one of the clauses of Section 4.09(a) or 4.09(b); provided that (i) Indebtedness under the Credit Agreement incurred after the Issue Date will be deemed to have been incurred pursuant to Section 4.09(b)(1) and may not be reclassified, (ii) Indebtedness under the Credit Agreement incurred or outstanding on the Issue Date will be deemed to have been incurred on such date in reliance on the exception provided in Section 4.09(b)(1) and not Section 4.09(a) or Section 4.09(b)(4)(b) and may not be reclassified and (iii) Indebtedness incurred pursuant to Section 4.09(b)(5)(B) may not be reclassified;;

(2)    Guarantees of, or obligations in respect of, letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(3)    if obligations in respect of letters of credit, bankers' acceptances or other similar instruments are Incurred pursuant to any Credit Facility and are being treated as Incurred pursuant to clause (1),(5), (7), (11) or (12) of Section 4.09(b) or pursuant to Section 4.09(a) and the letters of credit, bankers' acceptances or other similar instruments relate to other Indebtedness, then such other Indebtedness shall not be included;

(4)     the principal amount of any Disqualified Stock of the Company or a Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(5)     Indebtedness permitted by this Section 4.09 need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 4.09 permitting such Indebtedness; and

(6)     the amount of any Indebtedness outstanding as of any date shall be calculated as described under the definition of "Indebtedness"; provided that the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined on the basis of IFRS.

(d)     Accrual of interest, accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock or the reclassification of commitments or obligations not treated as Indebtedness due to a change in IFRS will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 4.09.

(e)     If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary shall be deemed to be Incurred by a Restricted Subsidiary as of such date.

(f)     For purposes of determining compliance with any euro-denominated restriction on the Incurrence of Indebtedness, the Euro Equivalent of the aggregate principal amount of Indebtedness denominated in another currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term Indebtedness, or, at the option of the Company, first committed, in the case of Indebtedness Incurred under a revolving credit facility; provided that (a) if such Indebtedness is Incurred to refinance other Indebtedness denominated in a currency other than euro, and such refinancing would cause the applicable euro-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such euro-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the aggregate principal amount of such Indebtedness being refinanced; (b) the Euro Equivalent of the aggregate principal amount of any such Indebtedness outstanding on the Issue Date shall be calculated based on the relevant currency exchange rate in effect on the Issue Date; and (c) if and for so long as any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal amounts payable on such Indebtedness, the amount of such Indebtedness, if denominated in euro, will be the amount of the principal payment required to be made under such Currency Agreement

100

and, otherwise, the Euro Equivalent of such amount plus the Euro Equivalent of any premium which is at such time due and payable but is not covered by such Currency Agreement.

(g)     Notwithstanding any other provision of this Section 4.09, the maximum amount of Indebtedness that the Company or a Restricted Subsidiary may Incur pursuant to this Section 4.09 shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies.  The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.10      Limitation on Sales of Assets and Subsidiary Stock.

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, make any Asset Disposition unless:

(1)     the Company or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the fair market value (such fair market value to be determined on the date of contractually agreeing to such Asset Disposition), as determined in good faith by the Board of Directors or an Officer of the Company, of the shares and assets subject to such Asset Disposition (including, for the avoidance of doubt, if such Asset Disposition is a Permitted Asset Swap);

(2)     in any such Asset Disposition (except to the extent the Asset Disposition is a Permitted Asset Swap), or series of related Asset Dispositions (except a series of related Permitted Asset Swaps), at least 75% of the consideration from such Asset Disposition (excluding any consideration by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise, other than Indebtedness) received by the Company or such Restricted Subsidiary, as the case may be, is in the form of cash, Cash Equivalents or Temporary Cash Investments; and

(3)     an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company or such Restricted Subsidiary, as the case may be:

(A)     to the extent the Company or any Restricted Subsidiary, as the case may be, elects (or is required by the terms of any Indebtedness of the Company or a Restricted Subsidiary), (i) to prepay, repay, purchase or redeem any Indebtedness of a non-Guarantor Restricted Subsidiary or Indebtedness that is secured by assets that do not constitute Collateral (in each case, other than Subordinated Indebtedness of the Company or a Guarantor or Indebtedness owed to the Company or any Restricted

101

Subsidiary) or Indebtedness that is secured by a Lien on the Collateral, which Lien ranks *pari passu* with the Liens securing the Notes and the Notes Guarantees, within 365 days from the later of (A) the date of such Asset Disposition and (B) the receipt of such Net Available Cash; provided, however, that in connection with any prepayment, repayment, purchase or redemption of Indebtedness pursuant to this clause (3)(A)(i) the Company or such Restricted Subsidiary will retire such Indebtedness and will cause the related commitment to be permanently reduced in an amount equal to the principal amount so prepaid, repaid, purchased or redeemed; provided, further, that the Company shall redeem, repay, repurchase or redeem Pari Passu Indebtedness that is Public Debt pursuant to this clause (3)(A)(i) only if the Company makes (at such time or subsequently in compliance with this Section 4.10) an offer to the Holders to purchase their Notes in accordance with the provisions set forth below for an Asset Disposition Offer for an aggregate principal amount of Notes at least equal to the proportion that (x) the total aggregate principal amount of Notes outstanding bears to (y) the sum of the total aggregate principal amount of Notes outstanding plus the total aggregate principal amount outstanding of such Pari Passu Indebtedness or (ii) to purchase the Notes pursuant to an offer to all Holders of Notes at a purchase price in cash equal to at least 100% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the date of repayment or purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date);

(B)     to the extent the Company or such Restricted Subsidiary elects, to make a capital expenditure or invest in or commit to invest in Additional Assets (including by means of an investment in Additional Assets by a Restricted Subsidiary with Net Available Cash received by the Company or another Restricted Subsidiary) within 365 days from the later of (i) the date of such Asset Disposition and (ii) the receipt of such Net Available Cash; provided, however, that any such reinvestment in Additional Assets made pursuant to a definitive binding agreement or a commitment approved by the Board of Directors or an Officer of the Company that is executed or approved within such time will satisfy this requirement, so long as such investment is consummated within 180 days of such 365th day; or

(C)     any combination of the foregoing;

provided that, pending the final application of any such Net Available Cash in accordance with clause (A), (B) or (C) above, the Company and its Restricted Subsidiaries may temporarily reduce Indebtedness or otherwise invest such Net Available Cash in any manner not prohibited by this Indenture.

(b)     Any Net Available Cash from Asset Dispositions that is not applied or invested or committed to be applied or invested, or offered to be applied or invested, as

provided in Section 4.10(a) will be deemed to constitute "<u>Excess Proceeds</u>" under this Indenture.  On the 366th day after an Asset Disposition, or at such earlier date that the Company elects, if the aggregate amount of "Excess Proceeds" under this Indenture exceeds €20.0 million, the Company will be required within 30 days thereof to make an offer (or procure an offer is made) ("<u>Asset Disposition Offer</u>") to all Holders of Notes issued under this Indenture and, to the extent the Company so elects, to all holders of other outstanding Pari Passu Indebtedness, to purchase the maximum aggregate principal amount of Notes and any such Pari Passu Indebtedness to which the Asset Disposition Offer applies that may be purchased out of the "Excess Proceeds," at an offer price in respect of the Notes in an amount equal to (and, in the case of any Pari Passu Indebtedness, an offer price of no more than) 100% of the principal amount of such Notes and 100% of the principal amount of such Pari Passu Indebtedness, in each case, plus accrued and unpaid interest, if any (and in the case of the Notes, Additional Amounts, if any), to, but excluding, the date of purchase, in accordance with the procedures set forth in this Indenture or the agreements governing the Pari Passu Indebtedness, as applicable, and in the case of the Notes, in minimum denominations of €100,000 and in integral multiples of €1,000 in excess thereof.

(c)     To the extent that the aggregate principal amount of Notes and Pari Passu Indebtedness so validly tendered and not properly withdrawn pursuant to an Asset Disposition Offer is less than the "Excess Proceeds," the Company may use any remaining "Excess Proceeds" for general corporate purposes, subject to the other covenants contained in this Indenture.  If the aggregate principal amount of the Notes surrendered in any Asset Disposition Offer by Holders and other Pari Passu Indebtedness surrendered by holders or lenders, collectively, exceeds the amount of "Excess Proceeds," the "Excess Proceeds" shall be allocated among the Notes and Pari Passu Indebtedness to be purchased on a pro rata basis or by use of a pool factor on the basis of the aggregate principal amount of tendered Notes and Pari Passu Indebtedness, or by such other method in compliance with applicable legal, depositary and exchange requirements. For the purposes of calculating the aggregate principal amount of any such Indebtedness not denominated in euro, such Indebtedness shall be calculated by converting any such aggregate principal amounts into their Euro Equivalent determined as of a date selected by the Company that is within the Asset Disposition Offer Period (as defined herein). Upon completion of any Asset Disposition Offer, the amount of "Excess Proceeds" shall be reset at zero.

(d)     To the extent that any portion of Net Available Cash payable in respect of the Notes is denominated in a currency other than euro, the amount thereof payable in respect of such Notes shall not exceed the net amount of funds in the currency in which the relevant Notes are denominated that is actually received upon converting such portion of Net Available Cash into such currency.

(e)     The Asset Disposition Offer, insofar as it relates to the Notes, will remain open for a period of not less than 20 Business Days following its commencement (the "<u>Asset Disposition Offer Period</u>").  No later than five Business Days after the termination of the Asset Disposition Offer Period (the "<u>Asset Disposition Purchase Date</u>"), the Company will purchase (or procure the purchase of) the aggregate principal amount of

Notes and, to the extent they so elect, any Pari Passu Indebtedness required to be purchased pursuant to this Section 4.10 (the "Asset Disposition Offer Amount") or, if less than the Asset Disposition Offer Amount has been so validly tendered, all Notes and Pari Passu Indebtedness validly tendered in response to the Asset Disposition Offer.

(f)     On or before the Asset Disposition Purchase Date, the Company will, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Asset Disposition Offer Amount of Notes and Pari Passu Indebtedness or portions of Notes and Pari Passu Indebtedness so validly tendered and not properly withdrawn pursuant to the Asset Disposition Offer, or if less than the Asset Disposition Offer Amount has been validly tendered and not properly withdrawn, all Notes and Pari Passu Indebtedness so validly tendered and not properly withdrawn and, in the case of the Notes, in minimum denominations of €100,000 and in integral multiples of €1,000 in excess thereof.  The Company will deliver to the Trustee an Officer's Certificate stating that such Notes or portions thereof were accepted for payment in accordance with the terms of this Section 4.10.  The Company or the Paying Agent, as the case may be, will promptly (but in any case not later than five Business Days after termination of the Asset Disposition Offer Period) mail or deliver (or procure the mail or delivery) to each tendering Holder an amount equal to the purchase price of the Notes so validly tendered and not properly withdrawn by such Holder, and accepted for purchase, and the Company will promptly issue a new Note (or amend the Global Note), and the Trustee, upon delivery of an Officer's Certificate from the Company, will (via an authenticating agent) authenticate and mail or deliver (or cause to be transferred by book-entry) such new Note to such Holder, in an aggregate principal amount equal to any unpurchased portion of the Note surrendered; provided that each such new Note will be in an aggregate principal amount with a minimum denomination of €100,000 or in integral multiples of €1,000 in excess thereof.  Any Note not so accepted will be promptly mailed or delivered (or transferred by book-entry) by the Company to the Holder thereof.

(g)     For the purposes of Section 4.10(a)(2) the following will be deemed to be cash:

(1)     the assumption by the transferee of Indebtedness of the Company or a Restricted Subsidiary (other than Subordinated Indebtedness of the Company or a Guarantor) and the release of the Company or such Restricted Subsidiary from all liability on such Indebtedness in connection with such Asset Disposition;

(2)     securities, notes or other obligations received by the Company or any Restricted Subsidiary from the transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days following the closing of such Asset Disposition;

(3)     Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Disposition, to the extent that the Company and each other Restricted Subsidiary are released from any Guarantee of payment of such Indebtedness in connection with such Asset Disposition;

(4)     consideration consisting of Indebtedness of the Company or any Restricted Subsidiary (other than Subordinated Indebtedness) received after the Issue Date from Persons who are not the Company or any Restricted Subsidiary; and

(5)     any Designated Non-Cash Consideration received by the Company or any Restricted Subsidiary in such Asset Dispositions having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 4.10 that is at that time outstanding, not to exceed the greater of (x) €20.0 million and (y) 2.1% of Total Assets (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

(h)     The Company will comply (or procure compliance), to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Indenture.  To the extent that the provisions of any securities laws or regulations (or exchange rules) conflict with provisions of this Section 4.10, the Company will comply (or procure compliance) with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by virtue of any conflict.

SECTION 4.11     Limitation on Transactions with Affiliates.  (a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or conduct any transaction or series of related transactions (including the purchase, sale, lease or exchange of any property or the rendering of any service) with or for the benefit of any Affiliate of the Company (such transaction or series of related transactions being an "Affiliate Transaction") involving aggregate value in excess of €5.0 million unless:

(1)     the terms of such Affiliate Transaction taken as a whole are not materially less favorable to the Company or such Restricted Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction or the execution of the agreement providing for such transaction in arm's length dealings with a Person who is not such an Affiliate;

(2)     in the event such Affiliate Transaction involves an aggregate value in excess of €15.0 million, the terms of such transaction or series of related transactions have been approved by a majority of the members of the Board of Directors of the Company resolving that such transaction complies with clause (1) of this Section 4.11(a); and

(3)     in the event such Affiliate Transaction involves an aggregate consideration in excess of €30.0 million, the Company has received a written opinion from an Independent Financial Advisor that such Affiliate Transaction is fair, from a financial standpoint, to the Company and its Restricted Subsidiaries or that the terms are not materially less favorable than those that could reasonably have been obtained in a comparable transaction at such time on an arm's length basis from a Person that is not an Affiliate.

Any Affiliate Transaction shall also be deemed to have satisfied the requirements set forth in Section 4.11(a)(2) if such Affiliate Transaction is approved by a majority of the Disinterested Directors. If there are no Disinterested Directors, any Affiliate Transaction shall also be deemed to have satisfied the requirements set forth in this covenant if the Company or any of its Restricted Subsidiaries, as the case may be, has received a letter from an Independent Financial Advisor that satisfies the requirements set forth in Section 4.11(a)(3).

(b)     The provisions of Section 4.11(a) will not apply to:

(1)     any Restricted Payment permitted to be made pursuant to Section 4.07, any Permitted Payments (other than pursuant to Section 4.07(b)(9)(B)(ii)) or any Permitted Investment (other than Permitted Investments as defined in clauses (1)(c), (2) and (11) of the definition thereof);

(2)     any issuance or sale of Capital Stock, options, other equity-related interests or other securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, or entering into, or maintenance of, any employment, consulting, collective bargaining or benefit plan, program, agreement or arrangement, related trust or other similar agreement and other compensation arrangements, options, warrants or other rights to purchase Capital Stock of the Company, any Restricted Subsidiary or any Parent, restricted stock plans, long-term incentive plans, stock appreciation rights plans, participation plans or similar employee benefits or consultants' plans (including valuation, health, insurance, deferred compensation, severance, retirement, savings or similar plans, programs or arrangements) or indemnities provided on behalf of officers, employees, directors or consultants approved by the Board of Directors of the Company, in each case in the ordinary course of business;

(3)     any Management Advances and any waiver or transaction with respect thereto;

(4)     any transaction between or among the Company and any Restricted Subsidiary (or entity that becomes a Restricted Subsidiary as a result of such transaction), or between or among Restricted Subsidiaries or any Receivables Subsidiary;

(5)     the payment of reasonable fees and reimbursement of expenses to, and customary indemnities (including under customary insurance policies) and employee benefit and pension expenses provided on behalf of, directors, officers, consultants or employees of the Company, any Restricted Subsidiary or any Parent (whether directly or indirectly and including through any Person owned or controlled by any of such directors, officers or employees);

(6)     the Transactions and the entry into and performance of obligations of the Company or any of its Restricted Subsidiaries under the terms of any transaction arising out of, and any payments pursuant to or for purposes of funding, any agreement or instrument in effect as of or on the Issue Date, as these

106

agreements and instruments may be amended, modified, supplemented, extended, renewed or refinanced from time to time in accordance with the other terms of this Section 4.11 or to the extent not more disadvantageous to the Holders in any material respect in the good faith judgment of the Board of Directors or an Officer of the Company and the entry into and performance of any registration rights or other listing agreement in connection with any Public Offering;

(7)     payments or other transactions pursuant to any Tax Sharing Agreement; provided, however, that such payments shall not exceed the Permitted Payments attributable to Related Taxes described pursuant to Section 4.07(b)(9)(A);

(8)     transactions with customers, clients, landlords, lessors and lessees of ships and suppliers or purchasers or sellers of goods or services, which, in each case, are in the ordinary course of business and are either fair to the Company or the relevant Restricted Subsidiary in the reasonable determination of the Board of Directors or an Officer of the Company or the relevant Restricted Subsidiary or are on terms no less favorable than those that could reasonably have been obtained at such time from an unaffiliated party;

(9)     any transaction in the ordinary course of business between or among the Company or any Restricted Subsidiary and any Affiliate of the Company or an Associate or similar entity that would constitute an Affiliate Transaction solely because the Company or a Restricted Subsidiary or any Affiliate of the Company or a Restricted Subsidiary or any Affiliate of any Permitted Holder owns an equity interest in or otherwise controls such Affiliate, Associate or similar entity;

(10)     (a) issuances or sales of Capital Stock (other than Disqualified Stock) of the Company or options, warrants or other rights to acquire such Capital Stock or Subordinated Shareholder Funding; provided that the interest rate and other financial terms of such Subordinated Shareholder Funding are approved by a majority of the members of the Board of Directors or an Officer of the Company in their reasonable determination and (b) any amendment, waiver or other transaction with respect to any Subordinated Shareholder Funding in compliance with the other provisions of this Indenture, the Intercreditor Agreement and any Additional Intercreditor Agreement, as applicable;

(11)     payment to any Permitted Holder of all reasonable out of pocket expenses Incurred by such Permitted Holder in connection with its direct or indirect investment in the Company and its Subsidiaries not to exceed €3.0 million in any 12-month period; and

(12)     any transaction effected as part of a Qualified Receivables Financing.

