# EXHIBIT D

To:

**<u>Moby S.p.A.</u>**

Largo Augusto, 8

20122 Milan

Italy

*To the kind attention of the Chief Executive Officer Achille Onorato*

11 February 2021

**RE: Confidentiality Agreement**

Dear Sirs,

We hereby confirm our acceptance of your proposal dated 11 February 2021 to enter into the following confidentiality agreement.

\*\*\*  \*\*\*  \*\*\*

"To:

**<u>Mr. Antonello Di Meo</u>**, acting on behalf of certain holders of the Notes (the "**Recipient**")

c/o Gatti Pavesi Bianchi Ludovici Studio Legale

Piazza Borromeo 8

20123 Milan

Italy

*To the kind attention of Messrs. Francesco Gatti and Paolo Garbolino*

Milan, 11 February 2021

**RE: Confidentiality Agreement**

Dear Sirs,

Further to our recent discussions and whereas:

(A)     Moby S.p.A. ("**Moby**" or the "**Company**") and Mr. Vincenzo Onorato in the capacity as indirect controlling shareholder of Moby ("**Onorato**") are considering a possible transaction aimed at the restructuring of the debt of the Company and its subsidiary Compagnia Italiana di Navigazione S.p.A. ("**CIN**") under one or more agreements pursuant to Article 182-*bis* of the

1

Italian Royal Decree no. 267/1942, with the participation of Arrow Global Group Plc advised by Europa Investimenti S.p.A. (the "**Potential Transaction**").

(B)     The members of the Ad Hoc Group (as defined below) are holders of about 50% of the principal amount outstanding under the €300,000,000 7.75% Senior Secured Notes due 2023 (ISIN: XS1361300996; XS1361301457, the "**Notes**") issued by Onorato Armatori S.p.A. (subsequently merged into Moby), pursuant to an indenture governed by the laws of the State of New York (USA) dated 11 February 2016 (the "**Indenture**").

(C)     The Recipient, as a member of the Ad Hoc Group, is willing to resume discussions with the Company, Onorato and the Potential Investor (as defined in Clause 1.3 below), and to conduct analyses and activities, on a preliminary and non-binding basis, for the purpose of verifying a viable and consensual solution to implement the Potential Transaction.

(D)     The Company has agreed to provide the Recipient with certain Confidential Information (as defined below) relating to the Company and its subsidiaries, including CIN (the "**Group**") in connection with the Permitted Purpose (as defined in Clause 1.3 below) under the terms and conditions set forth in this agreement (the "**Agreement**").

Now, therefore, the Parties agree as follows:

**1.      Recitals, Annexes, Definitions and Interpretation**

1.1     The recitals and annexes to this Agreement are a substantial part hereof.

1.2     Terms defined in the Indenture have the same meaning when used in this Agreement unless given a different meaning herein.

1.3     In this Agreement:

"**Ad Hoc Group**" means the informal ad hoc committee of certain holders of the Notes, including the Recipient.

"**Affiliate**" means a Person's Related Entities and any of its or their partners, officers, managers, directors, auditors, and employees.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Milan, New York and London.

"**Cleansing Announcement**" means a written announcement that shall be prepared by the Company and (without prejudice to the provisions of Clauses 5.7, 5.8 and 5.9) in accordance with Clauses 5.3 and 5.6, containing: (a) the fact that preliminary discussions and (if any) negotiations have occurred in relation to the Potential Transaction; (b) in the Company's reasonable judgment a summary of any Inside Information provided to the Recipient; (c) if the Parties have entered into any binding agreement in connection with the Potential Transaction, a summary of the terms and conditions of such agreement; and (d) if the Parties failed to enter into any binding agreement in connection with the Potential Transaction, the fact that such agreement has not been reached.

