# EXHIBIT 3

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| MOBY S.P.A.,<br><br>                    Plaintiff,<br><br>v.<br><br>SOUND POINT CAPITAL MANAGEMENT, LP; SOUND POINT BEACON GP, LLC; SOUND POINT CAPITAL MANAGEMENT UK, LLP; SOUND POINT BEACON MASTER FUND, LP; KEVIN GERLITZ; ANTONELLO DI MEO; BLUEBAY ASSET MANAGEMENT LLP; BLUEBAY ASSET MANAGEMENT USA LLC; THE EVENT DRIVEN CREDIT (MASTER) FUND LIMITED; BLUEBAY FUNDS – BLUEBAY HIGH YIELD BOND FUND; CHEYNE CAPITAL MANAGEMENT (UK) LLP; CHEYNE SVC GENERAL PARTNER S.A.R.L.; CHEYNE EUROPEAN STRATEGIC VALUE CREDIT FUND SCS SICAV-SIF; JACOPO RUBBIA; APTIOR CAPITAL LLP; APTIOR CAPITAL MASTER FUND LTD.,<br><br>                    Defendants. | Index No. _____<br><br>**SUMMONS**<br><br>Plaintiff designates New York County as the place of trial.<br><br>Venue is proper in this County pursuant to N.Y. C.P.L.R. § 503. |

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an answer to the Complaint in this action within twenty (20) days after service of this Summons, exclusive of its day of service, or within thirty (30) days after service is complete if the Summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you on default for the relief demanded in the Complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Plaintiff designated New York County as the place of trial.  Venue is appropriate in New York County pursuant to N.Y. C.P.L.R. § 503.

Dated:    February 22, 2021    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ *Jeanhee Hong*

Jeanhee Hong
Juan P. Morillo (*pro hac vice application forthcoming*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email:  jeanheehong@quinnemanuel.com
Email:  juanmorillo@quinnemanuel.com

Nicoletta Malogioglio (*pro hac vice application forthcoming*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Email:  nicolettamalogioglio@quinnemanuel.com

Alain Jaquet
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Email:  alainjaquet@quinnemanuel.com

*Attorneys for Moby S.p.A.*

To:    Sound Point Capital Management, LP
Sound Point Beacon GP, LLC
Sound Point Capital Management UK, LLP
Sound Point Beacon Master Fund, LP
Kevin Gerlitz
Antonello Di Meo
BlueBay Asset Management LLP
BlueBay Asset Management USA LLC
The Event Driven Credit (Master) Fund Limited
BlueBay Funds – BlueBay High Yield Bond Fund
Cheyne Capital Management (UK) LLP
Cheyne SVC General Partner S.r.l.

-2-

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 4 of 58

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 02/22/2021

Cheyne European Strategic Value Credit Fund SCS Sicav-SIF
Jacopo Rubbia
Aptior Capital LLP
Aptior Capital Master Fund Ltd.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1
INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 02/22/2021

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 5 of 58

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| MOBY S.P.A.,<br><br>            Plaintiff,<br><br>v.<br><br>SOUND POINT CAPITAL MANAGEMENT, LP; SOUND POINT BEACON GP, LLC; SOUND POINT CAPITAL MANAGEMENT UK, LLP; SOUND POINT BEACON MASTER FUND, LP; KEVIN GERLITZ; ANTONELLO DI MEO; BLUEBAY ASSET MANAGEMENT LLP; BLUEBAY ASSET MANAGEMENT USA LLC; THE EVENT DRIVEN CREDIT (MASTER) FUND LIMITED; BLUEBAY FUNDS – BLUEBAY HIGH YIELD BOND FUND; CHEYNE CAPITAL MANAGEMENT (UK) LLP; CHEYNE SVC GENERAL PARTNER S.A.R.L.; CHEYNE EUROPEAN STRATEGIC VALUE CREDIT FUND SCS SICAV-SIF; JACOPO RUBBIA; APTIOR CAPITAL LLP; APTIOR CAPITAL MASTER FUND LTD.,<br><br>            Defendants. | Index No. _____<br><br>**COMPLAINT** |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

PARTIES ............................................................................................................................9

    I.     PLAINTIFF..............................................................................................9

    II.    DEFENDANTS .......................................................................................10

JURISDICTION AND VENUE .........................................................................................18

FACTS ..............................................................................................................................19

    I.     BACKGROUND ....................................................................................19

         A.  Corporate Structure ........................................................................19

         B.  Business Activities ..........................................................................19

         C.  Fleet...............................................................................................20

         D.  Management ....................................................................................21

    II.    THE 2016 FINANCING .........................................................................21

         A.  Overview ........................................................................................21

         B.  Credit Facilities Agreement ............................................................22

         C.  Indenture ........................................................................................23

         D.  Intercreditor Agreement .................................................................26

    III.   EVENTS PRIOR TO THE DFDS SALE .................................................28

         A.  Decrease in Profitability in 2018 ....................................................28

         B.  The 2019-2021 Business Plan ........................................................28

         C.  The Ad Hoc Group Purchase the Notes ..........................................29

    IV.   THE DFDS SALE ..................................................................................29

    V.    THE ITALIAN BANKRUPTCY PROCEEDING .....................................31

    VI.   REQUEST TO RELEASE THE MORTGAGES ......................................33

    VII.  EFFECTS OF THE INTERFERENCE ...................................................34

CAUSES OF ACTION .....................................................................................................36

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# INTRODUCTION

1.      This is an egregious tortious interference action involving malicious, orchestrated efforts by investors and a large international bank to unlawfully take ownership and control over Moby S.p.A. ("Moby"), a leading Italian shipping company.[1]  Moby is privately owned by Onorato Armatori S.r.l. ("Onorato Holding"), the holding company of the Onorato family, which has been in the maritime business for five generations and over 140 years.

2.      The principal business of Moby and its group of companies (collectively, "Moby Group")[2] is the transport of passengers and freight between mainland Italy and France as well as between islands in the Mediterranean Sea.  In addition, the Moby Group (i) has a tugboat business (e.g., through its tugboats, the Moby Group provides rescue services in Italy); (ii) manages and operates the port of Olbia (in the north of Sardinia), which, in terms of passenger volume, is one of the main ports in Italy; and (iii) offers limited port services (e.g., passenger ticketing) at various Italian ports.  The Moby Group's fleet is one of the most modern and largest in Europe and, worldwide, it is the largest in terms of passenger, bed and vehicle capacity.  The fleet is composed of 48 ferries and 17 tugboats and, prior to the COVID-19 pandemic, had a market value of approximately €1 billion.

3.      The investors are a group of U.S. and European asset management firms and related affiliates and investment vehicles ("Ad Hoc Group"), including: (i) Aptior Capital LLP ("Aptior Capital"); (ii) BlueBay Asset Management LLP ("BlueBay"); (iii) Cheyne Capital

---

[1]      Unless otherwise specified, the term "Moby" refers only to Moby S.p.A. and not to Moby's subsidiaries, affiliates or related companies.

[2]      The Moby Group is a complex structure of tens of companies all dedicated to specific lines of services and markets operating in the maritime business.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 8 of 58

Management (UK) LLP ("Cheyne Capital"); and (iv) New York-based Sound Point Capital Management, LP ("Sound Point Capital").[3]

4.     At the time of the facts relevant to this Complaint, Sound Point Capital, Cheyne Capital and their respective related affiliates and investment vehicles were represented by and/or acted through the following individuals: (i) Kevin Gerlitz ("Gerlitz"), Sound Point Capital's CFO; (ii) Antonello Di Meo ("Di Meo"), a former employee of Sound Point Capital Management UK, LLP ("Sound Point UK"), which is Sound Point Capital's English affiliate; and (iii) Jacopo Rubbia ("Rubbia"), an employee of Cheyne Capital (collectively, "Individual Defendants").

5.     The bank is UniCredit S.p.A. ("UniCredit"), an Italian financial and banking conglomerate.

6.     In 2016, primarily to extinguish prior debt (totaling approximately €429.2 million), Moby executed three agreements with a consortium of U.S. and non-U.S. banks (including UniCredit) ("Lenders"), according to which Moby and related entities (i) borrowed a total of €260 million, which encompasses a €200 loan requiring annual payments ("Term Loan") and a €60 million revolving credit facility to be fully repaid by 2021 ("Revolving Facility"); and (ii) issued €300 million of notes ("Notes")—due in 2023 and to be listed on the Luxembourg Stock Exchange—in accordance with the related indenture ("Indenture"), which is the agreement detailing the terms of the securities issuance (collectively, "Debt Agreements"). Both the Notes and the Indenture are subject to New York law.

---

[3]     Aptior Capital and its associated entity that is further described in the Complaint are collectively defined as the "Aptior Defendants"; BlueBay and its associated entities as the "BlueBay Defendants"; Cheyne Capital, its associated entities and Jacopo Rubbia (one of Cheyne Capital's employees) as the "Cheyne Defendants"; and Sound Point Capital, its associated entities, Kevin Gerlitz (Sound Point Capital's CFO) and Antonello Di Meo (a former employee of Sound Point Capital's English affiliate) as the "Sound Point Defendants."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

7.      The Debt Agreements provided that (i) the €260 million in financing (comprising the Term Loan and Revolving Facility) and the €300 million Notes were secured by several collateral, including (a) mortgages over vessels, whose market value was estimated at approximately €900 million and belonged to Moby and Compagnia Italiana di Navigazione S.p.A. ("CIN"), Moby's main subsidiary; and (b) pledges over Moby and CIN's shares and certain of their bank accounts ("Collateral"); (ii) UniCredit, as "Security Agent," held and administered the Collateral for the benefit of all the secured parties, including (a) the Lenders; and (b) the "Holder" of the Notes, which is Citivic Nominees Limited ("Citivic"), an English private limited company based in London that, upon information and belief, is part of Citigroup, Inc., the U.S. financial and banking conglomerate.[4]

8.      UniCredit's administration of the Collateral encompassed the release of mortgages when Moby intended to sell collateralized vessels.  In particular, if Moby's request to release a mortgage over a vessel complied with the conditions set forth in the Debt Agreements, UniCredit was to release such mortgage without requiring any consent from the Lenders or Citivic as the Noteholder, let alone other third parties such as the owners of beneficial interests in the Notes (which include the Ad Hoc Group).[5]

9.      In 2018, the Moby Group's profitability decreased for several reasons, including the following: (i) an increase in competition in the ferry business in Sardinia, a key market for

---

[4]      *See* Section 1.01 of the Indenture, which defines "Holder" of the Notes as "each person in whose name the Notes are registered on the Registrar's books, which shall initially be the nominee of Euroclear or Clearstream."  We refer to the "Holder[s]" of the Notes herein as the "Noteholder[s]" or the "Holder[s]."