SECTION 4.12    Limitation on Liens.  The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, Incur or suffer to exist any Lien upon any of its property or assets (including Capital Stock of a Restricted Subsidiary), whether owned on the Issue Date or acquired after that date, or any interest therein or any income or profits therefrom, which Lien is securing any Indebtedness (such Lien, the "Initial Lien"), except (a) in the case of any property or asset that does not constitute Collateral, (1) Permitted Liens or (2) Liens on property or assets that are not Permitted Liens if the Notes and this Indenture (or a Notes Guarantee in the case of Liens of a Guarantor) are secured equally and ratably with, or prior to, in the case of Liens with respect to Subordinated Indebtedness, the Indebtedness secured by such Initial Lien for so long as such Indebtedness is so secured and (b) in the case of any property or assets that constitute Collateral, Permitted Collateral Liens.  Any such Lien created in favor of the Notes pursuant to Section 4.12(a)(2) shall be automatically and unconditionally released and discharged (i) upon the release and discharge of the Initial Lien to which it relates and (ii) otherwise as set forth under Section 12.04.

SECTION 4.13    Corporate Existence.  Subject to Article V hereof, the Company and each Guarantor shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of the Restricted Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company, such Guarantor or any such Restricted Subsidiary; and

(2)    the rights (charter and statutory), licenses and franchises of the Company, each Guarantor and the Restricted Subsidiaries;

provided, however, that the Company and each Guarantor shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of the Restricted Subsidiaries, if the Board of Directors or an Officer of the Company shall determine that the preservation thereof is no longer necessary or desirable in the conduct of the business of the Company, each Guarantor and the Restricted Subsidiaries, taken as a whole.

The foregoing shall not prohibit the Post-Issuance Merger or a sale, transfer or conveyance of a Restricted Subsidiary or any of its assets in compliance with the terms of this Indenture.

SECTION 4.14    Offer To Repurchase upon Change of Control.  (a) If a Change of Control occurs, subject to the terms hereof, each Holder will have the right to require the Company to repurchase all or part (equal to €100,000 principal amount, and integral multiples of €1,000 in excess thereof) of such Holder's Notes at a purchase price in cash equal to 101% of the principal amount of the Notes, plus accrued and unpaid interest and Additional Amounts, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided, however, that the Company shall not be obliged to repurchase Notes pursuant to this Section 4.14 in the event

and to the extent that it has unconditionally exercised its right to redeem all of the Notes pursuant to paragraph 5 of the Notes or all conditions to such redemption have been satisfied or waived.

(b)      Unless the Company has unconditionally exercised its right to redeem all of the Notes pursuant to paragraph 5 of the Notes and has not defaulted in the payment of the applicable redemption price or all conditions to such redemption have been satisfied or waived, no later than the date that is 60 days after any Change of Control, the Company will send a notice (the "Change of Control Offer") to each Holder of any such Notes, by mail or otherwise in accordance with the procedures set forth in this Indenture, with a copy to the Trustee:

(1)      stating that a Change of Control has occurred or may occur and that such Holder has the right to require the Company to purchase all or any part of such Holder's Notes at a purchase price in cash equal to 101% of the principal amount of such Notes plus accrued and unpaid interest and Additional Amounts, if any, to, but not including, the date of purchase (subject to the right of Holders of record on a record date to receive interest on the relevant interest payment date) (the "Change of Control Payment");

(2)      stating the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is sent) (the "Change of Control Payment Date");

(3)      describing the circumstances and relevant facts regarding the transaction or transactions that constitute the Change of Control;

(4)      describing the procedures determined by the Company, consistent with this Indenture, that a Holder must follow in order to have its Notes repurchased; and

(5)      if such notice is mailed prior to the occurrence of a Change of Control, stating that the Change of Control Offer is conditional on the occurrence of such Change of Control.

On the Change of Control Payment Date, if the Change of Control shall have occurred, the Company will, to the extent lawful:

(A)      accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer;

(B)      deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes so tendered;

(C)      deliver or cause to be delivered to the Trustee an Officer's Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company in the Change of Control Offer;

(D)      in the case of Global Notes, deliver, or cause to be delivered, to the Paying Agent the Global Notes in order to reflect thereon the portion of such Notes or portions thereof that have been tendered to and purchased by the Company; and

(E)      in the case of Definitive Registered Notes, deliver, or cause to be delivered, to the relevant Registrar for cancellation all Definitive Registered Notes accepted for purchase by the Company.

(c)      If any Definitive Registered Notes have been issued, the Paying Agent will promptly mail to each Holder of Definitive Registered Notes so tendered the Change of Control Payment for such Notes, and the Trustee or an authentication agent appointed by the Trustee will promptly authenticate (or cause to be authenticated) and mail (or cause to be transferred by book-entry) to each Holder of Definitive Registered Notes a new Definitive Registered Note equal in principal amount to the aggregate unpurchased portion of the Notes surrendered, if any; provided that each such new Note will be in a principal amount that is at least €100,000 or an integral multiple of €1,000 in excess thereof.

(d)      If holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Company, or any third party making a Change of Control Offer in lieu of the Company, purchases all of the Notes validly tendered and not withdrawn by such holders, the Company or such third party will have the right, upon not less than 10 nor more than 60 days' prior notice, given not more than 60 days following such purchase pursuant to such Change of Control Offer, to redeem all Notes that remain outstanding following such purchase at a redemption price equal to 101% of the principal amount thereof, plus accrued and unpaid interest and Additional Amounts, if any, to (but not including) the date of redemption (subject to the rights of holders of Notes on the relevant record date to receive interest due on the relevant interest payment date).

(e)      Notwithstanding anything to the contrary in this Section 4.14, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control; provided that the purchase date will be no earlier than 30 days from the date a notice of such Change of Control Offer is mailed.

(f)      The Change of Control provisions described in this Section 4.14 will be applicable whether or not any other provisions of this Indenture are applicable. Except as described in this Section 4.14, this Indenture does not contain provisions that permit the Holders to require that the Company repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction. The existence of a Holder's right to require the Company to repurchase such Holder's Notes upon the occurrence of a Change of Control may deter a third party from seeking to acquire the Company or its Subsidiaries in a transaction that would constitute a Change of Control.

(g)      The Company will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the

manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.

(h)     The Company will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations (or rules of any exchange on which the Notes are then listed) in connection with the repurchase of Notes pursuant to this Section 4.14.  To the extent that the provisions of any securities laws or regulations (or exchange rules) conflict with provisions of this Indenture, the Company will comply with the applicable securities laws and regulations (or exchange rules) and will not be deemed to have breached its obligations under the Change of Control provisions of this Indenture by virtue of the conflict.

(i)     If and for so long as the Notes are listed on the Official List of the LxSE and admitted for trading on the Euro MTF Market and the rules of such exchange so require, the Company will publish a public announcement with respect to the results of the Change of Control Offer as soon as practicable after the Change of Control Payment Date in a daily newspaper with general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*), or, to the extent and in the manner permitted by such rules, post such notices on the official website of the LxSE.

(j)     The provisions of this Indenture relating to the Company's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of Holders of a majority in outstanding aggregate principal amount of the Notes under this Indenture.

SECTION 4.15     Additional Notes Guarantees and Collateral.  (a) The Company will not cause or permit any of its Restricted Subsidiaries that is not a Guarantor, directly or indirectly, to guarantee any Credit Facility or Public Debt, in either case in excess of €15.0 million, and any refinancing thereof in whole or in part unless, in each case, such Restricted Subsidiary becomes a Guarantor on the date on which such other Guarantee is Incurred and, if applicable, executes and delivers to the Trustee a supplemental indenture in the form attached hereto as Exhibit D or other appropriate agreement pursuant to which such Restricted Subsidiary will provide a Guarantee on the same terms and conditions as those set forth in this Indenture, which Guarantee will be senior to or *pari passu* with such Restricted Subsidiary's Guarantee of such other Indebtedness; provided that if the Indebtedness Guaranteed by such other Guarantee is subordinated in right of payment to the Notes or a Notes Guarantee, then such other Guarantee must be subordinated to such Restricted Subsidiary's Guarantee of the Notes to at least the same extent as such other Indebtedness is subordinated to the Notes or the Notes Guarantee, as the case may be. Each additional Guarantee of the Notes provided pursuant to this Section 4.15(a) shall be referred to herein as an "Additional Notes Guarantee".

(b)     A Restricted Subsidiary that is not a Guarantor may become a Guarantor if it executes and delivers to the Trustee a supplemental indenture in the form attached hereto as Exhibit D pursuant to which such Restricted Subsidiary will provide a Guarantee.

111

(c)      Following the provision of any additional Guarantees as described in Section 4.15(a), subject to the Agreed Security Principles, the Intercreditor Agreement and any Additional Intercreditor Agreement (if such security is being granted in respect of the other Indebtedness), any such Guarantor shall provide security over its material assets that are of the same type as any of the Company's or the Guarantors' assets that are required to be part of the Collateral as of the Issue Date or following the Post-Issuance Merger, as applicable (excluding any assets of such Guarantor which are subject to a Permitted Lien at the time of the execution of such supplemental indenture if providing such security interest would not be permitted by the terms of such Permitted Lien or by the terms of any obligations secured by such Permitted Lien), to secure its Guarantee on a first priority basis consistent with the Collateral.  Any such additional Guarantee (and the accompanying Liens) created in favor of the Notes pursuant to clauses (b) and (c) of this Section 4.15 will be automatically and unconditionally released and discharged upon the repayment, retirement, release or discharge of the Indebtedness giving rise to such additional Guarantee under Section 4.15(a). Each additional Guarantee or security will be limited as consistent with the Agreed Security Principles as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, thin capitalization, distributable reserves, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

(d)      Notwithstanding clauses (a), (b) and (c) of this Section 4.15, the Company shall not be obligated to cause such Restricted Subsidiary to Guarantee the Notes or provide security to the extent and for so long as the Incurrence of such Guarantee or the grant of such security would be inconsistent with the Intercreditor Agreement or the Agreed Security Principles.

SECTION 4.16      Maintenance of Listing.  The Company will use its commercially reasonable efforts to obtain and maintain the listing of the Notes on the Official List of the LxSE for so long as such Notes are outstanding; provided that if the Company is unable to obtain admission to such listing or if at any time the Company determines that it will not maintain such listing, it will obtain (where the Notes are initially so listed, prior to the delisting of the Notes from the Official List of the LxSE), and thereafter use its commercially reasonable efforts to maintain, a listing of such Notes on another recognized stock exchange.

SECTION 4.17      Suspension of Covenants on Achievement of Investment Grade Status.  If on any date following the Issue Date, the Notes have achieved Investment Grade Status and no Default or Event of Default has occurred and is continuing (a "Suspension Event"), then, beginning on that day and continuing until the Reversion Date, the provisions of this Indenture summarized under the following captions will not apply to such Notes: Sections 4.07, 4.08, 4.09, 4.10, 4.11, 4.15 and 5.01(a)(3) and, in each case, any related default provision of this Indenture will cease to be effective and will not be applicable to the Company and its Restricted Subsidiaries.  Such Sections and any related default provisions will again apply according to their terms from the first day on which a Suspension Event ceases to be in effect. Such Sections will not, however, be of any effect with regard to actions of the Company or its Restricted Subsidiaries properly taken during the continuance of the Suspension Event, and

112

Section 4.07 will be interpreted as if it has been in effect since the date of this Indenture except that no Default will be deemed to have occurred solely by reason of a Restricted Payment made while Section 4.07 was suspended.  On the Reversion Date, all Indebtedness Incurred during the continuance of the Suspension Event will be classified, at the Company's option, as having been Incurred pursuant to Section 4.09(a) or one of the clauses set forth in Section 4.09(b) (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred prior to the Suspension Event and outstanding on the Reversion Date).  To the extent such Indebtedness would not be so permitted to be Incurred under Sections 4.09(a) and 4.09(b), such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.09(b)(4)(b).  The Company shall notify the Trustee that the conditions under this Section 4.17 have been satisfied, although such notification shall not be a condition for the suspension of the covenants set forth above to be effective.  The Trustee shall not be obliged to notify Holders of such event.

SECTION 4.18     Further Instruments and Acts.  Subject to the Agreed Security Principles, the Company and its Restricted Subsidiaries shall, at their own expense, execute and do all such acts and things and provide such assurances as the Security Agent may reasonably require (i) for registering any Security Documents in any required register and for perfecting or protecting the security intended to be afforded by such Security Documents and (ii) if such Security Documents have become enforceable, for facilitating the realization of all or any part of the assets which are subject to such Security Documents and for facilitating the exercise of all powers, authorities and discretions vested in the Security Agent or in any receiver of all or any part of those assets.  Subject to the Agreed Security Principles, the Company and its Restricted Subsidiaries shall (i) execute all transfers, conveyances, assignments and releases of that property whether to the Security Agent or to its nominees and give all notices, orders and directions which the Security Agent may reasonably request and (ii) following the Post-Issuance Merger, execute and do all such acts and things and provide such assurances as the Security Agent may reasonably require to confirm and extend (x) the MergerCo Share Pledge and (y) the Security Documents with respect to the Collateral granted by Moby on or about the Issue Date to confirm that such Collateral is granted by MergerCo following the Post-Issuance Merger.

As soon as reasonably practicable after the approval of the annual financial statements of CIN for the financial years ending December 31, 2015 and December 31, 2016, CIN shall update the Whitewash Procedure to increase the available Credit Support of CIN, subject to the corporate benefit analysis by the board of directors of CIN and the limitations on guarantees provided by the Italian Guarantors as set forth in Section 11.03(b). Following such updates of the Whitewash Procedure, CIN shall execute the Security Documents with respect to the Collateral issued or granted by CIN on or about the Issue Date to, *inter alia*, confirm such Collateral after the updates of the Whitewash Procedure.

SECTION 4.19     Permitted Reorganization. The Trustee and the Security Agent shall, at the Company's written request, without the consent of the holders of Notes, agree to the transfer of all Capital Stock of the Company (including any outstanding warrants in respect thereof) held by Holdco to New Holdco, provided that:

(a)     New Holdco will be a Person organized and existing under the laws of any member state of the European Union or the United States of America, any State of the

United States or the District of Columbia, Canada or any province of Canada or Switzerland;

(b)     New Holdco will acquire the Capital Stock of the Company held by Holdco subject to the Company Share Pledge and shall have entered into a confirmation deed or similar instrument in respect thereof expressly confirming the first-ranking pledge of the Capital Stock in favor of the holders of the Notes and the Credit Agreement and assuming all of the obligations of Holdco under the Company Share Pledge and the Intercreditor Agreement;

(c)     immediately after giving effect to such Permitted Reorganization, no Default or Event of Default shall have occurred and be continuing; and

(d)     the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating, subject to customary assumptions and qualifications, that such Permitted Reorganization, any supplemental indenture signed in connection therewith and the share pledge referred to in clause (b) above complies with the Indenture, any such supplemental indenture and the Intercreditor Agreement and that the share pledge is enforceable.

Following the Permitted Reorganization, Holdco shall be released from all obligations under the Company Share Pledge, which shall be assumed in full by New Holdco, and all references to "Holdco" in this Indenture shall be to "New Holdco".

SECTION 4.20     Completion of the Post-Issuance Merger; Granting of Post-Merger Collateral and Additional Vessel Collateral; Release of Tirrenia in A.S. Mortgages.

(a)     The Company shall implement, and shall cause Moby to implement, the Post-Issuance Merger on terms complying with Section 2501 (et seq.) of the Italian Civil Code and in accordance with the Structure Memorandum as soon as practicable following the Issue Date and in any case within 180 days thereof. Promptly following the completion of the Post-Issuance Merger, the Company shall, and shall cause (to the extent necessary) Moby to deliver to the Trustee each of the Merger Condition Precedent Documents in connection with the consummation of the Post-Issuance Merger.

(b)     Each of the Company and, subsequent to the Post-Issuance Merger, MergerCo shall take such necessary actions and shall cause its Restricted Subsidiaries to take such necessary actions so that the Post-Merger Collateral shall be fully effective no later than the earlier to occur of (i) the date on which the Credit Agreement is secured by such Post-Merger Collateral and (ii) the date that is 30 days after the Post-Issuance Merger.

(c)     Subject to compliance with the terms of this Indenture, including Article V each holder of the Notes, by accepting a Note will be deemed to agree, for the purposes of Section 2503-*bis* (et seq.) of the Italian Civil Code, to the consummation of the Post-Issuance Merger and the assumption by MergerCo of all obligations of the Company in respect of the Notes, the Indenture, the Intercreditor Agreement and the Security Documents.

114

(d)     Each of the Company and, subsequent to the Post-Issuance Merger, MergerCo shall take such necessary actions and shall cause its Restricted Subsidiaries to take such necessary actions so that the Notes are secured on a first priority basis by the Additional Vessel Collateral as soon as reasonably practicable following the date of registration of the last Additional Vessel under the Italian flag (the "Final Additional Vessel Registration") and in any event not later than the earlier to occur of (i) the date falling 30 Business Days after the Final Additional Vessel Registration and (ii) October 31, 2016.

(e)     The Company shall, and shall cause (to the extent necessary) CIN to, deliver to the Trustee within 180 days of the Issue Date the following documents: (i) a deed of formal release of the Tirrenia in A.S. Mortgages executed by Tirrenia di Navigazione S.p.A. in A.S. and (ii) evidence (*estratti matricola*) of the release of the Tirrenia in A.S. Mortgages.