"**Confidential Information**" means:

(a)     all information in whatever form shared by or on behalf of the Company or its Connected Persons on or after February 1st 2020 in whatever form (including all information shared during validity of the confidentiality agreement dated as of 7 February 2020), other than Non-Confidential Information:

2

(i)     in relation to the Group and its business, properties, assets, liabilities, operations, condition (financial or otherwise) and/or prospects; and/or

(ii)    in connection with the Potential Transaction;

(b)     the terms and conditions of the Potential Transaction, the fact that the Company, CIN, other members of the Group and/or the Potential Investor are considering entering into the Potential Transaction, or that discussions or negotiations (if any) are taking place or have been terminated (as the case may be) in connection with the Potential Transaction, and any information concerning the status or progress of such discussions or negotiations; and/or

(c)     the fact that the Recipient is interested in analysing, evaluating, assessing and considering the Potential Transaction, and/or the Recipient (and/or the Related Entities of the Recipient) may be interested or may participate in, or the terms on which the Recipient (and/or the Related Entities of the Recipient) may enter into or participate in, the Potential Transaction;

(d)     the fact that the Parties have or have not entered (as the case may be) into any agreement in connection with the Potential Transaction.

"**Connected Persons**" means: (a) a member of the Group; and (b) any officer, manager, director, auditor, employee, collaborator, adviser (whether financial, accounting, legal, tax or other), consultant, agent or representative of any member of the Group and any officer, manager, director, auditor, employee, collaborator of any such adviser, consultant, agent or representative.

"**Copies**" means copies of Confidential Information including any document, electronic file, note, extract, analysis, compilation, forecast, study (whether prepared by or on behalf of any member of the Group or by the Recipient) or any other way of representing or recording and recalling information which contains, reflects or is otherwise derived from Confidential Information.

"**Inside Information**" has the meaning given to that term in Clause 5.1.

"**MAR**" has the meaning given to that term in Clause 5.1.

"**Market Abuse Laws**" has the meaning given to that term in Clause 5.1.

"**Moby Debt**" means any bank debt or bond debt (however so constituted), including the Notes, issued or borrowed by any member of the Group or any other financial indebtedness owed by any member of the Group (whether actual or contingent).

"**Non-Confidential Information**" means information that:

(a)     is or becomes public information other than as a direct or indirect result of any breach of this Agreement;

(b)     the Company and the Recipient agrees in writing is not confidential;

(c)     has been made available to the Recipient or its Affiliates prior to the date of this Agreement on a non-confidential basis;

(d)     was independently developed by the Recipient or its Affiliates without reference to or use of Confidential Information; or

(e)     lawfully becomes available to the Recipient from a third party source provided that such information has, as far as the Recipient is aware, not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Noteholder Advisers**" means Gatti Pavesi Bianchi Ludovici Studio Legale Associato, Houlihan Lokey, Chiomenti Studio Legale and/or any other legal or financial adviser or consultant retained by the Ad Hoc Group in connection with the Possible Transaction.

"**Parties**" means the Company and the Recipient.

"**Permitted Purpose**" means the consideration, analysis, evaluation, assessment, discussion and negotiation of the Potential Transaction.

"**Person**" means any person, entity, fund or investment scheme (in any form and/or jurisdiction).

"**Potential Investor**" means Arrow Global Group Plc and Europa Investimenti S.p.A. collectively.

"**Related Entities**" means, in relation to any Person: (a) a Person directly or indirectly controlling, controlled by, or under direct or indirect common control with that Person; (b) a subsidiary of that Person, a holding company of that Person, or any other subsidiary of that holding company; and (c) any investment managers or advisers of that Person, any persons managed or advised by that investment manager or adviser, and any person that is managed or advised by that Person in its capacity as investment manager or adviser.

1.4     In this Agreement:

(a)     "including" means including without limitation;

(b)     "shall" or "will" shall be interpreted to express an obligation;

(c)     "cause" shall be interpreted to express a guarantee of third party's behaviour;

(d)     defined terms in the singular shall include the plural and vice versa;

(e)     references to a Clause or Annex are to a Clause of, or an Annex to, this Agreement; and

(f)     references to any provision of law shall be deemed to include any amendment, change, substitution, replacement, or successor provisions or principles, as may be in force from time to time.

## 2.     Duty of Confidentiality

2.1     In consideration for the disclosure of Confidential Information to it, the Recipient undertakes to the Company that it will:

(a)     keep the Confidential Information confidential and not disclose it to any Person other than as permitted by this Agreement;

(b)     only use such Confidential Information for the Permitted Purpose; and

(c)     ensure that all Confidential Information is protected with security measures and a degree of care that it would apply to its own business's sensitive or confidential information.