[5]      In the 1970s, the physical trade of securities in the United States transitioned to a system where investors only trade beneficial interests (commonly referred as "book entry interests") in the securities.  This model is called an "indirect holding system" because the investors (e.g., the Ad Hoc Group) do not hold or own legal title to the security itself, but rather own a beneficial interest (i.e., an economic stake) in the security through one or more intermediaries (such as Citivic).  None of the entities or individuals associated with the Ad Hoc Group own the Notes themselves, but only own book entry interests (i.e., beneficial interests) in the Notes through Citivic.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Moby, as well as Sicily; (ii) start-up costs relating to Moby's creation of new routes (e.g., cruises in the Baltic Sea); and (iii) a rise in operational costs (e.g., fuel). The Moby Group's financial stress in 2018 triggered a steep drop in the price of the Notes in the last quarter of 2018.

10.     In early 2019 and in order to reduce Moby's indebtedness, Moby, UniCredit and the other Lenders agreed on a business plan that Moby would implement during the period 2019 to 2021 ("2019-2021 Business Plan"). A key component of the 2019-2021 Business Plan entailed the sale of certain non-strategic vessels—namely, vessels that were not mission-critical and whose sale would not have disrupted Moby's essential business—to pre-pay part of Moby's bank debt ("Fleet Optimization Plan"). In particular, the Fleet Optimization Plan included the prospective sale of two vessels for €72.5 million in Q4 2019 to a still-to-be identified buyer. Moby, in compliance with the Debt Agreements, planned to use a substantial portion of these proceeds to repay its outstanding debt under the Term Loan (i.e., €100 million) to the Lenders.

11.     Upon information and belief, in or around mid-2019, when Moby's Notes were trading at around 30 cents on €1, the Ad Hoc Group and other related investors bought beneficial interests in the Notes equal to a holding of approximately 41.8% of the €300 million issuance. Upon information and belief, the Ad Hoc Group paid approximately €37.6 million to acquire Notes that were secured for approximately €125.43 million.

12.     On September 6, 2019 and in furtherance of the Fleet Optimization Plan, Moby and DFDS A/B ("DFDS"), a Danish shipping company, agreed on a transaction involving (i) the sale, to DFDS, of two Moby vessels that were part of the Collateral ("Moby Vessels"); and (ii) the simultaneous purchase by Moby, from DFDS, of two vessels ("DFDS Sale"). Through the DFDS Sale, Moby would have received approximately €75 million in net proceeds from DFDS.

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

13.     Moby planned to use most of the proceeds to pre-pay approximately €66 million of its outstanding €100 million Term Loan (as permitted by the Debt Agreements) and the remainder to bolster its fleet. The DFDS Sale would have thus significantly reduced the balance due on Moby's Term Loan (which was due in its entirety by 2021), decreasing it from €100 million to €34 million.

14.     Yet the Ad Hoc Group wanted the DFDS Sale to fail so that it could take over Moby, which had assets substantially more valuable than its debt. In particular, upon information and belief, as of August 31, 2019, Moby owed €125.43 million to the Ad Hoc Group and other related investors by virtue of their purchase—for approximately €37.6 million—of beneficial interests in the Notes at 30% of their nominal value. Under the Debt Agreements, Moby owed approximately €460 million to all secured creditors. Yet Moby's assets were worth at least €918 million, in contrast to liabilities of approximately €692 million, totaling a *net* equity of at least €226 million. By taking ownership and control over Moby, the Ad Hoc Group would end up owning a company whose assets exceeded the liabilities by at least €226 million in exchange for an investment that, upon information and belief, was approximately €37.6 million.

15.     To take over Moby and force it to capitulate, on September 10, 2019, the Ad Hoc Group filed a deceptive, and preposterous, involuntary bankruptcy petition ("Bankruptcy Petition") against Moby in the Bankruptcy Division of the Milan Tribunal in Italy ("Bankruptcy Court").[6] The Ad Hoc Group argued that Moby would not be able to repay the Notes that would be due in approximately three (3) years and eight (8) months from the date of the filing of the Bankruptcy Petition.

---

[6]     Upon information and belief, the Ad Hoc Group knew that it would obtain confidential, non-public information about Moby's finances and operations through the bankruptcy proceeding.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

16.     On September 16, 2019, the Ad Hoc Group also filed an *ex parte* temporary restraining order ("TRO") in the Bankruptcy Court arguing that the completion of the DFDS Sale would reduce Moby's assets to the detriment of the Ad Hoc Group.  The Ad Hoc Group thus asked that the Bankruptcy Court (i) oust Moby's Board of Directors and senior management; and (ii) block the sale of the Moby Vessels.

17.     The next day, September 17, 2019, the Bankruptcy Court denied the TRO.  It did so because, *inter alia*, (i) it was unclear if, under Italian bankruptcy law, members of the Ad Hoc Group were Moby's creditors and thus entitled to file the Bankruptcy Petition; and (ii) other elements for granting the TRO were not met (e.g., the Bankruptcy Court found no urgency to remove the Board of Directors and senior management).  Furthermore, the Bankruptcy Court reasoned that, if it would deem it necessary, it could block the DFDS Sale later in the bankruptcy proceedings, thus not warranting immediate action through the TRO.

18.     Less than three weeks later, on October 3, 2019, the Bankruptcy Court rejected the Bankruptcy Petition altogether.  It found that Moby was solvent.  The Bankruptcy Court also found that it could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due.  Furthermore, the Bankruptcy Court noted that the Ad Hoc Group—despite filing the Bankruptcy Petition—did not initiate the proceeding to obtain from the Bankruptcy Court a ruling that Moby was bankrupt, but instead, to induce Moby to restructure its debt.  The Bankruptcy Court directed the Ad Hoc Group to pay the legal costs related to the bankruptcy proceedings.

19.     After the dismissal of the baseless Bankruptcy Petition, the Ad Hoc Group—led, upon information and belief, by the Individual Defendants—improperly instructed UniCredit not to release the mortgages.  Upon information and belief, the Ad Hoc Group threatened UniCredit

6

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 13 of 58

(including via a letter dated October 17, 2019) with a lawsuit if it proceeded with the release. In addition to facing the threat of litigation, upon information and belief, UniCredit had a separate incentive to accede to the Ad Hoc Group's demand not to release the mortgages: a strategic opportunity to help Grimaldi Group S.p.A. ("Grimaldi"), a shipping conglomerate that is Moby's primary competitor in the ferry industry in the Mediterranean Sea and a key UniCredit client. Indeed, upon information and belief, at least one senior banker at UniCredit who was responsible, at least in part, for executing the release of mortgages from Moby vessels had business and/or personal connections to members of the Grimaldi's family, which owns and operates Grimaldi.

20.     UniCredit, in breach of both the Indenture and the Intercreditor Agreement, did not release the mortgages. This, in turn, caused the DFDS Sale to collapse (because Moby could not deliver to DFDS, nor would DFDS buy, the Moby Vessels absent them being encumbrance-free) and Moby to lose approximately €75 million. Specifically, DFDS asserted that, among other things, Moby had breached the agreements relating to the DFDS Sale (because Moby had been unable to deliver the Moby Vessels free of the mortgages to DFDS) and DFDS terminated such agreements. DFDS also claimed that Moby's alleged breach of the DFDS Sale agreements caused DFDS to suffer damages totaling approximately €31.2 million.

21.     The misconduct of the Ad Hoc Group caused additional reputational and financial harm to Moby. The unfounded Bankruptcy Petition had an adverse impact on the Moby Group's reputation with its customers, causing more than €16 million in loss of revenues (as measured by the loss of two main clients and a decrease in passenger and freight traffic) and, in turn, a corresponding decrease in its net profits. Furthermore, the unfounded allegations—which were publicly aired in Italy and elsewhere in Europe—adversely impacted Moby's standing with its

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

suppliers. In particular, certain of them reduced the usual payment window for invoices from four to six months to seven days or, in some instances, required them to be paid immediately.

22.     Ultimately, these events—a reduction in the number of customers and more stringent payment demands from suppliers, among other things—resulted in Moby experiencing a liquidity crisis. In Summer 2020—at the height of the first wave of the COVID-19 global pandemic—Moby thus had to file a preliminary petition for a court-supervised pre-bankruptcy restructuring procedure ("Preliminary Petition") with the Bankruptcy Court. Pursuant to Italian bankruptcy procedure, Moby's creditors, including the Ad Hoc Group, have to approve the restructuring.

23.     Since the filing of the Preliminary Petition, the Ad Hoc Group (led, upon information and belief, by the Individual Defendants) has unlawfully and intentionally continued to interfere with Moby's business operations—this time by sabotaging Moby's restructuring vis-à-vis the other creditors, including the other investors in the Notes. The objective is—as it was the case in 2019 with the filing of the baseless (and summarily dismissed) Bankruptcy Petition— to try to take over control of Moby and dispose of assets valued far above the initial investment that the Ad Hoc Group made.

24.     For instance, while, upon information and belief, other major creditors of Moby were impressed by and reacted favorably to the restructuring proposal that Moby made in December 2020, the Ad Hoc Group rejected it. The goal, of course, was to try to force Moby to give in and turn over control, with Di Meo declaring, at the time, that he would rather see Moby bankrupt than accept the deal.

25.     On February 15, 2021, the Ad Hoc Group rejected yet again another restructuring proposal, which Moby made on January 28, 2021 ("January 2021 Proposal"). Under this latest

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 15 of 58

proposal, the Ad Hoc Group would have earned as much as approximately five times its initial investment in the Notes.

26. During Moby's restructuring, upon information and belief, the Ad Hoc Group was prohibited by Luxembourg law from buying or selling Notes—which are traded in Luxembourg—because the Ad Hoc Group obtained confidential, non-public information regarding Moby's finances and operations. Upon information and belief, notwithstanding this prohibition, members of the Ad Hoc Group and the Individual Defendants traded the Notes.

27. Furthermore, the Ad Hoc Group, including through Gerlitz and Di Meo, continues to make false allegations against Moby, including the falsity that Moby has breached the Indenture (which it has not)—again with the sole objective to force Moby to retreat and relinquish Moby to the Ad Hoc Group.

28. Moby therefore brings this action to obtain recompense for the Ad Hoc Group's and the Individual Defendants' tortious and successful efforts in derailing the DFDS Sale, which caused Moby's 2019-2021 Business Plan and overall restructuring efforts to fail and, in turn, has forced Moby to terminate many of its employees (among other difficult decisions resulting from the derailed sale) and unjustly endure considerable financial losses, reputational damage and other damages to be proven at trial.

## PARTIES

### I. PLAINTIFF

29. Moby is a leading Italian shipping group. It was founded in 1982 by its current Chairman, Mr. Vincenzo Onorato ("V. Onorato"), whose family has played a leading role in the Italian shipping industry for over 140 years. Moby and the entities belonging to its group have more than 5,800 employees.