SECTION 4.21     Cancellation of Moby Treasury Shares. On or prior to the 30th day following the Post-Issuance Merger, the Company shall cause Moby to cancel its treasury shares, if any.

ARTICLE V

MERGER AND CONSOLIDATION

SECTION 5.01     The Company. (a) The Company will not consolidate with or merge with or into, or convey, transfer, lease or otherwise dispose of all or substantially all its assets to, any Person, unless (and subject to the other terms of this Indenture):

(1)     the Successor Company (if not the Company) will be a Person organized and existing under the laws of any Permissible Jurisdiction and the Successor Company (if not the Company) will expressly assume, (a) by supplemental indenture, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Company under the Notes and this Indenture and (b) all obligations of the Company under the Intercreditor Agreement, any Additional Intercreditor Agreement and the Security Documents;

(2)     immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the Successor Company or any Subsidiary of the Successor Company as a result of such transaction as having been Incurred by the Successor Company or such Subsidiary at the time of such transaction), no Default or Event of Default shall have occurred and be continuing;

(3)     immediately after giving effect to such transaction, either (a) the Successor Company would be permitted to Incur at least an additional €1.00 of Indebtedness pursuant to Section 4.09(a)(1), or (b) the Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would not be lower than it was immediately prior to giving effect to such transaction; and

115

(4)     the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each to the effect that such consolidation, merger or transfer and such supplemental indenture (if any) comply with this Indenture, and that all conditions precedent therein provided for relating to such transaction have been complied with and an Opinion of Counsel to the effect that such supplemental indenture (if any) has been duly authorized, executed and delivered and is a legal, valid and binding agreement enforceable against the Successor Company and the Notes constitute legal, valid and binding obligations of the Successor Company, enforceable in accordance with their terms (in each case, in form and substance reasonably satisfactory to the Trustee); provided that in giving an Opinion of Counsel, counsel may rely on an Officer's Certificate as to any matters of fact, including as to satisfaction of clauses (1), (2) and (3) of this Section 5.01(a).

(b)     Any Indebtedness that becomes an obligation of the Company or any Restricted Subsidiary (or that is deemed to be Incurred by any Subsidiary that becomes a Restricted Subsidiary) as a result of any such transaction undertaken in compliance with this Section 5.01, and any Refinancing Indebtedness with respect thereto, shall be deemed to have been Incurred in compliance with Section 4.09.

(c)     For purposes of this Section 5.01, the sale, lease, conveyance, assignment, transfer, or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of the Company, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company, as the case may be.

(d)     The Successor Company will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes, but in the case of a lease of all or substantially all its assets, the predecessor company will not be released from its obligations under this Indenture or the Notes.

(e)     Notwithstanding clauses (2), (3) and (4) of Section 5.01(a) and Section 5.02 (which do not apply to transactions referred to in this sentence), (a) any Restricted Subsidiary may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to the Company or a Guarantor and (b) any Restricted Subsidiary that is not a Guarantor may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to any other Restricted Subsidiary.  Notwithstanding clauses (2) and (3) of Section 5.01(a) (which do not apply to the transactions referred to in this sentence), the Company may consolidate or otherwise combine with or merge into, or transfer all or substantially all of its assets to, (a) an Affiliate incorporated or organized for the purpose of changing the legal domicile of the Company, reincorporating the Company in another jurisdiction, or changing the legal form of the Company or (b) a Restricted Subsidiary to effect the Post-Issuance Merger.

(f)     This Section 5.01 (other than the requirements of Section 5.01(a)(2)) will not apply to (i) any transactions which constitute an Asset Disposition if the Company has complied with Section 4.10 or (ii) the creation of a new subsidiary as a Restricted Subsidiary of the Company.

SECTION 5.02     The Guarantors.  (a) No Guarantor (other than a Guarantor whose guarantee is to be released in accordance with the terms of this Indenture, the Intercreditor Agreement and any Additional Intercreditor Agreement) may:

(1)     consolidate with or merge with or into any Person, or

(2)     sell, convey, transfer or dispose of, all or substantially all its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to any Person, or

(3)     permit any Person to merge with or into such Guarantor,

unless:

(A)     the other Person is the Company or any Restricted Subsidiary that is a Guarantor or becomes a Guarantor concurrently with the transaction; or

(B)     (i) either (x) a Guarantor is the continuing Person or (y) the resulting, surviving or transferee Person expressly assumes (a) all of the obligations of the Guarantor under its Notes Guarantee , this Indenture and the Security Documents and (b), to the extent required by the Intercreditor Agreement, the obligations under the Intercreditor Agreement, any Additional Intercreditor Agreement and the Security Documents to which it is a party, in each case subject to any limitation contemplated by the Agreed Security Principles; and

(ii)     other than in respect of the Post-Issuance Merger) immediately after giving effect to the transaction, no Default or Event of Default has occurred and is continuing; or

(C)     the transaction constitutes a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (in each case other than to the Company or a Restricted Subsidiary) otherwise permitted by this Indenture.

(b)     Notwithstanding Sections 5.02(a)(3)(B) and 5.01 (which do not apply to transactions referred to in this sentence), (a) any Restricted Subsidiary may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to the Company or any Guarantor and (b) any Guarantor may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to the Company or to any other Guarantor.  Notwithstanding Section 5.02(a)(3)(B)(ii) (which

117

does not apply to the transactions referred to in this sentence), any Guarantor may consolidate or otherwise combine with or merge into an Affiliate incorporated or organized for the purpose of changing the legal domicile of such Guarantor, reincorporating such Guarantor in another jurisdiction, or changing the legal form of such Guarantor.

ARTICLE VI

DEFAULTS AND REMEDIES

SECTION 6.01        Events of Default.  (a) Each of the following is an "Event of Default":

(1)        default in any payment of interest or Additional Amounts, if any, on any Note when due and payable, continued for 30 days;

(2)        default in any payment of the principal amount of or premium, if any, on any Note issued under this Indenture when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise;

(3)        failure by the Company or the relevant Guarantor to comply with its obligations under Article V;

(4)        failure to comply for 30 days after written notice by the Trustee on behalf of the Holders or by the Holders of at least 25% in aggregate principal amount of the outstanding Notes with any of the Company's obligations under Section 4.14 or the obligations of the Company and the Restricted Subsidiaries under Section 4.03, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.14, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 5.01, 5.02 or 12.03 (in each case, other than: (i) a failure to purchase Notes which will constitute an Event of Default under Section 6.01(a)(2) and (ii) a failure to comply with Article V which will constitute an Event of Default under clause Section 6.01(a)(3));

(5)        failure to comply by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee on behalf of the Holders or by the Holders of at least 25% in aggregate principal amount of the outstanding Notes with the Company's or the Guarantors' other agreements contained in this Indenture or the Notes (in each case, other than a default in performance, or breach of, a covenant or agreement specifically addressed in clauses (1) through (4) of this Section 6.01);

(6)        default under any mortgage, indenture or instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for money borrowed by Holdco, the Company or any of its Restricted Subsidiaries (or the payment of which is Guaranteed by Holdco, the Company or any of its Restricted Subsidiaries) other than Indebtedness owed to

118

the Company or a Restricted Subsidiary whether such Indebtedness or Guarantee now exists, or is created after the Issue Date, which default:

(A)    is caused by a failure to pay principal at Stated Maturity on such Indebtedness, immediately upon the expiration of the grace period provided in such Indebtedness; or

(B)    results in the acceleration of such Indebtedness prior to its maturity;

and, in each case, the aggregate principal amount of any such Indebtedness, together with the aggregate principal amount of any other such Indebtedness under which there has been a payment default or the maturity of which has been so accelerated, aggregates €25.0 million or more;

(7)    any of the following occurs:

(A)    a decree or order for relief in respect of Holdco, the Company or a Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary in an involuntary case or proceeding under any applicable Bankruptcy Law is sanctioned by a court of competent jurisdiction or becomes unconditional;

(B)    a decree or order adjudging Holdco, the Company or a Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, is bankrupt or insolvent, or other than on a solvent basis seeking reorganization, arrangement, adjustment, proposal or composition of or in respect of Holdco, the Company or a Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary under any Bankruptcy Law, or other than on a solvent basis appointing a custodian, receiver, (provisional, interim or permanent) or manager, liquidator, assignee, trustee, sequestrator (or other similar official) thereof for any substantial part of their respective properties or other than on a solvent basis ordering the winding up, dissolution or liquidation of their affairs, is sanctioned by a court of competent jurisdiction and becomes unconditional and any such decree, order or appointment pursuant to any Bankruptcy Law for relief shall continue to be in effect, or any such other decree, appointment or order shall be unstayed and in effect, for a period of 60 consecutive days; or

(C)    Holdco, the Company or a Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, (x) consents to the

119

filing of a petition, application, answer, proposal or consent seeking reorganization or relief under any applicable Bankruptcy Law, (y) consents to the entry of a decree or order for relief in respect thereof in an involuntary case or proceeding under any applicable Bankruptcy Law or to the commencement of any bankruptcy or insolvency with respect to the Company or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary shall have occurred; or case or proceeding against it, or (z) (i) other than on a solvent basis consents to the appointment of, or taking possession by, a custodian, receiver, (provisional, interim or permanent) or manager, liquidator, administrator, examiner, supervisor, assignee, trustee, sequestrator or similar official thereof, or of any substantial part of their respective properties, (ii) other than on a solvent basis makes an assignment or proposal for the benefit of creditors or (iii) admits it is insolvent or admits in writing its inability to pay its debts generally as they become due or commits an "act of bankruptcy" under any applicable Bankruptcy Law which, in the case of each of clauses (x), (y) or (z) of this Section 6.01(a)(7)(C), is sanctioned by a court and becomes unconditional.;

(8)     failure by the Company, a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary, to pay final and non-appealable judgments aggregating in excess of €25.0 million (exclusive of any amounts that a solvent insurance company has acknowledged liability for), which judgments are not paid, discharged or stayed for a period of 60 days after the judgment becomes final and due;

(9)     any security interest under the Security Documents on any Collateral having a fair market value in excess of €5.0 million shall, at any time, cease to be in full force and effect (other than in accordance with the terms of the relevant Security Document, the Intercreditor Agreement and this Indenture) for any reason other than the satisfaction in full of all obligations under this Indenture or the release or amendment of any such security interest in accordance with the terms of this Indenture, the Intercreditor Agreement or such Security Document or any such security interest created thereunder shall be declared invalid or unenforceable in a final non-appealable decision of a court of competent jurisdiction or the Company or any grantor of such Lien shall assert in writing that any such security interest is invalid or unenforceable and any such Default continues for 10 days;

(10)     failure by the Company or MergerCo or any of their respective Restricted Subsidiaries to comply with its obligations under this Indenture as described in Section 4.20 and such Default continues for 60 days; and

(11)    any Notes Guarantee ceases to be in full force and effect (other than in accordance with the terms of the Intercreditor Agreement and this Indenture), or a Guarantor denies or disaffirms its obligations under its Notes Guarantee in writing, other than in accordance with the terms thereof or upon release of the Notes Guarantee in accordance with this Indenture.

(b)    A default under clause (4), (5), (6) or (8) of Section 6.01(a) will not constitute an Event of Default until the Trustee or the Holders of at least 25% in aggregate principal amount of the outstanding Notes notify the Company of the default and, with respect to clauses (4), (5), (6) or (8) of Section 6.01(a), the Company does not cure such default (or arranges that such Default has been cured) within the time specified in clause (4), (5), (6) or (8) of Section 6.01(a), as applicable, after receipt of such notice.

(c)    If a Default occurs and a responsible officer of the Trustee is informed in writing of such occurrence by the Company, the Trustee shall give notice of the Default to the Holders within 60 days after being notified by the Company. Except in the case of a Default in the payment of principal of, or premium, if any, or interest on any Note, the Trustee may withhold notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding notice is in the interests of the Holders.

(d)    Holders may not enforce this Indenture or the Notes except as provided herein and may not enforce the Security Documents except as provided in such Security Documents and the Intercreditor Agreement or any Additional Intercreditor Agreement.

SECTION 6.02    <u>Acceleration</u>.  If an Event of Default (other than an Event of Default described in Section 6.01(a)(7)) occurs and is continuing, the Trustee by notice to the Company or the Holders of at least 25% in aggregate principal amount of the outstanding Notes may, and the Trustee at the request of such Holders shall, declare the principal of, premium, if any, and accrued and unpaid interest, including Additional Amounts, if any, on all the Notes to be due and payable.  Upon such a declaration, such principal, premium and accrued and unpaid interest, including Additional Amounts, if any, will be due and payable immediately.  In the event of a declaration of acceleration of the Notes because an Event of Default described in Section 6.01(a)(6) has occurred and is continuing, the declaration of acceleration of the Notes shall be automatically annulled if the event of default or payment default triggering such Event of Default pursuant to Section 6.01(a)(6) shall be remedied or cured, or waived by the holders of the Indebtedness, or the Indebtedness that gave rise to such Event of Default shall have been discharged in full, within 30 days after the declaration of acceleration with respect thereto and if (1) the annulment of the acceleration of the Notes would not conflict with any judgment or decree of a court of competent jurisdiction and (2) all existing Events of Default, except nonpayment of principal, premium or interest, including Additional Amounts, if any, on the Notes that became due solely because of the acceleration of the Notes, have been cured or waived.

If an Event of Default described in Section 6.01(a)(7) above occurs and is continuing, the principal of, premium, if any, and accrued and unpaid interest, including Additional Amounts, if any, on all the Notes will become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders.

SECTION 6.03        Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture or any Security Document. Following such Event of Default, the Trustee is entitled to require all Agents to act under its direction.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence to the Event of Default.  No remedy is exclusive of any other remedy.  All remedies are cumulative to the extent permitted by law.

SECTION 6.04        Waiver of Past Defaults.  Subject to Sections 6.07 and 9.02 hereof, the Trustee (subject to being indemnified, pre-funded and/or secured), upon receipt of written notice from the Holders of a majority in aggregate principal amount of the outstanding Notes then outstanding, may on behalf of the Holders of all the Notes waive all past or existing Defaults or Events of Default (except with respect to (i) nonpayment of principal, premium or interest, or Additional Amounts, if any, and (ii) a covenant or provision which under this Indenture cannot be modified or amended without the consent of the Holders of at least 75% of the principal amount of the Notes then outstanding, each of which may only be waived with the consent of the Holders of at least 75% of the principal amount of the Notes then outstanding) and rescind any such acceleration with respect to such Notes and its consequences if rescission would not conflict with any judgment or decree of a court of competent jurisdiction. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05        Control by Majority.  The Holders of a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Trustee will be entitled to indemnification and/or security (including by way of prefunding) satisfactory to it in its sole discretion against all losses, liabilities and expenses caused by taking or not taking such action.

SECTION 6.06        Limitation on Suits.  Subject to Article VII, if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity and/or security (including by way of pre-funding) satisfactory to it in its sole discretion against any loss, liability or expense.  Except to enforce the right to receive payment of principal or interest when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

122

(1)     such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)     Holders of at least 25% in aggregate principal amount of the outstanding Notes have requested in writing the Trustee to pursue the remedy;

(3)     such Holders have offered in writing the Trustee indemnity and/or security (including by way of pre-funding) satisfactory to it in its sole discretion against any loss, liability or expense;

(4)     the Trustee has not complied with such request within 60 days after the receipt of the written request and the offer of security and/or indemnity; and

(5)     the Holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder. The Trustee shall not be under any obligations to ascertain whether a Holder's actions are unduly prejudicial to another Holder.

SECTION 6.07      Rights of Holders To Receive Payment.  Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal, premium, if any, and interest on the Note held by such Holder, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of Holders of not less than 75% in aggregate principal amount of the Notes then outstanding.

SECTION 6.08      Collection Suit by Trustee.  If an Event of Default specified in clause (1) or (2) of Section 6.01(a) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company or any other obligor on the Notes for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

If the Company fails to pay such amounts forthwith upon such demand, the Trustee, in its own name as trustee of an express trust, may institute a judicial proceeding in its own name for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

123

SECTION 6.09       Trustee May File Proofs of Claim.  The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the properly incurred compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Company, any other obligor upon the Notes, their creditors or their property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims, and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof out of the estate in any such proceeding shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10       Priorities.  If the Trustee or the Security Agent collects any money pursuant to this Article VI, it shall pay out the money, subject to the terms of the Intercreditor Agreement, in the following order:

First:  to the Trustee, its agents and attorneys, the Security Agent and the Agents for amounts due under Section 7.06 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and/or the Security Agent and the costs and expenses of collection;

Second:  to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any and interest, respectively; and

Third:  to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.  At least 15 days before such record date, the Company shall mail or otherwise transmit to each Holder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11       Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee or the Security Agent

124

for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then outstanding Notes, or to any suit initiated by any Holder for the enforcement of the payment of any principal of or interest on any Note, on or after its maturity date.

SECTION 6.12      Stay, Extension and Usury Laws.  The Company and its Restricted Subsidiaries shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and its Restricted Subsidiaries (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

SECTION 6.13      Restoration of Rights and Remedies.  If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has  been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, any Guarantor, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

ARTICLE VII

THE TRUSTEE, THE SECURITY AGENT AND AGENTS

SECTION 7.01      Duties of Trustee.  (a) If an Event of Default has occurred, of which a Responsible Officer of the Trustee has received written notice, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)      Except during the continuance of an Event of Default of which a Responsible Officer of the Trustee has received written notice:

(1)      the duties of the Trustee, each Agent and the Security Agent shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture, the Intercreditor Agreement and the Security Documents (in each case to the extent

applicable) and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee or the Agents; and

(2)     The Trustee may conclusively rely upon, as to the truth of the statements and the correctness of the opinions expressed therein, certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, with respect to certificates or opinions specifically required to be furnished to it hereunder, the Trustee may examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.01;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.02, 6.04 or 6.05 hereof.

Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01.

(d)     No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, it being understood that the Trustee shall not be required to advance its own funds in connection with its duties and responsibilities as Trustee.

(e)     The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture or the Intercreditor Agreement at the request of any Holders, unless such Holders have provided to the Trustee security (including by way of pre-funding) and/or indemnity satisfactory to it against any loss, liability or expense.

(f)     The Trustee and the Agents shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

126

(g)     The Trustee is expressly authorized to enter into the Intercreditor Agreement and to perform all of its obligations thereunder. Each Holder, by accepting the Notes, acknowledges and agrees that in the event of a conflict between this Indenture and the terms of the Intercreditor Agreement the provisions of the Intercreditor Agreement will prevail unless expressly stated otherwise therein; provided that the Trustee's standard of conduct, rights and protections set forth in this Indenture shall prevail with respect to any action by the Trustee with respect to the Intercreditor Agreement or any of the Security Documents; and provided further that the Trustee does not have any duty to monitor the performance by the Company or by any other party under the Intercreditor Agreement or under any of the Security Documents.

Notwithstanding anything else herein contained, the Trustee, Paying Agent, the Registrar, the Transfer Agent and the Authentication Agent  may refrain without liability from doing anything that would or might in its opinion be contrary to any law of any state or jurisdiction (including but not limited to the United States of America or any jurisdiction forming a part of it and England & Wales) or any directive or regulation of any agency of any such state or jurisdiction and may without liability do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

SECTION 7.02     Rights of Trustee.  The Trustee and each Agent may rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document (whether in its original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper person.

Neither the Trustee nor any Agent shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent order, approval, appraisal, bond, debenture, note, coupon, security or other paper or document.  The Trustee shall not be deemed to have notice or any knowledge of any matter (including without limitation Defaults or Events of Default) unless a Responsible Officer assigned to and working in the Trustee's office has actual knowledge thereof or unless written notice thereof is received by the Trustee (attention:  Trust and Securities Services) and such notice clearly references the Notes, the Company or this Indenture.

(a)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any attorney, delegate, depositary, or agent appointed with due care.

(b)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(c)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.  The Trustee shall not be liable for relying in good faith on any such demand, request, direction or notice.

127

(d)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, direction, order, approval, bond, debenture, note, other evidence of indebtedness or other paper or document but the Trustee, in its sole and absolute discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the sole expense of the Company, and shall incur no liability of any kind by reason of such inquiry or investigation.

(e)     The Trustee shall have no duty to inquire as to the Company's performance of the covenants in Article IV hereof.  In addition, the Trustee shall not be deemed to have knowledge of any Default or Event of Default except any Default or Event of Default of which a Responsible Officer of the Trustee has received written notification identifying the Notes or Indenture or obtained actual knowledge.  The Trustee shall be under no obligation to monitor financial performance of the Company.

(f)     Neither the Trustee, the Agents nor any clearing system through which the Notes are traded shall have any obligation or duty to monitor, determine or inquire as to compliance, and shall not be responsible or liable for compliance, with restrictions on transfer, exchange, redemption, purchase or repurchase, as applicable, of minimum denominations imposed under this Indenture or under applicable law or regulation with respect of any transfer, exchange, redemption, purchase or repurchase, as applicable, of interest in any Note.

(g)     The Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture.

(h)     In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders, each representing less than a majority in aggregate principal amount of the Notes then outstanding, pursuant to the provisions of this Indenture, the Trustee, in its sole discretion, may determine what action, if any, will be taken and shall not incur any liability for its failure to act until such inconsistency or conflict is, in its opinion, resolved.

(i)     The permissive right of the Trustee to take the actions enumerated in this Indenture or the Intercreditor Agreement will not be construed as an obligation or duty to do so and the Trustee will not be answerable other than for its own gross negligence or willful default.

(j)     Delivery of reports, information and documents to the Trustee under Section 4.03 is for informational purposes only and the Trustee's receipt of the foregoing will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates or Opinions of Counsel, as applicable).

(k)     The rights, privileges, protections, immunities, indemnities and benefits given to, and disclaimers of, the Trustee, including, without limitation, its right to be indemnified and/or secured, are extended to, and will be enforceable by, the Trustee in each of its capacities hereunder, the Security Agent and each agent (including the Agents), custodian and other Person employed to act hereunder.  Absent willful misconduct or gross negligence, the Trustee, the Security Agent and each Agent shall not be liable for acting in good faith on instructions believed by it to be genuine and from the proper party.

(l)     The Trustee may request that the Company deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(m)     Under no circumstances will the Trustee, the Security Agent or the Agents be liable to the Company for any indirect, punitive or consequential loss (including, but not limited to, loss of business, goodwill, opportunities or profit) even if advised of the possibility of such loss or damage and regardless of whether the claim for loss or damage is made in negligence, for breach of contract or otherwise.

(n)     The Trustee and the Agents will be entitled to assume, without inquiry, that the Company is duly complying with all its obligations under the provisions of this Indenture, the Intercreditor Agreement or the Security Documents  and that no Default or Event of Default has occurred, unless notified to the contrary.

(o)     The Trustee may refrain from taking any action in any jurisdiction if the taking of such action in that jurisdiction would, in its opinion based upon legal advice in the relevant jurisdiction, be contrary to any law of that jurisdiction or, to the extent applicable, of New York.  Furthermore, the Trustee may also refrain from taking such action if it would otherwise render it liable to any person in that jurisdiction or New York or if, in its opinion based upon such legal advice, it would not have the power to do the relevant thing in that jurisdiction by virtue of any applicable law in that jurisdiction or in New York or if it is determined by any court or other competent authority in that jurisdiction or in New York that it does not have such power.

(p)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate  or Opinion of Counsel. The Trustee and the Agents may retain professional advisors to assist them in performing their duties.  The Trustee and the Agents may consult with counsel or other professional advisors and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(q)     In no event shall the Trustee or any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused, directly or indirectly, by acts of war or terrorism involving Italy, the United States, the United Kingdom or any member state of the European Monetary Union or any other national or international calamity or emergency (including but not limited to natural disasters or acts of God, strikes, work stoppages, loss or malfunctions of utilities, communications or computer (software and hardware) services), it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(r)     In no event shall the  Trustee or the Agents be responsible or liable to any Person if prevented or delayed in performing any of their obligations or discretionary functions under this Indenture by reason of any present or future law applicable to them, by any governmental or regulatory authority or by any circumstances beyond their control.

(s)     At any time that the security granted pursuant to the Security Documents has become enforceable and the Holders have given a direction to the Trustee to enforce such Collateral, the Trustee is not required to give any direction to the Security Agent with respect thereto unless it has been indemnified and/or secured and/or pre-funded in accordance with Section 7.01(a).  In any event, in connection with any enforcement of such security, the Trustee is not responsible for:

(1)     any failure of the Security Agent to enforce such security within a reasonable time or at all;

(2)     any failure of the Security Agent to pay over the proceeds of enforcement of the Collateral;

(3)     any failure of the Security Agent to realize such security for the best price obtainable;

(4)     monitoring the activities of the Security Agent in relation to such enforcement;

(5)     taking any enforcement action itself in relation to such security;

(6)     agreeing to any proposed course of action by the Security Agent which could result in the Trustee incurring any liability for its own account; or

(7)     paying any fees, costs or expenses of the Security Agent.

SECTION 7.03      Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any of its Affiliates or Subsidiaries with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interests it must

eliminate such conflict within 90 days, or resign.  Any Paying Agent or Registrar may do the same with like rights.  The Trustee is also subject to Section 7.09 hereof.

SECTION 7.04      Trustee's Disclaimer.  The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Notes or any Notes Guarantee or the Intercreditor Agreement or any Additional Intercreditor Agreement and it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

SECTION 7.05      Notice of Defaults.  If a Default occurs and is continuing and a Responsible Officer of the Trustee is informed in writing of such occurrence by the Company, the Trustee shall give notice of the Default to the Holders as set forth in Section 6.01(c).

SECTION 7.06      Compensation and Indemnity.  (a) The Company and each Guarantor, jointly and severally, shall pay to the Trustee, the Security Agent and the Agents from time to time such compensation for each of their acceptance of this Indenture and services hereunder and thereunder as shall from time to time be agreed in writing between them.  The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust.  The Company and each Guarantor, jointly and severally, shall reimburse the Trustee, the Security Agent and the Agents promptly upon request for all disbursements, advances and expenses properly incurred or made by it, including costs of collection, any additional fees the Trustee, the Security Agent and the Agents may incur acting after a Default or an Event of Default and any fees the Trustee, the Security Agent and the Agents may incur in connection with exceptional duties in relation thereto, in addition to the compensation for its services.  Such expenses will include the properly incurred compensation, disbursements, expenses and advances of the Trustee's agents, counsel, accountants and experts.

(b)      The Company and each Guarantor, jointly and severally, shall indemnify the Trustee, the Security Agent and the Agents, and hold them harmless, against any and all losses, claims, damages, liabilities or expenses (including properly incurred attorney's fees) incurred by it arising out of or in connection with the acceptance or administration of this trust and its duties under this Indenture or under the Intercreditor Agreement, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.06) and defending themselves against any claim (whether asserted by the Company, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder.  Each of the Trustee, the Security Agent and the Agents shall notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee, the Security Agent or the Agents to so notify the Company shall not relieve the Company of its obligations hereunder.  At the Trustee's sole discretion, the Company shall defend the claim and the Trustee, the Security Agent and the Agents shall provide reasonable cooperation and may participate at the Company's expense in the defense.  Alternatively, each of the Trustee,

131

the Security Agent and the Agents may, at its option, have one separate counsel of its own choosing and the Company shall pay the properly incurred fees and expenses of such counsel; provided that the Company shall not be required to pay such fees and expenses if, at the discretion of the Trustee, it assumes the Trustee's defense and there is, in the opinion of the Trustee, no conflict of interest between the Company and the Trustee in connection with such defense and no Default or Event of Default has occurred and is continuing.  The Company need not pay for any settlement made without its written consent, which consent shall not be unreasonably withheld.  The Company need not reimburse any expense or indemnify against any loss or liability to the extent incurred by the Trustee through its gross negligence or willful misconduct.

(c)     The obligations of the Company under this Section 7.06 and any Lien arising hereunder will survive the resignation or removal of the Trustee, the Security Agent and the Agents, the discharge of the Company's obligations pursuant to Article X or the termination of this Indenture.

(d)     To secure the Company's payment obligations in this Section 7.06, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

(e)     When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(8) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

(f)     All payments made by the Company under this Section 7.06 shall be made free and clear of, and without withholding or deduction for, any Taxes.

For the avoidance of doubt, the rights, privileges, protection, immunities and benefits given to the Trustee and the Agents under this Section 7.06 including its rights to be indemnified are extended to, and shall be enforced by the Trustee in each of its capacities hereunder, and by each Agent.

SECTION 7.07     Replacement of Trustee.  (a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.07.

(b)     The Trustee may resign without liability for doing so in writing at any time and be discharged from the trust hereby created by so notifying the Company.  The Holders of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing.  The Company may remove the Trustee, or any Holder who has been a bona fide Holder for not less than six months may petition any court for the removal of the Trustee and the appointment of a successor Trustee, if:

(1)     the Trustee fails to comply with Section 7.09 hereof;

132

(2)     the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)     a custodian or public officer takes charge of the Trustee or its property;

(4)     the Trustee becomes incapable of acting; or

(5)     the Trustee has or acquires a conflict of interest in its capacity as Trustee that this is not eliminated.

(c)     If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture and the Security Documents.  The successor Trustee shall mail or otherwise transmit a notice of any succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided that all sums owing to the Trustee hereunder have been paid and subject to the lien provided for in Section 7.06.

(e)     The Company covenants that, in the event of the Trustee giving reasonable notice pursuant to this Section 7.07, it shall use its best endeavors to procure a successor Trustee to be appointed.  If a successor Trustee is not appointed and does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee may appoint a successor Trustee at any time prior to the date on which a successor Trustee takes office.

(f)     If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in principal amount of the then outstanding Notes may petition at the expense of the Company any court of competent jurisdiction for the appointment of a successor Trustee.

(g)     If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.09, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(h)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail

133

or otherwise transmit a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.06 hereof.  Notwithstanding replacement of the Trustee pursuant to this Section 7.07, the Company's obligations under Section 7.06 hereof will continue for the benefit of the retiring Trustee or Agent as the case may be, and the Company shall pay to any replaced or removed Trustee or Agent all amounts owed under Section 7.06 upon such replacement or removal.

SECTION 7.08      Successor Trustee by Merger, etc.  If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to another corporation, the successor corporation without any further act will be the successor Trustee.

SECTION 7.09      Eligibility; Disqualification.  There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United Kingdom, or of the United States or of any state thereof that is authorized under such laws to exercise corporate trustee power, and which is generally recognized as a corporation which customarily performs such corporate trustee roles and provides such corporate trustee services in transactions similar in nature to the offering of the Notes as described in the Offering Memorandum.

SECTION 7.10      Resignation of Agents.  Any Agent may resign and be discharged from its duties under this Indenture at any time by giving thirty (30) days' prior written notice of such resignation to the Trustee and Company.  The Trustee or Company may remove any Agent at any time by giving thirty (30) days' prior written notice to any Agent. Upon such notice, a successor Agent shall be appointed by the Company, who shall provide written notice of such to the Trustee.  Such successor Agent shall become the Agent hereunder upon the resignation or removal date specified in such notice.  If the Company is unable to replace the resigning Agent within thirty (30) days after such notice, the Agent shall deliver any funds then held hereunder in its possession to the Trustee or may apply to a court of competent jurisdiction for the appointment of a successor Agent or for other appropriate relief.  The costs and expenses (including its counsels' fees and expenses) incurred by the Agent in connection with such proceeding shall be paid by the Company.  Upon receipt of the identity of the successor Agent, the Agent shall deliver any funds then held hereunder to the successor Agent, less the Agent's fees, costs and expenses or other obligations owed to the Agent.  Upon its resignation and delivery of any funds, the Agent shall be discharged of and from any and all further obligations arising in connection with this Indenture, but shall continue to enjoy the benefit of Section 7.06.  The Agents shall act solely as agents of the Company.

SECTION 7.11      Agents; General Provisions.

(a)      The rights, powers, duties and obligations and actions of each Agent under this Indenture are several and not (i) joint or (ii) joint and several.

(b)      The Company and the Agents acknowledge and agree that in the event of a Default or Event of Default, the Trustee may, by notice in writing to the Company and

the Agents, require the Agents act as agents of, and take instruction exclusively from, the Trustee (or the requisite Holders as provided for in Article VI). Prior to receiving such written notice from the Trustee, the Agents shall be the Agents of the Company and need have no concerns for the interest of Holders.

(c)     The Agents hold all funds as banker subject to the terms of this Indenture and shall not be liable to account for interest on money paid to it and as a result, such money will not be segregated except as required by law nor be held in accordance with the rules established by the UK Financial Conduct Authority in the UK Financial Conduct Authority's Handbook of rules and guidance from time to time in relation to client money.

(d)     Any obligation the Agents may have to publish a notice to Holders of Global Notes on behalf of the Company will have been met upon delivery of the notice to Euroclear and/or Clearstream, as applicable.

(e)     In the event that instructions given to any Agent are not reasonably clear, then such Agent shall be entitled to seek clarification from the Company or other party entitled to give the Agents instructions under this Indenture by written request promptly and in any event within one Business Day of receipt by such Agent of such instructions. If an Agent has sought clarification in accordance with this Section 7.11, then such Agent shall be entitled to take no action until such clarification is provided, and shall not incur any liability for not taking any action pending receipt of such clarification. For the avoidance of doubt an Agent is entitled to take no action (without liability for doing so) if conflicting, unclear or equivocal instructions are received by it or in order to comply with Applicable Law.

(f)     The Paying Agents shall be entitled to make payments net of any taxes or other sums required by any applicable law to be withheld or deducted.

(g)     Subject to clause (b), above, no Agent shall be under any fiduciary duty or other obligation towards or have any relationship of agency or trust for or with any person other than the Company.

ARTICLE VIII

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

SECTION 8.01     Option To Effect Legal Defeasance or Covenant Defeasance.  The Company may, at the option of its Boards of Directors evidenced by a resolution set forth in an Officer's Certificate, at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes, the Notes Guarantees, this Indenture, the Intercreditor Agreement (with respect to the Notes) and the Security Documents (with respect to the Notes), and cause the release of all Liens on the Collateral granted under the Security Documents (with respect to the Notes) upon compliance with the conditions set forth below in this Article VIII.

135

SECTION 8.02      Legal Defeasance and Discharge.  Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations and cured all then existing Defaults and Events of Default with respect to all outstanding Notes, the Notes Guarantees, this Indenture, the Intercreditor Agreement and the Security Documents, and cause the release of all Liens on the Collateral granted under the Security Documents on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (a) and (b) below, and to have satisfied all its other obligations under such Notes, the Notes Guarantees, this Indenture, the Intercreditor Agreement and the Security Documents and cause the release of all Liens on the Collateral granted under the Security Documents (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(a)      the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on such Notes when such payments are due from the trust referred to in Section 8.05 hereof;

(b)      the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust set forth in Article II hereof;

(c)      the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Company's obligations in connection therewith; and

(d)      this Article VIII.

Subject to compliance with this Article VIII, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

SECTION 8.03      Covenant Defeasance.  Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of its obligations under Sections 3.08, 4.03, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.14, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 5.01 (other than with respect to clauses (a)(1) and (a)(2) thereunder), 5.02 (other than with respect to clauses (3)(A), (3)(B) and (3)(C) of Section 5.02(a)) and 12.03 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "Covenant Defeasance"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it

136

being understood that such Notes will not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified in this Section 8.03, the remainder of this Indenture and such Notes will be unaffected thereby.  In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03 hereof, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, payment of the Notes may not be accelerated because of an Event of Default specified in Section 6.01(a)(3) or  (4) (other than with respect to clauses (1) and (2) of Section 5.01(a) and clauses (3)(A), (3)(B) and (3)(C) of Section 5.02(a)) or clause (4), (6), (7) (other than with respect to the Company), (8), (9) or (11) of Section 6.01(a).