## 3.     Permitted Disclosures

3.1   The Recipient may disclose Confidential Information:

(a)   to any of its respective Affiliates, provided that, prior to the disclosure of Confidential Information, such Affiliate(s) are informed of the confidential nature of the Confidential Information, the terms of this Agreement and their obligations to comply with this Agreement as if they were a party hereto;

(b)   to any other member of the Ad Hoc Group or any Noteholder Adviser, provided that each member of the Ad Hoc Group and each Noteholder Adviser who will receive Confidential Information has prior to the disclosure of any Confidential Information entered into a confidentiality agreement with and executed by the Company, on the same terms and conditions as provided for in this Agreement;

(c)   to the Potential Investor, and/or any of its Affiliates, in connection with the Permitted Purpose;

(d)   to any Person who the Company and the Recipient agrees in writing may receive such information; and/or

(e)   in accordance with and to the extent required by a valid and effective order issued by a court, governmental and/or regulatory body of competent jurisdiction (an "**Order**").

3.2   In the event that the Recipient or any of its Affiliates is required to disclose any Confidential Information pursuant to an Order, the Recipient shall, to the extent permitted by law or regulation: (i) notify the Company immediately of such Order or disclosure obligation so that the Company may seek an appropriate protective order, waive compliance with the provisions of this Agreement or take any other action which it deems reasonably necessary in respect of such Order or disclosure obligation; and (ii) cooperate with the Company in any actions it may choose to take in seeking to prevent or limit disclosure. If a protective order or other remedy is not obtained and/or, in the written opinion of the Recipient's counsel (which may be the Noteholder Advisers or internal counsel) disclosure is required, then (x) the Recipient shall notify the Company in writing (to the extent permitted by law and regulation) of the Confidential Information to be disclosed as far in advance of their disclosure, (y) the Recipient or its Affiliates may disclose only that portion of the Confidential Information which is legally required to be disclosed, and (z) the Recipient or its Affiliates (as applicable) shall inform the court and/or the governmental and/or regulatory body of the confidential nature of the Confidential Information disclosed and ask (without any obligation to obtain) that confidential treatment will be accorded to the information.

3.3   The Recipient undertakes to notify the Company immediately if it becomes aware that any Confidential Information:

(a)   has been disclosed in contravention of the terms of this Agreement; or

(b)   is possessed by any Person to whom the disclosure of Confidential Information is not permitted by the terms of this Agreement.

3.4   For the avoidance of doubt, subject to its confidentiality obligations under clause 2, nothing in this Agreement shall prohibit, limit, or otherwise affect, the rights of the Recipient and/or its Affiliates to:

(a)   purchase, sell or otherwise dispose of, any Notes and/or purchase, sell or otherwise dispose of, any other Moby Debt, in each case in accordance with the Market Abuse Laws;

(b)   enter into any discussion, agreement, arrangement or understanding whatsoever (whether legally binding or not) with any legal or beneficial owner of any Moby Debt, or any third party, relating to, in connection with, the Notes (or any other Moby Debt), the Potential Transaction or a member of the Group, in each case in accordance with the Market Abuse Laws;

(c)   take any action in the normal course of its or their investment, trading, or advisory activities or business; and

(d)   exercise any of its or their rights, including (where applicable) in the capacity as holders of Notes and/or creditors of the Company .

## 4.   Obligation to Cause Compliance by Affiliates

4.1   The Recipient shall:

(a)   inform each of its Affiliates, to whom the Recipient discloses Confidential Information, of its confidential nature, and of the undertakings set out in this Agreement;

(b)   cause each of its Affiliates, to whom the Recipient has disclosed Confidential Information, to comply with the terms of this Agreement as if that Affiliate was a party hereto directly;

(c)   be responsible for any breach of the terms of this Agreement by any of its Affiliates, except for the Affiliates that have adhered to this Agreement by signing the letter attached as **Annex A** hereto; and

(d)   inform the Company (provided that the Company so requests in writing) of the identity of each of its Affiliates (on an entity basis), to whom the Recipient has disclosed Confidential Information.