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

30.     The Moby Group's principal business is the transport of passengers and freight between mainland Italy and France and various islands in the Mediterranean Sea, such as Sicily, Sardinia and Corsica.  In 2017, the Moby Group expanded its business to the Baltic Sea.

31.     The Moby Group also has a tugboat business, providing rescue services in the aftermath of shipping accidents at sea.

32.     In addition, the Moby Group fully manages and operates the port of Olbia, located on the northern coast of Sardinia.  It also offers commercial embarkation and disembarkation services in other Italian cities, including Livorno (located on the coast of Tuscany) and Catania (the second largest city in Sicily).

33.     Moby's registered office is located at Largo Augusto 8, 20122 Milan, Italy, while its administrative headquarters is located at Viale Teseo Tesei, 57037 Portoferraio, Italy.

## II.     DEFENDANTS

### A.     Sound Point Defendants

#### 1.     Sound Point Capital

34.     Sound Point Capital is an asset management firm incorporated in Delaware as a limited partnership.

35.     Sound Point Capital has its principal place of business in New York.  Its address is 375 Park Avenue, 33rd Floor, New York, New York 10152.

36.     Sound Point Capital is the investment manager of Sound Point Beacon Master Fund, LP ("Sound Point Beacon Fund"), a fund that, upon information and belief, purchased a beneficial interest in the Notes in or around mid-2019.

#### 2.     Sound Point Beacon GP, LLC

37.     Sound Point Beacon GP, LLC ("Sound Point Beacon"), an affiliate of Sound Point Capital, is incorporated in Delaware as a limited liability company.

10

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1                                                                          RECEIVED NYSCEF: 02/22/2021

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 17 of 58

38.     Sound Point Beacon has its principal place of business in New York.  Its address is 375 Park Avenue, 33rd Floor, New York, New York 10152.

39.     Sound Point Beacon is the general partner of, and provides advisory and other services to, the Sound Point Beacon Fund.

### 3.     Sound Point UK

40.     Sound Point UK is incorporated in the United Kingdom as a limited liability partnership.

41.     Upon information and belief, Sound Point UK has its principal place of business in the United Kingdom.  Its registered office is located at 4th Floor Reading Bridge House, George Street, Reading, RG1 8LS.

42.     Sound Point UK acts as adviser to Sound Point Capital in connection with certain funds, including, upon information and belief, the Sound Point Beacon Fund.

### 4.     Sound Point Beacon Fund

43.     Sound Point Beacon Fund is a fund incorporated in the Cayman Islands as an exempted limited partnership and has its registered office located in the Cayman Islands.[7]  A Cayman Islands exempted limited partnership is a partnership that carries its business mainly outside of the Cayman Islands.  Upon information and belief, Sound Point Beacon Fund has its

---

[7]     Sound Point Beacon Fund is, in turn, the "master fund" of two "feeder funds": (i) Sound Point Beacon Fund, LP ("Sound Point Beacon Domestic Fund"), a Delaware limited partnership with its principal place of business in New York and located at 375 Park Avenue, 33rd Floor, New York, New York 10152; and (ii) Sound Point Beacon Offshore Fund, Ltd. ("Sound Point Beacon Offshore Fund"), a Cayman Islands exempted company with a registered office c/o Maples Corporate Services Limited ("Maples"), P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands.  Maples, a company providing registered office services, is part of the "Maple Group," an international law firm headquartered in the Cayman Islands.

A "master-feeder structure" typically entails a domestic fund (e.g., Sound Point Beacon Domestic Fund) and an offshore fund (e.g., Sound Point Beacon Offshore Fund) that invest all of their assets in the master fund (e.g., Sound Point Beacon Fund).  In turn, the master fund invests on behalf of the two "feeder funds."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

principal place of business in New York and carries its business at 375 Park Avenue, 33rd Floor, New York, New York 10152.

44.     As confirmed in an August 19, 2019 letter from Goldman Sachs & Co., LLC in New York ("GS&Co.") to Sound Point Capital, Sound Point Beacon Fund's beneficial interest in the Notes was reflected on the books and records of GS&Co. and Goldman Sachs International in London ("GSI") for an account named "Sound Point Beacon Master Fund LP."

45.     GS&Co. and two other banks based in New York—namely, BNP Paribas Prime Brokerage, Inc. ("Paribas") and Bank of New York Mellon ("BNYM")—are the custodians of Sound Point Beacon Fund.

46.     GS&Co. and Paribas, both based in New York, also serve as Sound Point Beacon Fund's brokers, providing clearing, settlement and risk management services.

47.     Sound Point Beacon Fund's auditor is KPMG LLP, based in New York.

48.     The funds that Sound Point Capital manages and for which it serves as investment adviser, including Sound Point Beacon Fund, raise substantial capital in the United States through private placements (i.e., investment offerings that do not entail selling securities that are registered with the United States Securities and Exchange Commission ("SEC")).

49.     To raise capital in the United States through private placements, an investment manager and its fund must file a Notice of Exempt Offering of Securities (known as a "Form D") with the SEC, providing general information about the fund, its investment manager and the amount that the fund will raise.  Sound Point Capital and related associated entities have filed numerous Form Ds with the SEC since at least 2010.  For example, on June 21, 2019, Sound Point Beacon Domestic Fund filed a Form D reflecting a private placement totaling

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

approximately $311 million, while Sound Point Beacon Offshore Fund filed a Form D reflecting a private placement totaling approximately $158 million.

### 5.     Kevin Gerlitz

50.     Gerlitz is a U.S. citizen and New Jersey resident.  His address is 1625 Watchung Avenue, Plainfield, New Jersey 07060.

51.     Gerlitz is Sound Point Capital's CFO and an authorized signatory of the Sound Point Beacon Fund.

52.     At the time of the facts described in this Complaint, Gerlitz worked from Sound Point's headquarters in New York.

### 6.     Antonello Di Meo

53.     Di Meo is an Italian citizen residing, upon information and belief, in Switzerland and Dubai.

54.     Di Meo was an employee of Sound Point UK from, at the latest, September 2014 to around June 2020.

55.     In or around June 2020, Di Meo left Sound Point UK and, upon information and belief, joined Mangart Capital Advisors SA ("Mangart"), an asset management firm incorporated in and with its principal place of business in Lugano, Switzerland, as portfolio manager.  Upon information and belief, as of the date of this Complaint, Di Meo is no longer with Mangart and is self-employed.

56.     At least until early February 2021, Di Meo used and, upon information and belief, still uses, a Sound Point Capital email address with the following email domain: "@soundpointcap.com."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

**B.     BlueBay Defendants**

**1.     BlueBay**

57.     BlueBay is an asset management firm incorporated in the United Kingdom as a limited liability partnership.

58.     BlueBay has its principal place of business in the United Kingdom.  Its address is 77 Grosvenor Street, London, W1K 3JR.

59.     Upon information and belief, BlueBay is the investment manager and adviser of funds that purchased a beneficial interest in the Notes in or around mid-2019, including: (i) The Event Driven Credit (Master) Fund Limited ("Event Drive Fund"); (ii) BlueBay Funds – BlueBay High Yield Bond Fund ("BlueBay Bond Fund"); and (iii) BlueBay Funds – BlueBay High Yield Corporate Bond Fund ("BlueBay Corporate Bond Fund").[8]

**2.     BlueBay Asset Management USA LLC**

60.     BlueBay Asset Management USA LLC ("BlueBay USA") is an asset management firm that is incorporated in Delaware as a limited liability company.

61.     BlueBay USA has its principal place of business in Stamford, Connecticut.  Its address is 750 Washington Blvd, Suite 802, Stamford, Connecticut 06901.

62.     Upon information and belief, BlueBay USA is the sub-investment manager of the BlueBay Bond Fund and BlueBay Corporate Bond Fund.

**3.     Event Driven Fund**

63.     The Event Driven Fund is incorporated in the Cayman Islands as an exempted limited company.  A Cayman Islands exempted limited company is a company carrying its business mainly outside of the Cayman Islands.  Upon information and belief, the Event Driven

---

[8]     Upon information and belief, the BlueBay Corporate Bond Fund was liquidated in or around March 2020.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

14

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 21 of 58

Fund's principal place of business is in the United Kingdom, and it carries its business at 77

Grosvenor Street, London, W1K 3JR (the same address as BlueBay) (*see supra* ¶ 58).

64.     Upon information and belief, similar to the Sound Point Beacon Fund, the Event

Driven Fund's registered office address is c/o Maples (*see supra* ¶ 43).

65.     As confirmed in an August 28, 2019 letter from Citigroup Global Markets Inc., a

financial services institution based in New York ("CGM"), to BlueBay and the Event Driven

Fund, at that time, the Event Driven Fund's beneficial interest in an unspecified amount of Notes

was reflected in a CGM "Euroclear/Clearstream account" named "The Event Driven Credit

(Master) Fund Limited."  CGM provided such confirmation to BlueBay and the Event Driven

Fund as "custodian on behalf of the beneficial holder of the position, Driven Credit (Master)

Fund Ltd."

66.     New York-based CGM is both the custodian and broker (providing clearing,

settlement and risk management services) to the Event Driven Fund.

67.     The Event Driven Fund has filed numerous Form Ds with the SEC since 2015.

For example, on November 20, 2020, the Event Driven Fund filed a Form D reflecting a private

placement totaling approximately $353 million.

### 4.     BlueBay Bond Fund

68.     The BlueBay Bond Fund is a Luxembourg fund and its address is 80 route d'Esch,

L-1470 Luxembourg.

69.     As confirmed in an August 29, 2019 letter from Brown Brothers Harriman

(Luxembourg) S.C.A., a financial services institution based in Luxembourg ("BBH

Luxembourg"), at that time, the BlueBay Bond Fund's beneficial interest in an unspecified

amount of Notes was reflected in a BBH Luxembourg "Euroclear account" named "BlueBay

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Funds – BlueBay High Yield Bond Fund." BBH provided such confirmation as the custodian of the BlueBay Bond Fund.

70.     As part of its investment strategy and diversification, the BlueBay Bond Fund has invested in bonds issued by U.S. companies (e.g., Netflix Inc.).

### C.     Cheyne Capital Defendants

#### 1.     Cheyne Capital

71.     Cheyne Capital is an asset management firm that is incorporated in the United Kingdom as a limited liability partnership.

72.     Cheyne Capital's principal place of business is in the United Kingdom. Its registered office is located at Stornoway House, 13 Cleveland Row, London, SW1A 1DH.

73.     Cheyne Capital is the investment manager of Cheyne European Strategic Value Credit Fund SCS SICAV-SIF ("Cheyne Fund"), a fund owning a beneficial interest in the Notes.

#### 2.     Cheyne SVC General S.a.r.l.

74.     Cheyne SVC General Partner S.a.r.l. ("Cheyne SVC") is an asset management firm that is incorporated in Luxembourg as a limited liability company.