SECTION 8.04     Conditions to Legal Defeasance or Covenant Defeasance. In order to exercise the Company's option under Section 8.02 or Section 8.03, the Company must irrevocably deposit in trust with the Trustee (or such other entity designated or appointed as agent by the Trustee for this purpose) cash in euro, euro-denominated European Government Obligations, or a combination of cash in euro and euro-denominated European Government Obligations in such amounts as will be sufficient, in the good faith determination of the Board of Directors or an Officer of the Company, for the payment of principal, premium, if any, and interest on the Notes to redemption or maturity, as the case may be, and must deliver to the Trustee of:

(a)     an Opinion of Counsel in the United States to the effect that Holders will not recognize income, gain or loss for United States federal income tax purposes as a result of such deposit and defeasance and will be subject to United States federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred (and in the case of legal defeasance only, such Opinion of Counsel in the United States must be based on a ruling of the U.S. Internal Revenue Service or other change in applicable United States federal income tax law since the Issue Date);

(b)     an Officer's Certificate stating that the deposit was not made by the Company with the intent of defeating, hindering, delaying, defrauding or preferring any creditors of the Company;

(c)     an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions), each stating that all conditions precedent provided for or relating to Legal Defeasance or Covenant Defeasance, as the case may be, have been complied with;

(d)     an Opinion of Counsel to the effect that the trust resulting from the deposit does not constitute, or is qualified as, a regulated investment company under the U.S. Investment Company Act of 1940; and

(e)       all other documents or other information that the Trustee may reasonably require in connection with the Company's option under Section 8.02 or Section 8.03.

SECTION 8.05       Deposited Money and Government Securities To Be Held in Trust; Other Miscellaneous Provisions.  Subject to Section 8.06 hereof, all money and European Government Obligations (including the proceeds thereof) deposited with the Trustee (or such other entity designated or appointed as agent by the Trustee for this purpose, or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.  Money and securities so held in trust are not subject to the Intercreditor Agreement and the Trustee is not prohibited from paying such funds to Holders by the terms of this Indenture or the Intercreditor Agreement.

The Company shall pay and indemnify the Trustee against any Taxes imposed or levied on or assessed against the cash or European Government Obligations deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such Taxes which by law are for the account of the Holders of the outstanding Notes.

The obligations of the Company under this Section 8.05 shall survive the resignation or renewal of the Trustee and/or satisfaction and discharge of this Indenture.

Notwithstanding anything in this Article VIII to the contrary, the Trustee shall deliver or pay to the Company from time to time upon the request of the Company any money or European Government Obligations held by it as provided in Section 8.04 hereof which are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

SECTION 8.06       Repayment to Company.  Any money deposited with the Trustee or any Paying Agent, or then held by the Company in trust, for the payment of the principal of, premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such money, and all liability of the Company as trustee thereof, will thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in the *New York Times* and the *Financial Times*, notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

SECTION 8.07       Reinstatement.  If the Trustee or Paying Agent is unable to apply any euro or euro-denominated European Government Obligations in accordance with

Section 8.04 or 8.05 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes will be revived and reinstated as though no deposit had occurred pursuant to Section 8.04 or 8.05 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.04 or 8.05 hereof, as the case may be; provided, however, that, if the Company makes any payment of principal of, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE IX

## AMENDMENT, SUPPLEMENT AND WAIVER

SECTION 9.01     Without Consent of Holders.  (a) Notwithstanding Section 9.02, the Company, the Guarantors, the Trustee and the other parties thereto, as applicable, may amend or supplement any Note Document without the consent of any Holder to:

(1)     cure any ambiguity, omission, defect, error or inconsistency, or reduce the minimum denomination of the Notes;

(2)     provide for the assumption by a successor Person of the obligations of the Company or the Guarantors under any Note Document;

(3)     provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 4701(b)(1)(B) of the Code) or change the minimum denominations for the Notes;

(4)     add to the covenants or provide for a Notes Guarantee for the benefit of the Holders or surrender any right or power conferred upon the Company or any Restricted Subsidiary;

(5)     make any change that would provide additional rights or benefits to the Trustee or the Holders or does not adversely affect the rights of or benefits to the Trustee or any Holder in any material respect;

(6)     make such provisions as necessary (as determined in good faith by the Board of Directors or an Officer of the Company) for the issuance of Additional Notes;

(7)     provide for any Restricted Subsidiary to provide a Notes Guarantee in accordance with Sections 4.09 and 4.15, to add Notes Guarantees, add security to or for the benefit of the Notes, or confirm and evidence the release, termination, discharge or retaking of any Notes Guarantee or Lien (including the Collateral and the Security Documents) or any amendment in respect thereof with respect to or securing the Notes when such release, termination, discharge or

139

retaking or amendment is permitted under this Indenture, the Intercreditor Agreement, any Additional Intercreditor Agreement and the Security Documents;

(8)     conform the text of this Indenture, the Notes Guarantees, the Security Documents or the Notes to any provision of the "Description of the Notes" in the Offering Memorandum to the extent that such provision in the "Description of the Notes" in the Offering Memorandum was intended to be a verbatim recitation of a provision of this Indenture, a Notes Guarantee, the Security Documents or the Notes;

(9)     evidence and provide for the acceptance and appointment under this Indenture of a successor Trustee or Security Agent pursuant to the requirements thereof or to provide for the accession by the Trustee or Security Agent to any Note Document; or

(10)    in the case of the Security Documents, mortgage, pledge, hypothecate or grant a security interest in favor of the Security Agent for the benefit of the Holders and the Trustee, in any property which is required by this Indenture (as in effect on the Issue Date) to be mortgaged, pledged or hypothecated, or in which a security interest is required to be granted to the Security Agent, or to the extent necessary to grant a security interest for the benefit of any Person; provided that the granting of such security interest is not prohibited by this Indenture and Section 12.03 is complied with.

(b)     In formulating its opinion on such matters, the Trustee shall be entitled to rely absolutely on such evidence as it deems appropriate, including Officer's Certificates and Opinions of Counsel.

(c)     Upon the request of the Company, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.  Notwithstanding anything to the contrary in Sections 9.01 and 9.02, in order to effect the amendments authorized by clauses (2), (4) and (7) of this Section 9.01 in respect of providing a Notes Guarantee for the benefit of the Holders, it shall only be necessary for the supplemental indenture providing for the accession of such additional Guarantor to be duly authorized and executed by (i) the Company, (ii) such additional Guarantor and (iii) the Trustee.

SECTION 9.02      With Consent of Holders.  (a) Except as provided below in this Section 9.02, the Company, the Guarantors and the Trustee may amend or supplement any Note Document with the consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding (including, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes) and, subject to this Indenture and the Notes, any existing Default or Event of Default (other than a Default or Event of Default in the payment of

the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes).  However, without the consent of Holders holding not less than 75% of the then outstanding aggregate principal amount of Notes (including consents obtained in connection with a purchase of, or tender offer or exchange offer for the Notes), or if any amendment, waiver or other modification will only amend, waive or modify one series of the Notes, without the consent of Holders holding not less than 75% of the then outstanding aggregate principal amount of Notes of such series amended, waived or modified, an amendment or waiver under this Section 9.02 may not, with respect to any Notes, held by a non-consenting Holder:

(1)     reduce the principal amount of such Notes whose Holders must consent to an amendment, waiver or modification;

(2)     reduce the stated rate of or extend the stated time for payment of interest on any such Note;

(3)     reduce the principal of or extend the Stated Maturity of any such Note;

(4)     reduce the premium payable upon the redemption of any such Note or change the time at which any such Note may be redeemed, in each case, pursuant to paragraphs 5 and 6 of the Notes;

(5)     make any such Note payable in money other than that stated in such Note;

(6)     impair the right of any Holder to receive payment of principal of and interest or Additional Amounts, if any, on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any such payment on or with respect to such Holder's Notes;

(7)     make any change in Section 2.13 that adversely affects the right of any Holder of such Notes in any material respect or amends the terms of such Notes in a way that would result in a loss of an exemption from any of the Taxes described thereunder or an exemption from any obligation to withhold or deduct Taxes so described thereunder unless the Payor agrees to pay Additional Amounts, if any, in respect thereof;

(8)     release any Guarantor from its obligations under its Notes Guarantee or this Indenture, except otherwise in accordance with the terms of this Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement;

(9)     release any security interest granted for the benefit of the Holders in the Collateral, other than pursuant to the terms of the Security Document or this

141

Indenture, as applicable, and as permitted by the Intercreditor Agreement or any Additional Intercreditor Agreement;

(10)    change the ranking of the Notes;

(11)    waive a Default or Event of Default with respect to the nonpayment of principal, premium, interest or Additional Amounts, if any, on such Notes (except pursuant to a rescission of acceleration of such Notes by the Holders of at least a majority in aggregate principal amount of such Notes and a waiver of the payment default that resulted from such acceleration); or

(12)    make any change in the amendment or waiver provisions which require the Holders' consent as described in this Section 9.02(a).

(b)    Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

(c)    Upon the request of the Company, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of such amended or supplemental indenture, waiver or other modification unless such amended or supplemental indenture, waiver or other modification directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture, waiver or other modification.

(d)    The consent of the Holders is not necessary under this Indenture to approve the particular form of any proposed amendment of any Note Document.  It is sufficient if such consent approves the substance of the proposed amendment.

(e)    A consent to any amendment or waiver under this Indenture by any Holder given in connection with a tender of such Holder's Notes will not be rendered invalid by such tender.

(f)    For so long as the Notes are listed on the Official List of the LxSE and the rules of such exchange so require, the Company will publish notice of any amendment, supplement and waiver on the official website of the LxSE or in a daily newspaper with general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*).

SECTION 9.03    <u>Supplemental Indenture</u>.  Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture.

SECTION 9.04    <u>Revocation and Effect of Consents</u>.  Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of

revocation before the date on which the Trustee receives an Officer's Certificate from the Company certifying that the requisite number of consents have been received.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

SECTION 9.05     Notation on or Exchange of Notes.  The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

SECTION 9.06     Trustee and the Security Agent To Sign Amendments, etc. The Trustee and the Security Agent shall sign any amended or supplemental indenture authorized pursuant to this Article IX if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Security Agent.  In executing any amended or supplemental indenture, the Trustee shall be provided with and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.03 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.  In signing any amendment, supplement or waiver, the Trustee shall be entitled to receive security (including by way of pre-funding) and/or an indemnity satisfactory to it.

SECTION 9.07     Payments for Consent.  The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms of the provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.  Notwithstanding the foregoing, the Company and its Restricted Subsidiaries shall be permitted, in any offer or payment of consideration for, or as an inducement to, any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes, to exclude Holders in any jurisdiction where (i) the solicitation of such consent, waiver or amendment, including in connection with an exchange offer or an offer to purchase for cash, or (ii) the payment of the consideration therefor would (A) require the Company or any of its Restricted Subsidiaries to file a registration statement, prospectus or similar document under any applicable securities laws (including, but not limited to, the United States federal securities laws and the laws of the European Union or its member states), which the Company in its sole discretion determines (acting in good faith) would be materially burdensome; or (B) otherwise not be permitted under applicable law in such jurisdiction.

SECTION 9.08     Notice of Amendment, Supplement or Waiver.  After an amendment becomes effective, the Company is required to mail or otherwise transmit, or cause to be mailed or otherwise transmitted, to Holders a notice briefly describing such amendment.

However, the failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of the amendment.

SECTION 9.09        Meeting of Holders of Notes.

(a)       In addition to and without prejudice to the provisions described in this Article IX in accordance with the provisions set forth under the Italian Civil Code, meetings of the Holders of the Notes to consider any matter affecting their interests, including any amendment, supplement or waiver described in this Article IX may be convened either (i) by the Board of Directors of the Company, (ii) by the Noteholders' Representative or (iii) upon request by Holders of at least 5.0% of the aggregate principal amount of the outstanding Notes.

(b)       In accordance to the Italian Civil Code, the vote required to pass a resolution by a meeting of Holders of the Notes will be (a) in the case of the first meeting, one or more persons that hold or represent Holders of more than one half of the aggregate principal amount of the outstanding Notes, and (b) in the case of the second and any further adjourned meeting, one or more persons that hold or represent Holders of at least two-thirds of the aggregate principal amount of the Notes so present or represented at such meeting. Any such second or further adjourned meeting will be validly held if there are one or more persons present that hold or represent Holders of more than one-third of the aggregate principal amount of the outstanding Notes; provided, however, that the Company's bylaws may provide for a higher quorum (to the extent permitted under Italian law). Certain proposals, as set out under article 2415 paragraph 1, item 2, and paragraph 3 of the Italian Civil Code (namely, the amendment of the economic terms and conditions of the Notes) may only be approved by a resolution passed at a meeting of Holders of the Notes (including any adjourned meeting) by one or more persons present that hold or represent Holders of not less than one-half of the aggregate principal amount of the outstanding Notes.

(c)       With respect to the matters set forth in Section 9.02, and to the extent permitted under Italian law, the percentage of the aggregate principal amount of Notes otherwise required by Article 2415 of the Italian Civil Code to pass an extraordinary resolution with respect to such matters shall be increased from 50% to 75%.

(d)       Any resolution duly passed at any such meeting shall be binding on all the Holders of the Notes, whether or not such Holder was present at such meeting or voted to approve such resolution. To the extent provided by the Italian Civil Code, the resolutions passed by a meeting of Holders of the Notes can be challenged by Holders pursuant to articles 2377 and 2379 of the Italian Civil Code.

(e)       The provisions described under this Section 9.09 will be in addition to, and not in substitution of, the provisions of Sections 9.01 and 9.02 As such and notwithstanding the foregoing, any amendment, supplement and/or waiver, in addition to complying with the provisions described under this Section 9.09 must also comply with the other provisions described under Sections 9.01 and 9.02.

ARTICLE X

SATISFACTION AND DISCHARGE

SECTION 10.01      Satisfaction and Discharge.  This Indenture, and the rights of the Trustee and the Holders under the Intercreditor Agreement, any Additional Intercreditor Agreement and the Security Documents, will be discharged and cease to be of further effect (except as to surviving rights of conversion or transfer or exchange of the Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(a)      either:

(1)      all the Notes previously authenticated and delivered (other than certain lost, stolen or destroyed Notes and certain Notes for which provision for payment was previously made and thereafter the funds have been released to the Company) have been delivered to the Trustee for cancellation; or

(2)      all Notes not previously delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year or (iii) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company;

(b)      the Company has deposited or caused to be deposited with the Trustee (or such other entity designated or appointed as agent by the Trustee for this purpose), cash in euro, euro-denominated European Government Obligations, or a combination of cash in euro and euro-denominated European Government Obligations, in an amount sufficient, in the good faith determination of the Board of Directors or an Officer of the Company, to pay and discharge the outstanding aggregate principal amount of indebtedness on the Notes not previously delivered to the Trustee for cancellation, for principal, premium, if any, and interest to the date of deposit (in the case of Notes that have become due and payable), or to the Stated Maturity or redemption date, as the case may be;

(c)      the Company has paid or caused to be paid all other sums payable under this Indenture;

(d)      the Company has delivered irrevocable instructions to the Trustee to apply the funds deposited towards the payment of the Notes at maturity or on the redemption date, as the case may be; and

(e)      the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each to the effect that all conditions precedent under this Section 10.01 have been complied with; provided that any such counsel may rely on any Officer's Certificate as to matters of fact (including as to compliance with Sections 10.01(a), 10.01(b) and 10.01(c)).

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to Section 10.01(b), the provisions of Sections 10.02 and 8.06 will survive.  In addition, nothing in this Section 10.01 will be deemed to discharge those provisions of Section 7.06 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

SECTION 10.02      Application of Trust Money.  Subject to the provisions of Section 8.06, all money deposited with the Trustee (or the entity designated or appointed as agent by the Trustee) pursuant to Section 10.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or securities in accordance with Section 10.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 10.01; provided that if the Company has made any payment of principal of, premium, if any, or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or European Government Obligations held by the Trustee or Paying Agent.

ARTICLE XI

GUARANTEES

SECTION 11.01      Guarantees.  (a) Each Guarantor, subject to the Agreed Security Principles, hereby jointly and severally, irrevocably and unconditionally guarantees to each Holder and to the Trustee and its successors and assigns (1) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Company under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest, premium or Additional Amounts, if any, on the Notes and all other monetary obligations of the Company under this Indenture and the Notes and (2) the full and punctual performance within applicable grace periods of all other obligations of the Company whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article XI notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)      Each Guarantor waives presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or

146

the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (1) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (2) any extension or renewal of any thereof; (3) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (4) the release of any security held by any Holder, the Security Agent or the Trustee for the Guaranteed Obligations or any of them; (5) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (6) any change in the ownership of such Guarantor, except as provided in Sections 11.09(b) and (c).

(c)     Each Guarantor hereby waives any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Company first be used and depleted as payment of the Company's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guarantor hereby waives any right to which it may be entitled to require that the Company be sued prior to an action being initiated against such Guarantor.

(d)     Each Guarantor further agrees that its Notes Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)     Except as expressly set forth in Sections 8.02, 11.02, 11.03 and 11.09, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)     Except as expressly set forth in Sections 8.02, 11.02, 11.03 and 11.09, each Guarantor agrees that its Notes Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Notes Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Company or otherwise.

147

(g)      In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Company to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Holders or the Trustee an amount equal to the sum of (1) the unpaid principal amount of such Guaranteed Obligations, (2) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by law) and (3) all other monetary obligations of the Company to the Holders and the Trustee.

(h)      Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of any Notes Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 11.01.