4.2   Except as provided for by Clause 4.1(c), the Recipient shall not be liable for any disclosure or use of Confidential Information, and/or for any failure to comply with the provisions of this Agreement, by any Person to whom they may disclose Confidential Information in accordance with the terms of this Agreement.

## 5.   Inside information

5.1   The Recipient acknowledges that:

(a)   some or all of the Confidential Information provided to it under this Agreement may be, at the time of disclosure, or become thereafter, inside information (*informazione privilegiata*, "**Inside Information**") for the purposes of Regulation EU No. 596/2014 of the European Parliament and the Council and the laws promulgated thereunder (together, "**MAR**"), the Legislative Decree no. 58 of 24 February 1998, and the relevant implementing regulations and/or interpretations issued by the European Commission, the ESMA, the Consob, and any other competent authorities, each as amended from time to time (collectively, the "**Market Abuse Laws**"); and

(b)   the abuse of Inside Information may cause the breach of law and enforcement of criminal and administrative sanctions, including without limitations those relating to insider dealing, unlawful disclosure of Inside Information and market manipulation as set forth under the Market Abuse Laws;

without prejudice to the foregoing, the Company acknowledges and accepts that no

6

Confidential Information may be delivered to the Recipient on or after the date of this Agreement if: (i) the Confidential Information contains any Inside Information that is not expressly identified as such by the Company (and/or its Affiliates, or respective advisers); and (ii) the Recipient has not confirmed in writing to be willing to receive that Confidential Information (or Inside Information). From the date of this Agreement, the Company, its Affiliates and their respective advisers may disclose Confidential Information containing Inside Information (provided that it is expressly identified as such) to the Noteholder Advisers only and not the Recipient directly, provided that the fact that such Confidential Information has been disclosed to the Noteholder Advisers shall not imply that Inside Information has been disclosed to the Recipient.

5.2  In connection with any Inside Information as may be disclosed to it under this Agreement, the Recipient shall at all times comply with the Market Abuse Laws, provided that it shall not be liable for any failure by any other Person to comply with Market Abuse Laws, except as provided for by Clause 4.1(c).

5.3  To the extent required by Market Abuse Laws, as soon as practicable and in any case by no later than 5 (five) Business Days after the earlier of: (a) the date of delivery of a written notice to the Company (which may be made also by email or other electronic means), whereby the Ad Hoc Group suspends or terminates the discussions, analyses and/or activities contemplated by this Agreement; (b) the date on which the Parties have entered into a binding memorandum of understanding, or other form of agreement (provided that it is in writing) in connection with the Potential Transaction; and (c) 28 February 2021 (the "**Publication Date**"), the Company shall publish the Cleansing Announcement in accordance with Market Abuse Laws. Upon the publication of the Cleansing Announcement, all information contained therein shall not be considered as Inside Information.

5.4  Except as otherwise required by Market Abuse Laws, the Publication Date may be extended one or more times by written agreement between:

(a)  the Company and those members of the Ad Hoc Group (including the Recipient) who, together, represent a majority in value of the Notes held by the Ad Hoc Group at that time (as confirmed by the Recipient or a Noteholder Adviser based on the current information available to it); or

(b)  any member of the Ad Hoc Group (including the Recipient) and the Company,

(an "**Extension Agreement**").

5.5  If the Publication Date is extended in accordance with Clause 5.4, Clause 5 of this Agreement shall be deemed to be amended and all references to the Publication Date in this Clause 5 shall be deemed to be the Publication Date as extended pursuant to the Extension Agreement.

5.6  For the purposes of Clause 5.3, the Company shall use reasonable endeavours to provide a draft of the Cleansing Announcement to the Recipient as soon as reasonably practicable and, in any case, to the extent reasonably practicable, at least 3 (three) Business Days prior to the Publication Date. The Recipient shall use reasonable endeavours to provide comments on the draft Cleansing Announcement within 2 (two) Business Days of receipt and the Parties shall confer in good faith to attempt to resolve any open issues with respect to the Cleansing Announcement prior to the Publication Date.