75.     Cheyne SVC has its principal place of business in Luxembourg. Its address is 11-13, Boulevard de la Foire, L-1528 Luxembourg.

76.     Cheyne SVC is the general partner of, and provides advisory and other services to, the Cheyne Fund.

#### 3.     Cheyne Fund

77.     The Cheyne Fund is a fund that is incorporated in Luxembourg as a common limited partnership. The Cheyne Fund has its principal place of business in Luxembourg. As with Cheyne SVC, the Cheyne Fund's address is 11-13, Boulevard de la Foire, L-1528 Luxembourg.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

78.     As confirmed in an August 22, 2019 letter from BNYM or an entity that is part of BNYM's group of companies, at that time, the Cheyne Fund's beneficial interest in an unspecified amount of Notes was reflected in "[BNYM's or the related entity's] books and records" for an account named "Cheyne Euro Strat Cred Value FD OP."

79.     Upon information and belief, Cheyne Capital US LP, which is based in New York, is the Cheyne Fund's marketer, and therefore acts as the fund's placement agent, consultant, finder or introducer (or performs other similar roles).

80.     The Cheyne Fund has filed numerous Form Ds with the SEC since 2018.  For example, on May 22, 2019, the Cheyne Fund filed a Form D reflecting a private placement totaling approximately $173 million.

### 4.     Jacopo Rubbia

81.     Rubbia is an Italian citizen residing, upon information and belief, in London, United Kingdom.

82.     Upon information and belief, at the time of the facts relevant to this Complaint, Rubbia was an employee of Cheyne Capital.

### D.     Aptior Defendants

### 1.     Aptior Capital

83.     Aptior Capital is an asset management firm that is incorporated in the United Kingdom as a limited liability partnership.

84.     Upon information and belief, Aptior's principal place of business is in the United Kingdom.  Its registered office is located at 4th Floor Reading Bridge House, George Street, Reading, RG1 8LS.

17

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

85.     Upon information and belief, Aptior Capital is the investment manager and adviser of Aptior Capital Master Fund Ltd. ("Aptior Fund"), a fund owning a beneficial interest in the Notes.

### 2.     Aptior Fund

86.     Upon information and belief, the Aptior Fund is incorporated in the Cayman Islands as an exempted limited company and has its principal place of business in the United Kingdom.  The Aptior Fund's registered office is located at 4th Floor Reading Bridge House, George Street, Reading, RG1 8LS (the same address as Aptior Capital) (*see supra* ¶ 84).

87.     Similar to the Sound Point Beacon Fund and the Event Driven Fund, the Aptior Fund's registered office address is c/o Maples (*see supra* ¶¶ 43, 64).

88.     As confirmed in an August 28, 2019 letter from GSI to Aptior Capital, at that time, the Aptior Fund's beneficial interest in the Notes was reflected on GSI's books and records.  GSI provided such confirmation to Aptior Capital as the custodian and broker to the Aptior Fund.

### JURISDICTION AND VENUE

89.     This Court has jurisdiction over this action pursuant to N.Y. C.P.L.R. §§ 301 and 302.

90.     This Court has personal jurisdiction over Sound Point Capital, Sound Point Beacon and Sound Point Beacon Fund because they have their principal place of business in New York.

91.     This Court has personal jurisdiction over each Defendant because (i) each Defendant is found or resides in New York; (ii) each Defendant has or had agents in New York; (iii) each Defendant transacted business in New York directly through its agent(s); (iv) each

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Defendant violated a right in New York; and/or (v) a substantial part of the events giving rise to the claims herein arose in New York.

92.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 503 because one or more of the parties resides in New York County.

**FACTS**

## I.     BACKGROUND

### A.     Corporate Structure

93.     Moby is fully owned by Onorato Holding, an Italian limited liability company owned by V. Onorato.

94.     The Moby Group owns companies that operate specific lines of services and markets, as further described in Section B below.  The majority of the Moby Group's businesses and operations are, however, executed by Moby and CIN (Moby's main subsidiary).

### B.     Business Activities

95.     The Moby Group is mainly a ferry business.  It focuses on the transport of passengers and freight in the Mediterranean Sea, where it connects mainland Italy and France with Mediterranean islands (including Sardinia, Corsica, Sicily and Malta).  The Italian national and regional governments provide the Moby Group with subsidies (totaling approximately €87 million per year) to operate certain routes considered to be in the public interest throughout the year and, in particular, during the low season (i.e., from October to March when there are less tourists using the ferries than in spring and summer).

96.     In 2017, the Moby Group expanded its ferry business to the Baltic Sea, where it launched cruises that has ports of call in Russia (St. Petersburg), Estonia (Tallinn), Sweden (Stockholm) and Finland (Helsinki).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

97.     The Moby Group has 48 vessels representing, worldwide, the largest fleet in terms of passenger, bed and vehicle capacity.  In addition, the Moby Group owns and operates 17 tugboats in eight cities across Italy.

98.     The Moby Group also (i) fully manages the port of Olbia in Sardinia; and (ii) provides other limited port services (e.g., passenger ticketing) in several other Italian cities, such as Livorno (on the coast of Tuscany) and Catania (the second largest city in Sicily).

99.     Until the second half of 2019—before the Ad Hoc Group began waging its campaign to undermine and take control over Moby—the Moby Group had an exceptional reputation in the maritime industry.  For instance, in 2016 and 2017, the Moby Group won the "Italian Travel Awards" (a leading tourism award) for the quality of the daily service offered on board its ferries.  Similarly, in 2018, the German Quality & Finance Institution praised Moby, as it had done four previous times, for offering its customers the best service among ferry carriers. In January 2019, Moby became a member of the exclusive "Club of Superbrands," which includes companies that have generated significant innovation in their respective business sectors.

**C.     Fleet**

100.    The Moby Group's fleet—composed of 48 vessels and 17 tugboats—is one of the most modern and largest fleets in Europe.

101.    Prior to the COVID-19 pandemic, vessels belonging to Moby—which had a market value estimated at approximately €450 million—in addition to vessels belonging to CIN (up to approximately €77 million) secured the outstanding debt due under the Term Loan, Revolving Facility and Notes.  This was equal to approximately €460 million (as of December 31, 2019) under the Debt Agreements.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1     Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 27 of 58    RECEIVED NYSCEF: 02/22/2021

### D.     Management

102.     Moby's Board of Directors has seven members, including Chairman V. Onorato and his sons A. Onorato and Alessandro Onorato (each a Vice Chairman). A. Onorato is Moby's CEO.

## II.     THE 2016 FINANCING

### A.     Overview

103.     In February 2016 and in order to extinguish prior debt of approximately €429.2 million, Moby and its related entities sought and obtained €560 million in financing through a combination of (i) a €200 million loan to be repaid by 2021 from the Lenders (a consortium of eight U.S. and non-U.S. banks) (the Term Loan);[9] (ii) a €60 million revolving credit facility from five of the Lenders (the Revolving Facility);[10] and (iii) the €300 million in Notes issued by Moby's predecessor, Onorato Armatori S.p.A. ("Onorato Armatori"),[11] and to be paid in February 2023 (the Notes, together with the Term Loan and Revolving Facility, "2016 Financing").[12]

---

[9]     The Lenders were as follows: (i) UniCredit; (ii) JP Morgan Securities PLC ("JP Morgan Securities"); (iii) GSI; (iv) Banca IMI S.p.A. ("Banca IMI"); (v) Banca Popolare di Milano S.c. a r.l. ("BPM"); (vi) Monte dei Paschi di Siena S.p.A. ("Monte dei Paschi"); (vii) Unione di Banche Italiane S.p.A. ("UBI"); and (viii) Banco Popolare Società Cooperativa ("Banco Popolare").

[10]     In total, (i) UniCredit agreed to fund Moby and related entities with €65 million; (ii) Banca IMI with €65 million; (iii) BPM with €50 million; (iv) Monte dei Paschi with €39 million; (v) UBI with €15 million; (vi) Banco Popolare with €15 million; (vii) JP Morgan Securities with €5.5 million; and (viii) GSI with €5.5 million.

[11]     On July 28, 2016, Onorato Armatori and Moby merged pursuant to and in compliance with the Debt Agreements, which required the merger to be completed within 180 days from the issuance of the Notes (i.e., on February 11, 2016).

[12]     Citibank, N.A., London Branch ("Citibank") is the bond's Trustee—that is, the entity to which the Noteholder[s] agreed to delegate the representation of their interests, in accordance with the Indenture's terms.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW    Document 26-3    Filed 10/01/21    Page 28 of 58

104.    In particular, between February 1 and February 11, 2016, Moby and the Lenders executed the Debt Agreements in furtherance of the 2016 Financing.[13]  These were as follows: (i) the Credit Facilities Agreement, dated February 1, 2016 and which governs the Term Loan and Revolving Facility; (ii) the Indenture, dated February 11, 2016 and which governs the Notes; and (iii) the Intercreditor Agreement, dated February 11, 2016 and which governs the relationship between the Lenders and the Noteholders.

105.    As set forth in these Debt Agreements and noted previously (*see supra* ¶ 7), the 2016 Financing is secured by the Collateral, which comprises, among other things, mortgages over almost all of Moby's vessels.  As to these vessels, the Indenture (Section 12.04) and the offering memorandum for the Notes ("Offering Memorandum")[14] expressly state that, if Moby intends to sell one vessel that is part of the Collateral and the sale complies with the terms of the Debt Agreements, UniCredit—as Security Agent—is required to release the mortgage and can do so *without* anyone's consent.

### B.    Credit Facilities Agreement

106.    The Credit Facilities Agreement governs the Term Loan and the Revolving Facility.  Pursuant to Section 9.1 of the Agreement, the Term Loan must be repaid, in five annual installments, by February 2021 ("Installment[s]").[15]

---

[13]    In addition to Onorato Armatori, Moby and CIN, the signatories of the Debt Agreements included: (i) UniCredit; (ii) JP Morgan Limited; (iii) JP Morgan Securities; (iv) GIS; (v) Banca IMI; (vi) BPM; (vii) Monte dei Paschi; (viii) UBI; (ix) Banco Popolare; (x) Citibank; and (xi) Citigroup Global Markets Deutschland AG.

[14]    *See* Offering Memorandum of Onorato Armatori S.p.A., €300,000,000 7.75% Senior Secured Notes due 2023, 258 (February 11, 2016) (hereinafter, "Offering Memorandum").