(i)      Each Guarantor also agrees to pay any and all costs and expenses (including attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 11.01.

(j)      Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 11.02      Limitation on Liability.  Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby guaranteed by the applicable Guarantor without rendering the Notes Guarantee, as it relates to such Guarantor, voidable under applicable law relating to ultra vires, fraudulent conveyance, fraudulent transfer, corporate benefit, financial assistance or similar laws affecting the rights of creditors generally or other considerations under applicable law.

SECTION 11.03      Limitations on Italian Guarantors.  The Notes Guarantees of each of Moby (prior to the Post-Issuance Merger) and CIN (each, an "Italian Guarantor"), as a consequence of applicable Italian corporate law limitations and in accordance with the Whitewash Procedures, will not exceed at any time, the amounts described in this Section 11.03.

(a)      With respect to Moby (prior to the Post-Issuance Merger):

(1)      the Notes Guarantee of Moby will not exceed at any time an aggregate amount equal to the sum of:  (i) principal amount of the Revolving

Credit Facility advanced from time to time to Moby (or any of its direct or indirect subsidiaries pursuant to article 2359 of the Italian Civil Code) as borrower under the Revolving Credit Facility, notwithstanding any subsequent repayment, reduction or cancellation; (ii) the aggregate principal amount of any intercompany loans, or other financial support in any form, advanced or granted from time to time to Moby (or any of its direct or indirect subsidiaries pursuant to article 2359 of the Italian Civil Code) by the Company and/or CIN (whether directly or indirectly) since the Issue Date, as resulting from time to time from the latest financial statements (*bilancio di esercizio*) of Moby duly approved by the shareholders meeting of Moby and/or any of its direct or indirect subsidiaries, as the case may be, notwithstanding any subsequent repayment, reduction or cancellation; and (iii) the amount of capital contributed by the Company to Moby on or about the Issue Date to provide Moby with funds to repay certain of its existing financial indebtedness in connection with the transaction documented hereunder; and

(2)     the maximum amount that Moby may be required to pay in respect of its obligations as Guarantor under this Indenture, the Credit Agreement and the Intercreditor Agreement and as security provider under the Security Documents (as applicable), shall not exceed at any time, the amount of the Credit Support approved by the shareholders' meeting of Moby held on January 13, 2016;

(b)     With respect to CIN:

(1)     the Notes Guarantees will not exceed at any time an aggregate amount equal to the sum of:  (i) the aggregate principal amount of the Revolving Credit Facility advanced from time to time to CIN (or any of its direct or indirect subsidiaries pursuant to article 2359 of the Italian Civil Code) as borrower under the Revolving Credit Facility, notwithstanding any subsequent repayment, reduction or cancellation; (ii) the aggregate principal amount of any intercompany loans, or other financial support in any form, advanced or granted from time to time to CIN (or any of its direct or indirect subsidiaries pursuant to article 2359 of the Italian Civil Code) by the Company and/or Moby (whether directly or indirectly) since the Issue Date, as resulting from time to time from the latest financial statements (*bilancio di esercizio*) of CIN duly approved by the shareholders meeting of CIN and/or any of its direct or indirect subsidiaries, as the case may be, notwithstanding any subsequent repayment, reduction or cancellation; and (iii) the amount of capital contributed by the Company to CIN on or about the Issue Date to provide CIN with funds to repay certain of its existing financial indebtedness in connection with the transaction documented hereunder; and

(2)     the maximum amount that CIN may be required to pay in respect of its obligations as Guarantor under this Indenture, the Credit Agreement and the Intercreditor Agreement and as security provider under the Security Documents, shall not exceed at any time, the amount of the Credit Support approved by the shareholders' meeting of CIN held on January 13, 2016, and as subsequently

updated by CIN in accordance with the Whitewash Procedure to be carried out after the approval of the annual financial statements of CIN for the financial years ended on December 31, 2015 and December 31, 2016.

(c)     The maximum amount that the Italian Guarantors may be required to pay in respect of their obligations as Guarantors under this Indenture shall ratably concur and not cumulate with the corresponding amounts due by each Italian Guarantor to any guaranteed and/or secured creditor pursuant to the Credit Agreement and/or the Intercreditor Agreement, and *vice versa*. The proceeds of the enforcement of said guarantees shall be distributed amongst the guaranteed and/or secured creditors (including, without, limitation, the Holders) in accordance with the provisions of the Intercreditor Agreement.

(d)     Pursuant to article 1938 of the Italian Civil Code, the maximum amount that each Italian Guarantor may be required to pay in respect of its obligations as a Guarantor under this Indenture and the Credit Agreement shall not exceed an amount equal to 120% of the aggregate principal amount of the Notes and the total commitments under the Credit Agreement.

SECTION 11.04     Successors and Assigns.  This Article XI shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 11.05     No Waiver.  Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article XI shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XI at law, in equity, by statute or otherwise.

SECTION 11.06     Modification.  No modification, amendment or waiver of any provision of this Article XI, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 11.07     Execution of Supplemental Indenture for Future Guarantors.  Each Restricted Subsidiary which is required to become a Guarantor pursuant to Section 4.15 shall promptly execute and deliver to the Trustee a supplemental indenture in the form attached hereto as Exhibit D or other appropriate agreement pursuant to which such Subsidiary shall become a Guarantor under this Article XI and shall guarantee the Guaranteed Obligations.  Concurrently with the execution and delivery of such supplemental indenture, the

150

Company shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Restricted Subsidiary and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Notes Guarantee of such Guarantor is a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms and or to such other matters as the Trustee may reasonably request.

SECTION 11.08    Non-Impairment.  The failure to endorse a Notes Guarantee on any Note shall not affect or impair the validity thereof.

SECTION 11.09    Release of Guarantees.  (a) Subject to Section 11.09(b) and the terms of the Intercreditor Agreement, each Notes Guarantee, once it becomes due, is a continuing guarantee and shall (i) remain in full force and effect until payment in full of all the Guaranteed Obligations, (ii) be binding upon each Guarantor and its successors and (iii) inure to the benefit of, and be enforceable by, the Trustee, the Holders and their respective successors, transferees and assigns.

(b)    Each Notes Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and such Guarantor and its obligations under the Notes Guarantee, this Indenture, the Security Documents and the Intercreditor Agreement shall be released and discharged:

(1)    by a sale or other disposition (including by way of consolidation or merger) of Capital Stock of the relevant Guarantor or of a Parent thereof (other than the Company), such that such Guarantor ceases to be a Restricted Subsidiary, or the sale or disposition of all or substantially all the assets of the relevant Guarantor (other than to the Company, a Successor Company or a Restricted Subsidiary), in each case in a transaction otherwise permitted by this Indenture;

(2)    by the designation in accordance with this Indenture of the relevant Guarantor as an Unrestricted Subsidiary;

(3)    by defeasance or discharge of the Notes, as provided in Article VIII or Article X;

(4)    upon full payment of all obligations of the Company and the Guarantors under this Indenture and the Notes;

(5)    with respect to the Notes Guarantee of Moby, upon effectiveness of the Post-Issuance Merger, provided that MergerCo assumes all obligations of the Company under this Indenture;

(6)    as provided by Section 4.15 or Article IX; or

(7)    as otherwise provided in the Intercreditor Agreement or any Additional Intercreditor Agreement.

151

(c)     Each Holder hereby authorizes the Trustee to take all actions, including the granting of releases or waivers under the Intercreditor Agreement, to effectuate any release in accordance with the provisions of this Section 11.09, subject to customary and reasonably satisfactory protections and indemnifications provided by the Company to the Trustee.

ARTICLE XII

COLLATERAL, SECURITY AND INTERCREDITOR AGREEMENT

SECTION 12.01     The Collateral.  (a) The due and punctual payment of the principal of, premium, if any, and interest on the Notes and the Notes Guarantees thereof when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, interest on the overdue principal of and interest (to the extent lawful), if any, on the Notes and the Notes Guarantees thereof and performance of all other obligations under this Indenture, the Notes and the Notes Guarantees and the Security Documents, shall be secured by Liens (provided the assets subject to such Liens may also be subject to Permitted Collateral Liens in accordance with Section 4.12) as provided in the Security Documents which the Company, Holdco and the Guarantors, as the case may be, have entered into before, on or about the date hereof and shall be secured by all Security Documents hereafter delivered as required or permitted by this Indenture, the Security Documents and the Intercreditor Agreement.

(b)     Holdco, the Company and the Guarantors hereby agree that the Security Agent shall hold and administer the Collateral in trust (to the extent possible under applicable law and in accordance with the terms of the relevant Security Document) for the benefit of all the Holders and the Trustee, in each case pursuant to the terms of the Security Documents and the Intercreditor Agreement and the Security Agent and the Trustee are hereby authorized to execute and deliver the Security Documents and the Intercreditor Agreement (including any other agreements, deeds or other documents in relation thereto) on behalf of all the Holders.

(c)     Each Holder, by its acceptance of any Notes and the Notes Guarantees thereof, consents and agrees to and accepts the terms of the Security Documents and the Intercreditor Agreement (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or as may be amended from time to time in accordance with their terms, appoints the Security Agent as representative of the Holders (*rappresentante*) pursuant to and for the purposes set forth under Article 2414-*bis*, paragraph 3 of the Italian Civil Code, and irrevocably authorizes and directs the Security Agent and the Trustee to:

(A)     perform the duties and exercise the rights, powers and discretions that are specifically given to each of them under the Security Documents and the Intercreditor Agreement, together with any other incidental rights, powers and discretions; and

152

(B)     execute each Security Document, waiver, modification, amendment, renewal or replacement or any other document expressed to be executed by the Security Agent and/or the Trustee on its behalf, including any deed of cancellation and release thereof.

(d)     The Trustee and each Holder, by accepting the Notes and the Notes Guarantees thereof, acknowledges that, as more fully set forth in the Security Documents and the Intercreditor Agreement, the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders and the Trustee, and that the Lien of this Indenture and the Security Documents in respect of the Trustee and the Holders is subject to and qualified and limited in all respects by the Security Documents and the Intercreditor Agreement and actions that may be taken thereunder.

(e)     Subject to the terms of this Indenture, the Intercreditor Agreement and the Security Documents, the Company, Holdco and the Guarantors shall have the right to remain in possession and retain control of the Collateral securing the Notes (other than as set forth in the Security Documents), to freely operate the Collateral and to collect, invest and dispose of any income therefrom.

SECTION 12.02     Limitations on the Collateral.  The Liens will be subject to the Agreed Security Principles as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, thin capitalization, voidable preference, financial assistance, corporate purpose, distributable reserves, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

SECTION 12.03     Impairment of Security Interests.  Holdco shall not, the Company shall not, and the Company shall not permit any Restricted Subsidiary to, take or omit to take any action, which action or omission would have the result of materially impairing the security interest with respect to the Collateral (it being understood that the Incurrence of Permitted Collateral Liens shall under no circumstances be deemed to materially impair the security interest with respect to the Collateral) for the benefit of the Trustee and the Holders, and Holdco shall not, the Company shall not, and the Company shall not permit any Restricted Subsidiary to, grant to any Person other than the Security Agent, for the benefit of the Trustee and the Holders and the other beneficiaries described in the Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement, any Lien over any of the Collateral that is prohibited by Section 4.12; provided that Holdco, the Company and its Restricted Subsidiaries may Incur Permitted Collateral Liens, and the Collateral may be discharged or released in accordance with this Indenture, the applicable Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement.

Notwithstanding the above, nothing in this Section 12.03 shall restrict the discharge and release of any Lien in accordance with this Indenture, the applicable Security Documents, the Intercreditor Agreement or any Additional Intercreditor Agreement.

Subject to the foregoing, the Security Documents may be amended, extended, renewed, restated or otherwise modified or released (followed by an immediate retaking of a

Lien of at least equivalent ranking over the same assets) to (i) cure any ambiguity, omission, defect or inconsistency therein; (ii) provide for Permitted Collateral Liens; (iii) add to the Collateral; or (iv) make any other change thereto that does not adversely affect the Holders in any material respect; provided, however, that (except where permitted by this Indenture or the Intercreditor Agreement or to effect or facilitate the creation of Permitted Collateral Liens for the benefit of the Security Agent and holders of other Indebtedness Incurred in accordance with this Indenture) no Security Document may be amended, extended, renewed, restated or otherwise modified or released (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), unless contemporaneously with such amendment, extension, renewal, restatement or modification or release (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), the Company delivers to the Security Agent and the Trustee, either (1) a solvency opinion, in form and substance reasonably satisfactory to the Security Agent and the Trustee, from an Independent Financial Advisor or appraiser or investment bank which confirms the solvency of the Company and its Subsidiaries, taken as a whole, after giving effect to any transactions related to such amendment, extension, renewal, restatement, modification or release, (2) a certificate from an Officer of the relevant Person which confirms the solvency of the Person granting such Lien after giving effect to any transactions related to such amendment, extension, renewal, restatement, modification or release (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), or (3) an Opinion of Counsel (subject to any qualifications customary for this type of opinion of counsel), in form and substance reasonably satisfactory to the Trustee, confirming that, after giving effect to any transactions related to such amendment, extension, renewal, restatement, modification or release (followed by an immediate retaking of a lien of at least equivalent ranking over the same assets), the Lien or Liens created under the Security Document, so amended, extended, renewed, restated, modified or released and retaken are valid and perfected Liens not otherwise subject to any limitation, imperfection or new hardening period, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to such amendment, extension, renewal, restatement, modification or release and retake and to which the new Indebtedness secured by the Permitted Collateral Lien is not subject.  In the event that Holdco, the Company and its Restricted Subsidiaries comply with the requirements of this Section 12.03, the Trustee and the Security Agent shall (subject to customary protections and each of the Trustee and Security Agent being indemnified, pre-funded and/or secured to its satisfaction) consent to such amendments without the need for instructions from the Holders.

SECTION 12.04    Release of Liens on the Collateral.  To the extent a release is required by a Security Document, at the request of the Company the Security Agent shall release, and the Trustee (as applicable) shall release and if so requested direct the Security Agent to release (in accordance with the provisions of this Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement and the applicable Security Document), without the need for consent of the Holders, Liens on the Collateral securing the Notes:

(1)    upon payment in full of principal, interest and all other obligations on the Notes issued under this Indenture or discharge or defeasance thereof;

(2)    upon release of a Notes Guarantee (other than the release of the Note Guarantee of Moby in connection with the Post-Issuance Merger), with respect to the Liens securing such Notes Guarantee granted by such Guarantor;

(3)     in connection with one or more Permitted Reorganizations as described in Section 4.19;

(4)     in connection with any disposition of Collateral (other than in respect of, following the Post-Issuance Merger the pledge over the shares of MergerCo (the "MergerCo Share Pledge") or, except as provided in clause (6) below, the pledge over the shares of the Company (the "Company Share Pledge")), directly or indirectly, to (a) any Person other than the Company or any of the Restricted Subsidiaries (but excluding any transaction subject to Section 5.01) that is not prohibited by this Indenture or (b) the Company or any Restricted Subsidiary, provided  the relevant Collateral remains subject to, or otherwise becomes subject to, a Lien in favor of the Notes;

(5)     if the Company designates any of its Restricted Subsidiaries to be an Unrestricted Subsidiary in accordance with the applicable provisions of this Indenture, the release of the property, assets and Capital Stock of such Unrestricted Subsidiary;

(6)     in respect of the Company Share Pledge only, in connection with the Post-Issuance Merger, provided that, subject to certain perfection requirements and any Permitted Collateral Liens, the MergerCo Share Pledge is granted in favor of the Notes;

(7)     as otherwise provided in the Intercreditor Agreement or any Additional Intercreditor Agreement;

(8)     as may be permitted by the covenant described under Section 12.03;

(9)     automatically without any action by the Trustee, if the Lien granted in favor of the Indebtedness that gave rise to the obligation to grant the Lien over such Collateral is released (other than pursuant to the repayment and discharge thereof), provided that such release would otherwise be permitted by another clause above; and

(10)     except as provided in clause (5) above in connection with the Post-Issuance Merger, in order to effectuate a merger, consolidation, conveyance or transfer conducted in compliance with the covenant described under Article V.

Each of these releases shall be effected by the Security Agent without the consent of the Holders or any action on the part of the Trustee.

SECTION 12.05     Additional Intercreditor Agreement.  At the request of the Company, in connection with the Incurrence or refinancing by the Company or its Restricted Subsidiaries of any Indebtedness secured or permitted to be secured on the Collateral, the Company, the relevant Restricted Subsidiaries, the Trustee and the Security Agent, as applicable, shall enter into an intercreditor or similar agreement or a restatement, replacement, amendment or other modification of the existing Intercreditor Agreement (an "Additional Intercreditor

Agreement") with the holders of such Indebtedness (or their duly authorized representatives) on substantially the same terms as the Intercreditor Agreement (or on terms that in the good faith judgment of the Board of Directors or an Officer of the Company are not materially less favorable to the Holders), including containing substantially the same terms with respect to sharing of the proceeds of security and enforcement of security, priority and release of security, it being understood that an increase in the amount of Indebtedness being subject to the terms of the Intercreditor Agreement or Additional Intercreditor Agreement will not be deemed to be less favorable to the Holders and will be permitted by this Section 12.05 if the Incurrence of such Indebtedness and any Lien in its favor is permitted by Sections 4.09 and 4.12; provided that such Additional Intercreditor Agreement will not impose any personal obligations on the Trustee or the Security Agent or, in the opinion of the Trustee or the Security Agent, adversely affect the rights, duties, liabilities or immunities of the Trustee or the Security Agent under this Indenture or the Intercreditor Agreement.  As used herein, the term "Intercreditor Agreement" shall include references to any Additional Intercreditor Agreement that supplements or replaces the Intercreditor Agreement.