5.7  To the extent that the Recipient reasonably determines that: (a) the Company was required, but failed, to make the Cleansing Announcement publicly available in accordance with Clause 5.3; or (b) the Cleansing Announcement published by the Company omitted any Confidential Information that the Company should have disclosed in accordance with Market Abuse Laws,

then the Recipient may provide written notice to the Company and the Parties shall use reasonable endeavours in good faith to agree on the scope of the Confidential Information to be published in accordance with Market Abuse Laws.

5.8 If no agreement has been reached between the Parties within 24 hours after the Company has received the above notice:

    (a) the Recipient may:

        (i) prepare its own public announcement which, in its reasonable judgment contains all Confidential Information that must be disclosed in accordance with Market Abuse Laws (the "**Holder Cleansing Announcement**"); and

        (ii) request in writing that the Company (and the Company shall) immediately (and, in any case, within 1 (one) Business Day of receiving the Holder Cleansing Announcement) makes the Holder Cleansing Announcement publicly available in accordance with Market Abuse Laws; and

    (b) if the Company fails to make the Holder Cleansing Announcement publicly available in accordance with Clause 5.8(a) above, the Recipient shall thereafter be entitled immediately to make the Holder Cleansing Announcement publicly available (and neither the Company nor any Connected Person shall be entitled to oppose to, prevent, contest or seek any remedy or relief against, such disclosure) in accordance with normal market procedures for the dissemination of public information. This shall permit the Recipient to publish such information on (without limitation) Bloomberg, Reuters, Debtwire, Capital Structure, or otherwise, any similar financial news outlet, it being agreed and understood that, in connection with the publication by the Recipient of the Holder Cleansing Announcement and safe for the case of fraud or gross negligence of the Recipient, the Company shall hold the Recipient and any of its Affiliates harmless and indemnified against any loss or damage incurred by the Recipient and any of its Affiliates.

5.9 Notwithstanding Clauses 5.7 and 5.8, the Recipient shall be entitled to all available remedies in order to obtain that any Confidential Information is made publicly available in accordance with Market Abuse Laws to the extent that such disclosure is necessary to ensure that the Recipient is not restricted, prevented or prohibited from trading the securities (including the Notes) of the Group.

5.10 Notwithstanding anything to the contrary in this Agreement, the Recipient shall be entitled to independently evaluate and determine, whether or not any Confidential Information qualifies as Inside Information, and shall not be bound by any qualification given by the Company (or any Connected Person, as the case may be) or any other member of the Ad Hoc Group.

5.11 The Parties acknowledge and agree that none of the Parties shall have any liability to the other Party, its Related Entities, its and their Affiliates and/or the Connected Persons for the act of disclosing any Confidential Information to the extent that disclosure is made in accordance with this Clause 5.

## 6. Destruction/Return of Confidential Information and Copies

6.1 If the Company so requests in writing, the Recipient shall (and shall cause its Affiliates to):

    (a) destroy or return to us (at the Recipient's election) all Confidential Information and Copies held in physical form; and

(b)   destroy or (to the extent practically feasible) permanently erase all Confidential Information and Copies from any computer, word processor or other device containing it.

6.2   The obligation to destroy any notes, analysis, reports or memorandum that may have been prepared by the Recipient or on their behalf based on the Confidential Information ("**Secondary Information**") shall apply only to the extent that such Secondary Information contains Confidential Information.

6.3   No person will be obliged to destroy, return or erase:

(a)   Confidential Information that is stored in an electronic back-up system or that is retained in accordance with any law, regulation or internal document retention policy provided that such Confidential Information is not used directly for any commercial purpose and shall remain at all times confidential in accordance with the provisions of this Agreement; or

(b)   Confidential Information which has been disclosed pursuant to Clause 3.2.