[15]    Each Installment is due in February of each of the five years between 2017 and 2021, with the schedule of payments as follows: (i) €10 million due in the first year (February 2017); (ii) €40 million due in the second year (February 2018); (iii) €50 million due in the third year (February 2019); (iv) €50 million due in the fourth year (February 2020); and (v) €50 million due in the fifth year (February 2021).  *See* Section 9.1(a) of the Credit Facilities Agreement.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

107.     Under the Credit Facilities Agreement, Moby is entitled to sell a vessel that is part of the Collateral.  Specifically, under Sections 1.1 and 11.3 of this Agreement, Moby can do so if (i) the vessel's sale proceeds are in an amount equal to or greater than the vessel's pro-rata allocation of the loan amount (i.e., a fraction of the total loan amount that is allocated to a specific vessel based on its value); and (ii) the sale proceeds are used to make mandatory Term Loan prepayments (i.e., payments occurring before the due date for each Installment) in an amount that is equal or not less than the pro-rata allocation.[16]  The Offering Memorandum also provides that a vessel sale can entail a prepayment of debt under the Credit Facilities Agreement.[17]  The Credit Facilities Agreement is governed by English law, and the courts of England have exclusive jurisdiction over disputes related to it.[18]

### C.     Indenture

108.     The Indenture governs the Notes (totaling €300 million).  In or around mid-2019, at the time that the Ad Hoc Group invested in Moby, the following had been clearly disclosed (e.g., in the Debt Agreements and Offering Memorandum), and/or otherwise was known, to the Defendants:

(a)     The Notes were issued by Onorato Armatori (i.e., Moby's predecessor);

(b)     The Notes' principal is due on February 15, 2023;

(c)     The Notes accrue interest of 7.75% per year that is payable in two semi-annual payments in February and August;

---

[16]     If these conditions are met, the sale is considered a "Permitted Disposal" under the Credit Facilities Agreement.  *See* Section 1.1 of the Credit Facilities Agreement.

[17]     *See* Offering Memorandum at 244:  "The Credit Facilities Agreement also permits the lenders to require the mandatory prepayment in full or in part of the amounts utilized thereunder upon, *inter alia*, (i) a 'change of control' or sale of all or substantially all of the assets of the Group (including the vessels), (ii) the case of illegality, (iii) a listing of any member of the Group or its holding company and (iv) receipt of disposal, vessel disposals report and/or insurance proceeds (not reinvested)."

[18]     *See* Sections 45 and 46.1 of the Credit Facilities Agreement.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(d)    The Notes are secured by the same Collateral that governs the Credit Facilities Agreement;

(e)    The Notes are traded on the Luxembourg Stock Exchange; and

(f)    The Notes are held in global form—meaning the Notes are not individually issued but, in Moby's case, two certificates represent the entire amount of the bond—and, as such, (i) the Noteholder is Citivic, which is the nominee of Euroclear and/or Clearstream (i.e., the two main clearinghouses in Europe); (ii) the investors in the Notes (e.g., Sound Point Beacon Fund) are not the Noteholders for any purpose and only own book entry interests (i.e., beneficial interests) in the Notes; and (iii) the owners of book entry interests must rely on the procedures of Euroclear and/or Clearstream as well as Citivic, through which they own book entry interests, in order to (a) transfer their interests; or (b) exercise any rights of the Noteholders under the Indenture.[19]

109.    The Offering Memorandum, referencing Section 12.01(e) of the Indenture, notes that Moby has the right to remain in possession of the Collateral and retain control over it.  This includes the right to sell or otherwise dispose of the assets.  The Offering Memorandum disclaims that "*[t]he sale of particular assets could reduce the pool of assets securing the Notes*."[20]

---

[19]    *See* generally Offering Memorandum at 327 *et seq.*

[20]    *See* Offering Memorandum at 85.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 02/22/2021

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 31 of 58

110.    UniCredit executed the Indenture as the "Security Agent" and "Representative of the Holders" under Article 2414-bis paragraph 3 of the Italian Civil Code ("ICC").[21]  In its role as Security Agent, UniCredit is primarily in charge of administering the Collateral.   In connection with any requests from Moby to release mortgages over its assets, the Indenture provides that the Security Agent is required to act without obtaining the consent of the Noteholders (let alone the owners of a beneficial interest in the Notes, such as the Ad Hoc Group).

111.    As stated in the Offering Memorandum, the Security Agent "will agree to *release a security interest . . . that is in accordance with the Indenture and the Intercreditor Agreement without requiring any consent*" from the Noteholders (or any other third party) (emphasis added).[22]  Section 12.04 of the Indenture provides that, at the request of Moby, the "Security Agent shall release . . . *without the need for consent of the [Noteholders], Liens on the Collateral securing the Notes . . .* in connection with any disposition of Collateral [e.g., Moby's vessels] . . .

---

[21]    Under Article 2414-bis paragraph 3 ICC (introduced by Law No. 164 of 11 November 2014), security interests and guarantees can be validly created in favor of an agent of the Noteholders, who will then be entitled to exercise in the name, and on behalf, of the Noteholders all their rights (including any rights before any court and judicial proceedings) relating to the security interests and guarantees.

[22]    *See* Offering Memorandum at 257 ("Under the Note Documents, the Holders may only act through the Trustee or the Security Agent, as applicable. The Security Agent will agree to release a security interest created by the Security Documents that is in accordance with the Indenture and the Intercreditor Agreement without requiring any consent of the Holders."); *see also id.* at 258 ("To the extent a release is required by a Security Document, at the request of the Company the Security Agent shall release, and the Trustee (as applicable) shall release and if so requested direct the Security Agent to release (in accordance with the provisions of the Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement and the relevant Security Document), without the need for consent of the Holders, Liens on the Collateral securing the Notes . . .").

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 32 of 58

to any Person other than the Company [Moby] . . . that is not prohibited by the Indenture.[23]

(Emphasis added.)  In connection with the above, Section 12.04 emphasizes that "[e]ach of these

releases shall be effected by the Security Agent without the consent of the [Noteholders] or any

action on the part of the Trustee."

112.     Section 13.07 of the Indenture provides that the "Indenture and the Notes,

including the Notes Guarantees, and the rights and duties of the parties thereunder, shall be

governed by and construed in accordance with the laws of the State of New York."  Further,

Section 13.13 of the Indenture states that "[Moby] irrevocably submits to the non-exclusive

jurisdiction of any New York state or United States federal court located in the Borough of

Manhattan in the City, County and State of New York, United States over any suit, action or

proceeding arising out or relating to this Indenture."

### D.    Intercreditor Agreement

113.     On February 11, 2016, Moby and the Lenders—bound by the Credit Facilities

Agreement and Indenture—executed the Intercreditor Agreement.   UniCredit executed the

---

[23]      *See* Section 12.04 (entitled "Release of Liens on the Collateral") of the Indenture, which states:  "To the
extent a release is required by a Security Document, at the request of the Company the Security Agent shall release,
and the Trustee (as applicable) shall release and if so requested direct the Security Agent to release (in accordance
with the provisions of this Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement and the
applicable Security Document), without the need for consent of the Holders, Liens on the Collateral securing the
Notes: . . . (4) in connection with any disposition of Collateral (other than in respect of, following the Post-Issuance
Merger the pledge over the shares of MergerCo (the 'MergerCo Share Pledge') or, except as provided in clause (6)
below, the pledge over the shares of the Company (the 'Company Share Pledge')), directly or indirectly, to (a) any
Person other than the Company or any of the Restricted Subsidiaries (but excluding any transaction subject to
Section 5.01) that is not prohibited by this Indenture or (b) the Company or any Restricted Subsidiary, provided the
relevant Collateral remains subject to, or otherwise becomes subject to, a Lien in favor of the Notes."

Pursuant to Section 4.10 of the Indenture, Moby is authorized to sell a vessel if the following conditions are
met: (i) it receives consideration at least equal to the fair market value of the vessel, as determined in good faith by
its Board of Directors or one of its officers; (ii) at least 75% of the consideration received by Moby is in the form of
cash or an equivalent; and (iii) an amount equal to 100% of the (net) proceeds from such sale is applied by Moby to
reduce its indebtedness (e.g., the Term Loan) and/or to make a capital expenditure or invest in other assets.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Intercreditor Agreement as, among other things, Security Agent and "Senior Agent" (i.e., as the agent of the Lenders under the Credit Facilities Agreement).

114.    According to the Intercreditor Agreement, Moby's indebtedness under the Credit Facilities Agreement and the Notes ranks *pari passu*—that is, the debts owed to the Lenders and the Noteholders are treated the same way.[24]  Similarly, the Intercreditor Agreement provides that the Collateral securing these debts ranks *pari passu* and without any preference between them.[25]

115.    The fact that the debts of the Lenders and Noteholders and the Collateral rank *pari passu* does not restrict Moby from making payments to the Lenders that are compliant with other provisions of the Debt Agreements.  For instance, according to Section 13(1)(d) of the Intercreditor Agreement, Moby is authorized to make a mandatory prepayment of the Term Loan resulting from a vessel sale that is not forbidden by the Credit Facilities Agreement and Indenture.

116.    Section 13(1)(b) of the Intercreditor Agreement provides that UniCredit, as Security Agent, is irrevocably authorized—without further consent of the Lenders or Noteholders, let alone owners of book entry interests—to release a mortgage over a vessel if certain conditions are met.  Specifically, when the release is related to the sale of an asset (e.g., a vessel), Moby must certify to UniCredit that (i) the sale complies with the terms of the Credit Facilities Agreement and Indenture; (ii) the asset is not required to remain as part of the Collateral under the Credit Facilities Agreement; and (iii) the sale is not taking place in the context of an enforcement of the security or other case of debt acceleration (i.e., the sale is not a "Distressed Disposal").

---

[24]    *See* Section 2.1 of the Intercreditor Agreement.

[25]    *See* Section 2.2 of the Intercreditor Agreement.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

117.    Pursuant to Sections 17.6(a)(vi) and 17.8(a) of the Intercreditor Agreement, when requested to release a mortgage over a vessel, UniCredit is not required to inquire whether Moby is breaching, or may in the future breach, the Debt Agreements, and can generally rely on Moby's certifications.

118.    Sections 28 and 29 of the Intercreditor Agreement provide that disputes are governed by English law and that the courts of England have exclusive jurisdiction over those disputes.

## III.    EVENTS PRIOR TO THE DFDS SALE

### A.    Decrease in Profitability in 2018

119.    In 2017, the Moby Group had a profitable year, increasing its revenues by 8.6% from 2016.

120.    However, in 2018, the Moby Group's profitability decreased due to the following: (i) increased competition for the Sardinia and Sicily ferry routes; (ii) expenses associated with Moby's expansion in the Mediterranean and Baltic Seas; and (iii) increased costs, including for fuel and other port-related expenses.  As a result, the price of the Notes decreased.

### B.    The 2019-2021 Business Plan

121.    In early 2019 and to improve the Moby Group's profitability and reduce its debt, Moby and its Lenders (including UniCredit) agreed on a business plan that Moby would implement from 2019 to 2021.  This was the 2019-2021 Business Plan.  (*See also supra* ¶ 10.)

122.    A key component of the 2019-2021 Business Plan was for Moby to optimize its fleet, as set forth in the Fleet Optimization Plan.  The Fleet Optimization Plan envisioned the sale of non-strategic vessels—namely, vessels that were not critical to Moby's core business—to pre-pay part of Moby's debt to the Lenders.