At the written direction of the Company and without the consent of the Holders, the Trustee or the Security Agent shall from time to time enter into one or more amendments to any Intercreditor Agreement to:  (i) cure any ambiguity, omission, defect or inconsistency of any such agreement, (ii) increase the amount or types of Indebtedness covered by any such agreement that may be Incurred by the Company or any Restricted Subsidiary that is subject to any such agreement (provided that such Indebtedness is Incurred in compliance with this Indenture), (iii) add Restricted Subsidiaries to the Intercreditor Agreement, (iv) further secure the Notes (including Additional Notes Incurred in compliance with this Indenture), (v) make provision for equal and ratable pledges of the Collateral to secure Additional Notes Incurred in compliance with this Indenture or to implement any Permitted Collateral Liens or (vi) make any other change to any such agreement that does not adversely affect the Holders in any material respect.  The Company shall not otherwise direct the Trustee or the Security Agent to enter into any amendment to any Intercreditor Agreement without the consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding, except as otherwise permitted by Article IX or as permitted by the terms of such Intercreditor Agreement, and the Company may only direct the Trustee or the Security Agent to enter into any amendment to the extent such amendment does not impose any personal obligations on the Trustee or the Security Agent or, in the opinion of the Trustee or the Security Agent, adversely affect the rights, duties, liabilities or immunities of the Trustee or the Security Agent under this Indenture relating to the Notes or any Intercreditor Agreement. In formulating its opinion on such matters, the Trustee shall be entitled to request and rely absolutely on such evidence as it deems appropriate, including an Officer's Certificate and an Opinion of Counsel.

Each Holder, by accepting a Note, shall be deemed to have agreed to and accepted the terms and conditions of any Intercreditor Agreement (whether then entered into or entered into in the future pursuant to the provisions described herein), and to have authorized the Trustee and the Security Agent to enter into any one or more amendments to any Intercreditor Agreement or any Additional Intercreditor Agreement as set forth in this Section 12.05.

SECTION 12.06      Security Agent.  Any resignation or replacement of the Security Agent shall be made in accordance with the terms of the Intercreditor Agreement or any Additional Intercreditor Agreement.

ARTICLE XIII

MISCELLANEOUS

SECTION 13.01      Notices.  Any notice or communication by the Company or the Trustee to the others is duly given if in writing and delivered in Person or mailed by first class mail (registered or certified, return receipt requested), telecopier, facsimile, electronic transmission or overnight air courier guaranteeing next day delivery, to the others' address as follows:

If to the Company, Holdco or any Guarantor, to:

Moby S.p.A.
Largo Augusto 8
20122 Milan
Italy
Attention: Chairman of the Board of Directors
Fax: +39 02 77331636

with copies to:

White & Case LLP
5 Old Broad Street
London EC2N 1DW
United Kingdom
Facsimile:  +44 (0) 20 7532 1001
Attention:  Paul Clews

If to the Trustee:

Citibank, N.A., London Branch
Citigroup Center
25 Canada Square
London E14 5LB
United Kingdom
Facsimile:  +44 (0) 20 7500 5877
Attention:  Agency and Trust

If to the Security Agent:

UniCredit S.p.A.
Via A. Specchi, 16
00186 Rome
Italy

157

Facsimile: +39 0249536239
Attention: Enrico Bertoli/Giorgio Carosi – Loans Agency Rome

The Company, Holdco, any Guarantor, the Trustee or the Security Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices to Holders will be validly given if mailed to them at their respective addresses in the register of the Holders, if any, maintained by the Registrar. In addition, for so long as any of the Notes are listed on the Official List of the LxSE and admitted for trading on the Euro MTF Market of the LxSE and the rules of the LxSE so require, notices with respect to the Notes listed on the Official List of the LxSE will be published on the official website of the LxSE or in a leading newspaper having general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, to the extent and in the manner permitted by such rules, posted on the official website of the LxSE. For so long as any Notes are represented by Global Notes, all notices to Holders will be delivered to Euroclear and Clearstream, delivery of which shall be deemed to satisfy the requirements of this paragraph, each of which will give such notices to the holders of book-entry interests.

Each such notice shall be deemed to have been given on the date of such publication or, if published more than once on different dates, on the first date on which publication is made; provided that, if notices are mailed, such notice shall be deemed to have been given on the later of such publication and the seventh day after being so mailed.

Any notice or communication mailed to a Holder shall be mailed to such Person by first-class mail or other equivalent means and shall be sufficiently given to such Holder if so mailed within the time prescribed. Failure to mail, cause to be delivered or otherwise transmit a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 13.02    Communications.  (a) In no event shall the Agents or any of their respective Affiliates be liable for any losses arising from the Agent or any of their Affiliates receiving or transmitting any data from the Company, any Authorized Person or Officer or any party to the transaction via any non-secure method of transmission or communication, such as, but without limitation, by facsimile or email.

(b)    The parties hereto accept that some methods of communication are not secure and the Trustee, the Agents or any of their respective Affiliates shall incur no liability for receiving instructions via any such non-secure method. The Agents or any of their Affiliates are authorized to comply with and rely upon any such notices, instructions or other communications believed by it to have been sent or given by an Authorized Person or Officer or an appropriate party to the transaction (or authorized representative thereof). The Company or authorized officer of the Company shall use all reasonable endeavors to ensure that instructions transmitted to an Agent or any of its Affiliates

158

pursuant to this Indenture are complete and correct.  Any instructions shall be conclusively deemed to be valid instructions from the Company or authorized officer of the Company to such Agent or any of its Affiliates for the purposes of this Indenture.

SECTION 13.03     Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1)     an Officer's Certificate in form and substance satisfactory to the Trustee (which must include the statements set forth in Section 13.04 hereof) stating that, in the opinion of the signer, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)     an Opinion of Counsel in form and substance satisfactory to the Trustee (which must include the statements set forth in Section 13.04 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

SECTION 13.04     Statements Required in Certificate or Opinion.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

SECTION 13.05     Rules by Trustee and Agents.  The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar and Paying Agent may make reasonable rules and set reasonable requirements for each of their respective functions.

SECTION 13.06     No Personal Liability of Directors, Officers, Employees and Stockholders.  No director, officer, employee, incorporator or shareholder of the Company, any of the Company's Subsidiaries, or any of their respective Affiliates, as such, shall have any liability for any obligations of the Company or the Guarantors under the Note Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are

part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the U.S. federal securities laws and it is the view of the SEC that such a waiver is against public policy.

SECTION 13.07    Governing Law.  THIS INDENTURE AND THE NOTES, INCLUDING THE NOTES GUARANTEES, AND THE RIGHTS AND DUTIES OF THE PARTIES THEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

SECTION 13.08    No Adverse Interpretation of Other Agreements.  This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 13.09    Successors.  All agreements of the Company in this Indenture and the Notes will bind its successors.  All agreements of the Trustee in this Indenture will bind its successors.

SECTION 13.10    Severability.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

SECTION 13.11    Counterpart Originals.  The parties may sign any number of copies of this Indenture.  Each signed copy will be an original, but all of them together represent the same agreement.

SECTION 13.12    Table of Contents, Headings, etc.  The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

SECTION 13.13    Submission to Jurisdiction; Appointment of Agent.  The Company and each Guarantor irrevocably submits to the non-exclusive jurisdiction of any New York state or United States federal court located in the Borough of Manhattan in the City, County and State of New York, United States over any suit, action or proceeding arising out of or relating to this Indenture.  The Company and each Guarantor irrevocably waives, to the fullest extent permitted by law, any objection which it may have, pursuant to New York law or otherwise, to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in any inconvenient forum.  In furtherance of the foregoing, the Company and each Guarantor hereby irrevocably designates and appoints C T Corporation System, 111 Eighth Avenue, New York, New York 10011, as its agent to receive service of all process brought against them with respect to any such suit, action or proceeding in any such court in the City and State of New York, such service being hereby acknowledged by it to be effective and binding service in every respect.  The Company and each Guarantor expressly consents to the jurisdiction of any such courts in respect of any such action and waives any other requirements of or objections to personal jurisdiction with respect thereto and waives any right to trial by jury.

Copies of any such process so served shall also be given to the Company in accordance with Section 13.01 hereof, but the failure of the Company to receive such copies shall not affect in any way the service of such process as aforesaid.

Nothing in this Section shall limit the right of the Trustee or any Holder to bring proceedings against the Company or any Guarantor in the courts of any other jurisdiction or to serve process in any other manner permitted by law.

SECTION 13.14     Prescription.  Claims against the Company or any Guarantor for the payment of principal, or premium, if any, on the Notes or any Notes Guarantee will be prescribed five years after the applicable due date for payment thereof.  Claims against the Company or any Guarantor for the payment of interest on the Notes will be prescribed three years after the applicable due date for payment of interest.

SECTION 13.15     Noteholders' Representative.

(a)     The Security Agent, acknowledges and agrees that the Security Agent shall be appointed, as from the Issue Date, as representative of the Holders (*rappresentante*) (the "Representative") pursuant to and for the purposes set forth under Article 2414-*bis*, paragraph 3 of the Italian Civil Code in order to create and grant in its favor security interests and guarantees securing and guaranteeing the Notes and entitle it to exercise in the name and on behalf of the Holders of the Notes all their rights (including any rights before any court and judicial proceedings) relating to such security interests and guarantees. The execution of this Indenture and the issuance and purchase of the Notes on the Issue Date shall be deemed to constitute the authorization and agreement on behalf of the Holders of the Notes of the appointment as of the Issue Date of the Security Agent as Representative.

(b)     A representative of the Holders of the Notes (*rappresentante comune*) (the "Noteholders' Representative") may be appointed pursuant to Articles 2415 and 2417 of the Italian Civil Code by the Holders of the Notes in order to represent the interests of the Holders of the Notes pursuant to Article 2418 of the Italian Civil Code as well as give effect to resolutions passed at a meeting of the Holders of the Notes. If the Noteholders' Representative is not appointed by a meeting of the Holders of the Notes, the Noteholders' Representative shall be appointed by a decree of the Court where the Company has its registered office upon the request of one or more Holders of the Notes or upon the request of the directors of the Company. The Noteholders' Representative shall remain appointed for a maximum period of three years but may be reappointed again thereafter.

*[Signatures on following pages]*

161

**ONORATO ARMATORI S.P.A.**, as the Company

By: _____

Name:
Title:        Natasha Claire Charles, Attorney

[*Signature Page to Indenture*]

**ALE1 B.V.**, as Holdco

By: _____ *N Charles*

Name:
Title:  **Natasha Claire Charles, Attorney**

[*Signature Page to Indenture*]

**MOBY S.P.A.**, as a Guarantor

By:  _____
      *N Charles*

Name:
Title:                    Natasha Claire Charles, Attorney

[*Signature Page to Indenture*]

**COMPAGNIA ITALIANA DI
NAVIGAZIONE S.P.A.**, as a Guarantor

By: _____

Name:
Title:       Natasha Claire Charles, Attorney

[*Signature Page to Indenture*]

SIGNED for and on behalf of
**CITIBANK, N.A., LONDON BRANCH**, as
Trustee, Paying Agent and Transfer Agent

By:   _____

Name:   *STUART SULLIVAN*

Title:   *VICE PRESIDENT*

SIGNED for and on behalf of
**UNICREDIT S.P.A.,**
as Security Agent

By: _____

Name:

Title:        **Jana Derska, Attorney**

By: _____

Name:

Title:

[*Signature Page to Indenture*]

SIGNED for and on behalf of
**CITIGROUP GLOBAL MARKETS
DEUTSCHLAND AG,**
as Registrar

By:   _____

   Name:   STUART SULLIVAN
   Title:   UNDER ATTORNEY

*[Signature Page to Indenture]*

EXHIBIT A

**[Form of Face of Note]**[1]

**[REGULATION S/RULE 144A]**
**ISIN: [*For Regulation S Global Notes*: XS1361301457]**
**[*For Rule 144A Global Notes*: XS1361300996]**
**Common Code: [*For Regulation S Global Notes*: 136130145]**
**[*For Rule 144A Global Notes*: 136130099]**

**No. ____**                                                                                                   **[€_____]**

**7.75% Senior Secured Note due 2023**

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

**ISIN: [*For Regulation S Global Notes*: XS1361301457]**
**[*For Rule 144A Global Notes*: XS1361300996]**
**Common Code: [*For Regulation S Global Notes*: 136130145]**
**[*For Rule 144A Global Notes*: 136130099]**

**No. ____**                                                                                                   **[€_____]**

**7.75% Senior Secured Note due 2023**

**ONORATO ARMATORI S.P.A.**

ONORATO ARMATORI S.P.A., a joint stock company established under the laws of the Republic of Italy registered under number 09120190963 with the Register of Companies of Milan (*Registro delle Imprese di Milano*) with registered office at Largo Augusto, 8, Milan (the "Company") promises to pay to Citivic Nominees Limited, or its registered assigns, the principal sum of €[ ● ] [or such greater or lesser amount as indicated in the schedule of Exchanges of Interests in the Global Note][2] on  February 15, 2023.

Issue Date: February 11, 2016.

Interest Payment Dates: February 15 and August 15, commencing August 15, 2016.

---

[1]    Note that in place of and/or in addition to the provisions contained in this Exhibit A, any Additional Notes will include terms that the Company shall set forth in an Officer's Certificate, pursuant to Section 2.16(b) of the Indenture.

[2]    Use the Schedule of Exchanges of Interests language if Note is in Global Form.

A-1

Record Dates: February 1 and August 1 immediately preceding each Interest Payment Date.

Pursuant to Article 4 of its by-laws (*statuto*), the Company's corporate purpose is:  (i) the acquisition and administration of shareholdings in domestic and foreign companies, the acquisition and sale of patents, know-how and trademarks, purchase and sale of real properties, carrying out factoring and leasing activities as well as granting guarantees and security interests; (ii) the purchase, sale, management, rental, hire and fitting-out of any ships and vessels; (iii) renting sail boats and cruise ships and taking part in regattas; and (iv) the organization of regattas and sailing events.

As of the Issue Date, the issued and outstanding share capital of the Company is equal to €100,000.00, fully paid-up, and consisting of 100,000 ordinary shares each with a nominal value of €1.00, and the outstanding reserves of the Company (excluding net result) are equal to €211,218 thousand.

The issue of the Notes has been authorized by a resolution of the board of directors of January 13, 2016 which has been registered in the Companies' Register of Milan (*Registro delle Imprese di Milano*) on January 22, 2016.

The Notes will be guaranteed by the Guarantors and will be secured by the Collateral as set forth in the Indenture and subject to the limitations set out therein and in the Security Documents.

The Notes are subject to the transfer restrictions set forth on the other side of this Note and in the Offering Memorandum dated February 5, 2016.

The aggregate principal amount of the Notes is €300,000,000. The denomination of each Note is equal to €100,000.00 minimum with integral multiples of €1,000.00 in excess thereof.

The issue price of the Notes is 100.0%, plus accrued interest from the Issue Date.

Rights of the holders of the Notes are regulated under the Indenture.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

A-2

IN WITNESS WHEREOF, the Company has caused this Note to be signed by its duly authorized director, officer or other authorized signatory.

ONORATO ARMATORI S.P.A.

By: _____

     Name:
     Title:

**Certificate of Authentication**

This is one of the Notes referred to in the within-mentioned Indenture.

> SIGNED for and on behalf of CITIBANK, N.A.,
> LONDON BRANCH, not in its personal capacity,
> but in its capacity as Authentication Agent
> appointed by the Trustee, CITIBANK, N.A.,
> LONDON BRANCH
>
> By:  _____
>             Authorized Signatory

A-4

**[Form of Reverse of Note]**

**7.75% Senior Secured Note due 2023**

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1. Interest.  ONORATO ARMATORI S.P.A., a joint stock company (*società per azioni*) organized under the laws of the Republic of Italy (the "Company"), promises to pay interest on the principal amount of this Note at 7.75% per annum from February 11, 2016 until maturity.  The Company shall pay interest semi-annually in arrears on February 15 and August 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date").  Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of original issuance; provided that the first Interest Payment Date shall be August 15, 2016.  The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and on overdue installments of interest, if any (without regard to any applicable grace periods), from time to time on demand at the then applicable interest rate on the Notes, to the extent lawful.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.  Each interest period shall end on (but not include) the relevant Interest Payment Date.

2. Method of Payment.  The Company shall pay interest on the Notes to the Persons who are registered Holders of the Notes at the close of business on the February 1 and August 1 immediately preceding each Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  The Notes will be payable as to principal, premium and Additional Amounts, if any, and interest at the office or agency of the Company maintained for such purpose as provided in the Indenture or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of and interest and premium, if any, on all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent.  Such payment will be in such coin or currency of the European Union as at the time of payment is legal tender for payment of public and private debts.

3. Paying Agent and Registrar.  Initially, Citibank, N.A., London Branch, will act as Paying Agent and Citigroup Global Markets Deutschland AG will act as Registrar.  The Company may change any Paying Agent or Registrar without notice to any Holder.  The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

4. Indenture.  The Company issued the Notes under an Indenture, dated as of February 11, 2015 (the "Indenture"), among the Company, the subsidiaries of the Company from time to time party thereto and the Trustee, the Security Agent, the Paying Agent, the Transfer Agent and the Registrar.  The terms of the Notes include those stated in the Indenture.  The Notes include all such terms, and Holders are referred to the Indenture for a statement of such

A-5

terms.  To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.  The Notes are senior secured obligations of the Company.

5. Optional Redemption.

(1)     Except pursuant to sub-paragraphs (2), (3) and (4) below and paragraph (6) hereof, the Notes are not redeemable at the option of the Company.