## 7.   No Representation, Undertaking or Warranty

7.1   Except as may be expressly set forth in binding agreements as may be entered into by the Company or any member of the Group in connection with the Potential Transaction:

(a)   the Recipient acknowledges that no representation, undertaking or warranty is made, either expressly or by implication, as to the accuracy or completeness of the Confidential Information;

(b)   the Recipient and its Affiliates will be solely responsible for making their own evaluation of and decisions upon the Confidential Information. Accordingly, the Recipient agrees with the Company and with each of its Connected Persons that neither the Company nor any of its Connected Persons:

(i)   will have any duty of care or liability to the Recipient, its Affiliates, or any other Person to whom Confidential Information has been disclosed for any direct, indirect or consequential loss or damage suffered by any person as a result of relying on any statement contained in or omitted from the Confidential Information; and

(ii)   neither the Company nor any of its Connected Persons will incur any obligation to provide further Confidential Information, to update Confidential Information nor to correct any inaccuracies in it; and

(c)   the Recipient acknowledges and agrees that no Person has nor is held out as having any authority to give any statement, warranty, representation or undertaking on behalf of any of the Group including in connection with the Potential Transaction.

7.2   The foregoing limitations do not apply in the case of fraud or gross negligence of the Company or any member of the Group.

## 8.   Communications and Notices

8.1   Any communication or notice among the Parties in connection with this Agreement shall be made in English language, and may be made also by email or other electronic means provided that it is in writing, at the following address, and to the following recipients:

- if to the Company:

   **Moby S.p.A.**

   Largo Augusto, 8

   20122 Milan

   Italy

   Attention: Mr. Francesco Greggio in the capacity as Chief Financial Officer of the Company

   Email: francesco.greggio@moby.it

- if to the Recipient:

   **Mr. Antonello Di Meo**

   c/o Gatti Pavesi Bianchi Ludovici Studio Legale

   Piazza Borromeo 8

   20123 Milan

   Italy

   Attention: Messrs. Francesco Gatti, Paolo Garbolino

   Email: francesco.gatti@gpblex.it, paolo.garbolino@gpblex.it

and/or to such other address or recipient as each Party may from time to time nominate in writing.

## 9. Announcements

9.1 Except as otherwise provided for by this Agreement or a mandatory provision of law or regulation, the Recipient agrees not to make, and that its Affiliates will not make, or permit or procure to be made, or solicit or assist any other person to make, any disclosure or announcement relating to, or otherwise publicise, the Potential Transaction, including the Company's involvement in the Potential Transaction and any discussions or negotiations with regard to the Potential Transaction, without the Company's prior written consent.

9.2 Except as otherwise provided for by this Agreement or a mandatory provision of law or regulation, neither the Company, nor any of its Affiliates, may make, or permit or procure to be made, or solicit or assist any other person to make, any disclosure or announcement relating to, or otherwise publicise, the Ad Hoc Group and/or the Recipient's involvement in the Potential Transaction, and/or in any discussions or negotiations with regard to the Potential Transaction, without the Recipient's prior written consent.

## 10. Data Room

If an electronic data room will be utilised to impart the Confidential Information at any point, the terms of this Agreement supersede and replace the terms of any "click through" which the Recipient or its Affiliates are required to accept to be given access.

10

**11.    Not a contract or offer for contract**

11.1   Neither this Agreement, nor any contacts, discussions, or negotiations, as may take place between the Parties, nor any other activity as may be carried out by a Party in connection with the Potential Transaction, constitute or will constitute (or may be interpreted or construed as) a contract or offer for contract, or a consent, agreement or undertaking by any Party to:

    (a)   negotiate, propose, enter into, complete, support and/or approve (in any noteholders' or creditors' meeting, or otherwise) the Potential Transaction;

    (b)   restructure, amend and/or reschedule any debt of the Company or any other member of the Group; and/or

    (c)   sell or purchase, dispose or acquire, issue, subscribe for, convert, cancel or redeem, any Notes, securities, equity or debt (in any other form), of the Company or any other member of the Group.

11.2   The Company, also on behalf of Onorato, acknowledges and accepts that the Recipient may at any time suspend or terminate the discussions, analyses and/or activities contemplated by this Agreement, by means of a written notice to the Company, without incurring any penalty or liability.

**12.    Your Capacity**

12.1   The Recipient confirms that:

    (a)   it (except in the case of any investment manager); or

    (b)   in the case of any investment manager, each of the beneficial owners of the Notes it manages or advises,

is acting in this matter as principal and not as a nominee, agent or broker for any other person and not in any other capacity.