28

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

123.    In the 2019-2021 Business Plan, Moby planned to (i) sell seven vessels for €178.4 million; and (ii) pre-pay a significant portion of the Term Loan (which, at the time, amounted to €100 million).

124.    At the Lenders' request, PricewaterhouseCoopers Advisory S.p.A. ("PwC") evaluated the viability of the 2019-2021 Business Plan.  On March 18, 2019, PwC issued a report—a copy of which was shared with the Lenders—in which it attested to the viability and feasibility of the 2019-2021 Business Plan, including the sale of the vessels.

### C.      The Ad Hoc Group Purchase the Notes

125.    Upon information and belief, in or around mid-2019 and when the Notes were traded at approximately 30% of their nominal value, the Ad Hoc Group and related investors purchased beneficial interests in the Notes equal to a holding of approximately 41.8% (or €125.429 million) of the €300 million issuance for approximately €37.6 million.  This purchase price represented a discount of approximately €87.8 million (or 70% of the Notes' nominal value).

126.    Under either the Notes or the Debt Agreements, the Ad Hoc Group has no right to control the Collateral, which remains under Moby's control.

## IV.    THE DFDS SALE

127.    In or around mid-2019, Moby began negotiating the DFDS Sale.  This involved the simultaneous sale and purchase of vessels to and from DFDS, as follows:  (i) the sale of the Moby Vessels—specifically, those named "Moby Aki" and "Moby Wonder," two of its non-strategic vessels; and (ii) the purchase of two vessels from DFDS named "King Seaways" and "Princess Seaways" ("DFDS Vessels").

29

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)  INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:21-cv-08031-GHW    Document 26-3    Filed 10/01/21    Page 36 of 58    RECEIVED NYSCEF: 02/22/2021

128.    The DFDS Sale—which was permissible under the Debt Agreements—was an ordinary business transaction and consistent with Moby's prior practice.  In recent years, Moby had sold ten vessels and purchased eight.

129.    On September 6, 2019 and pursuant to the English law agreements underlying the transaction ("DFDS Sale Agreements"),[26] Moby agreed to sell the Moby Vessels to DFDS for the fair market price of approximately €137 million (Moby Aki for €75 million and Moby Wonder for €62 million).  Moby, in return, agreed to purchase the DFDS Vessels for the fair market price of €62 million.

130.    Moby was required to deliver the Moby Vessels to DFDS free of any encumbrances, including the mortgages that collateralized the Term Loan and Notes, by October 25, 2019.[27]  If, by that date, Moby was unable to comply with such obligations, DFDS was entitled to damages in case of Moby's negligence and/or could terminate the DFDS Sale.[28]

---

[26]    Moby and DFDS entered one "Framework Agreement" ("Framework Agreement") and four "Saleform 2012 Norwegian Shipbrokers' Association's Memorandum[s] of Agreement for the sale and purchase of ships" ("MoA[s]").

[27]    *See* Section 9 (entitled "Encumbrances") of the MoAs, which states that Moby "warrant[s] that the Vessel, at the time of delivery [i.e., by October 25, 2019], is free from all charters, encumbrances, mortgages and maritime liens or any other debts whatsoever, and is not subject to Port State or other administrative detentions."

[28]    *See* Section 14 (entitled "Seller's Default") of the MoAs (including those relating to the sale of "Moby Aki" and "Moby Wonder"), which states as follows: "Should the Sellers [i.e., Moby] fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date [i.e., October 25, 2019] the Buyers [i.e., DFDS] shall have the option of cancelling this Agreement. . . . Should the Sellers fail to give Notice of Readiness by the Cancelling Date or fail to be ready to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for their loss and for all expenses together with interest if their failure is due to proven negligence and whether or not the Buyers cancel this Agreement."

*See also* Section 1.1 of the Framework Agreement, which states as follows: "The Parties [i.e., DFDS and Moby] have agreed for the application of 'all or nothing rule', i.e. although the Parties have entered into 4 (four) separate Memoranda of Agreement in respect of the 4 (four) vessels . . . , it is hereby mutually agreed that this transaction should be considered as enbloc sale of 4 (four) vessels . . . . Should any party be in default (Defaulting Party') of . . . a) the sale (including non-delivery of any of the vessels due to actual, constructive or compromised total loss), respectively, the purchase pursuant to the terms and conditions of the respective Memorandum of Agreement; . . . the other party ('Non-Defaulting Party') has the right, at its own discretion, of . . . cancelling all 4 (four) aforementioned Memoranda of Agreement . . . ."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1          Case 1:21-cv-08031-GHW    Document 26-3    Filed 10/01/21    Page 37 of 58          RECEIVED NYSCEF: 02/22/2021

131.    Moby had the right to proceed with the DFDS Sale.  The approximately €75 million in net proceeds that it would have realized would have allowed Moby to (i) restructure its debt by repaying approximately two-thirds of its outstanding Term Loan (i.e., approximately €66 million out of the overall €100 million due); and (ii) pursue other legitimate corporate purposes with the remaining €9 million, including bolstering its existing fleets (e.g., by making improvements to the vessels).  As a consequence of the DFDS Sale, Moby's remaining two installments for the repayment of the outstanding amount of the Term Loan due by February 2021 would have been reduced to €17 million each.

## V.    THE ITALIAN BANKRUPTCY PROCEEDING

132.    On September 10, 2019, just four days after the announcement of the DFDS Sale, the Ad Hoc Group—led, upon information and belief, by the Individual Defendants—filed an involuntary bankruptcy petition in the Bankruptcy Court in Milan alleging that Moby would not be able to pay the full amount of the Notes due in February 2023.  In sum, they asserted that, notwithstanding the fact that Moby was *current* on its interest payments on the Notes as of September 2019 (the date of the filing), Moby would somehow *not* be able to fulfill payments that were due three (3) years and eight (8) months *in the future*.

133.    On August 21, 2019, Gerlitz had, on behalf of Sound Point Capital (which was acting as investment manager to the Sound Point Beacon Fund), signed a "Special Power of Attorney" ("POA[s]") pursuant to which he appointed four Italian attorneys to represent Sound Point Capital in connection with the anticipated proceeding against Moby in the Bankruptcy Court.  Gerliz signed the POA in New York, which was authenticated by the New York State Department of State.  In addition, other members of the Ad Hoc Group executed POAs in favor of the same Italian attorneys.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 38 of 58

RECEIVED NYSCEF: 02/22/2021

134.    On September 16, 2019, the Ad Hoc Group—led, upon information and belief, by the Individual Defendants—also sought a TRO in the Bankruptcy Proceeding requesting, among other things, (i) the removal of Moby's Board of Directors and senior management; and (ii) the block of the DFDS Sale.  With no knowledge of the maritime industry, they alleged, *inter alia,* mismanagement and improper disposal of company assets and sought to block the sale of the Moby Vessels to DFDS, alleging that it would have affected Moby's repayment of the Notes in February 2023.

135.    On September 17, 2019, the Bankruptcy Court denied the TRO because, *inter alia,* (i) it was unclear if, under Italian bankruptcy law, members of the Ad Hoc Group were Moby's creditors and thus entitled to file the Bankruptcy Petition; and (ii) other elements for granting the TRO were not met (e.g., the Bankruptcy Court found no urgency to remove the Moby's Board of Directors and senior management).  Furthermore, the Bankruptcy Court noted that it could block the DFDS Sale later in the bankruptcy proceedings, as necessary, and thus an immediate action through the TRO was not warranted.  In view of the Bankruptcy Court's denial of the request to block the DFDS Sale as of mid-September 2019, there was no legal or other basis (e.g., financial) precluding Moby from proceeding to execute it.

136.    Less than three weeks later, on October 3, 2019, the Bankruptcy Court rejected the Bankruptcy Petition altogether, finding that Moby was solvent and current on its interest payments.  In its decision, the Bankruptcy Court noted that the Ad Hoc Group—despite having proactively filed the Bankruptcy Petition—did not initiate the proceeding to obtain a ruling that Moby was bankrupt but, instead, to serve another purpose: to force Moby to restructure its debt.  The Bankruptcy Court also ordered the Ad Hoc Group to pay the legal costs related to the bankruptcy proceeding because its request was denied.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## VI.     REQUEST TO RELEASE THE MORTGAGES

137.    On September 20, 2019 and in order to finalize the DFDS Sale, Moby sent a letter to UniCredit—as the Security Agent—seeking that UniCredit release the mortgages.

138.    Moby confirmed to UniCredit that the sale of Moby Vessels was a "Permitted Transaction" that satisfied the conditions and complied with the requirements set forth in the Debt Agreements.[29]   Notably, in compliance with and as required under the Intercreditor Agreement, Moby certified to UniCredit that (i) the sale complied with the terms of the Credit Facilities Agreement and Indenture; (ii) the assets (here, the Moby Vessels) were not required to remain as part of the Collateral under the Credit Facilities Agreement; and (iii) the sale was not taking place in the context of an enforcement of the security or other case of debt acceleration (i.e., it was not a Distressed Disposal).

139.    According to the Debt Agreements and in connection with the DFDS Sale, UniCredit did not have to seek consent from, or follow the instructions of, any third party. Nonetheless, upon information and belief, the Ad Hoc Group—led yet again by the Individual Defendants—improperly instructed UniCredit not to release the mortgages and threatened UniCredit (including through a letter dated October 17, 2019) with a lawsuit if it proceeded with the release.  In addition to facing the threat of litigation, upon information and belief, UniCredit had a separate incentive to accede to the Ad Hoc Group's demand not to release the mortgages: a strategic opportunity to help Grimaldi, Moby's primary competitor in the ferry industry in the Mediterranean Sea and a key UniCredit client.  (*See supra* ¶ 19.)

140.    UniCredit did not release the mortgages (which, in and of itself constitutes a breaches of both the Indenture and Intercreditor Agreement) and, as a result, a series of

---

[29]      *See* Section 13.1(b) of the Intercreditor Agreement.

33

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

cascading events quickly ensued.  As described below, these were the direct consequence of the actions undertaken by the Ad Hoc Group to force Moby's management to surrender and hand them control over Moby.

## VII.   EFFECTS OF THE INTERFERENCE

141.   <u>First</u>, the DFDS Sale inexorably collapsed because, without the release of the mortgages, Moby was unable to deliver to DFDS the Moby Vessels free of any encumbrances by October 25, 2019 (as required under the DFDS Sale Agreements).  Within days of this deadline, on October 29, 2019, DFDS walked away from the DFDS Sale.  In so doing, DFDS improperly asserted that Moby's inability to provide encumbrance-free vessels by October 25, 2019 showed that Moby had no intention to complete the DFDS Sale altogether.  That surely was not the case as reflected in, among other things, the fact that Moby had invested over €2.2 million to prepare the Moby Vessels for their delivery to DFDS.  As a result, DFDS preemptively and on an incorrect basis breached the DFDS Sale Agreements—namely, by purporting to terminate them for repudiatory breach when, in fact, it had no right to do so.

142.   <u>Second</u>, as a result of the collapse of the DFDS Sale, Moby was deprived of the approximately €75 million in proceeds that it had anticipated from the deal.  This led to Moby (i) not being able to implement its 2019-2021 Business Plan, which was premised upon receiving the proceeds and using them to pay down debt and refurbish its fleet, thereby continuing to meet or exceed top market standards; (ii) not being able to timely honor, for the very first time, its debt obligations due under the Notes and Credit Facilities Agreement (both interest and the Installment payment due in February 2020) to both the Lenders and the Ad Hoc Group; and (iii) facing a potential claim from DFDS for purported losses that DFDS suffered as a result of the busted DFDS Sale, totaling in the tens of millions of Euros.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

143.  Third, the filing of the Bankruptcy Petition in 2019—despite having been summarily rejected by the Bankruptcy Court—had an adverse impact on the Moby Group's reputation with its customers, causing approximately €16 million in loss of revenues and counting (as measured by the loss of two main clients and a decrease in passenger and freight traffic).  In addition, the unfounded allegations and the Bankruptcy Petition—which were covered in media in Italy and elsewhere in Europe—adversely impacted Moby's standing with its suppliers.  Following the filing of the Bankruptcy Petition, for example, certain of the suppliers reduced the usual payment window for invoices from four to six months to seven days or, in some instances, required immediate payment.

144.  Fourth, because of the intentional and egregious actions of the Ad Hoc Group, Moby (i) defaulted on the payment of the interest due under the Notes and other debt relating to the Credit Facilities Agreement in February 2020 (as noted above); and, as a result, (ii) had to present, on June 29, 2020, the Preliminary Petition.  As noted earlier, this was a preliminary petition for a court supervised pre-bankruptcy restructuring procedure filed with the Bankruptcy Court.  The Bankruptcy Court accepted the Preliminary Petition and granted Moby the possibility to submit, by March 29, 2021, a debt restructuring agreement pursuant to Article 182-bis of the Italian bankruptcy law.  This is an out-of-court agreement for the restructuring of indebtedness that must be approved by creditors who hold at least 60% of Moby's debts and must be ratified by the Bankruptcy Court.

145.  The Ad Hoc Group, however, has refused time and again to agree to any of Moby's restructuring proposals.  This is notwithstanding the fact that the proposals submitted by Moby inure to the benefit of the Ad Hoc Group.  Most recently, on February 15, 2021, the Ad

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Hoc Group rejected Moby's latest proposal, pursuant to which the Ad Hoc Group would have earned as much as approximately five times its initial investment in the Notes.

146.    Such continued recalcitrance, particularly when it is not economically rational, makes clear that the Ad Hoc Group has but one objective: to assume control over Moby.  This is the scheme that the Ad Hoc Group initiated in around mid-2019 and has perpetuated over the last 20 months.

147.    Fifth, in furtherance of its malicious scheme, including through Gerlitz and Di Meo, the Ad Hoc Group continues to make false allegations to Moby's detriment—including the falsity that Moby has breached the Indenture (which it has not).  Again, the intent of this targeted campaign is clear: to induce Moby to retreat and relent, thereby paving the way for the Ad Hoc Group to finally obtain control over the Moby Group, which it has long sought.

148.    Last, during Moby's restructuring, upon information and belief, the Ad Hoc Group was prohibited by Luxembourg law from buying or selling Notes (which are traded in Luxembourg) because the Ad Hoc Group obtained confidential, non-public information regarding Moby's finances and operations.  Notwithstanding this clear and unequivocal prohibition, upon information and belief, members of the Ad Hoc Group and the Individual Defendants traded the Notes.

## CAUSES OF ACTION

## COUNT ONE

**(Tortious Interference and Conspiracy to
Tortiously Interfere with the DFDS Sale Agreements)**

149.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

150.    The DFDS Sale Agreements were valid contracts between Moby and DFDS.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

151. The Defendants knew that the DFDS Sale Agreements existed, were valid and were between Moby and DFDS.

152. The Defendants intentionally caused, or conspired to cause, DFDS to materially breach the DFDS Sale Agreements and, in any event, the Defendants rendered, or conspired to render, Moby's performance of the DFDS Sale Agreements impossible by:

> (a)    Filing the Bankruptcy Petition, which was baseless;
>
> (b)    Filing the TRO, which was also baseless; and
>
> (c)    Unlawfully threatening UniCredit, which thereafter did not release the mortgages over the Moby Vessels, despite the fact that the Bankruptcy Court dismissed both the TRO and the Bankruptcy Petition.

153. The Defendants had no justification to take, or conspire to take, any of these actions that interfered with the DFDS Sale Agreements because:

> (a)    The Defendants were not parties to the DFDS Sale Agreements;
>
> (b)    The Defendants had no right to disturb Moby's control over the Moby Vessels;
>
> (c)    Moby had the right to pursue the DFDS Sale and its request to release the mortgages complied with the terms of the Debt Agreements;
>
> (d)    Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Sale to repay the Term Loan, and UniCredit and other Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);
>
> (e)    The Defendants did not initiate the Bankruptcy Petition in good faith, but rather did so to facilitate their ability to assume control over Moby and its

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

assets, as well as to obtain confidential and non-public information regarding the company through the bankruptcy proceeding;

(f)    Indeed, the Bankruptcy Court rejected the Bankruptcy Petition, holding that (i) Moby was solvent; and (ii) the Bankruptcy Court could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)    The Defendants did not file the TRO in good faith, but rather as a means to improperly oust Moby's Board of Directors and block the DFDS Sale;

(h)    Indeed, the Bankruptcy Court rejected the TRO because the Defendants utterly failed to meet the standard for one;

(i)    Had the DFDS Sale closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders; and

(j)    Despite being on notice that UniCredit had to act independently in connection with Moby's request to release the mortgages and was required to release the mortgages, the Defendants threatened UniCredit, which thereafter did not release the mortgages over the Moby Vessels.

154.    The Defendants' improper actions were aimed at harming Moby by:

(a)    Causing the disruption of the DFDS Sale and compromising Moby's relationship with DFDS;

(b)    Causing the disruption of the 2019-2021 Business Plan and Fleet Optimization Plan and compromising Moby's relationship with UniCredit;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

38

(c)    Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing a baseless Bankruptcy Petition and TRO; and

(d)    Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements.

155.    Indeed, from the time that the Defendants executed the purchase of the book entry interests in the Notes in or around mid-2019, they have undertaken a number of deliberate steps to undermine and interfere with Moby's business operations—including interfering with measures expressly aimed at rehabilitating Moby's financial health (such as the execution of the 2019-2021 Business Plan and Fleet Optimization Plan). The Defendants have done so in an effort to:

(a)    Force Moby to renegotiate a debt restructuring with the Defendants in a manner that would result in (i) Moby transferring control over the company from Moby to the Defendants; and (ii) the Defendants obtaining substantially higher returns than those provided by the Notes by gaining control over Moby and its assets; or

(b)    Collect on their Notes against the Collateral if the attempted debt restructuring and takeover failed.

156.    The Individual Defendants at all relevant times participated in the conduct of the Ad Hoc Group, including by driving, effectuating or participating directly and/or indirectly in the Ad Hoc Group's interference with the DFDS Sale Agreements.

157.    The Defendants knowingly damaged Moby by interfering with the DFDS Sale Agreements because this caused Moby to lose approximately €75 million in net proceeds that it

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

would have earned from the DFDS Sale. This amount is equal to the difference in the sale price of the Moby Vessels and the purchase price of the DFDS Vessels. The Defendants also exposed Moby to customer losses, claims from DFDS as a consequence of the collapse of the DFDS Sale, as well as other losses.

158.    As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

## **COUNT TWO**

### **(Tortious Interference and Conspiracy to
Tortiously Interfere with the Indenture)**

159.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

160.    The Indenture was a valid contract between Moby and UniCredit.

161.    The Defendants knew that the Indenture existed, was valid and was between Moby and UniCredit.

162.    The Defendants intentionally caused, or conspired to cause, UniCredit to materially breach the Indenture (by failing to release the mortgages over the Moby Vessels despite being required to do so) by:

      (a)    Filing the Bankruptcy Petition, which was baseless;

      (b)    Filing the TRO, which was also baseless; and

      (c)    Unlawfully threatening UniCredit, which thereafter did not release the mortgages over the Moby Vessels, despite the fact that the Bankruptcy Court dismissed both the TRO and the Bankruptcy Petition.

163.    The Defendants had no justification to take, or conspire to take, any of these actions that interfered with the Indenture because:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(a)     The Defendants were not parties to the Indenture;

(b)     The Defendants had no right to disturb Moby's control over the Moby Vessels;

(c)     Moby had the right to pursue the DFDS Sale and its request to release the mortgages complied with the terms of the Debt Agreements;

(d)     Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Sale to repay the Term Loan, and UniCredit and other Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);

(e)     The Defendants did not initiate the Bankruptcy Petition in good faith, but rather did so to facilitate their ability to assume control over Moby and its assets, as well as to obtain confidential and non-public information regarding the company through the bankruptcy proceeding;

(f)     Indeed, the Bankruptcy Court rejected the Bankruptcy Petition, holding that (i) Moby was solvent; and (ii) the Bankruptcy Court could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)     The Defendants did not file the TRO in good faith, but rather as a means to improperly oust Moby's Board of Directors and block the DFDS Sale;

(h)     Indeed, the Bankruptcy Court rejected the TRO because the Defendants utterly failed to meet the standard for one;

(i)     Had the DFDS Sale closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders; and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(j)     Despite being on notice that UniCredit had to act independently in connection with Moby's request to release the mortgages and was required to release the mortgages, the Defendants threatened UniCredit, which thereafter did not release the mortgages over the Moby Vessels.

164.     The Defendants' improper actions were aimed at harming Moby by:

(a)     Causing the disruption of the DFDS Sale and compromising Moby's relationship with DFDS;

(b)     Causing the disruption of the 2019-2021 Business Plan and Fleet Optimization Plan and compromising Moby's relationship with UniCredit;

(c)     Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing a baseless Bankruptcy Petition and TRO; and

(d)     Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements.

165.     Indeed, from the time that the Defendants executed the purchase of the book entry interests in the Notes in or around mid-2019, they have undertaken a number of deliberate steps to undermine and interfere with Moby's business operations—including interfering with measures expressly aimed at rehabilitating Moby's financial health (such as the execution of the 2019-2021 Business Plan and Fleet Optimization Plan). The Defendants have done so in an effort to:

(a)     Force Moby to renegotiate a debt restructuring with the Defendants in a manner that would result in (i) Moby transferring control over the company from Moby to the Defendants; and (ii) the Defendants obtaining

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 49 of 58

substantially higher returns than those provided by the Notes by gaining control over Moby and its assets; or

(b)     Collect on their Notes against the Collateral if the attempted debt restructuring and takeover failed.

166.    The Individual Defendants at all relevant times participated in the conduct of the Ad Hoc Group, including by driving, effectuating or participating directly and/or indirectly in the Ad Hoc Group's interference with the DFDS Sale.

167.    The Defendants knowingly damaged Moby by interfering with the Indenture, which caused Moby to lose approximately €75 million in net proceeds that it would have earned from the DFDS Sale. This amount is equal to the difference in the sale price of the Moby Vessels and the purchase price of the DFDS Vessels. The Defendants also exposed Moby to customer losses, claims from DFDS as a consequence of the collapse of the DFDS Sale, as well as other losses.

168.    As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

## COUNT THREE

### (Tortious Interference and Conspiracy to Tortiously Interfere with the Intercreditor Agreement)

169.    Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

170.    The Intercreditor Agreement was a valid contract between Moby and UniCredit.

171.    The Defendants knew that the Intercreditor Agreement existed, was valid and was between Moby and UniCredit.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 50 of 58

172.    The Defendants intentionally caused, or conspired to cause, UniCredit to materially breach the Intercreditor Agreement (by failing to release the mortgages over the Moby Vessels despite being required to do so), by:

(a)     Filing the Bankruptcy Petition, which was baseless;

(b)     Filing the TRO, which was also baseless; and

(c)     Unlawfully threatening UniCredit, which thereafter did not release the mortgages over the Moby Vessels, despite the fact that the Bankruptcy Court dismissed both the TRO and the Bankruptcy Petition.

173.    The Defendants had no justification to take, or conspire to take, any of these actions that interfered with the Intercreditor Agreement because:

(a)     The Defendants were not parties to the Intercreditor Agreement;

(b)     The Defendants had no right to disturb Moby's control over the Moby Vessels;

(c)     Moby had the right to pursue the DFDS Sale and its request to release the mortgages complied with the terms of the Debt Agreements;

(d)     Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Sale to repay the Term Loan, and UniCredit and other Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);

(e)     The Defendants did not initiate the Bankruptcy Petition in good faith, but rather did so to facilitate their ability to assume control over Moby and its assets, as well as to obtain confidential and non-public information regarding the company through the bankruptcy proceeding;

44

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

(f)     Indeed, the Bankruptcy Court rejected the Bankruptcy Petition, holding that (i) Moby was solvent; and (ii) the Bankruptcy Court could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)     The Defendants did not file the TRO in good faith, but rather as a means to improperly oust Moby's Board of Directors and block the DFDS Sale;

(h)     Indeed, the Bankruptcy Court rejected the TRO because the Defendants utterly failed to meet the standard for one;

(i)     Had the DFDS Sale closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders; and

(j)     Despite being on notice that UniCredit had to act independently in connection with Moby's request to release the mortgages and was required to release the mortgages, the Defendants threatened UniCredit, which thereafter did not release the mortgages over the Moby Vessels.

174.    The Defendants' improper actions were aimed at harming Moby by:

(a)     Causing the disruption of the DFDS Sale and compromising Moby's relationship with DFDS;

(b)     Causing the disruption of the 2019-2021 Business Plan and Fleet Optimization Plan and compromising Moby's relationship with UniCredit;

(c)     Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing a baseless Bankruptcy Petition and TRO; and

45

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

(d)    Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements.

175.    Indeed, from the time that the Defendants executed the purchase of the book entry interests in the Notes in or around mid-2019, they have undertaken a number of deliberate steps to undermine and interfere with Moby's business operations—including interfering with measures expressly aimed at rehabilitating Moby's financial health (such as the execution of the 2019-2021 Business Plan and Fleet Optimization Plan). The Defendants have done so in an effort to:

(a)    Force Moby to renegotiate a debt restructuring with the Defendants in a manner that would result in (i) Moby transferring control over the company from Moby to the Defendants; and (ii) the Defendants obtaining substantially higher returns than those provided by the Notes by gaining control over Moby and its assets; or

(b)    Collect on their Notes against the Collateral if the attempted debt restructuring and takeover failed.

176.    The Individual Defendants at all relevant times participated in the conduct of the Ad Hoc Group, including by driving, effectuating or participating directly and/or indirectly in the Ad Hoc Group's interference with the Intercreditor Agreement.

177.    The Defendants knowingly damaged Moby by interfering with the Intercreditor Agreement, which caused Moby to lose approximately €75 million in net proceeds that it would have earned from the DFDS Sale. This amount is equal to the difference in the sale price of the Moby Vessels and the purchase price of the DFDS Vessels. The Defendants also exposed Moby

46

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

to customer losses, claims from DFDS as a consequence of the collapse of the DFDS Sale, as well as other losses.

178.     As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

## **COUNT FOUR**

### **(Tortious Interference and Conspiracy to Tortiously Interfere with Moby's Business Relationship with UniCredit)**

179.     Moby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

180.     Moby and UniCredit had a business relationship.

181.     The Defendants knew that Moby and UniCredit had a business relationship.

182.     The Defendants intentionally interfered, or conspired to interfere, with Moby's business relationship with UniCredit by arranging or participating, or conspiring to arrange or participate, in meetings and telephone conferences with, or issuing correspondence to, UniCredit to cause UniCredit to:

(a)     Not release the mortgages over the Moby Vessels in breach of the Indenture and Intercreditor Agreement;

(b)     Preclude Moby from closing the DFDS Sale despite Moby having fully complied with the Debt Agreements; and

(c)     Derail the 2019-2021 Business Plan and Fleet Optimization Plan that were aimed at restoring Moby's financial health.

183.     The Defendants had no justification for interfering with Moby's business relationship with UniCredit because:

47

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1                                                                          RECEIVED NYSCEF: 02/22/2021

Case 1:21-cv-08031-GHW   Document 26-3   Filed 10/01/21   Page 54 of 58

(a)    The Defendants were not parties to the Debt Agreements between Moby and UniCredit;

(b)    The Defendants had no right to disturb Moby's control over the Moby Vessels;

(c)    Moby had the right to pursue the DFDS Sale and its request to release the mortgages complied with the terms of the Debt Agreements;

(d)    Moby had the right to use approximately €66 million of the anticipated proceeds resulting from the DFDS Sale to repay the Term Loan, and UniCredit and other Lenders were entitled to receive such payment from Moby (all pursuant to the Debt Agreements);

(e)    The Defendants did not initiate the Bankruptcy Petition in good faith, but rather did so to facilitate their ability to assume control over Moby and its assets, as well as to obtain confidential and non-public information regarding the through the bankruptcy proceeding;

(f)    Indeed, the Bankruptcy Court rejected the Bankruptcy Petition, holding that (i) Moby was solvent; and (ii) the Bankruptcy Court could not conclude that Moby would be insolvent in the near future, let alone in February 2023 when the Notes' principal was due;

(g)    The Defendants did not file the TRO in good faith, but rather as a means to improperly oust Moby's Board of Directors and block the DFDS Sale;

(h)    Indeed, the Bankruptcy Court rejected the TRO because the Defendants utterly failed to meet the standard for one;

48

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(i)     Had the DFDS Sale closed, the Collateral would still fully guarantee the Notes and the loans granted by the Lenders; and

(j)     Despite being on notice that UniCredit had to act independently in connection with Moby's request to release the mortgages and was required to release the mortgages, the Defendants threatened UniCredit, which thereafter did not release the mortgages over the Moby Vessels.

184.     The Defendants' improper actions were aimed at harming Moby by:

(a)     Causing the disruption of the DFDS Sale and compromising Moby's relationship with DFDS;

(b)     Causing the disruption of the 2019-2021 Business Plan and Fleet Optimization Plan and compromising Moby's relationship with UniCredit;

(c)     Impugning and tarnishing Moby's reputation, particularly among customers and peers in the ferry and travel industries, by filing a baseless Bankruptcy Petition and TRO; and

(d)     Triggering a liquidity crisis that subsequently led to Moby's default under the Debt Agreements.

185.     Indeed, from the time that the Defendants executed the purchase of the book entry interests in the Notes in or around mid-2019, they have undertaken a number of deliberate steps to undermine and interfere with Moby's business operations—including interfering with measures expressly aimed at rehabilitating Moby's financial health (such as the execution of the 2019-2021 Business Plan and Fleet Optimization Plan).  The Defendants have done so in an effort to:

49

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

(a)    Force Moby to renegotiate a debt restructuring with the Defendants in a manner that would result in (i) Moby transferring control over the company from Moby to the Defendants; and (ii) the Defendants obtaining substantially higher returns than those provided by the Notes by gaining control over Moby and its assets; or

(b)    Collect on their Notes against the Collateral if the attempted debt restructuring and takeover failed.

186.    The Individual Defendants at all relevant times participated in the conduct of the Ad Hoc Group, including by driving, effectuating or participating directly and/or indirectly in the Ad Hoc Group's interference with Moby's business relationship with UniCredit.

187.    The Defendants knowingly damaged Moby by interfering with its business relationship with UniCredit, which caused Moby to lose approximately €75 million in net proceeds that it would have earned from the DFDS Sale. This amount is equal to the difference in the sale price of the Moby Vessels and the purchase price of the DFDS Vessels. The Defendants also caused the disruption of the 2019-2021 Business Plan and Fleet Optimization Plan, and exposed Moby to customer losses, claims from DFDS as a consequence of the collapse of the DFDS Sale, as well as other losses.

188.    As a result of the foregoing, Moby seeks damages, including punitive damages, in an amount to be proven at trial.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08031-GHW    Document 26-3    Filed 10/01/21    Page 57 of 58

**WHEREFORE**, for the reasons set forth above, Moby S.p.A. respectfully requests judgment be entered in its favor and against the Defendants, jointly and severally, as follows:

(a)    Awarding damages to Moby S.p.A., including punitive damages, in an amount to be determined at trial;

(b)    Awarding Moby S.p.A.'s fees and expenses in bringing this action;

(c)    Awarding pre-judgment interest at the maximum legal rate applicable to a judgment issued by the Court entering such judgment; and

(d)    Granting any such additional relief as the Court deems just and proper.

Moby S.p.A. reserves the right to seek all remedies available at law and equity.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Dated:  February 22, 2021

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

<u>/s/ Jeanhee Hong</u>

Jeanhee Hong
Juan P. Morillo (*pro hac vice application forthcoming*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email:  juanmorillo@quinnemanuel.com
Email:  jeanheehong@quinnemanuel.com

Nicoletta Malogioglio (*pro hac vice application forthcoming*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Email:  nicolettamalogioglio@quinnemanuel.com

Alain Jaquet
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Email:  alainjaquet@quinnemanuel.com

*Attorneys for Moby S.p.A.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.