(2)     At any time and from time to time on or after February 15, 2019, the Company may redeem the Notes, in whole or in part, at its option, upon not less than 10 nor more than 60 days' prior notice at a redemption price equal to the applicable percentage of principal amount set forth below plus accrued and unpaid interest to, but excluding, the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

| Period commencing | Percentage |
| --- | --- |
| February 15, 2019 | 103.8750% |
| February 15, 2020 | 101.9375% |
| February 15, 2021 and thereafter | 100.0000% |

(3)     At any time and from time to time prior to February 15, 2019, upon not less than 10 nor more than 60 days' prior notice, the Company may redeem up to 40% of the original aggregate principal amount of the Notes (including Additional Notes) at a redemption price equal to (i) 107.75% of the aggregate principal amount thereof, with the net cash proceeds of one or more Equity Offerings of any Parent of the Company to the extent the net cash proceeds from such Equity Offering are contributed to the Company's common equity capital or are paid to the Company as consideration for the issuance of ordinary shares of the Company or the issuance or incurrence of Subordinated Shareholder Funding, plus (ii) accrued and unpaid interest thereon, if any, to, but excluding, the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided that:

(A)     in each case the redemption takes place not later than 180 days after the closing of the related Equity Offering, and

(B)     not less than 60% of the original aggregate principal amount of the Notes (including the principal amount of any Additional Notes) remains outstanding immediately thereafter.

(4)     At any time prior to February 15, 2019, the Company may redeem the Notes in whole or in part, at its option, upon not less than 10 nor more than 60 days' prior notice at a redemption price equal to 100% of the principal amount of such Notes plus the relevant Applicable Premium as of, and accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

A-6

6. <u>Redemption for Taxation Reasons</u>.  The Company or Successor Company may redeem the Notes in whole, but not in part, at any time upon giving not less than 10 nor more than 60 days' notice to the Holders (which notice will be irrevocable) at a redemption price equal to 100% of the outstanding principal amount thereof, together with accrued and unpaid interest, if any, to, but excluding, the date fixed for redemption (a "Tax Redemption Date") (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date) and all Additional Amounts, if any, then due and which will become due on the Tax Redemption Date as a result of the redemption or otherwise, if any, if as a result of:

(1)     any change in, or amendment to, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Taxing Jurisdiction affecting taxation; or

(2)     any change in, or amendment to, an official position regarding the application, administration or interpretation of such laws, treaties, regulations or rulings (including pursuant to a holding, judgment or order by a court of competent jurisdiction or a change in published administrative practice) of a Relevant Taxing Jurisdiction (each of the foregoing in clauses (1) and (2), a "<u>Change in Tax Law</u>"),

the Company, Successor Company or Guarantor is, or on the next interest payment date in respect of the Notes or any Notes Guarantee would be, required to pay any Additional Amounts, and such obligation cannot be avoided by taking reasonable measures available to the Company, Successor Company or Guarantor (including, for the avoidance of doubt, the appointment of a new Paying Agent where this would be reasonable and, in the case of a payment by a Guarantor, having the Company, Successor Company or another Guarantor make the payment, but not including assignment of the obligation to make payment with respect to the Notes).  In the case of redemption due to withholding as a result of a Change in Tax Law in a jurisdiction that was a Relevant Taxing Jurisdiction at the date of the Offering Memorandum, such Change in Tax Law must become effective on or after the date of the Offering Memorandum.  In the case of redemption due to withholding as a result of a Change in Tax Law in a jurisdiction that becomes a Relevant Taxing Jurisdiction after the date of the Offering Memorandum, such Change in Tax Law must become effective on or after the date the jurisdiction becomes a Relevant Taxing Jurisdiction (and, in the case of a Successor Company, on or after the date of assumption by the Successor Company of the Company's obligations hereunder).  Notice of redemption for taxation reasons will be published in accordance with Section 3.03 of the Indenture.  Notwithstanding the foregoing, no such notice of redemption will be given (a) earlier than 90 days prior to the earliest date on which the Payor would be obliged to make such payment of Additional Amounts and (b) unless at the time such notice is given, such obligation to pay such Additional Amounts remains in effect.  Prior to the publication or mailing of any notice of redemption of the Notes pursuant to the foregoing, the Company, Successor Company or Guarantor will deliver to the Trustee (a) an Officer's Certificate stating that it is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to its right to so redeem have been satisfied and that it would not be able to avoid the obligation to pay Additional Amounts by taking reasonable measures available to it and (b) an opinion of an independent tax counsel of recognized standing to the effect that the Company, Successor Company or Guarantor has or will become obligated to pay Additional Amounts as a result of a Change in Tax Law.  The Trustee will accept and shall be entitled to rely on such Officer's Certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent

A-7

described above, without further inquiry, in which event it will be conclusive and binding on the Holders.

The foregoing provisions of this paragraph (6) will apply *mutatis mutandis* to any jurisdiction in which any successor to the Company, Successor Company or any Guarantor is organized or any political subdivision or taxing authority or agency thereof or therein.

      7.  <u>Mandatory Redemption</u>.  The Company is not required to make mandatory redemption payments or sinking fund payments with respect to the Notes.

      8.  <u>Repurchase at the Option of Holder</u>.

      (1)  Upon the occurrence of a Change of Control, unless the Company has unconditionally exercised its right to redeem all of the Notes pursuant to paragraph 5 hereof, or all conditions to such redemption have been satisfied or waived, each Holder shall have the right to require the Company to purchase all or any part of such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but excluding, the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date).  Within 60 days following any Change of Control, the Company shall mail or otherwise transmit a notice to each Holder setting forth the procedures governing the Change of Control Offer as set forth in the Indenture.

      (2)  In the event of an Asset Disposition that requires the purchase of Notes pursuant to Section 4.10 of the Indenture, the Company shall be required to commence an Asset Disposition Offer pursuant to Sections 3.08 and 4.10 of the Indenture to purchase the maximum principal amount of Notes that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if any, to the date fixed for the closing of such offer (subject to the right of  Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date) in accordance with the procedures set forth in the Indenture.

      9.  <u>Notice of Redemption</u>.  Notice of redemption shall be given in accordance with Section 3.03 of the Indenture and the effect of notice of redemption is set forth in Section 3.04 of the Indenture.

      10.  <u>Denominations, Transfer, Exchange</u>.  The Notes are in registered form without coupons in minimum denominations of €100,000 and integral multiples of €1,000 in excess thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture.  The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents.  The Registrar may not require a Holder to pay any taxes and fees, except as otherwise set forth in the Indenture.  The Registrar need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part.  Also, the Registrar need not exchange or register the transfer or exchange of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

11.  Security.  The Initial Notes and Additional Notes are treated as a single class of securities under the Indenture and shall be secured by Liens on and security interests in, subject to Permitted Collateral Liens, the Collateral, on the terms and conditions set forth in the Indenture, the Intercreditor Agreement and the Security Documents.  The Security Agent holds the Collateral in trust (to the extent possible under applicable law and in accordance with the terms of the relevant Security Document) for the benefit of the Trustee and the Holders, in each case pursuant to the Indenture, the Security Documents and the Intercreditor Agreement.  Each Holder, by accepting this Note, consents and agrees to and accepts the terms of the Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture and authorizes and directs the Security Agent and the Trustee to enter into the Security Documents and the Intercreditor Agreement, and to perform its obligations and exercise its rights thereunder in accordance therewith.

12.  Persons Deemed Owners.  The registered Holder of a Note may be treated as its owner for all purposes, except as otherwise ordered by a court of competent jurisdiction.

13.  Amendment, Supplement and Waiver.  The provisions of the Indenture governing amendment, supplement and waiver are set forth in Article IX of the Indenture.

14.  Defaults and Remedies.  Events of Default and remedies are set forth in Article VI of the Indenture.

15.  Trustee Dealings with Company.  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

16.  No Recourse against Others.  No director, officer, employee, incorporator or shareholder of the Company or any of its Subsidiaries or any of their respective Affiliates, as such, shall have any liability for any obligations of the Company or any other Guarantor under the Note Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

17.  Authentication.  This Note will not be valid until authenticated by the manual or facsimile signature of the Trustee or the Authentication Agent.

18.  Abbreviations.  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A (= Uniform Gifts to Minors Act).

19.  ISIN Numbers and Common Codes.  The Company has caused ISIN numbers and Common Codes to be printed on the Notes, and the Trustee may use ISIN numbers and Common Codes in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any

notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

   20. <u>Governing Law</u>. THIS NOTE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

    The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to:

ONORATO ARMATORI S.P.A.
Largo Augusto, 8
20122 Milan
Italy
Facsimile: +39 02 77331636
Attention: Chairman of the Board of Directors

**ASSIGNMENT FORM**

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Company.  The agent may substitute another to act for him or her.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

    * Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 4.10 or 4.14 of the Indenture, check the appropriate box below:

☐ Section 4.10                            ☐ Section 4.14

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.10 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

€ _____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-12

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The following increases, decreases and exchanges of this Global Note have been made:

| Date of Increase/Decrease | Amount of Decrease in Principal Amount of this Global Note | Amount of Increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such Increase (or Decrease) | Signature of Authorized Officer of Trustee or Registrar or Depositary |
|---|---|---|---|---|
| | | | | |

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

ONORATO ARMATORI S.P.A.
Largo Augusto, 8
20122 Milan
Italy

Citibank, N.A., London Branch
Citigroup Center 25 Canada Square
London E14 5LB
United Kingdom

Re: 7.75% Senior Secured Notes due 2023

(Rule 144A Common Code: 136130099; Regulation S Common Code: 136130145; Rule 144A ISIN: XS1361300996; Regulation S ISIN: XS1361301457)

Reference is hereby made to the Indenture, dated as of February 11, 2016 (the "Indenture"), among ONORATO ARMATORI S.P.A., a joint stock company (*società per azioni*) organized under the law of the Republic of Italy (the "Company"), certain subsidiaries of the Company from time to time party thereto, CITIBANK, N.A., LONDON BRANCH, as Trustee, Paying Agent and Transfer Agent, UNICREDIT S.P.A. as Security Agent and CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG, as Registrar.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "Transferor") owns and proposes to transfer the Note[s] or beneficial interest in such Note[s] specified in Annex A hereto, in the principal amount of €_____ (the "Transfer"), to _____ (the "Transferee"), as further specified in Annex A hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.   **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Definitive Registered Note Pursuant to Rule 144A.**  The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Registered Note is being transferred to a Person that the B-1 Transferor reasonably believed and believes is purchasing the beneficial interest or Definitive Registered Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive

B-1

Registered Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Definitive Registered Note and in the Indenture and under the Securities Act.

      2.    **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Definitive Registered Note pursuant to Regulation S.**  The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the 40 day "Distribution Compliance Period" under Regulation S, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than a "Distributor" as defined in Rule 902 of Regulation S) and the transferred beneficial interest will be held immediately after such Transfer through Euroclear or Clearstream, Luxembourg.  Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Registered Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Definitive Registered Note and in the Indenture and under the Securities Act.

      3.    **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Registered Note.**

      (a)    **Check if Transfer is pursuant to Rule 144.**  (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Registered Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Registered Notes and in the Indenture.

      (b)    **Check if Transfer is Pursuant to Regulation S.**  (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive

B-2

Registered Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Registered Notes and in the Indenture.

       (c)    **Check if Transfer is Pursuant to an Effective Registration Statement.** The Transfer is being effected in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

       (d)    **Check if Transfer is Pursuant to Other Exemption.**  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Registered Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Registered Notes and in the Indenture.

       4.    **Check if Transfer is to the Company or any of its Subsidiaries.**  The transfer is being effected in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____

Name:
Title:

Dated: _____

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)      a beneficial interest in the:

(i)      144A Global Note (Rule 144A ISIN: XS1361300996, Rule 144A Common Code: 136130099); or

(ii)      Regulation S Global Note (Regulation S ISIN: XS1361301457, Regulation S Common Code: 136130145); or

(b)      a Restricted Definitive Registered Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a)      a beneficial interest in the:

(i)      144A Global Note (Rule 144A ISIN: XS1361300996, Rule 144A Common Code: 136130099); or

(ii)      Regulation S Global Note (Regulation S ISIN: XS1361301457, Regulation S Common Code: 136130145); or

(iii)      Unrestricted Global Note (144A ISIN:                ,                144A Common Code:                ); or

(b)      a Restricted Definitive Registered Note; or

(c)      an Unrestricted Definitive Registered Note, in accordance with the terms of the Indenture.

EXHIBIT C

## FORM OF CERTIFICATE OF EXCHANGE

ONORATO ARMATORI S.P.A.
Largo Augusto, 8
20122 Milan
Italy

Citibank, N.A., London Branch
Citigroup Center 25 Canada Square
London E14 5LB
United Kingdom

Re: 7.75% Senior Secured Notes due 2023

(Rule 144A Common Code: 136130099; Regulation S Common Code: 136130145; Rule 144A
ISIN: XS1361300996; Regulation S ISIN: XS1361301457)

Reference is hereby made to the Indenture, dated as of February 11, 2016 (the "Indenture"), among ONORATO ARMATORI S.P.A., a joint stock company (*società per azioni*) organized under the law of the Republic of Italy (the "Company"), certain subsidiaries of the Company from time to time party thereto, CITIBANK, N.A., LONDON BRANCH, as Trustee, Paying Agent and Transfer Agent, UNICREDIT S.P.A. as Security Agent and CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG, as Registrar.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "Owner") owns and proposes to exchange the Note[s], or beneficial interest in such Note[s] specified herein, in the principal amount of €_____ (the "Exchange").  In connection with the Exchange, the Owner hereby certifies that:

**1.  Exchange of Restricted Definitive Registered Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Registered Notes or Beneficial Interests in an Unrestricted Global Note.**

(a)     **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note.**  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)     **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Registered Note.**  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Registered Note in an equal principal amount, the Owner hereby certifies (i) the Definitive Registered Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Registered Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)     **Check if Exchange is from Restricted Definitive Registered Note to beneficial interest in an Unrestricted Global Note.**  In connection with the Owner's Exchange of a Restricted Definitive Registered Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Registered Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)     **Check if Exchange is from Restricted Definitive Registered Note to Unrestricted Definitive Registered Note.**  In connection with the Owner's Exchange of a Restricted Definitive Registered Note for an Unrestricted Definitive Registered Note in an equal principal amount, the Owner hereby certifies (i) the Unrestricted Definitive Registered Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Registered Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions

C-2

on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Registered Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.   **Exchange of Restricted Definitive Registered Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Registered Notes or Beneficial Interests in Restricted Global Notes.**

(a)   **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Registered Note.**  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Registered Note in an equal principal amount, the Owner hereby certifies that the Restricted Definitive Registered Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Registered Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Registered Note and in the Indenture and under the Securities Act.

(b)   **Check if Exchange is from Restricted Definitive Registered Note to beneficial interest in a Restricted Global Note.**  In connection with the Exchange of the Owner's Restricted Definitive Registered Note for a beneficial interest in the [CHECK ONE] □ 144A Global Note, □ Regulation S Global Note, in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and under the Securities Act.

C-3

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____
[Insert Name of Transferor]

By: _____
      Name:
      Title:

Dated: _____

EXHIBIT D

FORM OF SUPPLEMENTAL INDENTURE

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [ ● ], among [name of New Guarantors]] ([each, a][the] "New Guarantor"), ONORATO ARMATORI S.P.A., a joint stock company (*società per azioni*) organized under the law of the Republic of Italy (the "Company") and CITIBANK, N.A., LONDON BRANCH, as trustee (the "Trustee") and as security agent, under the Indenture referred to below.

WITNESSETH:

WHEREAS the Company and the Trustee are parties to an Indenture, dated as of February 11, 2016 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of the Company's 7.75% Senior Secured Notes due 2023;

WHEREAS, pursuant to Section 4.15 of the Indenture, [each][the] New Guarantor is required to execute a Supplemental Indenture;

WHEREAS, pursuant to Article IX of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, [the][each] New Guarantor, the Company, and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.      Definitions.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture.

2.      Agreement to Guarantee.  Pursuant to, and subject to the provisions of, Article XI of the Indenture, [each][the] New Guarantor (which term includes each other New Guarantor that hereinafter guarantees the Notes pursuant to the terms of the Indenture) hereby unconditionally and irrevocably guarantees, jointly and severally with [each other New Guarantor and] all Guarantors, to each Holder and to the Trustee and their successors and assigns to the extent set forth in the Indenture and subject to the provisions thereof (a) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Company under the Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest or premium, if any, on the Notes and all other monetary obligations of the Company under the Indenture and the Notes and (b) the full and punctual performance within applicable grace periods of all other obligations of the Company whether for fees, expenses, indemnification or otherwise under the Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations"). [Each][The] New Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from such New Guarantor and that each such New Guarantor shall remain bound under Article XI of the Indenture, notwithstanding any extension or renewal of any Guaranteed Obligation.

D-1

The Guaranteed Obligations of [each][the] New Guarantor to the Holders and to the Trustee pursuant to the Indenture as supplemented hereby, are expressly set forth in Article XI of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantee.

[Relevant legal and practical limitations imposed by local law analogous to the limitations provided for in the Agreed Security Principles to be inserted, if and as applicable].

3.    Ratification of Indenture: Supplemental Indentures Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and each Holder, by accepting the Notes whether heretofore or hereafter authenticated and delivered (a) agrees to and shall be bound by such provisions, (b) authorizes and directs the Trustee, on behalf of such Holder, to take such action as may be necessary or appropriate to effectuate the subordination as provided in the Indenture and (c) appoints the Trustee as attorney-in-fact of such Holder for such purpose; provided, however, that [the][each] New Guarantor and each Guarantor shall be released from all its obligations with respect to this Guarantee in accordance with the terms of the Indenture, including Section 11.09 of the Indenture and upon any defeasance of the Notes in accordance with Article VIII of the Indenture.

4.    Governing Law.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5.    Trustee Makes No Representation.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The recitals of fact contained herein shall be treated as statements of the other parties hereto and not the Trustee.

6.    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

7.    Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NAME OF NEW GUARANTOR], as New Guarantor

By:

_____
Name:
Title:

ONORATO ARMATORI S.P.A., as the Company

By:

_____
Name:
Title:

SIGNED for and on behalf of CITIBANK, N.A., LONDON BRANCH, as Trustee

By:

_____
Name:
Title:

By:

_____
Name:
Title:

D-3