12.2   Nothing in this Agreement constitutes an agreement or undertaking by the Company or any member of the Group to pay any fees, costs or other expenses of the Recipient, its Affiliates, any member of the Ad Hoc Group or their Affiliates, or the Noteholder Advisers.

**13.    Term and Termination**

13.1   The Recipient acknowledges and agrees that this Agreement will terminate on the earlier of (a) twelve (12) months from the date of this Agreement; and (b) the date of entry into a definitive and legally binding written agreement between the Parties in relation to the Potential Transaction.

13.2   The provisions of Clauses 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 8, 11, 13.2, 14, 15, 16, 17, 19, 20 and 21 shall survive, and may be enforced after, the termination of this Agreement.

**14.    Assignment**

The terms of this Agreement will be binding on each Party's successors. No Party may assign its rights under this Agreement without the other Party's prior written consent.

**15.    Amendments and Waivers**

No amendment or waiver to this Agreement shall be effective unless it is made in writing and

signed by each Party or, in the case of a waiver, by each Party against whom the waiver is to be effective.

**16.    Waiver**

No delay or omission in exercising any right or remedy under this Agreement will operate as a waiver, nor shall any single or partial exercise preclude any further exercise of any other right or remedy under this letter or otherwise.

**17.    Severability of Provisions**

If any term of this Agreement is or becomes invalid or unenforceable, it shall be deemed to be severed from this letter and replaced with one having an effect as close as possible to the deficient provision. The remaining terms of this Agreement will continue in full force.

**18.    Costs and Expenses**

Each Party shall bear its own costs and expenses incurred in connection with the preparation, negotiation and execution of this Agreement.

**19.    Statement of holdings**

Within 10 (ten) Business Days after the execution of this Agreement, the Recipient shall deliver, or cause to be delivered, a notarized statement setting out the name of the members of the Ad Hoc Group, and the aggregate nominal value of the Notes held, controlled, managed, advised, or represented by the Ad Hoc Group, provided that: (i) no member of the Ad Hoc Group shall be required to disclose the name and holdings of any of its Affiliates; (ii) the notarized statement (including all information contained therein) shall be deemed as confidential information, and shall not be used or disclosed by the Company and/or any of its Affiliates without the prior written consent of the Ad Hoc Group.

**20.    Entire Agreement**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, including the confidentiality agreement dated as of 7 February 2020.

**21.    Governing Law and Jurisdiction**

21.1   This Agreement, including any non-contractual obligations arising out of, or in connection with, this Agreement shall be governed by, and interpreted and construed in accordance with, the laws of Italy, without regards to conflict of law rules.

21.2   The Courts of Milan shall have exclusive jurisdictions for any dispute as may arise in connection with this Agreement.

*** *** ***

Please confirm your acceptance of the foregoing, by returning to us a duly executed copy of this letter (including the annexes hereto).

Yours faithfully,

Moby S.p.A."

\*\*\*   \*\*\*   \*\*\*

Kind regards,

_Mr. Antonello Di Meo, for and on behalf of certain holders of the Notes_

13

**Annex A**

To:

Moby S.p.A.
Largo Augusto, 8
20122 Milan
Italy

[●] 2021

Dear Sirs,

Reference is made to the confidentiality agreements entered into by Moby S.p.A. and the members of the Ad Hoc Group, who together hold about 50% of the principal amount outstanding under the €300,000,000 7.75% Senior Secured Notes due in 2023 (ISIN: XS1361300996; XS1361301457) on 11 February 2021 (the "**Confidentiality Agreements**").

Capitalised terms used but not defined herein have the meaning assigned to such terms in the Confidentiality Agreement.

The undersigned, in connection with the Potential Transaction [and in its capacity as [●]] hereby adheres to the Confidentiality Agreements and, therefore, undertakes to comply with the terms and conditions of the Confidentiality Agreements, which shall [*to be included for legal or financial advisers only:* other than Clause 12] apply *mutatis mutandis*, it being agreed and understood that the Confidentiality Agreements and this letter (including any non-contractual obligations arising out of) shall be governed by and construed in accordance with Italian law, and the Company and the undersigned irrevocably submit to the exclusive jurisdiction of the Courts of Milan.

This letter constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

Yours faithfully,

_____
[●]

In acceptance of the terms set above: